1   A. KRISTINE FLOYD (BAR NO. 155930)
    NICHOLAS S. SHANTAR (BAR NO. 228980)
2   ALLEN MATKINS LECK GAMBLE
       MALLORY & NATSIS LLP
3   1900 Main Street, Fifth Floor
    Irvine, California 92614-7321
4   Phone:  (949) 553-1313
    Fax:  (949) 553-8354
5   E-Mail: kfloyd@allenmatkins.com
             nshantar@allenmatkins.com
6
    Attorneys for Defendant and Counterclaimant
7   INDYMAC VENTURE LLC

8                  UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  EDEN GARDEN, LLC, a California limited liability company; ALI K. AMIDY, an individual; GUITI NAHAVANDI AMIDY, an individual; CENTRA NET INVESTMENT LLC, a California limited liability company, | Case No. CV11-02356-HRL **COUNTERCLAIM OF INDYMAC VENTURE, LLC FOR BREACH OF WRITTEN GUARANTIES** [DEMAND FOR JURY TRIAL] |

10  EDEN GARDEN, LLC, a California
    limited liability company; ALI K.
11  AMIDY, an individual; GUITI
    NAHAVANDI AMIDY, an individual;
12  CENTRA NET INVESTMENT LLC, a
    California limited liability company,
13
                    Plaintiffs,
14
            v.
15
    INDY MAC VENTURE, LLC, a limited
16  liability company; FEDERAL DEPOSIT
    INSURANCE CORPORATION, as
17  Conservator of IndyMac Federal Bank,
    FSB, and Does 1 through 10,
18
                    Defendants.
19  _____
20  INDYMAC VENTURE, LLC, a limited
    liability company,
21
                    Counterclaimant,
22
            v.
23
    ALI K. AMIDY, an individual; GUITI
24  NAHAVANDI AMIDY, an individual;
    CENTRA NET INVESTMENT LLC, a
25  California limited liability company,
26                  Counterdefendants.
27
28

Case No. CV11-02356-HRL

**COUNTERCLAIM OF INDYMAC VENTURE, LLC FOR BREACH OF WRITTEN GUARANTIES**

[DEMAND FOR JURY TRIAL]

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

925725.03/OC

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

1    Counterclaimant and Defendant Indymac Venture, LLC ("IMV") hereby

2  alleges as follows:

3  **I.    THE PARTIES.**

4    1.    Counterclaimant and Defendant IMV is a limited liability company

5  organized and existing under the laws of the State of Delaware.  IMV is authorized

6  to do business, and is doing business, in the State of California.

7    2.    IMV is informed and believes, and based thereon alleges that,

8  Counterdefendant Ali K. Amidy ("Ali Amidy") is, and at all times herein mentioned

9  was, an individual residing in the County of Santa Clara, State of California.

10    3.    IMV is informed and believes, and based thereon alleges that,

11  Counterdefendant Guiti Nahavandi Amidy ("Guiti Amidy") is, and at all times

12  herein mentioned was, an individual residing in the County of Santa Clara, State of

13  California.

14    4.    IMV is informed and believes, and based thereon alleges that,

15  Counterdefendant Centra Net Investment, LLC ("Centra Net") is a limited liability

16  company organized and existing under the laws of the State of California.  IMV is

17  informed and believes, and based thereon alleges that, Centra Net is authorized to do

18  business, and is doing business, in the State of California at 655 Campbell

19  Technology Park, Suite 125, Campbell, California 95008.  (Ali Amidy, Guiti Amidy

20  and Centra Net are hereinafter referred to collectively as "Guarantors.")

21  **II.    JURISDICTION.**

22    5.    Jurisdiction for this counterclaim is proper based on 28 U.S.C.

23  §1367(a), in that the claims asserted herein arise out of the same transaction or

24  occurrence and/or form part of the same constitutional case or controversy as the

25  claims asserted by Eden Garden, LLC, Ali Amidy, Guiti Amidy and Centra Net,

26  plaintiffs herein.  On information and belief, this Court has jurisdiction over

27  plaintiffs' claims based on 12 U.S.C. §1819(b)(2)(A) because the Federal Deposit

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

-1-

1  Insurance Corporation is a party, and therefore the entire action is "deemed to arise

2  under the laws of the United States."

3  **III.   BACKGROUND FACTS.**

4  **A.   The Loan.**

5       6.     On or about September 30, 2005, Indymac Bank, FSB ("Original

6  Lender"), as Lender, and Eden Garden, LLC ("Borrower"), as Borrower, entered

7  into that certain Building Loan Agreement dated September 30, 2005 ("BLA"), as

8  amended by that certain Additional Advance and First Modification Agreement to

9  the Building Loan Agreement; Promissory Note; Construction Deed of Trust with

10  Assignment of Rents, Security Agreement and Fixture Filing And Other Loan

11  Documents (short form) dated February 14, 2007 ("Short Form Modification") and

12  that certain Additional Advance and First Modification Agreement to the Building

13  Loan Agreement; Promissory Note; Construction Deed of Trust with Assignment of

14  Rents, Security Agreement and Fixture Filing And Other Loan Documents (long

15  form) dated February 14, 2007 ("Long Form Modification").  (The BLA, the Short

16  Form Modification, and the Long Form Modification are hereinafter referred to

17  collectively as the "Loan Agreement.")  A true and correct copy of the Loan Agree-

18  ment is attached hereto as Exhibit 1 and incorporated herein by this reference.

19       7.     Pursuant to the BLA, Original Lender agreed to loan Borrower the

20  principal sum of $5,904,000, which was later increased by the Short Form

21  Modification and Long Form Modification to $6,820,628 (the "Loan").

22       8.     The Loan was made to finance Borrower's construction of 18

23  residential housing units and other improvements on that certain land consisting of

24  approximately 0.80 acres located in the County of Santa Clara and identified in

25  Exhibit A to the BLA ("Property").

26       9.     The Loan is evidenced by that certain Promissory Note dated

27  September 30, 2005 made, executed, and delivered by Borrower to Original Lender,

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

1   as amended by the Short Form Modification and the Long Form Modification, in the

2   principal sum of $6,820,628 (collectively, the "Note").

3        10.    To secure Borrower's obligations under the Loan Agreement and the

4   Note, Borrower, as Trustor, made, executed and delivered to Original Lender, as

5   Beneficiary, a Construction Trust Deed with Assignment of Rents, Security Agree-

6   ment and Fixture Filing dated September 30, 2005 ("Trust Deed"), encumbering and

7   creating a lien on the Property, including, among other things, all building and

8   improvements thereon, and all present and future rents, inventory, equipment,

9   fixtures, and other goods and personal property therefrom.   The Trust Deed was

10  recorded in the Official Records of Santa Clara County, California (the "Official

11  Records") on or about November 8, 2005, as Instrument Number 18668901.    The

12  security interests granted under the Trust Deed were further perfected by the

13  recording of that certain UCC-1 Financing Statement (the "UCC-1") filed with the

14  California Secretary of State on or about October 7, 2005, as Filing Number 05-

15  7045034513.  (The Loan Agreement, Note, Trust Deed, and UCC-1 are hereinafter

16  referred to collectively as the "Loan Documents.")

17        **B.    The Guaranties.**

18        11.    In order to induce Original Lender to, among other things, enter into

19  the Loan, Guarantors executed certain General Guaranties.  Specifically, on or about

20  September 30, 2005:  (1) Counterdefendants Ali Amidy and Guiti Amidy executed

21  that certain General Guaranty (Real Estate Secured Loan) in favor of Original

22  Lender, a true and correct copy of which is attached hereto as Exhibit 2 and

23  incorporated herein by this reference (the "Amidy Guaranty"), and

24  (2) Counterdefendant Centra Net executed that certain General Guaranty (Real

25  Estate Secured Loan) in favor of Original Lender, a true and correct copy of which

26  is attached hereto as Exhibit 3 and incorporated herein by this reference (the "Centra

27  Net Guaranty").  (The Amidy Guaranty and the Centra Net Guaranty are hereinafter

28  referred to collectively as the "Guaranties.")

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

12.     Pursuant to the terms of the Guaranties, Guarantors absolutely and unconditionally guaranteed and promised to pay to Original Lender, its successors, and assigns any and all of Borrower's indebtedness under the Loan and the Loan Documents.

13.     In addition, Guarantors, under the Guaranties, unconditionally and irrevocably waived any rights and defenses they may have because the Loan was secured by real property.  These rights and defenses include, without limitation, rights and defenses based on Sections 580a, 580b, 580d and/or 726 of the California Code of Civil Procedure, together with all rights and defenses provided by California law of suretyship and guaranty and deficiency laws.

14.     Concurrently with the execution of the Short Form Modification and the Long Form Modification, Guarantors executed that certain Reaffirmation of General Guaranty and Environmental Guaranty In Connection With Additional Advance and First Modification Agreement To The Building Loan Agreement; Promissory Note; Construction Deed Of Trust With Assignment of Rents, Security Agreement And Fixture Filing And Other Loan Documents, Dated September 30, 2005 ("Guaranty Reaffirmation").  In the Guaranty Reaffirmation, Guarantors, among other things, acknowledged and agreed that the Guaranties would include all obligations under the Loan Documents, including, without limitation, as amended by the Short Form Modification and the Long Form Modification.  The Guaranty Reaffirmation is attached as Exhibit A to the Long Form Modification, which is included in the Loan Agreement attached hereto as Exhibit 1 and incorporated herein by this reference.

**C.      IMV Acquires All Rights, Title And Interests Of Original Lender Under The Loan, The Loan Documents, and The Guaranties.**

15.     On or about July 11, 2008, Original Lender was seized by the Office of Thrift Supervision ("OTS") which appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Original Lender.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

-4-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

16.     Also on July 11, 2008, the OTS chartered Indymac Federal Bank, FSB ("IMFB") as a new federal savings bank.  The OTS appointed the FDIC as Conservator of IMFB, and the FDIC, as Receiver for Original Lender, transferred some, but not all, of the rights, title and interests of Original Lender to IMFB, including the Loan, the Loan Documents, and the Guaranties.

17.     Thereafter, on March 19, 2009 the OTS appointed the FDIC as Receiver for IMFB.  The FDIC, as Receiver for IMFB, set up IMV as a single-member limited liability company and, pursuant to that certain Asset Contribution and Assignment Agreement, transferred to IMV all rights, title and interests of IMFB in the Loan, the Loan Documents, and the Guaranties.

18.     To evidence IMV's acquisition of the Loan, the Loan Documents, and the Guaranties, the FDIC executed that certain "Assignment of Beneficial Interest Under Deed of Trust" dated June 17, 2009, in favor of IMV, as Assignee ("Assignment of Beneficial Interest").  The Assignment of Beneficial Interest was recorded in the Official Records on July 6, 2009, as Instrument Number 20325339.

19.     IMV now has all rights, title and interests of Original Lender under the Guaranties.

**D.     <u>Borrower Defaults Under The Loan Documents</u>.**

20.     Pursuant to the Loan Documents, Borrower was required to pay all principal under the Note on or before March 28, 2008.  Furthermore, accrued interest after March 28, 2008 was due and payable "immediately and without demand."

21.     Borrower has failed to pay the principal balance under the Note and has repeatedly failed to make timely interest payments as required by the Loan Documents.  As of January 28, 2011, principal and interest payments aggregating approximately $6,465,000, plus late charges, legal fees, property taxes, appraisal fees, forced placed insurance, title fees, and miscellaneous fees of approximately $353,000 were due and owing in accordance with the Loan Documents.  The total

1  outstanding balance on the Note as of January 28, 2011 was in excess of $6,817,000

2  ("Outstanding Balance").

3       22.     Following Borrower's defaults under the terms of the Loan Documents,

4  Original Lender sent Borrower and Guarantors a default letter on April 7, 2008 (the

5  "First Default Letter"), notifying Borrower and Guarantors of the defaults and

6  demanding immediate repayment of the Loan.  A true and correct copy of the First

7  Default Letter is attached hereto as Exhibit 4 and incorporated herein by this

8  reference.  IMFB sent Borrower and Guarantors another default letter on

9  October 24, 2008 (the "Second Default Letter"), notifying Borrower and Guarantors

10  of the defaults and demanding immediate repayment of the Loan.  A true and correct

11  copy of the Second Default Letter is attached hereto as Exhibit 5 and incorporated

12  herein by this reference.

13       23.     Borrower refused, and continues to refuse, to cure its defaults under the

14  Loan Documents, including, without limitation, by paying to IMV the Outstanding

15  Balance.

16       24.     Guarantors refused, and continue to refuse, to pay IMV pursuant to the

17  terms of the Guaranties.

18       25.     Accordingly, IMV commenced, on or about January 31, 2011, a non-

19  judicial foreclosure sale (the "Sale") in accordance with the Loan Documents.  At

20  the Sale, the Property sold for $3,043,241, leaving a deficiency of at least

21  approximately $3,773,759 ("Deficiency Amount"), which remains due and owing by

22  Guarantors in accordance with the Guaranties.

23

24  ## FIRST CAUSE OF ACTION

25  **(For Breach of Written Guaranty Against Counterdefendants**

26  **Ali Amidy and Guiti Amidy)**

27       26.     IMV realleges and incorporates by reference paragraphs 1 through 24,

28  above, as though set forth in full.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

-6-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

27.     IMV is the lawful owner and holder of the Amidy Guaranty.

28.     IMV has performed all obligations (if any) under the terms of the Amidy Guaranty and the Loan Documents, except those obligations it was prevented or excused from performing by the actions of Borrower or Guarantors or by law, including, without limitation, providing notice of demand for payment to Ali Amidy and Guiti Amidy of Borrower's indebtedness under the Loan Documents.

29.     Pursuant to the Amidy Guaranty, Ali Amidy and Guiti Amidy have waived, among other things, any right to require that IMV first resort to the Borrower or to any other guaranty or any collateral which IMV may hold.

30.     Ali Amidy and Guiti Amidy have breached the Amidy Guaranty by failing and refusing to pay their obligations under the Amidy Guaranty (which include Borrower's total obligations to IMV under the Loan Documents).

31.     As a result of the above breach, IMV has suffered damages for which Counterdefendants Ali Amidy and Guiti Amidy are liable, including, without limitation, the full amount of the Deficiency Amount.  In addition, Ali Amidy and Guiti Amidy must pay IMV's attorneys' fees and costs to which IMV is entitled under the Amidy Guaranty in connection with this litigation, in the sum to be proven at trial.

## SECOND CAUSE OF ACTION

### (For Breach of Written Guaranty Against Counterdefendant Centra Net)

32.     IMV realleges and incorporates by reference paragraphs 1 through 24, above, as though set forth in full.

33.     IMV is the lawful owner and holder of the Centra Net Guaranty.

34.     IMV has performed all obligations (if any) under the terms of the Centra Net Guaranty and the Loan Documents, except those obligations it was prevented or excused from performing by the actions of Borrower or Guarantors or

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

-7-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

1   by law, including, without limitation, providing notice of demand for payment to the
2   Guarantors of the Borrower's indebtedness under the Loan Documents.

3       35.     Pursuant to the Centra Net Guaranty, Counterdefendant Centra Net has
4   waived, among other things, any right to require that IMV first resort to the
5   Borrower or to any other guaranty or any collateral which IMV may hold.

6       36.     Counterdefendant Centra Net has breached the Centra Net Guaranty by
7   failing and refusing to pay its obligations under the Centra Net Guaranty (which
8   include Borrower's total obligations to IMV under the Loan Documents).

9       37.     As a result of the above breach, IMV has suffered damages for which
10  Counterdefendant Centra Net is liable, including, without limitation, the full amount
11  of the Deficiency Amount.  In addition, Centra Net must pay IMV's attorneys' fees
12  and costs to which IMV is entitled under the Centra Net Guaranty in connection
13  with this litigation, in the sum to be proven at trial.

14      WHEREFORE, Counterclaimant IMV prays for judgment against
15  Counterdefendants, and each of them, as follows:

16  ON THE FIRST CAUSE OF ACTION:

17      1.      For general, special, consequential, and incidental damages according
18  to proof, but in an amount not less than $3,773,759; and

19      2.      For reasonable attorneys' fees, costs and expenses or other amounts as
20  provided for under the terms of the Loan Documents and the Amidy Guaranty.

21  ON THE SECOND CAUSE OF ACTION:

22      1.      For general, special, consequential, and incidental damages according
23  to proof, but in an amount not less than $3,773,759; and

24      2.      For reasonable attorneys' fees, costs and expenses or other amounts as
25  provided for under the terms of the Loan Documents and the Centra Net Guaranty.

26  ON ALL CAUSES OF ACTION:

27      1.      For costs of suit pursuant to the terms of the Amidy Guaranty, the
28  Centra Net Guaranty, and/or as allowed by law according to proof incurred herein;

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC                                    -8-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

1    2.    For any interest as may be allowed by law; and

2    3.    For such other and further relief as the Court deems just and proper.

3    Dated:  June 8, 2011                    ALLEN MATKINS LECK GAMBLE
                                             MALLORY & NATSIS LLP
4                                            A. KRISTINE FLOYD
                                             NICHOLAS S. SHANTAR
5

6                                            By:_____/s/A. Kristine Floyd_____
                                                  A. KRISTINE FLOYD
7                                                 Attorneys for Defendant and
                                                  Counterclaimant INDYMAC
8                                                 VENTURE, LLC

9
                                 **JURY DEMAND**
10
         Counterclaimant and Defendant IMV demands a trial by jury on all issues so
11
    triable.
12

13
    Dated:  June 8, 2011                    ALLEN MATKINS LECK GAMBLE
14                                           MALLORY & NATSIS LLP
                                             A. KRISTINE FLOYD
15                                           NICHOLAS S. SHANTAR

16
                                             By:_____/s/A. Kristine Floyd_____
17                                                A. KRISTINE FLOYD
                                                  Attorneys for Defendant and
18                                                Counterclaimant INDYMAC
                                                  VENTURE, LLC
19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

925725.03/OC

-9-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES

9/30/05

Loan No. 49-0320000

## BUILDING LOAN AGREEMENT

(Residential Tract Construction)

Dated as of September 30, 2005

Eden Garden, LLC, a California limited liability company (the "Borrower"), and INDYMAC BANK, F.S.B. (the "Lender"), agree as follows:

1.00     Preliminary Statement.  The Borrower owns or is about to acquire the Land described in Exhibit "A", which consists of approximately 0.80 acres, and intends to construct eighteen (18) residential housing Units and other Improvements on the Land in accordance with the Improvement Plans submitted by the Borrower to the Lender.  In order to finance the Land and the construction of the Improvements and the payment of various costs and expenses relating to the Project, the Borrower has applied to the Lender for a Loan in the amount of $5,904,000.00, the repayment of which will be secured by the Borrower's interest in the Land and the Improvements and the other Collateral covered by the Trust Deed to be executed by the Borrower in favor of the Lender.  The Lender is willing to make the Loan to the Borrower on the terms and conditions set forth in this Agreement.

Capitalized terms used in this Agreement and not otherwise defined are used with the meanings set forth in Exhibit "F".

2.00     Documentation.  Prior to the earlier of the first Disbursement of the proceeds of the Loan or the issuance of the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower, the Borrower shall deliver or cause to be delivered to the Lender, in form and substance satisfactory to the Lender, the Loan Documents and other "Required Items" specified in Exhibit "C" and shall satisfy the conditions specified in Exhibit "C", together with such other Documents and information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request.

3.00     Disbursements, Set Aside Letters and Letters of Credit.  Subject to the terms, conditions and procedures set forth in this Agreement and in the "Disbursement Schedule" attached as Exhibit "B", the Lender shall make Disbursements to or for the account of the Borrower and issue or cause to be issued Set Aside Letters and Letters of Credit from time to time from the date of this Agreement to the Banking Day immediately preceding the Maturity Date.  The aggregate amount of all Disbursements made by or on behalf of the Lender (including amounts funded under any Set Aside Letter or Letter of Credit) shall not exceed the Loan Amount plus the amount of any "Borrower's Funds" deposited with the Lender pursuant to the Disbursement Schedule (provided, however, that the foregoing limitation shall not affect the liability of the Borrower for payment of any Disbursements in excess of such amounts and interest thereon, whether occurring by reason of a payment under a Letter of Credit or Set Aside Letter or

REVISED MAY 2003

**EXHIBIT 1**

otherwise). All Disbursements of the proceeds    of the Loan shall be evidenced by and repayable in accordance with the terms of the Note.

    **4.00**    <u>Covenants of the Borrower</u>. Unless the Lender otherwise consents in writing:

    **4.01**    <u>Construction of Improvements</u>. The Borrower shall cause construction of the Improvements to commence immediately after the date the Trust Deed is recorded, and shall be diligently and continuously prosecuted to completion, subject in each case to the following requirements: (a) the Improvements shall be constructed in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, and in a good and workmanlike manner with new materials of good quality; (b) except as otherwise contemplated by the Improvement Plans with respect to any "Site Development" referred to in the Project Budget, the Improvements shall be constructed entirely on the Land and shall not encroach upon or overhang any lot line, boundary, set-back, easement, right-of-way or other land; (c) the "plan number" for each Unit shall be constructed on the lot or at the location specified in Exhibit "E"; and (d) construction of the Improvements shall in any event be completed on or before the Maturity Date; and (e) the Borrower hereby covenants and agrees, on behalf of itself and any of its Affiliates, that no such Person shall construct, create, arrange, develop, purchase or sell any residential housing improvement (or units which are components thereof) which constitute a Competing Project.

    If at any time the Lender notifies the Borrower that construction of the Improvements does not conform to the requirements of this § 4.01 or any such nonconformity is otherwise discovered by the Borrower, the Borrower shall immediately cause such nonconforming construction to be stopped and all necessary corrective work to be commenced and diligently and continuously prosecuted to completion.

    **4.02**    <u>Change Orders</u>. The Borrower shall not permit any Change Order to the Improvement Plans to be implemented without the prior approval of the Lender, provided that this § 4.02 shall not prevent routine changes in construction which would not cause the Improvements to fail to be in substantial conformity with the approved Improvement Plans and which are not otherwise material in the aggregate.

    **4.03**    <u>Compliance with Laws and Other Requirements</u>. The Borrower shall (a) designate the Lender as "construction lender" in all applications for building permits and in the Construction Contract, if any, and provide the Lender's name and address to all Lien Claimants who have given preliminary 20-day notice, in each case as required by § 3097 of the California Civil Code, (b) comply in all material respects with all other applicable Laws and Other Requirements relating to the Collateral or the Project, and (c) obtain and maintain all Authorizations required in connection with the Collateral or the Project.

    **4.04**    <u>Project Agreements</u>. The Borrower shall (a) take all action reasonably necessary or appropriate to maintain and enforce its rights and interests under each of the Project Agreements (including the Architect Agreement, the Construction Contract, if any, and any Financing Commitment), (b) comply in all material respects with its obligations under each of the Project Agreements, (c) not permit or agree to any supplement, modification, amendment or termination of, or consent or agree to any waiver of or departure from the terms of, any of the Project Agreements, and (d) not transfer, encumber or release any interest in, or commit or permit any material breach or default on the part of the Borrower under, any of the Project Agreements,

REVISED MAY 2003

**EXHIBIT 1**

except that so long as no Event of Default has occurred, this § 4.04 shall not apply (i) to any amendment of the Architect Agreement or the Construction Contract, if any, to incorporate any Change Orders which are permitted to be implemented by § 4.02, or (ii) to the termination of any Project Agreement as a result of a material breach or default by a party other than the Borrower, provided such Project Agreement is replaced with a contract between the Borrower and a contractor reasonably approved by the Lender, in form and content reasonably approved by the Lender, which contract provides for performance of the work of the terminated Project Agreement within the time and budget approved by the Lender, and the Borrower delivers to the Lender an assignment of such contract and a consent by the contractor to such assignment, in each case in form and content reasonably approved by the Lender.

    4.05   <u>Lien Priority and Restrictions on Sale or Encumbrance; Partial Releases</u>.  The Borrower shall take all action necessary or appropriate from time to time to maintain the Trust Deed as an indefeasible first priority perfected Lien in the Collateral, and shall not at any time part with possession of or abandon any of the Collateral or cause or permit any interest in any of the Collateral to be sold, transferred, leased, encumbered, released, relinquished or otherwise disposed of (whether voluntarily, by operation of law or otherwise), provided that: (a) so long as no Event of Default has occurred and is continuing, and subject to satisfaction of all "Presale Requirements" set forth in Exhibit "C" and receipt by the Lender of the applicable "Release Price" set forth in Exhibit "E" and payment of all applicable costs, fees and expenses, (i) the Borrower may sell Units (together with undivided interests in common areas to be transferred to purchasers of such Units) in the ordinary course of business for an amount not less than the "Minimum Sales Price" set forth in Exhibit "E" and transfer common areas to a homeowners association if and when required by applicable Laws or Other Requirements, (ii) the Lender shall release Units and common areas or interests in common areas so sold or transferred from the Lien of the Trust Deed, and (iii) the Borrower may, in the ordinary course of business, receive, hold and dispose of any excess proceeds resulting from the sale of any Unit after payment of the applicable "Release Price"; and (b) the requirements of this sentence shall not prohibit (1) the creation or existence of any Permitted Exceptions or other Permitted Transfers, or (2) any action with respect to any Project Agreements to the extent permitted by § 4.04.

    The amount of any "Release Price" received by the Lender shall be applied to the principal of the Note, provided that if such amount exceeds the principal of the Note then outstanding, the excess shall be held by the Lender in a Cash Collateral Account and thereafter applied by the Lender (A) so long as no Event of Default has occurred and is continuing, to future advances of principal under the Note as and when made, or (B) if an Event of Default has occurred and is continuing, to any Obligations of the Borrower under the Loan Documents at such time or times and in such manner as the Lender deems appropriate.  Upon payment in full of all Obligations of the Borrower and termination of all obligations of the Lender under the Loan Documents (including obligations of the Lender under any Set Aside Letters issued by the Lender hereunder) and all Letters of Credit, the Lender shall release its interest in any amounts then held in any such Cash Collateral Account.

    The Borrower shall at all times use its best efforts to market and sell Units in compliance with the terms of this Agreement.

REVISED MAY 2003

**EXHIBIT 1**

**4.06  Personal Property.**  The Borrower  shall not (a) install or otherwise use or acquire for use in connection with the Collateral or the Project any Personal Property (including replacement Personal Property pursuant to clause (iii) below) which is not owned by the Borrower free and clear of all Liens (including conditional sale contracts) and Rights of Others (other than Permitted Exceptions) or which is not a part of the Collateral, or (b) cause or permit the removal from the Land (or, in the case of offsite improvements, from the location of installation) of any Personal Property which is installed or otherwise used or acquired for use in connection with the Collateral or the Project, except that so long as no Event of Default has occurred and is continuing, this clause (b) shall not prohibit (i) the temporary removal of Personal Property for repairs in the ordinary course of business, (ii) the removal of Personal Property of insignificant value which is not reasonably necessary or appropriate to the completion of the Project, or (iii) the removal of defective or worn out Personal Property which has been replaced by other Personal Property of equal or greater suitability and value which is intended for the same purpose.  Upon removal of any Personal Property in compliance with clauses (ii) and (iii) above, the Borrower shall be permitted to transfer or otherwise dispose of such Personal Property as the Borrower may determine.

**4.07  Liens and Taxes.**  The Borrower shall (a) pay, prior to delinquency, all Taxes which are or may become a Lien affecting any of the Collateral, and not consent to any Special Taxes which affect or may affect any of the Collateral, (b) keep the Collateral free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers, (c) promptly pay or cause to be paid, and obtain valid and enforceable lien releases or waivers (together with invoices or receipts identifying the nature of each payment) from, all Lien Claimants, (d) to the extent permitted by applicable Laws, diligently file or procure the filing of valid notices of completion upon completion of construction of any Improvements and a notice of cessation of labor upon cessation of construction for a continuous period of 30 days or more, and take all other steps necessary to forestall the assertion of Lien Claims, and (e) pay and perform when due all other obligations secured by or constituting a Lien affecting any of the Collateral, except that the Borrower shall not be required to pay or perform any such Taxes, Lien Claims or other obligations which are being actively contested in good faith by appropriate proceedings, provided that the Borrower has posted such security for the payment or performance of such Taxes, Lien Claims or other obligations as the Lender may reasonably require and, by reason of nonpayment, none of the Collateral or any Lien or other interest of the Lender under the Loan Documents is prejudiced or in danger of being sold, foreclosed or otherwise lost or forfeited.

In the event that a stop notice is asserted against the Lender or any action or other proceeding is instituted to enforce any Lien (including any mechanics lien, and whether or not such Lien constitutes a Permitted Exception) against any of the Collateral, the Borrower shall immediately make such payments, obtain such surety bonds and/or take such other action as the Lender may reasonably require in order to release the stop notice or Lien.  Upon failure of the Borrower to release any such stop notice, the Lender may, at its option, file an interpleader action to resolve any pending claims.

The Borrower irrevocably appoints the Lender as its agent (such agency being coupled with an interest) to file any notices (including notices of completion and cessation of labor) that the Lender deems appropriate in order to protect its interests under the Loan Documents.

**4.08  Property and Liability Insurance.**  The Borrower shall at all times maintain the following policies of insurance:

REVISED MAY 2003

EXHIBIT 1

    (a)    with respect to any Improvements as to which construction has commenced but has not been completed and any Personal Property used or to be used in connection with such Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage;

    (b)    with respect to any Improvements as to which construction has been completed and any other Improvements now or in the future located on the Land and any Personal Property used or to be used in connection with such Improvements, property "all risk" fire and extended coverage insurance (including coverage for vandalism and malicious mischief but without coverage restriction for vacancy);

    (c)    commercial general liability insurance in favor of the Borrower (and naming the Lender and its Affiliates as additional insureds) in an aggregate amount not less than $2,000,000.00 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

    (d)    such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including comprehensive form boiler and machinery insurance, if applicable).

The Borrower shall also cause the Contractor, if any, and each subcontractor to maintain all policies of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain all of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of professional liability and errors and omissions insurance, in each case for such periods and in such amounts and with such deductible amounts as the Lender may reasonably require from time to time.

Each policy of property insurance required by this § 4.08 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "full replacement cost" endorsement, shall insure against flood loss risk if the Land is located in a Flood Hazard Area, shall insure against loss due to earthquake and earth movement if required by the Lender, and shall name the Lender and its Affiliates as "loss payee" pursuant to form BFU 438 or other form approved by the Lender. Each policy of commercial general liability insurance required by this § 4.08 shall cover personal injury, property damage, owner/contractor protective, blanket contractual liability and (where applicable) completed operations, with x, c and u exclusions deleted, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductibles and such endorsements as the Lender may reasonably require. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies and certificates evidencing such policies.

5

REVISED MAY 2003

**EXHIBIT 1**

4.09   Title Insurance and Searches.  The Borrower shall deliver to the Lender, in form and substance satisfactory to the Lender, a Title Policy, such endorsements to the Title Policy and such preliminary title reports and other title or lien searches (including UCC searches) and tax service contracts as the Lender may reasonably require from time to time.

4.10   Books, Records and Inspections.  The Borrower shall at all times maintain (a) full and complete books of account and other records with respect to the Collateral and the Project and its business and operations, (b) complete copies of the Improvement Plans (including all Change Orders), all Project Agreements and all Authorizations issued in connection with the Collateral or the Project, and (c) a complete file of all invoices, receipts and lien releases and waivers obtained by the Borrower with respect to amounts paid for Project Costs, and shall permit the Lender and its agents, upon request from time to time, to inspect and copy any of such books, records and other Documents and to enter and inspect the Real Property and any other Collateral and all work and materials furnished in connection with the Project.

4.11   Construction Information and Reporting Requirements.  The Borrower shall cause to be delivered to the Lender, in form and detail satisfactory to the Lender:

(a)   promptly after discovery by the Borrower, notice of (i) any fact or circumstance that may or will cause the Project Costs associated with any Line Item to exceed or be less than the corresponding amount set forth in the Project Budget or the Line Item Budget by more than 5%, or that may or will cause any Project Costs for any matters not covered by specific Line Items to exceed, in the aggregate, $50,000, (ii) any failure of the Project or the Improvements to be in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, (iii) any actual or anticipated material delays in construction, (iv) any serious threat or the commencement of any action or other proceeding (including any action to foreclose or otherwise enforce any Lien Claim or other Lien and any proceedings in condemnation or eminent domain) affecting or relating to any of the Collateral or the Project, (v) the occurrence or allegation of any termination, material breach or default, or failure of any material condition or other requirement under the Architect Agreement, the Construction Contract, if any, or any Financing Commitment, (vi) any dispute between the Borrower and any Governmental Agency relating to any of the Collateral or the Project, the adverse determination of which could adversely affect the Collateral or the Project in any material respect, (vii) any injury or damage to or loss or destruction of any of the Collateral if the cost of repair, restoration or replacement exceeds $25,000, (viii) any imposition of or proposal for any Special Taxes which affect or may affect any of the Collateral, (ix) any material adverse change in the financial condition, operations, properties or prospects of any Loan Party, (x) any event which has or may have a material adverse impact on the Collateral or the Project, (xi) the occurrence of any Event of Default or event which, with the giving of notice and/or the passage of time, could become an Event of Default, and (xii) any Change Order required by Section 4.02.

(b)   promptly after receipt by the Borrower, copies of all notices or other communications delivered to the Borrower or the Real Property which are addressed to the Lender or to "construction lender";

REVISED MAY 2003

EXHIBIT 1

(c)      on or before the 15th day of each month, a report on a form approved by the Lender describing sales activities for the Project as of the end of the prior month;

(d)      the end of each fiscal year for each Loan Party, Financial Statements for such Loan Party for and as at the end of such fiscal year, and upon request by the Lender from time to time, quarterly Financial Statements and Tax Returns for each Loan Party and copies of any audited Financial Statements prepared for any Loan Party, in each case certified in a manner acceptable to the Lender as more fully defined in Exhibit C of this Agreement; and

(e)      such other Documents or information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request from time to time.

The Lender is authorized at any time and from time to time to directly contact the Contractor, if any, or any subcontractor or other Lien Claimant or potential Lien Claimant or other Person to verify any information provided by the Borrower or for any other purpose.

4.12   Costs, Fees and Expenses.  The Borrower shall bear sole responsibility for and promptly pay or cause to be paid all costs and expenses relating to the performance by the Borrower of its Obligations or the delivery to the Lender of any Documents or other items or information under or in connection with any of the Loan Documents, and any Taxes (other than income taxes of the Lender), costs, expenses, fees or charges payable or determined to be payable in connection with the execution, delivery, filing or recording of, or otherwise with respect to, any Loan Document or any other Document delivered under or in connection with any Loan Document.

The Borrower shall pay the Loan Fee to the Lender at or prior to the time of recordation of the Trust Deed, and shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the approval of the Loan by the Lender and the negotiation, preparation, execution, delivery, administration, supplement, modification, amendment, waiver and enforcement of, and any other action taken by the Lender under or otherwise to protect its rights and interests in respect of, any Loan Document, and any litigation, dispute, action or other proceeding (including bankruptcy proceedings) relating thereto, including recording fees, filing fees, search fees, reconveyance fees, title insurance premiums, appraisal, engineering, inspection and consulting fees, the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, the reasonable charges of the Lender's internal legal counsel, and any fees or other charges of the Lender for appraisals or inspections or for review of appraisals, budgets, plans and specifications or other matters relating to the Project or the Collateral.

The Borrower shall also pay to the Lender, as a condition to the issuance by the Lender of any Set Aside Letter or Letter or Letter of Credit or any extension or modification thereof, the applicable Set Aside Letter Fee or Letter of Credit Fee and/or the applicable extension or modification fee, as the case may be.

Any amount payable to the Lender under any of the Loan Documents (including any amount payable under this § 4.12) which is not paid on the date when due shall, from and after

REVISED MAY 2003

**EXHIBIT  1**

such date, bear interest at the Alternate Rate     until paid. Such interest shall be payable by the Borrower to the Lender immediately and without demand.

4.13    Indemnification by the Borrower. The Borrower shall indemnify, defend and save and hold harmless the Lender and its Affiliates, and the respective directors, officers, agents, attorneys and employees of each (collectively the "Indemnitees") from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees, charges and disbursements of internal and external legal counsel) suffered or incurred by any Indemnitee as a result of (a) any failure of the Borrower to perform any of its Obligations under any Loan Document, (b) any failure of any Representation by the Borrower to be correct in all respects when made, (c) injury or death to persons or damage to property or other loss occurring on or in connection with the Collateral or the Project, whether caused by the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or by negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or otherwise, (d) any claim of any surety in connection with any bond relating to construction of any Improvements or offsite improvements, and (e) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee which relates to or arises out of the Loan Documents, the Loan, any Set Aside Letter or Letter of Credit or any disbursement thereunder, the Collateral, the Project or any transaction contemplated by, or the relationship between the Borrower and the Lender or any action or inaction by the Lender under, the Loan Documents, provided that no Indemnitee shall be entitled to indemnification under this § 4.13 for matters caused solely by such Indemnitee's gross negligence or willful misconduct. Any obligation of the Borrower under this § 4.13 shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and shall be secured by the Trust Deed for so long as the Trust Deed remains a lien upon the Real Property, and shall continue as an unsecured obligation of the Borrower thereafter.

4.14    Additional Covenants. The Borrower shall perform each of the obligations (if any) set forth in Exhibit "C", in the manner and within the time limits set forth therein.

4.15    Actions and Further Assurances. The Borrower shall appear in and defend all actions and other proceedings purporting to affect any of the Collateral or the Project or the rights or interests of the Lender under the Loan Documents (and the Lender may, at the Borrower's expense, appear in and defend any such action or other proceeding as the Lender may determine), and the Borrower shall take or cause to be taken such further action and execute and deliver or cause to be executed and delivered such further Documents as the Lender from time to time may reasonably require to maintain, perfect, protect, assure and confirm the Lender's rights and interests (including rights and interests in the Collateral), the Borrower's Obligations and the intention of the parties under the Loan Documents.

4.16    Performance by the Lender. If the Borrower fails to perform any of its Obligations under any Loan Document and the Lender reasonably determines that remedial action is necessary to protect the rights or interests of the Lender, the Lender may, without notice to or demand on the Borrower, perform any such Obligations in such manner and to such extent and take such other action as the Lender may deem appropriate, and all costs, expenses and charges of the Lender relating to any such action shall be payable by the Borrower to the Lender in accordance with § 4.12.

REVISED MAY 2003

**EXHIBIT 1**

5.00   Representations of the Borrower. The Borrower represents and warrants to the Lender that:

5.01   Formation and Qualification. Each Loan Party which is a corporation is duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified in California; each Loan Party which is a limited liability company, partnership, trust or other entity is duly formed and validly existing under the Laws of the jurisdiction of its formation and, in the case of a limited liability company or limited partnership formed under the Laws of a jurisdiction other than California, is duly registered in California; each Loan Party which is a corporation, limited liability company, or limited partnership is in good standing in California; and each Loan Party has all requisite power and authority to conduct its business and to own and lease its properties.

5.02   Loan Documents. The execution, delivery and performance of the Loan Documents by each Loan Party are within such Loan Party's power and authority, have been duly authorized by all necessary action and do not and will not (a) require any Authorization which has not been obtained (except to the extent indicated in § 5.05(b) with respect to Authorizations required in connection with the Collateral or the Project), (b) contravene the Charter Documents of any Loan Party, any applicable Laws or Other Requirements or any agreement or restriction binding on or affecting any Loan Party or its property, or (c) result in or require the creation or imposition of any Lien or Right of Others upon or with respect to any property now or in the future owned by any Loan Party (other than Liens in favor of the Lender). No Authorization which has not been obtained is required for the creation of the Liens or the enforcement by the Lender of its Remedies under the Loan Documents. Each Loan Document, when executed and delivered, will constitute the legal, valid and binding obligations of each Loan Party which is a party to or bound by such Loan Document, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally.

5.03   Finder's or Broker's Fees.   Except as otherwise disclosed in Part B of Exhibit "C": (a) no finder's, broker's or other fee or compensation of any kind is payable to any Person in connection with the Loan, and (b) the payment of any such fee disclosed in Part B of Exhibit "C" is the sole responsibility of the Borrower and such fee has been (or upon recordation of the Trust Deed will be) paid in full by the Borrower. The Borrower hereby indemnifies and holds harmless the Lender from any claims, liability, damages, costs or expenses (including without limitation the fees and expenses of legal counsel) resulting from or arising out of any claims or assertions by any Person (including without limitation any broker, agent, financial advisor or other intermediary) for any finder's, broker's or other fee or compensation of any kind in connection with the Loan. Such indemnification obligation on the part of the Borrower shall survive termination of the Loan Documents.

5.04   Collateral. The Borrower has and will continue to have (or upon recordation of the Trust Deed will have and from and after such recordation will continue to have) good and marketable title to the Collateral, free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers. Upon recordation of the Trust Deed and filing of the financing statement executed by the Borrower, the Trust Deed will create a valid and indefeasible first priority perfected Lien in the Collateral securing the payment and performance of all Obligations, subject only to Permitted Prior Exceptions and Permitted Transfers. No financing

9

**EXHIBIT 1**

statements covering any of the Collateral are on file in any public office, except financing statements in favor of the Lender and any other financing statements approved by the Lender in writing.

5.05   Project Information.  (a) The Borrower and, to the best knowledge of the Borrower, any Governmental Agency having jurisdiction over the Land, have complied in all material respects with all applicable Laws and Other Requirements relating to the division and development of the Real Property, and the Borrower is, and the construction of the Improvements in accordance with the terms of this Agreement will be, in compliance in all respects with all applicable Laws and Other Requirements relating to the Collateral or the Project. (b) Except as otherwise disclosed in Part B of Exhibit "C", (i) all Authorizations required in connection with the Collateral or the Project have been regularly and finally received (other than routine permits for work which has not yet commenced and any required certificates of occupancy or other approvals of construction by any Governmental Agency which (in each case) are to be issued on a ministerial basis as required from time to time during the course of construction and after completion), and (ii) the development and use of the Real Property for its intended purpose do not require the payment of extraordinary fees or assessments or the construction of other improvements, will not contravene any applicable Laws or Other Requirements, and are not subject to any other legal, contractual or practical impediments which are material in the aggregate. (c) The Project Budget and any Line Item Budget delivered to the Lender are based on information deemed reliable by the Borrower and represent the Borrower's best estimate of all Project Costs that will be required in connection with the Project, and all Project Costs shown in the Project Budget or any such Line Item Budget as "Previously Paid By Borrower" have been paid in full. (d) All Utility Services, streets, walks and other offsite improvements relating to or adjoining the Land or necessary for the development of the Project and the occupancy of the Real Property for its intended purpose have been or will be promptly completed and/or otherwise made available at no further expense to the Borrower (except for costs relating to such work reflected in the Project Budget for "Site Development") and are not and will not be subject to any conditions or restrictions which may adversely affect the Collateral or the Project in any material respect. (e) The approximate acreage of the Land is correctly set forth in § 1.00 and, except as otherwise disclosed in Part B of Exhibit "C", (i) the Land is not located in a Flood Hazard Area, nor is the Land subject to or affected by any existing or proposed Special Taxes (other than Special Taxes approved in writing by the Lender after the date of this Agreement), and (ii) each Unit (together with any undivided interests in common areas to be transferred to the purchaser of such Unit) and any common areas to be transferred to a homeowners association are separately transferable in compliance with all applicable subdivision Laws and Other Requirements. (f) Except as otherwise disclosed in writing to the Lender, the Architect Agreement and the Construction Contract, if any, are in full force and effect and free from any material breach or default by any party.

5.06   Financial Information.  (a) The Financial Statements of each Loan Party which have been furnished to the Lender fairly present such Loan Party's financial condition as at the dates of such Financial Statements and the results of operations for the periods covered by such Financial Statements in accordance with generally accepted accounting principles consistently applied (or such other method of preparation approved by the Lender in writing), and since the respective dates of such Financial Statements, there has been no material adverse change in the financial condition, operations, properties or prospects of such Loan Parties. (b) Each Loan Party has filed all tax returns required to be filed by it, and has paid all Taxes due pursuant to such returns or in respect of any of its properties (except for any such Taxes which are being actively contested in good faith by appropriate proceedings), and to the best knowledge of each Loan Party, no basis

10

EXHIBIT 1

exists for additional assessments which have not been adequately reserved against in the Financial Statements referred to above or otherwise disclosed in writing to the Lender.

5.07    Litigation and Other Matters.  Except as otherwise disclosed in writing to the Lender:  (a) no actions or other proceedings affecting or relating to the Collateral or the Project are pending or, to the best knowledge of each Loan Party, threatened, (b) no actions or other proceedings are pending or, to the best knowledge of each Loan Party, threatened against or affecting any Loan Party or any property of any Loan Party which, if determined adversely to such Loan Party, could materially impair the financial condition, operations, properties or prospects of such Loan Party or the ability of such Loan Party to perform its obligations under the Loan Documents, and (c) the Borrower has given notice to the Lender of any other matters which the Borrower is required to disclose to the Lender under § 4.11(a).

5.08    Documents and Other Information.  All Documents and other information delivered to the Lender pursuant to any of the Loan Documents are and will be complete and correct in all material respects at the time of delivery to the Lender.

5.09    Competing Projects.  The Borrower hereby represents and warrants that neither the Borrower nor any of its affiliates has or intends to construct, create, arrange, develop, purchase or sell any residential housing improvements (or units which are components hereof) which constitute a Competing Project.

5.10    Compliance with Laws.  Without in any way limiting any of Borrower's other representations, warranties or covenants contained in this Agreement, Borrower hereby represents, warrants and covenants that the Improvement Plans are, and the construction of the Improvements according thereto will be, in compliance with all applicable federal, state and local laws, rules, regulations, ordinances and codes, including without limitation the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et. seq., as amended, and the Fair Housing Act, 42 U.S.C. § 3601, et. seq., as amended.

6.00    Events of Default and Remedies of the Lender.

6.01    Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default:

(a)    the Borrower shall fail to pay all or any portion of the principal of the Note when due; or

(b)    the Borrower shall fail to pay any installment of interest on the Note when due, or shall fail to pay any other amount payable by the Borrower to the Lender under the Loan Documents (including any deposit of Borrower's Funds required by the Disbursement Schedule) within 20 days after the date when due, or the Borrower shall fail to pay all accrued interest and all other amounts then payable by the Borrower to the Lender under the Loan Documents on the Maturity Date or the date of final payment of the principal of the Note in full; or

EXHIBIT 1

(c)     any Loan Party shall fail     to perform or observe any other term, covenant or agreement contained in any Loan D ocument on its part to be performed or observed and either (i) such failure shall continue for more than 30 days after notice of such failure is given by the Lender to such Loan Party, unless such failure is not reasonably capable of being cured within such 30-day period (but is reasonably capable of bei ng cured within 60 days after such notice) and such Loan Party commences action to cure such failure within such 30-day period and diligently and continuously prosecutes such action to completion and causes such failure to be cured within 60 days after such notice, or (ii) such failure is not reasonably capable of bei ng cured within 60 days after notice of such failure is given by the Lender to such Loan Party; or

(d)     any Representation proves to have been incor rect in any material respect when made; or

(e)     work relating to construction of the Improvements ceases for 15 consecutive days for any reason other than acts of God or other causes beyond the reasonable control of the Borrower, or such work ceases for 30 consecutive days for any reason; or

(f)     the Borrower is enjoined by any court or other Governmental Agency from constructing the Improvements or selling Units or performing any Obligations and such injunction continues unreleased and unstayed for 45 days; or

(g)     all or a substantial or material portion of the Collateral is damaged or destroyed by fire or other casualty and the Lender has reasonably determined that the security of the Trust Deed has been impaired or that the repair, restoration or replacement of the Collateral in accordance with the requirements of the Trust Deed is not economically practicable or is not likely to be completed prior to the Maturity Date; or all or a substantial or material portion of the Collateral is condemned, seized or appropriated by any Governmental Agency or subject to any action or other proceeding instituted by any Governmental Agency for any such purpose; or

(h)     any Loan Party is dissolved or liquidated or merged with or into any other Person; or for any period of more than 10 days any Loan P arty which is a corporation, limited liability company, partnership, trust or other entity ceases to exist in its present form and (where applicable) in good standing and duly qual ified under the Laws of the jurisdiction of its incorporation or formation and California; or any Loan Party who is an individual dies or becomes incapacitated; or all or substantially all of the assets of any Loan Party are sold or otherwise transferred; or

(i)     any Loan Party ceases to be managed and contr olled by the Person or Persons who manage and control such Loan Party as of the date of this Agreement, or any Loan Party assigns or attempts to assign any rights or interests under any Loan Document without the prior written consent of the Lender; or any Loan Document becomes or is claimed by any Loan P arty to be unenforceable against any Loan P arty; or the Trust Deed shall cease to constitute a valid and indefeasible first priority perfected Lien in the Collateral, or any sale, transfer or encumbrance of all or any portion of the Collateral occurs in violation of Section 4.05, subject only to Permitted Prior Exceptions and Permitted Transfers; or

**EXHIBIT 1**

(j)      any Loan Party is subject to an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors; or any Loan Party applies for or consents to the appointment of any receiver, trustee or similar official for it or for all or any part of its property (or any such appointment is made without its consent and the appointment continues undischarged and unstayed for 60 days); or any Loan Party institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceeding relating to it or to all or any part of its property under the Laws of any jurisdiction (or any such proceeding is instituted without its consent and continues undismissed and unstayed for 60 days); or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against any of the Collateral or any other property of any Loan Party and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(k)      any demand for payment is made to the Lender under any Set Aside Letter and not rescinded or withdrawn within 3 days; or any demand for payment is made to the LC Bank under any Letter of Credit and not rescinded or withdrawn prior to payment thereunder; or

(l)      any Guarantor purports to revoke, cancel or terminate its Guaranty prior to the termination date (if any) provided therein;

(m)      any material adverse change shall occur in the financial condition, operations, properties or prospects of any Loan Party, or any event shall occur which has a material adverse impact on the Collateral or the Project, or.

(n)      any Loan Party is in default or an event of default has occurred (with respect to any loan or other obligation owing by Loan Party to Lender) or on Loan Party's debt with any other lender.

6.02    Remedies of the Lender.  Upon the occurrence of any Event of Default, the Lender may, without notice to or demand upon the Borrower, which are expressly waived by the Borrower (except for notices or demands otherwise required by applicable Laws to the extent not effectively waived by the Borrower and any notices or demands specified in the Loan Documents), exercise any one or more of the following Remedies as the Lender may determine:

(a)      the Lender may, at its option, terminate all commitments to make Disbursements or issue Set Aside Letters or cause the issuance of Letters of Credit, or to release any Collateral from the Trust Deed, or the Lender may waive the Event of Default or, without waiving, determine, upon terms and conditions satisfactory to the Lender, to make further Disbursements or issue further Set Aside Letters or cause the issuance of further Letters of Credit, or to release any Collateral from the Trust Deed;

(b)      the Lender may declare the unpaid principal of the Note and all accrued interest and other amounts payable under the Loan Documents to be immediately due and

payable, in which event all such amounts shall immediately be due and payable without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Borrower;

(c)     the Lender may demand from the Borrower, and upon such demand the Borrower shall pay to the Lender, for placement in a Cash Collateral Account, in addition to all other amounts payable by the Borrower under the Loan Documents, an amount equal to the sum of (i) the maximum aggregate unfunded potential liability of the Lender under all Set Aside Letters then outstanding, and (ii) the maximum aggregate amount that could be drawn under all Letters of Credit then outstanding, assuming strict compliance with all conditions to drawing;

(d)     the Lender may perform any of the Borrower's Obligations in such manner as the Lender may determine;

(e)     the Lender may foreclose upon the Collateral by judicial action or private power of sale;

(f)     the Lender may, either directly or through an agent or court-appointed receiver, take possession of the Collateral and enter into such contracts and take such other action as the Lender deems appropriate to complete or partially construct all or any part of the Improvements, subject to such modifications and changes in the Project or the plan of development as the Lender may deem appropriate;

(g)     the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Borrower against any and all obligations of the Borrower under this Agreement; and

(h)     the Lender may proceed to protect, exercise and enforce any and all other Remedies provided under the Loan Documents or by applicable Laws.

All costs, expenses, charges and advances of the Lender in exercising any such Remedies (including any such amounts which cause the obligations of the Borrower to exceed the face amount of the Note) shall be payable by the Borrower to the Lender in accordance with § 4.12.

Each of the Remedies of the Lender provided in the Loan Documents is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in the Loan Documents or by applicable Laws. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy. No application of payments, or any advances or other action by the Lender, will cure or waive any Event of Default or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents or prevent the exercise, or continued exercise, of any Remedies of the Lender.

7.00   Miscellaneous.

14

REVISED MAY 2003

EXHIBIT 1

7.01   Waivers and Amendments.  No supplement to, modification or amendment of, or waiver, consent or approval under, any of the Loan Documents shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

7.02   Survival of Representations.  All Representations shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and have been or will be relied upon by the Lender, notwithstanding any investigation made by the Lender or on its behalf.

7.03   Notices.  All notices and other communications provided under any Loan Document shall be in writing and mailed or personally delivered to the appropriate party at the address set forth on the signature page of this Agreement or any other Loan Document or, as to any party, at any other address in the State of California as shall be designated by it in a written notice sent to the other party. All notices and other communications by the Borrower which are expressly subject to receipt by the Lender under the terms of the Loan Documents will be effective when received by an officer or other representative of the Lender having direct responsibility for administration of the Loan. In all other cases, any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered, provided that the requirements of this sentence shall not impair or delay the effectiveness of any notice or other communication given by the Lender under the Trust Deed or any Additional Collateral Agreements when such notice or other communication is given in compliance with and would otherwise be effective under applicable Laws.

7.04   Relationship of Parties.  The relationship between the Borrower and the Lender is, and at all times shall remain, solely that of debtor and creditor, and shall not be, or be construed to be, a joint venture, equity venture, partnership or other relationship of any nature.

7.05   Nonliability of the Lender.  The Borrower acknowledges and agrees that:

(a)     the Borrower shall be solely responsible for and shall rely solely on its own judgment with respect to all matters relating to the Collateral or the Project, including the conduct of the Borrower and its agents and employees, the quality, adequacy and suitability of the Improvement Plans and any Change Orders and any work or materials furnished or to be furnished in connection with the Project, the skill, qualifications and performance of architects, contractors, subcontractors and suppliers, the feasibility of the Project and the sufficiency of budgets, cost projections and insurance, the supervision, status and progress of construction and compliance by the Borrower with the requirements of this Agreement with respect to such construction and the accuracy and completeness of all Disbursement Requests, Set Aside Letter Requests and Letter of Credit Requests, and the Lender does not assume any responsibility to the Borrower or any other Person to review, inspect, supervise or approve, or to provide any advice or information with respect to, any such matters;

REVISED MAY 2003

**EXHIBIT 1**

(b)     inspections of              construction made by or on behalf of the Lender, and acceptance, approval or review by the Lender of any Documents, information, conditions or performance or any other action by the Lender under any of the Loan Documents, are for purposes of administration of the Loan only and for the sole protection of the Lender, and shall not constitute a representation or warranty by the Lender to the Borrower or any other Person or be relied upon by the Borrower or any other Person for any other purpose;

(c)     the Lender shall have no responsibility or liability for any delays in funding or construction caused by any inspection of construction or review of Documents, information, conditions or performance or any other action by the Lender in connection with any Disbursement or Change Order;

(d)     the Lender does not owe any duty of care to protect the Borrower or any other Person against or to inform the Borrower or any other Person of, and the Lender shall not be responsible or liable to the Borrower or any other Person for any loss, damage, liability or claim of any kind relating to injury or death to persons or damage to property or other loss resulting from, the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or any negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or the improper application of any Disbursements; and

(e)     the provisions set forth in this Agreement for the issuance of Letters of Credit are included solely as an accommodation to the Borrower and shall not constitute an agreement, commitment, guarantee or other assurance by the Lender that any such Letters of Credit are available or will be issued on the terms set forth herein or otherwise, and the Lender shall in no event have any liability or obligation to the Borrower, or be subject to any setoff, counterclaim or other defense, as a result of the failure, inability or unwillingness of the Lender to designate one or more LC Banks hereunder or to request or cause any LC Bank to issue any Letters of Credit hereunder.

7.06    Benefits and Assignment.  The Loan Documents are made for the purpose of defining the rights and obligations of the Loan Parties and the Lender in connection with the Loan and are intended for the sole protection of the Loan Parties and the Lender and the Lender's successors and assigns, and no other Person shall have any rights of any nature under or by reason of the Loan Documents.  The Loan Documents shall be binding on and inure to the benefit of each of the Loan Parties and the Lender and their respective successors and assigns, except that no Loan Party shall have the right to assign any rights or interests under any Loan Document without the prior written consent of the Lender.  The Lender may from time to time sell participations in the Loan to any Person (including Affiliates of the Lender) without notice to or the consent of any Loan Party.

7.07    Payments and Computations.  All payments by any Loan Party under the Loan Documents shall be made in lawful money of the United States free and clear of, and without reduction by reason of, any Taxes.  Any payment which is stated to be due on a day which is not a Banking Day shall be made on the next succeeding Banking Day, and any such extension shall be included in the computation of the payment of interest.  Whenever any interest or other amount payable under the Loan Documents is to be computed on the basis of a year of a specified number of days, the amount shall be calculated on the basis of a year of such specified number of days for

REVISED MAY 2003

EXHIBIT 1

the actual number of days (including the first, but excluding the last) occurring in the period for which such calculation is made. For purposes of calculating amounts paid or payable under the Loan Documents, credit for payments shall be given upon receipt of same day funds by the Lender at its office located at 3465 E. Foothill Blvd, Pasadena, California 91107, Attention: Homebuilder Division (or such other location specified by the Lender from time to time in writing) at or before the close of business, Los Angeles time, on any Banking Day. Except as otherwise expressly provided in the Loan Documents, all payments on the Obligations received by the Lender shall be applied to the Obligations in such order and manner as the Lender may determine.

7.08    Publicity. During the course of construction of the Improvements and until the Loan is repaid in full, the Lender may place signs on the Land and issue or publish releases or announcements stating that construction financing is being provided by the Lender to the Borrower.

7.09    Unsecured Environmental Obligations. Anything contained in this Agreement or the Trust Deed to the contrary notwithstanding, (a) the Borrower shall have no obligation or liability under this Agreement or the Trust Deed for any obligation or liability of the Borrower under any Environmental Indemnity executed by the Borrower which does not state it is secured by the Trust Deed (any such obligation or liability being deemed to arise and exist solely under such Environmental Indemnity), and (b) any obligation or liability of the Borrower under such Environmental Indemnity shall not be secured by the Trust Deed.

7.10    Obligations Absolute. The obligations of the Borrower under this Agreement with respect to any Letter of Credit or Set Aside Letter (including the obligation to pay or reimburse to the Lender any and all amounts paid thereunder and interest thereon) shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and the Note under all circumstances, including without limitation the following circumstances:

(a)    any lack of validity or enforceability of this Agreement, any Letter of Credit or Set Aside Letter or any other agreement or instrument relating thereto (this Agreement and all of the other foregoing being collectively referred to herein as the "Related Documents");

(b)    any change in the time, manner or place of payment of, or in any other term of, any or all of the obligations of the Borrower in respect of any Related Document or any other amendment or waiver of or any consent to departure from any Related Document;

(c)    the existence of any claim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a Letter of Credit or Set Aside Letter (or any Persons for whom any such beneficiary or any such transferee may be acting), the Lender, the LC Bank or any other Person, whether in connection with the transactions contemplated by the Related Documents or any unrelated transaction;

(d)    any statement or any other document presented under a Letter of Credit or Set Aside Letter proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

REVISED MAY 2003

**EXHIBIT 1**

(e)     payment by the LC Bank under    a Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit;

(f)     any exchange, release or non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any guarantee, for any or all of the obligations of the Borrower in respect of the Related Documents; or

(g)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

7.11     Rules of Construction.  (a) For purposes of this Agreement and the other Loan Documents: (i) any reference to "days" or "months" shall mean calendar days or months, (ii) the word "including" shall mean "including without limitation", (iii) any reference in any of the Loan Documents to any Loan Document or other Document or exhibit shall mean such Loan Document or other Document or exhibit as it may from time to time be supplemented, modified, amended and extended in accordance with the terms of this Agreement, (iv) defined terms shall be equally applicable to the singular and plural forms, and (v) all existing and future exhibits to this Agreement are incorporated in this Agreement by this reference.  (b) Time is of the essence of the Loan Documents, and the provisions of the Loan Documents are declared to be severable.  (c) All accounting terms used and not otherwise defined in any Loan Document shall be construed in conformity with, and all financial information maintained or submitted by any Loan Party or other Person under any Loan Document shall be prepared in accordance with, generally accepted accounting principles consistently applied (or such other principles approved by the Lender in writing).  (d) If more than one Loan Party signs or is otherwise bound by any Loan Document, the liability of each shall be joint and several.  (e) The Loan Documents shall be governed by, and construed and enforced in accordance with, the Laws of California.

7.12     Counterparts; Facsimile Signatures.  This Agreement, and any document executed in connection with this Agreement, may be signed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page.  Any signature page of this Agreement, or any document executed in connection with this Agreement, may be detached from any counterpart of this Agreement or such other document and reattached to any other counterpart of this Agreement or such other document identical in form hereto or thereto but having attached to it one or more additional signature pages.  This Agreement, and any document executed in connection with this Agreement, shall be deemed executed upon each party's delivery of signed signature pages of this Agreement or such other document, which signature pages may be delivered by facsimile with the same effect as delivery of the originals.

7.13     Waiver of Jury Trial.  EACH OF THE LENDER AND THE BORROWER WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE BORROWER AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE BORROWER OR ANY ACTION OR INACTION BY EITHER PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

18

REVISED MAY 2003

**EXHIBIT 1**

**[Signatures Commence on Next Page]**

REVISED MAY 2003

**EXHIBIT 1**

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Agreement to be duly executed as of the date first written above.

"LENDER":

INDYMAC BANK, F.S.B.

By: _____
    Kenneth Shellem, S.V.P.

"BORROWER":

Eden Garden, LLC,
a California limited liability company

By: _____ 10-07-05
    Ali K. Amidy, Managing Member

Lender's Address:
IndyMac Bank, F.S.B.
3465 E. Foothill Blvd., FH-01-09
Pasadena, California 91107
Attn: Homebuilder Division

Borrower's Address:
Eden Garden, LLC
655 Campbell Technology Park, #125
Campbell, CA 95008

REVISED MAY 2003

20

**EXHIBIT 1**

Loan No. 49-0320000

EXHIBIT "A"

**LEGAL DESCRIPTION OF LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DECRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

REVISED MAY 2003

A-1

**EXHIBIT  1**

Loan No. 49-0320000

## EXHIBIT "B"

## DISBURSEMENT SCHEDULE

All Disbursements, Set Aside Letters and Letters of Credit shall be made or issued in accordance with the following terms, conditions and procedures:

(a) <u>Disbursement Account</u>. The following demand deposit account (the "Disbursement Account") has been opened at the _____ branch of _____ (the "Bank") in the name of the Borrower, subject to a security interest in favor of the Lender, which has been acknowledged in writing by the Bank: Account Number _____, ABA Routing Number _____.

(b) <u>Method of Disbursement</u>. Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule: (i) each Disbursement shall be made on the basis of a Disbursement Request submitted (in duplicate) by the Borrower to the Lender, pursuant to which Borrower shall certify that the Project Costs covered by the Disbursement Request have been paid or incurred by the Borrower, and (ii) upon the Lender's approval of the Disbursement Request, the proceeds of the Disbursement shall be deposited into the Disbursement Account or, in the case of Disbursements for any Line Item for "Land," into an escrow designated by the Borrower and approved by the Lender, except that (A) the proceeds of any Disbursement to pay interest or other amounts owing to the Lender shall be made by book entry, and (B) at the Lender's option, Disbursements may otherwise be made by the Lender directly to the Borrower, to the Contractor, if any, or to any other Lien Claimant, or jointly to one or more of such Persons or to other Persons designated by the Borrower, or in such other manner as the Lender may approve or require, including, without limitation, through the title company.

(c) <u>Set Aside Letters and Letters of Credit</u>. Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule, the Lender shall issue Set Aside Letters from time to time and cause the LC Bank to issue Letters of Credit from time to time upon written request of the Borrower, provided that (i) the obligation of the Lender to issue any Set Aside Letter and the agreement of the Lender to cause the LC Bank to issue any Letter of Credit shall be subject to receipt by the Lender of the applicable Set Aside Letter Fee or Letter of Credit Fee and to the Lender's approval, in its sole discretion, of the form and substance of the Set Aside Letter or Letter of Credit and, except insofar as the purpose and maximum amount of the Set Aside Letter or Letter of Credit are set forth in Part C of Exhibit "C", the purpose and maximum amount of the Set Aside Letter or Letter of Credit, (ii) the issuance of any Letter of Credit shall be further subject to the consent and approval of the LC Bank in its sole discretion and to the approval by the Lender in its sole discretion of the terms and conditions of issuance, and the provisions for the issuance of Letters of Credit set forth herein shall in any event be subject to § 7.05(e) of the Agreement, and (iii) unless the Lender otherwise consents, (A) no Set Aside Letter shall obligate the Lender to advance funds after the Maturity Date, (B) no Letter of Credit shall have an expiration date after the Maturity Date, and (C) no Set

B-1

**EXHIBIT 1**

Aside Letter or Letter of Credit shall be issued if the Lender has reasonably determined that any Project Costs intended to be covered or secured by such Set Aside Letter or Letter of Credit are not likely to be incurred prior to the Maturity Date. The maximum amount that the Lender may be obligated to fund under any Set Aside Letter at any time plus any amounts actually funded by the Lender under any such Set Aside Letter or by the LC Bank under any Letter of Credit shall reduce, to that extent, the amount otherwise available to be disbursed or set aside for other Project Costs covered by the same Line Item, and any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall be deemed to be a Disbursement of the proceeds of the Loan or Borrower's Funds (as the case may be) for purposes of the Agreement, the Note and the other Loan Documents (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount), except that the funding of any such amount shall not be subject to any conditions or requirements other than those set forth in the Set Aside Letter or Letter of Credit. Without limitation on the foregoing provisions of this paragraph (c), the Borrower acknowledges and agrees that (1) any disbursement by the LC Bank under any Letter of Credit represents an advance of the proceeds of the Loan to or for the account of the Borrower on behalf of the Lender, and (2) in consideration of the issuance of any such Letter of Credit and the obligation of the Lender to reimburse the LC Bank for any such disbursement thereunder, each such disbursement shall be deemed to be a Disbursement of the Loan (as described above) and the Borrower agrees to pay to the Lender the amount of each such disbursement, with interest thereon, on the terms set forth in the Note with respect to all Disbursements of the Loan (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount).

(d) <u>Line Item Budgets; Use of Proceeds.</u> The Borrower shall deliver to the Lender, prior to the earlier of the first Disbursement or the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower (or prior to such later date as the Lender may approve in writing), a Line Item Budget for the Project. Unless the Lender otherwise consents: (i) each Disbursement shall be made and used solely to pay or reimburse the Borrower for payment of, and each Set Aside Letter or Letter of Credit shall be issued solely with respect to, Project Costs associated with specific Line Items set forth in the Project Budget and any applicable Line Item Budget as specified in the Disbursement Request, and (ii) the total amount disbursed for Project Costs associated with any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget (plus any amounts disbursed by the Lender for such purpose from "Contingency" in accordance with clause (B) below), and the amount of any Set Aside Letter or Letter of Credit issued in respect of any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget less the total of all amounts previously disbursed or set aside (or secured by any Letter of Credit) for such Line Item. For purposes of this paragraph: (A) Disbursements with respect to any Line Item for "Land" shall be made for the purchase price of the Land and any existing improvements (if not previously purchased by the Borrower) and payment of existing Liens affecting the Collateral (other than Permitted Exceptions), with any balance to be disbursed as directed by the Borrower, (B) Disbursements with respect to any Line Item for "Contingency" shall be available for cost overruns on specific Line Items or for Project Costs for matters not covered by specific Line Items shall not exceed the percent of hard costs complete as determined by Lender's most current inspection, subject in each case to the prior approval of the Lender, and (C) Disbursements with

REVISED MAY 2003

B-2

**EXHIBIT 1**

respect to any Line Item for "Developer Overhead" and "Project Indirects" shall not exceed the percent of hard costs complete as determined by Lender's most current inspection.

If the Borrower effects any cost savings with respect to any Line Item, the Borrower shall give notice to the Lender of such cost savings promptly upon the discovery of the same, whereupon the amount of such cost savings shall be transferred from the Line Item(s) in question to the "Contingency" Line Item, and shall thereafter be available for disbursement as stated in clause (B) above.

Unless the Lender otherwise consents, no modifications shall be made to the Project Budget or any Line Item Budget at any time, except that (i) the Project Budget shall be supplemented from time to time by any Line Item Budget approved by the Lender, and (ii) the Project Budget and any applicable Line Item Budget shall be appropriately modified by the Lender from time to time to reflect any increase in Project Costs for which additional Borrower's Funds have been deposited by the Borrower with the Lender in accordance with paragraph (f) below.

(e)     Disbursement, Set Aside Letter and Letter of Credit Procedures.  Each Disbursement (other than Disbursements to pay interest or other amounts owing to the Lender) and each Set Aside Letter or Letter of Credit shall be subject to prior receipt by the Lender, in form and substance satisfactory to the Lender, of each of the following items: (i) a Disbursement Request or Set Aside Letter Request or Letter of Credit Request, as the case may be, submitted (in duplicate) by the Borrower, certifying the status of construction of the Improvements and the amount requested (and the total of all amounts previously requested) with respect to each Line Item, and also certifying that no Event of Default has occurred and is continuing and that all Representations made by the Borrower in any of the Loan Documents are correct in all material respects as of the date of the Disbursement Request or Set Aside Letter Request or Letter of Credit Request, (ii) if requested by the Lender, a certificate or statement from the Contractor, if any, and/or the Architect with respect to the status of construction or the amount requested, (iii) originals or copies of such bills, invoices, receipts, lien releases or waivers or other evidence of payment or information as the Lender may reasonably require with respect to any Lien Claims or potential Lien Claims or the status of construction or amounts paid or payable for any Project Costs, (iv) to the extent that any Disbursement relates to costs for building materials, equipment or other Personal Property, evidence that such building materials, equipment or other Personal Property have been incorporated into the Improvements or have been delivered to the Borrower and stored and insured in a manner satisfactory to the Lender, (v) evidence of any insurance required by § 4.08 (if not previously furnished to the Lender) and, if requested by the Lender, evidence that any required Financing Commitment is in full force and effect, (vi) such endorsements to the Title Policy (including CLTA Endorsement No. 102.5 upon completion of foundations and CLTA Endorsement No. 122) and such other Documents and information relating to the Collateral or the Project as the Lender may reasonably request, (vii) in the case of the first Disbursement or Set Aside Letter or Letter of Credit only, the "Required Items" described in Exhibit "C", and (viii) to the extent provided in paragraph (d) above, any Line Item Budget required to be delivered to the Lender prior to the Disbursement or Set Aside Letter or Letter of Credit, and (ix) in the case of any portion of the Loan which is subject to any "Retention Requirements" or other "Holdback Requirements" specified in Exhibit "C", such evidence as the Lender may require that all applicable conditions have been fulfilled.

REVISED MAY 2003

**EXHIBIT 1**

Unless the Lender otherwise consents, not more than 2 Disbursements (other than Disbursements to pay interest or other amounts owing to the Lender) shall be made during any month.  Unless otherwise paid by the Borrower, and notwithstanding paragraph (b) above, Disbursements for interest and other amounts owing to the Lender may be made by the Lender without further authorization from the Borrower.

Unless the Lender otherwise consents, the Lender shall not be obligated to make any Disbursement or issue any Set Aside Letter or cause any Letter of Credit to be issued if (A) the Lender has determined that an Event of Default has occurred or that an event which, with notice of the passage of time or both, would be an Event of Default has occurred or that any Representation made by the Borrower in any of the Loan Documents would not be correct in all material respects if made on and as of the date of the Disbursement or Set Aside Letter or Letter of Credit, or (B) the Lender has determined, based on inspections by or on behalf of the Lender or such other information as the Lender deems appropriate, that the construction of the Improvements is not substantially as represented by the Borrower or is not in compliance with the requirements of the Agreement, or (C) the Borrower has failed to deposit with the Lender any Borrower's Funds required by paragraph (f) below, or (D) the Lender is required under applicable Laws to withhold the Disbursement or Set Aside Letter or Letter of Credit or a stop notice has been asserted against the Lender and has not been fully released, or (E) the Lender has determined that any Liens or Rights of Others, other than Permitted Prior Exceptions, may have priority over the Trust Deed with respect to the Disbursement or amounts that may be funded under the Set Aside Letter or Letter of Credit.

(f)     Deposit of Borrower's Funds.  Prior to the first Disbursement or Set Aside Letter or Letter of Credit (or prior to such later date as the Lender may approve in writing), the Borrower shall deposit with the Lender Borrower's Funds in an amount equal to all "Additional Costs To Be Paid By Borrower" set forth in the original Project Budget, and the Borrower may from time to time deposit additional Borrower's Funds with the Lender as the Borrower deems appropriate to cover any increase in Project Costs.  In addition, if the Lender at any time determines that any actual or estimated Project Costs have exceeded or can reasonably be expected to exceed the corresponding amount set forth in the Project Budget or any applicable Line Item Budget (whether as a result of Change Orders or otherwise), or that Project Costs for any matters not covered by specific Line Items have been or may be incurred by the Borrower, or that the undisbursed portion of the Loan [together with the undisbursed portion of all Borrower's Funds deposited with the Lender under this paragraph (f)] is or may be insufficient to pay all Project Costs that may be payable under the Loan Documents or otherwise required in connection with the Project (including a reasonable reserve for contingency, interest and other costs and expenses), then the Borrower shall deposit with the Lender, on demand, additional Borrower's Funds in an amount deemed reasonably necessary by the Lender to pay such Project Costs or to cover such insufficiency.  Any Borrower's Funds deposited with the Lender under this paragraph (f) shall be held in a Cash Collateral Account and shall be disbursed by the Lender prior to further Disbursements of the Loan.

(g)     Disbursement Controls.  Notwithstanding anything in this Exhibit "B" to the contrary, the disbursement controls shall be as follows:

REVISED MAY 2003

**EXHIBIT  1**

| Disbursement Controls | Standard ☒ |
|---|---|
| Guidelines for selection: | Established customers with conforming projects |
| Disbursement Processing Description: | |
| • Loan Admin Due Diligence Review | Prior to Disbursement |
| • Backup Invoices for Hard Costs | Not Required |
| • Backup Invoices for Soft Costs | Required |
| • Conditional/Unconditional Lien Waivers | Not Required |
| • Retention | Consistent with Building Contract |
| • Inspection of Hard Cost Items | Prior to Disbursement |
| • Title Endorsement | At disbursement |
| • Borrower's Draw Request (HBD –CL Form) | Required |
| • Frequency of Disbursement | 1-2 a month |
| Sales Verification | Monthly Sales Report |
| Specify Retention percentage | 5% |

REVISED MAY 2003

B-5

**EXHIBIT 1**

Loan No. 49-0320000

EXHIBIT "C"

**LOAN REQUIREMENTS**

(Residential Tract Construction)

Borrower: Eden Garden, LLC, a California limited liability company

Project: Eden Garden Townhomes

Loan Amount: $5,904,000.00

Loan Fee: $44,280.00 (0.75% of Loan Amount)

A.  Required Items (to be furnished by the Borrower prior to the first Disbursement or Set Aside Letter):

   1. Promissory Note in the face amount of $5,904,000.00 executed by the Bor rower in favor of the Lender to evidence the Loan.

   2. Construction Trust Deed with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower in favor of the Lender to secure the Loan and other Obligations of the Borrower, which shall cover the Real Property, certain Personal Property, the Project Agreements, the Improvement Plans and such other rights, properties and interests relating to the Project or any other Collateral as the Lender may require.

   3. Financing statement for the account of the Borrower in favor of the Lender with respect to such Collateral as the Lender may require.

   4. Unsecured Environmental Indemnity executed by the Borrower.

   5. General Guaranty of all Obligations of the Borrower executed by Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

   6. Completion Guaranty executed. N/A

   7. Environmental Guaranty executed by Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

   8. Authorizing Resolutions for each Loan Party.

   9. Charter Documents for each Loan Party.

REVISED MAY 2003

C-1

**EXHIBIT  1**

10. Current Financial Statements for Eden Garden, LLC, a California limited liability company, Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

11. Evidence of insurance required by § 4.08 and Insurance Requirements Letter.

12. Copy of Improvement Plans.

13. Copy of Architect Agreement.

14. Copy of Construction Contract.

15. Copy of Contractor's Resume.

16. Assignment of Project Documents executed by the Borrower.

17. Copies of permits when available.

18. Copy of preliminary title report and recorded exceptions.

19. Copy of soils report. N/A

20. Copy of final subdivision map.

21. Evidence of compliance with zoning and other land use restrictions.

22. Copy of environmental impact report or negative declaration. N/A

23. Environmental investigative report. N/A

24. Environmental Questionnaire shall be fully executed.

25. Appraisal prepared by the Lender or an appraiser approved by the Lender confirming the prospective market value of the Real Property, assuming completion of the Improvements, to be not less than $7,380,000.00.

26. Cost Review prepared by Construction Services Manager in form and content satisfactory to Lender.

27. Evidence of Utility Services.

28. Copy of any proposed CC&R's or easements.

29. List of bonds, security deposits, set aside letters or letters of credit required in connection with the Project.

REVISED MAY 2003

C-2

**EXHIBIT 1**

30. Evidence of payment of all Project Costs "Previously Paid By Borrower" set forth in the Project Budget.

31. Borrower's Funds in the form of cash deposits for all "Additional Costs To Be Paid By Borrower" set forth in the Project Budget.

32. Evidence of recording/filing of Trust Deed/financing statement.

33. Confirmation that Title Policy has been or will be issued at or prior to first Disbursement or Set Aside Letter.

34. Evidence that the Loan Fee and all of Lender's closing costs payable by the Borrower under § 4.12 have been or will be paid at or prior to the recordation of the Trust Deed.

35. Opinion of counsel for the Loan Parties. N/A

36. Loan Servicing Guaranty executed. N/A

37. Additional Collateral Agreements. N/A

38. Copy of Takeout Commitment. N/A

39. Copy of budget for homeowners association.

40. Statement of conditions for transfer of common areas to homeowners association.

41. Insured Closing Protection Letter from the title company addressed to Lender concerning the title agent, if applicable.

42. UCC searches showing financing statement executed by the Borrower to be a first priority filing.

B.     Additional Matters (including disclosure of finder's or broker's fees, Special Taxes, flood conditions, development conditions or impediments, pending or unissued consents and approvals, delayed delivery of Line Item Budgets and delayed deposit of Borrower's Funds): "NONE"

C.     Set Aside Letters and Letters of Credit. The Borrower anticipates that the following Set Aside Letter(s) and Letter(s) of Credit may be necessary or desirable in connection with the Project: "NOT KNOWN AT THIS TIME"

| Beneficiary | Purpose | Maximum Amount |
|---|---|---|
| | | |

REVISED MAY 2003

**EXHIBIT 1**

| 1. | _____ | _____ | $_____ |
| 2. | _____ | _____ | $_____ |
| 3. | _____ | _____ | $_____ |

    As a condition to the issuance of each Set Aside Letter and Letter of Credit, the Borrower shall pay to the Lender a nonrefundable Set Aside Letter Fee in an amount equal to 2% of the face amount of such Set Aside Letter or a nonrefundable Letter of Credit Fee in an amount equal to 2% of the face amount of such Letter of Credit. Each such Set Aside Letter Fee or Letter of Credit Fee shall be fully earned when paid and shall not be refundable, in whole or in part, under any circumstances.

**D.**    Presale Requirements: "NONE"

1.    No sales of Units shall be closed and no common areas shall be transferred to any homeowners association until at least ___ Units have become "sold" Units.

2.    Unless the Lender otherwise consents in writing, no "Model Units" shown on Exhibit "E" shall be sold or closed until all other Units in the Project of the same type have become "sold" Units or "closed" Units.

3.    *No Letter credit and No charge of ½ at any time* AY FA

    As used in Part D of this Exhibit: (a) a "closed" Unit means a Unit as to which title has been conveyed to the purchaser, and (b) a "sold" Unit means a Unit as to which a purchaser (other than the Borrower or an Affiliate of the Borrower) has entered into a binding agreement to purchase the Unit for an amount not less than the "Minimum Sales Price" set forth on Exhibit "E" and has paid a nonrefundable deposit to the Borrower, and escrow instructions have been executed by the Borrower and the purchaser.

**E.**    Holdback Requirements (other than any "Retention Requirements" specified below): "NONE"

**F.**    Retention Requirements:

    Ninety five percent (95%) of each line item disbursed; five percent (5%) withheld until completion of applicable line item – ninety five percent (95%) of the amount otherwise available for disbursement at any time for costs associated with any Line Item for direct or hard construction costs may be disbursed with the remaining 5% retained and not disbursed to Borrower; the 5% retained amount may be disbursed upon satisfactory completion of the work associated with such Line Item and receipt by the Lender of a certification from the Borrower and the contractor, if any, and such other evidence as the Lender any require to confirm that such work has been completed and that upon disbursement of such balance all direct or hard construction costs relating to such work will

**EXHIBIT 1**

be paid in full and all Lien Claims and potential Lien Claims with respect to such work will be released or otherwise discharged.

C-5

**EXHIBIT 1**

G  Financial Covenants:

    1.    Borrower shall provide or cause to provide to Lender until the Loan is paid in full:

        a.  *Financial Statement for each Borrower after the end of each fiscal year end within 90 days prepared in accordance with generally accepted accounting principals consistently applied;*

        b.  Financial Statement for each Guarantor after the end of each fiscal year end within 90 days prepared in accordance with generally accepted accounting principals consistently applied;

        c.  Financial Statement for each Borrower after the end of each quarter end within 30 days prepared in accordance with generally accepted accounting principals consistently applied;

        d.  Financial Statement for each Guarantor after the end of each quarter end within 30 days prepared in accordance with generally accepted accounting principals consistently applied;

        e.  Federal Tax Returns with all schedules including K-1, if applicable, for each Borrower within 30 days of filing;

        f.  Federal Tax Returns with all schedules including K-1, if applicable, for each Guarantor within 30 days of filing;

    2.  Borrower acknowledges that net worth is a significant consideration to Lender in connection with the making of the Loan. Accordingly, Borrower agrees that the failure by Borrower and Guarantors to maintain the following financial capabilities shall constitute an Event of Default.

        a.  tangible net worth of not less than Five Million Dollars And No Cents ($5,000,000.00) as of the end of each calendar quarter. Tangible Net Worth shall mean the excess of Assets over Liabilities, excluding, however from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, including without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

        b.  liquid assets of not less than Three Hundred Thousand Dollars And No Cents ($300,000.00) as of the end of each calendar quarter. Liquid assets shall mean cash or readily marketable publicly traded securities traded or nationally recognized public exchange.

REVISED MAY 2003

**EXHIBIT  1**

    c.   maximum Debt to worth ratio not exceeding 1.00 to 1.00, measured at the end of each calendar quarter.  For purposes of this section, the maximum debt to worth ratio shall be calculated by adding together total liabilities, minority partner's interest and including contingent liabilities divided by the equity.  As used in this Section "Debt" shall be defined as direct liabilities plus the outstanding balances of contingent liabilities.

H.    <u>Subdivisions</u>.  The Borrower shall cause a final subdivision map or a parcel map, as applicable, covering all of the Land, to be filed for record in the county in which the Land is located, subdividing the Land in a manner consistent with the plans for the Project approved by the Lender, in full compliance with all Laws and requirements of Governmental Agencies (including without limitation the requirements of the California Subdivision Map Act and all local ordinances thereunder), on or before N/A.

I.    <u>Absorption Rate</u>.  The Borrower shall cause not less than two (2) Units to be sold during each month commencing the Sales Start Date.

J.    <u>Sales Start Date</u>.  The Borrower shall cause the first Unit to be available for sale no later than May 1, 2006.

K.    <u>Speculative Unit Limit</u> The Borrower shall not have more than eighteen (18) Speculative Units at any one time.  "Speculative Unit" shall be defined as a unit that is not complete and has not been sold.

L.    <u>Unit Closings.</u>  The Borrower shall cause the first Unit to close no later than August 1, 2006 and shall cause not less than three (3) Units to be closed during each month, commencing after the first Unit closing or August 1, 2006, whichever is sooner.

M.    <u>Maximum Units Under Construction.</u> The maximum number of Units allowed under construction at any one time is eighteen (18) Units.

P.    <u>Standing Inventory</u>. Standing inventory of completed and unsold Units shall not exceed eighteen (18) Units at any one time in the aggregate.

Q.    <u>Plans</u>.  Borrower shall provide a complete set of city-approved plans to Lender for review when available.

R.    <u>Subcontracts.</u>  There shall be no disbursements made for vertical construction until Lender receives copies for subcontracts for all major trades (including, but not limited to grading, concrete, masonry, rough lumber and framing, roofing, stucco, drywall, painting, pluming, HVAC and electrical) in form and content acceptable to Lender.

REVISED MAY 2003

**EXHIBIT  1**

Loan No. 49-0320000

Exhibit "D"
Budget Summary

| Cost Category | Total Project Cost | Total Loan Funds | Cash Equity | Deferred / and Apprec. Equity |
|---|---|---|---|---|
| Land | $880,000 | $0 | $880,000 | $920,000 |
| Land Cost | $880,000 | $0 | $880,000 | $920,000 |
| Land Cost Other | $0 | $0 | $0 | $0 |
| OTHER | $0 | $0 | $0 | $0 |
| Site Costs | $50,497 | $50,497 | $0 | $0 |
| Overall Sitework | $50,497 | $50,497 | $0 | $0 |
| Direct Construction Costs | $4,518,748 | $4,491,248 | $27,500 | $0 |
| Direct Construction Costs | $4,518,748 | $4,491,248 | $27,500 | $0 |
| Indirect Construction Costs | $1,350,884 | $500,644 | $850,240 | Cash Flow |
| Developer O/H Firm Contract | $343,594 | $343,594 | $0 | $0 |
| Indirect Soft Costs | $323,030 | $30,550 | $292,480 | $0 |
| Insurance | $442,500 | $126,500 | $316,000 | $0 |
| Permits & Fees | $241,760 | $0 | $241,760 | $0 |
| Sales / Marketing Costs | $0 | $0 | $0 | $0 |
| On-going Marketing/Advertising | $0 | $0 | $0 | $0 |
| Start-Up Marketing | $0 | $0 | $0 | $0 |
| Model Landscape/Furnishing | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| Financing Costs | $641,574 | $635,824 | $5,750 | $0 |
| Interest Reserve | $532,188 | $532,188 | $0 | $0 |
| Loan Fee - HBD | $44,280 | $44,280 | $0 | $0 |
| Appraisal Fee - | $6,750 | $1,000 | $5,750 | $0 |
| Cost Analysis- | $1,500 | $1,500 | $0 | $0 |
| PBG Application Fee- | $2,195 | $2,195 | $0 | $0 |
| Closing costs | $15,916 | $15,916 | $0 | $0 |
| Loan Document fees | $1,500 | $1,500 | $0 | $0 |
| In-house appraisal & Cost Review | $525 | $525 | $0 | $0 |
| Inspection Fees | $7,200 | $7,200 | $0 | $0 |
| Loan Fee - Broker | $29,520 | $29,520 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| General Contingency | $225,787 | $225,787 | $0 | $0 |
| Contingency | $225,787 | $225,787 | $0 | $0 |
| Additional Contingency | $0 | $0 | $0 | $0 |
| OTHER | $0 | $0 | $0 | $0 |
| Total | $7,667,490 | $5,904,000 | $1,763,490 | $920,000 |

**EXHIBIT 1**

Loan No. 49-0320000

Exhibit "D" Continued
Line Item Breakdown

# IndyMac Bank.
### Homebuilder Division

| Borrower Name | Eden Garden LLC | | Tel # 408-399-4888 | Permit # | | |
| Project name | Eden Graden Townhomes | | | Architect: | | Tel# |
| CONTRACTOR: | Masuda Services Co. | | Tel # 408-353-5552 | Engineer: | | Tel# |

| | Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|---|
| | **A. Land Costs** | | | | |
| 1001 | Land Acquisition | $ 880,000 | $ 880,000 | $ (920,000.00) | o |
| 1002 | Land Cost Other | | | | $ - |
| 1003 | OTHER | | | | $ - |
| **TOTAL LAND COSTS** | | $ 880,000 | $ 880,000 | $ (920,000) | $ - |
| | **B. PRE CONSTRUCTION COSTS:** | | | | |
| 101 | Architect, Engineering & Soils Study Fees | $ 291,230 | $ 260,880 | | $ 30,550 |
| 102 | Design Review/Plan Check Fees | | | $ - | $ - |
| 103 | Permits - City/County | $ 241,760 | $ 241,760 | | $ - |
| 104 | Utility Connection Fees | $ 25,997 | | $ - | $ 25,997 |
| 105 | School/Park/Misc. Taxes | | | $ - | $ - |
| 106 | Project Bonds- Letters of Credit | $ 31,800 | $ 31,800 | | $ - |
| 107 | Insurance incl. General Liability Ins. | $ 442,500 | $ 316,000 | $ - | $ 126,500 |
| 108 | Proctection | | | $ - | $ - |
| **TOTAL PRE-CONSTRUCTION COSTS** | | $ 1,033,287 | $ 850,240 | $ - | $ 183,047 |
| | **C. "SITE" CONSTRUCTION COSTS:** | | | | |
| 201 | Temporary Utilities & Facilities | $ 20,500 | | $ - | $ 20,500 |
| 202 | Special Inspections/Testing-Geo-tech, Structural | | | $ - | $ - |
| 203 | Job Security | $ 4,000 | | $ - | $ 4,000 |
| 204 | Equipment Rental | | | $ - | $ - |
| 205 | Jobsite overhead | | | $ - | $ - |
| 206 | Project Management/Supervision | $ 343,594 | | $ - | $ 343,594 |
| 207 | General Contractor's office overhead/profit. | | | $ - | $ - |
| 208 | State Sales Tax (where applicable) | | | $ - | $ - |
| 209 | Builder Contingency | | | $ - | $ - |
| 210 | General Liability Ins. | $ - | $ - | $ - | $ - |
| **SUB-TOTAL GENERAL REQUIREMENTS** | | $ 368,094 | $ - | $ - | $ 368,094 |
| 301 | Demolition | $ 5,600 | $ 5,600 | | $ - |
| 302 | Clearing/Stakeout ( Hauling) | $ 12,000 | | | $ 12,000 |
| 303 | Rough grading/shoring/excavation/fill | $ 101,000 | | | $ 101,000 |
| 304 | Site retaining walls/waterproofing/backfill | | | $ - | $ - |
| 305 | Site drainage | $ 50,000 | | $ - | $ 50,000 |
| 306 | Curb / Gutter / Walks | $ 24,000 | | $ - | $ 24,000 |
| 307 | PG & E | $ 124,400 | $ 14,400 | $ - | $ 110,000 |
| 308 | Utility Trenching | $ 20,000 | | $ - | $ 20,000 |
| 309 | san jose water | $ 4,500 | $ 4,500 | $ - | $ - |
| 310 | Sewer Hook Up - Pumps | $ 45,000 | | $ - | $ 45,000 |
| 311 | Water Mains & Meters | $ 105,000 | | $ - | $ 105,000 |
| 312 | Off-Site Paving | | | $ - | $ - |
| 313 | Dry Utilities | | | $ - | $ - |
| 314 | Landscape | | | $ - | $ - |
| **SUB-TOTAL SITE PREPARATION** | | $ 491,500 | $ 24,500 | $ - | $ 467,000 |

REVISED MAY 2003

D-2

**EXHIBIT 1**

Loan No. 49-0320000          Line Item Breakdown Continued

| Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|
| 401 | | | | $ - |
| 402 Plumbing System - Ground | $ 69,000 | | | $ 69,000 |
| 403 Ground Mechanical | | | | $ - |
| 404 Electrical System Ground & Rough | $ 153,000 | | | $ 153,000 |
| 405 Embedded hardware | | | | $ - |
| 406 Foundation & Building retaining walls poured | | | | $ - |
| 407 Concrete slab poured-house, garage | $ 266,985 | | | $ 266,985 |
| **SUB-TOTAL FOUNDATION COMPLETE** | $ 488,985 | $ - | $ - | $ 488,985 |
| 501 Structural masonry | | | | $ - |
| 502 Rough Framing - Labor & Material | $ 1,080,000 | | $ - | $ 1,080,000 |
| 503 Structural steel | $ 242,817 | | | $ 242,817 |
| 504 Modular or Sectional Mfg. Home | | | | $ - |
| 505 Mfg. Trusses/components | | | | $ - |
| 506 Rough framing labor | | | | $ - |
| 507 Lightweight concrete interior floors | | | | $ - |
| 508 Plumbing top-out | $ 138,000 | | | $ 138,000 |
| 509 Rough heating, ventilation, air conditioning | $ 135,000 | | | $ 135,000 |
| 510 Rough electrical | | | | $ - |
| 511 Fire protection sprinklers - rough in | $ 43,000 | $ 3,000 | | $ 40,000 |
| 512 Fireplaces incl. Flues | $ 12,000 | | | $ 12,000 |
| 513 Security & Communications pre-wiring | | | | $ - |
| 514 Exterior painting | | | | $ - |
| **SUB-TOTAL BUILDING ROUGH-IN COMPLETION** | $ 1,650,817 | $ 3,000 | $ - | $ 1,647,817 |
| 601 Waterproofing decks, shower pans, etc. | | | | $ - |
| 602 Gutters & Downspouts | $ 34,212 | | | $ 34,212 |
| 603 Roofing 61.4K / hot mopping 2.4K / Sheetmetal 10K | $ 73,805 | | | $ 73,805 |
| 604 Windows | $ 101,000 | | | $ 101,000 |
| 605 Wood & Glass doors | $ 28,000 | | | $ 28,000 |
| 606 Skylights | | | | $ - |
| 607 Glazing | | | | $ - |
| 608 Exterior siding | | | | $ - |
| 609 Exterior trim- planters | $ 600 | | | $ 600 |
| 610 Stucco | $ 250,000 | | | $ 250,000 |
| 611 Masonry veneer | | | | $ - |
| 612 Ornamental Iron | $ 11,250 | | | $ 11,250 |
| 613 Garage Doors | $ 16,800 | | | $ 16,800 |
| 614 Exterior painting | | | | $ - |
| **SUB-TOTAL EXTERIOR WEATHER-TIGHT** | $ 515,667 | $ - | $ - | $ 515,667 |
| 701 Insulation | $ 33,809 | | | $ 33,809 |
| 702 Drywall/Plaster | $ 75,400 | | | $ 75,400 |
| 703 Finish Lumber | $ 35,000 | | | $ 35,000 |
| 704 Cabinetry | $ 194,448 | | | $ 194,448 |
| 705 Finish Materials/Millwork | | | | $ - |
| 706 Stairs & Railing | $ 174,000 | | | $ 174,000 |
| 707 Finish Hardware | $ 30,000 | | | $ 30,000 |
| 708 Finish Carpentry Labor & Fine Tuning | $ 92,708 | | | $ 92,708 |
| **SUB-TOTAL DRYWALL/FINISH CARPENTRY** | $ 635,365 | $ - | $ - | $ 635,365 |
| 801 Countertops | $ 42,000 | | | $ 42,000 |
| 802 Tub/shower/enclosures | | | | $ - |
| 803 Interior painting/Wall Coverings | $ 96,000 | | | $ 96,000 |
| 804 Hard surface finish flooring labor 86K Material By Ow | $ 86,000 | | | $ 86,000 |
| 805 Carpeting | $ 100,488 | | | $ 100,488 |
| 806 Built-in Appliances | $ 50,000 | | | $ 50,000 |
| 807 Special Equipment | | | | $ - |
| 808 Scaffolding | $ 20,000 | | | $ 20,000 |
| 809 Intercom | | | | $ - |
| 810 Fire protection sprinklers - Finish | $ 8,000 | | | $ 8,000 |
| 811 Finish Plumbing | $ 23,000 | | | $ 23,000 |
| 812 Plumbing Fixtures | $ 30,000 | | | $ 30,000 |
| 813 Finish Electrical | $ 17,000 | | | $ 17,000 |

**EXHIBIT 1**

Loan No. 49-0320000          Line Item Breakdown Continued

| | Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|---|
| 814 | Lighting Fixtures By Owner | $ 40,000 | | | $ 40,000 |
| 815 | Finish Heating, Ventilating, Air Cond. | $ 45,000 | | | $ 45,000 |
| 816 | Mirrors | $ 8,000 | | | $ 8,000 |
| 817 | Bath Accessories | $ 9,000 | | | $ 9,000 |
| 818 | Tub and Shower Doors | $ 13,200 | | | $ 13,200 |
| 819 | Finish Grading | | | | $ - |
| 820 | Pool/Spa | | | | $ - |
| 821 | Hardscape-Driveway, Walkways, Steps | $ 58,364 | | | $ 58,364 |
| 822 | Landscaping | $ 50,362 | | | $ 50,362 |
| 823 | Irrigation System | | | | $ - |
| 824 | Fencing Including Gates | $ 10,000 | | | $ 10,000 |
| 825 | Touch-up/Clean Up 20K Final Cleaning 10K | $ 30,000 | | | $ 30,000 |
| | SUB-TOTAL BUILDING COMPLETION | $ 736,414 | $ - | $ - | $ 736,414 |
| | D. Sales / Marketing Costs | | | | |
| 901 | On-going Marketing/Advertising | | | | $ - |
| 902 | Start-Up Marketing | | | | $ - |
| 903 | Model Landscape/Furnishing | | | | $ - |
| 904 | OTHER | | | | $ - |
| 905 | OTHER | | | | $ - |
| | SUB-TOTAL SALES & MARKETING | $ - | $ - | $ - | $ - |
| | E. Financing Costs | | | | |
| 6001 | Loan Fee - IndyMac | $ 44,280 | | | $ 44,280 |
| 6002 | Loan Fee - Broker | $ 29,520 | | | $ 29,520 |
| 6003 | Closing Costs | $ 15,916 | | | $ 15,916 |
| 6004 | Loan Document Fees | $ 1,500 | | | $ 1,500 |
| 6005 | Inspection Fees | $ 7,200 | | | $ 7,200 |
| 6006 | Inhouse Appraisal& Cost Review | $ 525 | | | $ 525 |
| 6007 | PBG Application Fee | $ 2,195 | | | $ 2,195 |
| 6008 | Appraisal Fee | $ 6,750 | $ 5,750 | | $ 1,000 |
| 6009 | Cost Analysis | $ 1,500 | | | $ 1,500 |
| 6010 | OTHER | | | $ - | $ - |
| 6011 | OTHER | | | $ - | $ - |
| | SUB-TOTAL FINANCING COSTS | $ 109,386 | $ 5,750 | $ - | $ 103,636 |
| | F. LENDER RESERVES | | | | |
| 7002 | Interest Reserve | $ 532,188 | | | $ 532,188 |
| 7003 | Contingency | $ 225,787 | | | $ 225,787 |
| 7004 | Additional Contingency | | | | $ - |
| 7005 | OTHER | | | | $ - |
| 7006 | OTHER | | | | $ - |
| | SUB-TOTAL LENDERS RESERVES | $ 757,975 | $ - | $ - | $ 757,975 |
| | TOTAL | $ 7,687,490 | $ 1,763,490 | $ (920,000) | $ 5,904,000 |

I hereby certify that the above referenced numbers are accurate and complete to the best of my knowledge.

X _____          09/30/2005
                                              Date
Borrower     Eden Garden LLC

X _____          09/30/2005
                                              Date
Contractor     Masuda Services Co.

REVISED MAY 2003                    D-4

**EXHIBIT 1**

Loan No. 49-0320000

EXHIBIT "E"

**MINIMUM SALES AND RELEASE PRICES**

(Residential Tract Construction)

| Plan | Number of Units | Minimum Sales Price | Release - 120% of PAR per Unit | SQFT |
|------|-----------------|---------------------|-------------------------------|------|
| A | 2 | $ 456,375.00 | $ 355,686.70 | 1,217 |
| B | 1 | $ 462,750.00 | $ 360,655.21 | 1,234 |
| C | 3 | $ 529,480.00 | $ 507,372.32 | 1,736 |
| D | 4 | $ 476,700.00 | $ 398,065.15 | 1,362 |
| E | 1 | $ 482,250.00 | $ 375,853.00 | 1,286 |
| F | 1 | $ 470,400.00 | $ 392,804.38 | 1,344 |
| G | 1 | $ 494,325.00 | $ 444,535.31 | 1,521 |
| H | 3 | $ 428,250.00 | $ 333,766.81 | 1,142 |
| I | 1 | $ 437,625.00 | $ 341,073.44 | 1,167 |
| J | 1 | $ 439,875.00 | $ 342,827.04 | 1,173 |

REVISED MAY 2003

E-1

**EXHIBIT 1**

Loan No.  49-0320000

EXHIBIT "F"

**DEFINITIONS**

(Residential Tract Construction)

As used in this Agreement, the following terms shall have the following meanings:

"Additional Collateral Agreements" means the "Additional Collateral Agreements" (if any) specified in Exhibit "C" and any other mortgages, assignments or other agreements (other than the Trust Deed) now or in the future securing the Loan or any Guaranty.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with the Person specified.

"Agreement" means this Building Loan Agreement, including all exhibits.

"Alternate Rate" means the "Alternate Rate" set forth in the Note.

"Architect" means any Person engaged by the Borrower from time to time as an architect or to perform similar functions in connection with the Project.

"Architect Agreement" means, as to any Architect, the agreement between the Borrower and the Architect relating to services to be provided by the Architect in connection with the Project.

"Authorization" means any authorization, consent, approval, order, license, permit, exemption or other action by or from, or any filing, registration or qualification with, any Governmental Agency or other Person.

"Authorizing Resolutions" means (a) in the case of a corporation, a certified copy of resolutions adopted by its board of directors, (b) in the case of a partnership (whether general or limited), a certificate signed by all of its general partners, and (c) in the case of a trust or any other entity, evidence of such other action as the Lender may require, in each case authorizing the execution, delivery and performance of all Loan Documents to which it is a party or by which it is bound.

"Banking Day" means any day (excluding Saturdays and Sundays) on which banks located in California are not authorized or required by law to close.

"Borrower's Funds" means funds of the Borrower deposited with the Lender pursuant to the Disbursement Schedule.

REVISED MAY 2003

**EXHIBIT 1**

"Cash Collateral Account" means a cash collateral account maintained by the Lender for the account of the Borrower for purposes of this Agreement or any of the other Loan Documents which shall be subject to a security interest in favor of the Lender for the purpose of securing the Borrower's Obligations and over which the Lender shall have sole and exclusive control and right of withdrawal.

"Certificate of Reasonable Value" means a Master Certificate of Reasonable Value issued by the United States Veterans Administration with respect to Units constructed or to be constructed in accordance with the Improvement Plans.

"Change Order" means a change in, or supplement to, the Improvement Plans.

"Charter Documents" means (a) in the case of a corporation, its articles of incorporation and bylaws, (b) in the case of a limited liability company, its articles of organization and operating and/or management agreement, (c) in the case of a partnership, its partnership agreement and any certificate or statement of partnership, and (d) in the case of a trust or any other entity, its formation documents, in each case as amended from time to time.

"Collateral" means all property in which the Lender is granted or purportedly granted a Lien pursuant to the Trust Deed.

"Competing Project" means any residential housing improvements or units which are located within a radius of five miles (5) of the Project and the Minimum Sales Price for which on a per unit basis, is within $5,000.00 of any Unit in the Project.

"Conditional Commitment" means a HUD Conditional Commitment issued by the Federal Housing Administration or the United States Veterans Administration with respect to Units constructed or to be constructed in accordance with the Improvement Plans.

"Construction Contract" means, as to any Contractor, the agreement between the Borrower and the Contractor relating to services to be provided by the Contractor in connection with the Project.

"Contractor" means any Person engaged by the Borrower from time to time as a general contractor in connection with the Project.

"Cost Savings" means the excess, if any, of any Line Item over the actual Project Costs incurred in connection with the work associated with such Line Item, as determined by the Lender after such work has been completed and all such Project Costs have been paid in full and all Lien Claims and potential Lien Claims relating to such work have been released or otherwise discharged to the satisfaction of the Lender.

"Disbursement" means each disbursement of the proceeds of the Loan and each disbursement of any Borrower's Funds in accordance with the Disbursement Schedule or any Set Aside Letter or Letter of Credit. Without limitation on the foregoing, any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall

EXHIBIT 1

be deemed to be a disbursement of the proceeds of the Loan (or, in the case of any Set Aside Letter, a disbursement of Borrower's Funds, if applicable).

"Disbursement Account" has the meaning set forth in paragraph (a) of the Disbursement Schedule.

"Disbursement Request" means a written request for a Disbursement in a form approved by the Lender.

"Disbursement Schedule" means the "Disbursement Schedule" attached as Exhibit "B".

"Documents" means written documents and materials, including agreements, approvals, certificates, consents, instruments, financing statements, reports, budgets, forecasts and opinions.

"Environmental Indemnity" means the Environmental Indemnity executed by the Borrower in favor of the Lender and described in Exhibit "C".

"Events of Default" means the events set forth in § 6.01.

"Financial Statements" means balance sheets and income statements.

"Financing Commitment" means any Certificate of Reasonable Value, Conditional Commitment or Takeout Commitment.

"Flood Hazard Area" means an area which has been designated as a special flood hazard area or subject to comparable risks by the Federal Emergency Management Agency or any successor to such Agency.

"Governmental Agency" means (a) any government or municipality or political subdivision of any government or municipality, (b) any assessment, improvement, community facilities or other special taxing district, (c) any governmental or quasi-governmental agency, authority, board, bureau, commission, corporation, department, instrumentality or public body, (d) any court, administrative tribunal, arbitrator, public utility or regulatory body, or (e) any central Lender or comparable authority.

"Guarantor" means any Person who has executed or is required to execute a Guaranty, and such Person's successors and assigns.

"Guaranty" means any Guaranty executed in favor of the Lender and described in Exhibit "C".

"Improvement Plans" means the improvement plans and specifications described in Exhibit "C", as modified by any Change Orders approved by the Lender.

REVISED MAY 2003

F-3

**EXHIBIT 1**

"Improvements" means the Units and other improvements, including site development work (if any), constructed or to be constructed pursuant to the Improvement Plans.

"Land" means the land described in Exhibit "A".

"Laws" means all federal, state and local laws, rules, regulations, ordinances and codes.

"LC Bank " means a bank designated by the Lender as the LC Bank in connection with any Letter of Credit to be issued under this Agreement.

"Letter of Credit" means a standby letter of credit issued by an LC Bank for the account of the Lender, or for the account of the Borrower and the Lender, in favor of a surety, Governmental Agency or other Person approved by the Lender, to secure the payment of Project Costs by the Borrower or the payment or performance of other obligations of the Borrower in connection with the Project, in each case as approved by the Lender in its sole discretion.

"Letter of Credit Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Letter of Credit, in each case in the amount set forth in Exhibit "C".

"Letter of Credit Request" means a written request for a Letter of Credit in a form approved by the Lender.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest or other charge or encumbrance.

"Lien Claim" means (a) any mechanics lien affecting any of the Collateral, (b) any stop notice affecting the undisbursed portion of the Loan or any Borrower's Funds, (c) any right of any Person to assert or maintain any such mechanics lien or stop notice, and (d) any other claim to payment by any Lien Claimant.

"Lien Claimant" means the Contractor, if any, and any other Person who has furnished labor, service, equipment or material in connection with the Project or who is otherwise entitled to payment for any Project Costs.

"Line Item" means each of the separate items set forth in the Project Budget and in any Line Item Budget.

"Line Item Budget" means a budget for the Project in form and substance satisfactory to the Lender and setting forth in such detail as the Lender may require the nature and amount of all Project Costs anticipated in connection with the Project as such budget may be modified from time to time in accordance with the Disbursement Schedule.

"Loan" means the loan to be made by the Lender to the Borrower pursuant to this Agreement in an amount not to exceed the Loan Amount.

REVISED MAY 2003

**EXHIBIT 1**

"Loan Amount" means the amount of the Loan set forth in § 1.00.

"Loan Documents" means this Agreement, the Note, the Trust Deed, the Environmental Indemnity, the Guaranties, if any, and any Additional Collateral Agreements, as the same may be amended, renewed or extended from time to time.

"Loan Fee" means a nonrefundable loan fee to be paid by the Borrower to the Lender at or prior to the time of recordation of the Trust Deed in the amount set forth in Exhibit "C".

"Loan Party" means (a) the Borrower, (b) any Guarantor which at the time has or may have any obligation or liability (whether fixed, contingent or otherwise) under the Guaranty executed or to be executed by it, (c) any Person executing any Additional Collateral Agreements, and (d) in the case of any Loan Party which is a partnership, any general partner of such Loan Party.

"Maturity Date" means the maturity date of the Note; as such maturity date may be extended pursuant to this Agreement.

"Note" means the Promissory Note executed by the Borrower in favor of the Lender to evidence the Loan.

"Obligations" means all obligations of the Borrower of every nature under the Loan Documents.

"Other Requirements" means (a) the terms, conditions and requirements of all Project Agreements, Authorizations and Rights of Others relating to the Collateral or the Project and all other Documents, agreements and restrictions relating to, binding on or affecting the Collateral or the Project, including covenants, conditions and restrictions, leases, easements, reservations, rights and rights-of-way, (b) requirements relating to the sale or transfer of individual Units or common areas or portions of common areas or the supply of Utility Services to the Real Property, (c) requirements and recommendations of the soils report and any environmental impact report or negative declaration, (d) all building, zoning, land use, planning and subdivision requirements, and (e) requirements relating to construction of any offsite improvements or any construction contemplated by any Set Aside Letter or Letter of Credit.

"Permitted Exceptions" means (a) Liens in favor of the Lender, (b) Permitted Prior Exceptions, and (c) other matters expressly approved by the Lender in writing which are subject and subordinate to the Lien of the Trust Deed.

"Permitted Prior Exceptions" means (a) general ad valorem real property taxes which are not delinquent, (b) Special Taxes described in Part B of Exhibit "C" or otherwise approved in writing by the Lender which in each case are not delinquent, (c) mechanics liens affecting the Real Property and arising from the construction of the Improvements, over which the Title Policy has insured the priority of the Lien of the Trust Deed, and (d) such other matters as the Lender shall expressly approve in writing as "Permitted Prior Exceptions" for purposes of this Agreement.

**EXHIBIT 1**

"Permitted Transfer" means (a) any sale or other transfer of Units and common areas (or undivided interests in common areas) and the disposition of any excess proceeds of sale, in each case to the extent permitted by § 4.05, and (b) any transfer or other disposition of Personal Property permitted by § 4.06.

"Person" means any person or entity, whether an individual, trustee, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association or firm, joint venture, Governmental Agency or otherwise.

"Personal Property" means tangible personal property and fixtures, including building materials and supplies, appliances, furnishings, equipment and other "Goods" (as defined in the Trust Deed), but excluding construction equipment of a type intended for use in connection with other projects.

"Project" means the project for the acquisition and/or refinancing of the Land, the construction of the Improvements, the acquisition and installation of certain Personal Property and the development of the Land in accordance with the Improvement Plans, and the marketing and sale of Units.

"Project Agreements" means (a) the Architect Agreement, the Construction Contract, if any, any Financing Commitment and any other takeout, refinancing or permanent loan commitment issued or assigned to the Borrower with respect to the Real Property, and (b) all leases, rental agreements, service and maintenance agreements, purchase and sale agreements, purchase options and other agreements of any nature relating to the Collateral or the Project, including agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents and consultants.

"Project Budget" means the budget for the Project attached as Exhibit "D", as supplemented by each Line Item Budget approved by the Lender from time to time, in each case as modified from time to time in accordance with the Disbursement Schedule.

"Project Costs" means all costs and expenses of any nature relating to the Project or the financing of the Project.

"Real Property" means the Land and the Improvements and all other buildings, structures and improvements now or in the future located on the Land.

"Remedy" means any right, power or remedy.

"Representations" means the representations and warranties of the Borrower set forth in § 5.00 and all other representations, warranties and certifications to the Lender in the Loan Documents or in any other Document delivered under or in connection with the Loan Documents.

"Right of Others" means, as to any property in which a Person has an interest, any legal or equitable claim or other interest (other than a Lien but including a leasehold interest, a right of first refusal or a right of repossession or removal) in or with respect to such property held by any

REVISED MAY 2003

**EXHIBIT 1**

other Person, and any option or right held by any other Person to acquire any such claim or other interest or any Lien in or with respect to such property.

"Set Aside Letter" means (a) a letter from the Lender to a surety setting forth the Lender's undertaking to fund Project Costs for construction of Improvements to be bonded by the surety in connection with the Borrower's development of the Project, or (b) a letter from the Lender to a Governmental Agency setting forth the Lender's undertaking to fund Project Costs for construction of Improvements in connection with the Borrower's development of the Project.

"Set Aside Letter Fee" means·a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Set Aside Letter, in each case in the amount set forth in Exhibit "C".

"Set Aside Letter Request" means a written request for a Set Aside Letter in a form approved by the Lender.

"Special Tax" means, as to any property, (a) any special assessment or other Tax which is or may become a Lien affecting such property, other than general ad valorem real property taxes, and (b) any assessment, improvement, community facilities or other special taxing district in or into which such property is or may be located or incorporated or under which any special assessment or other Tax which is or may become a Lien affecting such property is or may be imposed.

"Takeout Commitment" means a commitment issued by an institutional lender to make permanent loans to purchasers of Units.

"Taxes" means all taxes, assessments, charges, fees and levies (including interest and penalties) imposed, assessed or collected by any Governmental Agency.

"Title Policy" means an ALTA extended coverage lender's policy of title insurance in form and substance satisfactory to the Lender, issued by an insurer selected by the Borrower and satisfactory to the Lender, together with such indorsements and policies of coinsurance and/or reinsurance as may be required by the Lender, in a policy amount equal to the Loan Amount, insuring the Trust Deed to be a valid first priority Lien on the Land and showing the Land to be subject only to Permitted Prior Exceptions.

"Trust Deed" means the Construction Trust Deed with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower to secure the Loan.

"Unit" means a single-family residential housing unit to be constructed on the Land in accordance with the Improvement Plans.

"Utility Services" means all utility services, including water, gas, electricity, telephone, garbage removal and sewer services.

EXHIBIT 1

| DOCUMENT: 19392640 | Pages: 5 |
|---|---|
| | Fees.... 21.00 |
| | Taxes... |
| | Copies.. |
| | AMT PAID 21.00 |

**imb**
# IndymacBank
Homebuilder Division

REGINA ALCOMENDRAS          RDE # 005
SANTA CLARA COUNTY RECORDER  4/19/2007
Recorded at the request of   2:03 PM
Fidelity National Title Ins.

RECORDING REQUESTED BY AND )
WHEN RECORDED MAIL TO:      )
IndyMac Bank, F.S. B.       )
155 North Lake Avenue, LK-11-19  )
Pasadena, California 91101  )
Attn: Digia Dam
Loan No. 49-0320000

51034570                Space Above for Recorder's Use

### ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS

(short form)

This Additional Advance And First Modification Agreement To The Building Loan Agreement; Promissory Note; Construction Deed Of Trust With Assignment Of Rents, Security Agreement And Fixture Filing And Other Loan Documents ("Agreement-(short form)") is made as of February 14, 2007, by Eden Garden LLC, a California limited liability company ("Borrower") and INDYMAC BANK, F.S.B. ("Lender").

<u>Factual Background</u>

A.     Under a building loan agreement dated September 30, 2005, (the "Loan Agreement"), Lender agreed to make a loan (the "Loan") to Borrower. The Loan Agreement has subsequently been modified by that certain First Modification to Building Loan Agreement and Loan Documents dated February 14, 2007 ("First Modification"). The First Modification and Loan Agreement are hereinafter referred to collectively as the "Loan Agreement". Capitalized terms used here without definition have the meanings given to them in the Loan Agreement.

B.     The Loan is evidenced by a Note dated September 30, 2005, made payable to Lender in the stated principal amount of $5,904,000.00. The Note is secured by a Deed of Trust dated September 30, 2005, executed by Borrower as trustor, Fidelity National Title Insurance Company, whose address is 4041 MacArthur Boulevard, Suite 490, Newport Beach, California 92660, as trustee, for the benefit of Lender as beneficiary. The Deed of Trust was recorded on November 08, 2005 in the Official Records of Santa Clara County, California, as Instrument No. 18668901. The Deed of Trust encumbers certain Property located in Santa Clara County, California, as more particularly therein described.

C.     As used here, the term "Loan Documents" means the Loan Agreement, the Note, the Deed of Trust, and any other documents executed in connection with the Loan, including those which evidence, guaranty, secure or modify the Loan, as any or all of them may have been amended to date.

D.     Lender and Borrower have agreed to modify the Loan as provided in an Additional Advance and First Modification Agreement to Building Loan Agreement and First Modification to Trust Deed and Loan Documents (the "Agreement") of the same date as this Agreement-(short form). This Agreement-(short form) and the Agreement are Loan Documents.

Additional Advance Mod
Loan Number: 49-0320000

**EXHIBIT 1**

<u>Agreement</u>

Therefore, Borrower and Lender agree as follows:

      1.      The Agreement is incorporated in this Agreement-(short form) reference, the same as though set forth here in full.

      2.      The Loan is amended on the terms and subject to the conditions of the Agreement. Among other things, the stated principal amount of the Note is now increased to $6,820,628.00 and the budget and release prices have been revised.

      3.      The Deed of Trust is modified to secure payment and performance of the Loan as amended to date, in addition to all other "Secured Obligations" as therein defined. The foregoing notwithstanding, certain obligations continue to be excluded from the Secured Obligations, as provided in the Deed of Trust.

"BORROWER"

Eden Garden, LLC,
a California limited liability company

By: _____
    Ali K. Amidi, Managing Member

"LENDER"

INDYMAC BANK, F.S.B.

By: _____
    Grace Soueidan, First Vice President

**EXHIBIT 1**

## ACKNOWLEDGEMENT

STATE OF  CALIFORNIA      )
COUNTY OF SANTA CLARA   )

On ____2/21____, 2007, before me, HOUMAN SIASI , a
Notary Public, personally appeared ALI K. AMIDY
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

> HOUMAN S. SIASI
> COMM. #1709956
> NOTARY PUBLIC - CALIFORNIA
> SANTA CLARA COUNTY
> COMM. EXPIRES DEC. 10, 2010

_____
(Signature)

(Space above for official notarial seal)

## ACKNOWLEDGEMENT

STATE OF _____   )
COUNTY OF _____   )

On _____, 20___, before me, _____, a
Notary Public, personally appeared _____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

(Space above for official notarial seal)

Additional Advance Mod
Loan Number: 49-0320000

**EXHIBIT  1**

## ACKNOWLEDGEMENT

STATE OF CALIFORNIA )
COUNTY OF SANTA CLARA )

On 2/21 , 2007, before me, HOUMAN SIASI , a
Notary Public, personally appeared ALI K. AMADI ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

> HOUMAN S. SIASI
> COMM. #1709956
> NOTARY PUBLIC - CALIFORNIA
> SANTA CLARA COUNTY
> COMM. EXPIRES DEC. 10, 2010

_____
(Signature)

(Space above for official notarial seal)

---

## ACKNOWLEDGEMENT

STATE OF California )
COUNTY OF Los angeles )

On APRIL 13, 2007 20— before me, Digia Dam , a
Notary Public, personally appeared Grace Rouidan ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

> DIGIA DAM
> Commission # 1639057
> Notary Public - California
> Los Angeles County
> My Comm. Expires Jan 17, 2010

(Space above for official notarial seal)

Additional Advance Mod
Loan Number. 49-0320000

**EXHIBIT 1**



**IndymacBank**
Homebuilder Division

Loan Number 49-0320000

## ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS

(Long Form)

This Additional Advance And First Modification Agreement To The Building Loan Agreement; Promissory Note; Construction Deed Of Trust With Assignment Of Rents, Security Agreement And Fixture Filing And Other Loan Documents (the "Agreement") is dated as of February 14, 2007, by and between Eden Garden LLC, a California limited liability company ("Borrower") and INDYMAC BANK, F.S.B. ("Lender") as follows:

## R E C I T A L S :

A. Unless otherwise defined herein, all initially-capitalized terms used herein shall have the same meanings ascribed to such terms in the Loan Agreement (as hereinafter defined).

B. Borrower and Lender have entered into that certain Building Loan Agreement, dated as of September 30, 2005 (the "Loan Agreement"), pursuant to the terms and conditions of which Lender agreed to make a loan (the "Loan") to Borrower in the stated principal amount of $5,904,000.00. The Loan Agreement has subsequently been modified by that certain First Modification Agreement to the Building Loan Agreement and Loan Documents dated February 14, 2007 ("First Modification"). The First Modification and Loan Agreement are hereinafter referred to collectively as the "Loan Agreement". The Loan is evidenced by that certain Promissory Note, dated September 30, 2005, in the original principal amount of $5,904,000.00, executed by Borrower, and payable to the order of Lender (the "Note").

C. The repayment of the Note and Borrower's performance of its obligations under the Loan Agreement and the other Loan Documents are secured, inter alia, by (i) that certain Construction Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated as of September 30, 2005, executed by Borrower, as Trustor, to Fidelity National Title Insurance Company, whose address is 4041 MacArthur Boulevard, Suite 490, Newport Beach, California 92660, as Trustee, in favor of Lender, as Beneficiary, recorded on November 08, 2005, as Instrument No. 18668901, in the Official Records of Santa Clara County, California (the "Trust Deed").

D. The Loan Documents also include that certain General Guaranty, Environmental Guaranty, and that certain Completion Guaranty, each dated as of September 30, 2005, executed by Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC, a California limited liability company (individually and collectively, the "Guarantor"), in favor of the Lender. The General Guaranty and the Environmental Guaranty shall hereinafter be referred to collectively as the "Guaranty".

E. In connection with the Loan, Borrower executed an Unsecured Indemnity Agreement ("Borrower's Unsecured Indemnity"). Borrower's Unsecured Indemnity is not a Loan Document, as defined below.

**EXHIBIT 1**

F.     Borrower has requested that Lender increase the amount of the Loan from $5,904,000.00 to $6,820,628.00 and Lender is willing to do so upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Borrower and Lender hereby incorporate the foregoing Recitals by reference herein and further agree as follows:

1.     Modification to Loan Agreement.

(a)     Loan Amount.  The Loan Amount referenced in § 1.00 of the Loan Agreement, and elsewhere in the Loan Agreement and in the other Loan Documents, is hereby amended to read as $6,820,628.00, which includes additional Loan funds in the amount of $916,628.00.

(b)     Loan Fees.  At or prior to the time of recordation of the First Modification to Trust Deed and Loan Documents referenced in this Agreement, Borrower shall pay to Lender a nonrefundable Loan fee with respect to the additional advance in the amount of $66,540.00, an Appraisal fee in the amount of $6,500.00, a Loan Documentation fee in the amount of $300.00, and a Title Modification Endorsement and Recording fees in the amount of $609.00 (estimated).

(c)     Loan.  All references in the Loan Agreement and in the other Loan Documents to the Loan shall mean and refer to the Loan, as amended herein.

(d)     Loan Documents.  All references in the Loan Agreement and in the other Loan Documents to the Loan Documents shall mean and refer to the Loan Documents, as amended herein.  The Loan Documents, however, do not include Borrower's Unsecured Indemnity.  This Agreement is a Loan Document.

(e)     Section "J" of Exhibit "C" in the Loan Agreement under "Sales Start Date" shall be amended and replaced with the following:

"J.     Sales Start Date.  The Borrower shall cause the first Unit to be available for sale no later than July 30, 2007."

(f)     Section "L" of Exhibit "C" in the Loan Agreement under "Unit Closings" shall be amended and replaced with the following:

"L.     Unit Closings.  The Borrower shall cause the first Unit to close no later than September 30, 2007 and shall cause not less than three (3) Units to be closed during each month, commencing after the first Unit closing or September 30, 2007, whichever is sooner."

(f)     Exhibit "D" Budget line items shall be amended and superseded with the following line item increases:

"Additional Advance of $916,628.00 applied as follows:

| SITE: | #2005 Site Drainage | $24,000.00 |
|---|---|---|
| | #2008 Utility Trenching | $68,000.00 |
| | #2010 Sewer Hook-up/Pumps | $145,000.00 |

**EXHIBIT 1**

| DIRECT CONSTRUCTION: | #3005 Rough Framing-Labor/Material | $238,590.00 |
|---|---|---|
| | #3008 Rough HVAC | $65,000.00 |
| | #3010 Fireplaces including Flues | $10,000.00 |
| | #3018 Garage Doors | $4,000.00 |
| | #3020 Drywall/Plaster | $51,600.00 |
| | #3027 Interior Paintings/Wall Covering | $32,000.00 |
| INDIRECT COSTS: | #4003 Permits & Fees | $104,489.00 |
| FINANCING COSTS: | #6010 Inspection Fees | $6,600.00 |
| | #6012 Loan Extension/Mod Fees | $66,540.00 |
| | #6013 Mod/Appraisal Fees | $6,500.00 |
| | #6014 Mod/Loan Documentation Fees | $300.00 |
| | #6015Mod/Title 110.10 Endorsement Fee | $609.00 |
| GENERAL CONTINGENCY: | #7001 Contingency | $93,400.00 |
| | Additional Advance Total: | $916,628.00 |

(g)     Exhibit "E" Minimum Release Prices shall be amended and replaced with the following:

## "MINIMUM RELEASE PRICES"

(Residential Tract Construction)

| Plan | Number of Units | Release Prices - 110% of PAR per Unit | Approx. SQFT |
|---|---|---|---|
| A | 2 | $406,745.00 | 1,217 |
| A-1 | 1 | $414,008.00 | 1,234 |
| B | 3 | $457,588.00 | 1,736 |
| C | 1 | $421271.00 | 1,358 |
| C-1 | 3 | $421,271.00 | 1,362 |
| C-2 | 1 | $421,271.00 | 1,286 |
| C-3 | 1 | $421,271.00 | 1,344 |
| D | 1 | $428,535.00 | 1,521 |
| E | 2 | $384,955.00 | 1,142 |
| E-1 | 1 | $384,955.00 | 1,143 |
| F | 1 | $392,218.00 | 1,167 |
| G | 1 | $399,482.00 | 1,173 |

(h)     The defined term "Note" referenced in Exhibit "F" attached to the Loan Agreement shall be amended and replaced with the following:

"Note" means the Promissory Note and the **ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST**

**EXHIBIT 1**

**WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS** executed by the Borrower in favor of Lender.

(i)    Paragraph 5.10 is hereby added to the Loan Agreement as follows:

5.10   <u>Compliance with Laws</u>. Without in any way limiting any of Borrower's other representations, warranties or covenants contained in this Agreement, Borrower hereby represents, warrants and covenants that the Improvement Plans are, and the construction of the Improvements according thereto will be, in compliance with all applicable federal, state and local laws, rules, regulations, ordinances and codes, including without limitation the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et. seq., as amended, and the Fair Housing Act, 42 U.S.C. § 3601, et. seq., as amended.

2.   <u>Modification to Note</u>.

(a)    The dollar amount of "$5,904,000.00" set forth in the upper left hand corner of the Note is hereby deleted and restated in its entirely to read "$6,820,628.00".

(b)    Paragraphs 1 and 2 of the Note are hereby deleted and restated in its entirely to read as follows:

"1.   FOR VALUE RECEIVED, the Borrower promises to pay to the Lender, or order, at the Lender's office located at 155 North Lake Avenue, LK-11-19, Pasadena, California 91101, Attention: Homebuilder Division - PBG (or such other location specified by the Lender from time to time in writing), the principal amount of Six Million Eight Hundred Twenty Thousand Six Hundred Twenty-Eight Dollars and No Cents ($6,820,628.00), or so much of such amount as may be advanced by or on behalf of the Lender from time to time, together with interest as provided in § 3 below."

"2.   If not sooner paid, the principal of this Note shall be payable on March 28, 2008 (the "Maturity Date"). Accrued interest shall be payable on the first day of each calendar month, on the Maturity Date and on the date of final payment of the principal of this Note in full, except that any interest which accrues after the Maturity Date or the acceleration of the maturity of this Note shall be payable immediately and without demand."

(c)    Sub-paragraph (e) is hereby added to Section 3 in the Note as follows:

"3. (e)  Accrued interest not paid to Lender on or before the twentieth (20[th]) calendar day of each month in which it becomes due, Borrower shall pay, upon demand by the Lender, a late or collection charge equal to five percent (5.00%) of the amount of such unpaid interest payment. Borrower agrees that this late or collection charge represents a reasonable sum considering all of the circumstances existing on the date of execution of this Note and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower further agrees that proof of actual damages would be costly and inconvenient. Acceptance by Lender of payment of the late or collection charge payable pursuant to this Section 3(e) will not constitute a waiver of the Event of Default which occurred by reason of the failure of Borrower to make timely

**EXHIBIT 1**

payment and will not prevent Lender from exercising any other rights or remedies available to Lender by reason of such Event of Default."

3.      Modification to Trust Deed. Clause (a) of Section 2.00 of the Trust Deed is hereby deleted and restated in its entirely to read as follows:

(a)      all present and future indebtedness evidenced by the Note dated the date of this Trust Deed in the face principal amount up to $6,820,628.00 executed by Trustor in favor of Beneficiary, including principal, interest and all other amounts payable under the terms of the Note, and any and all supplements, amendments and modifications thereto and any and all extensions and renewals thereof;"

4.      Modification to All Loan Documents.  All of the Loan Documents shall be amended to reflect that the Loan Amount has been increased $916,628.00 to $6,820,628.00, and that such Loan Documents have been modified by this Agreement, together with any and all amendments, modifications and supplements thereto.

5.      Representations and Warranties. Borrower hereby represents and warrants to Lender that:

(a)      Borrower has full power and authority to execute, deliver and perform its obligations under this Agreement, and this Agreement is binding upon, and enforceable against Borrower in accordance with its terms; and

(b)      As of the date hereof, there is no Event of Default hereunder or under the Loan Agreement, the Note, the Trust Deed, or any of the other Loan Documents, and no event exists which, with the giving of notice or the passage of time, or both, would give rise to an Event of Default hereunder or thereunder.

6.      Reaffirmation of Obligations.   Borrower hereby acknowledges and reaffirms its obligations under the Loan Agreement, the Note, the Trust Deed, and the other Loan Documents, as such documents have been amended by this Agreement, and agrees that any reference made in the Loan Agreement, the Note, the Trust Deed, or any of the other Loan Documents, to such document shall mean as amended pursuant to this Agreement.

7.      Events of Default. The breach or default by Borrower of any term, covenant, agreement, condition, provision, representation or warranty contained herein, and the expiration of any applicable cure period set forth in the Loan Agreement or in such other applicable Loan Document, shall constitute an Event of Default under the Loan Agreement and shall give Lender the right, exercisable at Lender's sole option, to pursue any or all of its remedies under the Loan Documents.

8.      Closing Conditions.      Notwithstanding anything to the contrary contained herein, the modification to the Loan Documents set forth herein shall not be effective prior to the date that the Agreement-(short form) (as defined below) has been recorded in the Official Records of Santa Clara County, California, and Borrower has delivered or caused to be delivered to Lender the following items, all of which shall be satisfactory in form and content to Lender and, if applicable, duly executed (and acknowledged where necessary) by the appropriate parties thereto:

(a)      The **ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY**

**EXHIBIT 1**

**AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS**
("Agreement-(short form)") dated the date hereof.

     (b)    Exhibit "A" attached to this Agreement, executed by each Guarantor in favor of the Lender (the "Reaffirmation of Guaranty"), under the terms of which each Guarantor reaffirms its obligations under each Guaranty and each Environmental Guaranty;

     (c)    An updated preliminary title report for the Land and evidence satisfactory to Lender that the title insurer under the Lender's Title Policy is prepared to issue such endorsement, including 110.10 endorsement, to the Lender's Title Policy as required by Lender in its reasonable discretion, all of which shall be in form and substance satisfactory to Lender;

     (d)    Federal Tax Returns for 2005 for Eden Garden LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

     (e)    Such other documents, materials or information as Lender may reasonably require.

    9.    Modification to Loan Documents. Upon the recording of the Agreement-(short form) with the Official Records of Santa Clara County, California, the parties hereto agree that the Loan Agreement, the Note, the Trust Deed and the other Loan Documents shall be amended in the manner and to the extent set forth herein.

    10.    Effect on Loan Documents. Except as specifically amended pursuant to the terms of this Agreement, the terms and conditions of the Loan Agreement, the Note, the Trust Deed and the other Loan Documents shall remain unmodified and in full force and effect.

    11.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

    12.    Counterparts. This Agreement may be executed in counterparts, all of which executed counterparts shall together constitute a single document. Signature pages may be detached from the counterparts and attached to a single copy of this document to physically form one document.

    13.    Submission of Agreement. The submission of this Agreement to Borrower or its agents or attorneys for review or signature does not constitute a commitment by Lender to increase the Loan Amount, and this Agreement shall have no binding force or effect until the closing conditions under Section 8 above have been satisfied.

    14.    Indemnification and Waiver.

     (a)    Indemnification. Refer to Section 4.13 of the Agreement.

     (b)    Waivers and Amendments. Refer to Section 7.01 of the Agreement.

     (c)    Non-Reliance and Non-Liability. Refer to Section 7.05 of the Agreement.

     (d)    Waiver of Jury Trial. Refer to Section 7.13 of the Agreement.

**EXHIBIT 1**

15. _Entire Agreement._ This Agreement and the Exhibits hereto, contains the entire agreement between the parties relating to the subject matter hereof. Any oral representations or statements concerning the subject matter hereof or thereof shall be of no force or effect.

"BORROWER"

Eden Garden, LLC,
a California limited liability company

By: _____
     Ali K. Amidy, Managing Member

"LENDER"

INDYMAC BANK, F.S.B.

By: _____
     Grace Soueidan, First Vice President

**EXHIBIT 1**

Exhibit "A"

REAFFIRMATION OF GENERAL GUARANTY AND ENVIRONMENTAL GUARANTY IN
CONNECTION WITH ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO
THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST
WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER
LOAN DOCUMENTS, DATED SEPTEMBER 30, 2005.

Pursuant to that certain Building Loan Agreement dated as of September 30, 2005 by and
between INDYMAC BANK, F.S.B., (the "Lender"), Eden Garden LLC, a California limited liability
company(the "Borrower"), Lender agreed to make a loan to Borrower in the amount of $5,904,000.00
(the "Loan"). The Loan is evidenced by that certain Promissory Note, dated September 30, 2005,
executed by Borrower and payable to the order of Lender (the "Note"). Capitalized terms not otherwise
defined herein shall have the same meaning given to such terms in the Loan Agreement.

Pursuant to that certain General Guaranty (the "Guaranty"), dated as of September 30, 2005, and
that certain Environmental Guaranty (the "Environmental Guaranty") dated as of September 30, 2005,
executed by Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC, a California
limited liability company (individually and collectively the "Guarantor"), Guarantor has guaranteed the
punctual and complete payment and performance when due of certain obligations of the Borrower to the
Lender under the Loan Documents, and has guaranteed the punctual and complete payment and
performance of certain obligations of the Borrower to the Lender under the Environmental Indemnity.

Guarantor understands that Lender and Borrower have agreed to modify the Loan Documents for
the purpose of, among other things, increasing the Loan Amount from $5,904,000.00 to $6,820,628.00,
all as more particularly set forth in that certain **ADDITIONAL ADVANCE AND FIRST
MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY
NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY
AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS**], dated the date
hereof (the "Agreement"), between Borrower and Lender.

By this Exhibit "A", Guarantor acknowledges and agrees that Guarantor has read, consulted with
its attorneys regarding, and understands that this consent to the execution of this Agreement dated the
date hereof, agrees to remain fully bound by the Guaranty and Environmental Guaranty notwithstanding
the modification of the Loan Documents evidenced by the execution and delivery of the Agreement, and
agrees that any reference made in the Guaranty or in the Environmental Guaranty to any of the Loan
Documents or any terms or conditions contained therein shall mean such loan documents, terms or
conditions as modified by this agreement.

[The remainder of this page has been left intentionally blank. The signature page(s) follow(s).]

**EXHIBIT 1**

Exhibit "A" (continued)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR"

_____
Ali K. Amidy, an individual

Guarantor's Address:
16840 Cypress Way
Los Gatos, CA 95032

_____
Guiti Nahavandi Amidy, an individual

16840 Cypress Way
Los Gatos, CA 95032

Centra Net Investment, LLC,
a California limited liability company

Centra Net Investment, LLC
655 Campbell Technology Park, Suite 125
Campbell, CA 95008

By:_____
Ali K. Amidy, Managing Member
04-8-07

Additional Advance Mod
Loan Number: 49-0320000

Page 9 of 9

**EXHIBIT 1**

Title No. 05-**51034570**-B-PM
Locate No. CAFNT0943-0943-0051-0051034570

## LEGAL DESCRIPTION

### EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE , COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

APN: 455-52-036 through 455-52-053

CLTA Preliminary Report Form (11/17/04)

**EXHIBIT 1**

9/30/05

Loan No. 49-0320000

**GENERAL GUARANTY**

(Real Estate Secured Loan)

TO:  INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated September 30, 2005, is made by Ali K. Amidy and Guiti Nahavandi Amidy (individually and collectively the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty between the Lender and Eden Garden, LLC, a California limited liability company (the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference. The Agreement provides, among other things, for rules of construction which apply to this Guaranty.  Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $5,904,000.00 (the "Loan") to finance the real estate project of the Borrower known as Eden Garden Townhomes (the "Project").  The Loan will be secured by a Trust Deed executed by the Borrower with respect to the Project.  As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.      Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $5,904,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise.  Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

REVISED MAY 2003

**EXHIBIT 2**

2

2.     Nature of Guaranty.  This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan.  This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.     Obligations Independent.  The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security.  The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security.  The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.     Action with Respect to Other Obligations or Security.  The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to:  (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

REVISED MAY 2003

**EXHIBIT 2**

<u>3</u>

5.    <u>Waiver of Defenses</u>.  The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of:  (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party.  Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

        The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property.  This means, among other things:

1.    The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2.    If the Lender forecloses on any real property collateral pledged by the Borrower:

    (A)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

    (B)    The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

REVISED MAY 2003

**EXHIBIT 2**

4

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a nonjudicial sale or other disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of California or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.      Waiver of Reimbursement Rights. Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.      Representations of the Guarantor. The Guarantor represents and warrants to the Lender that: (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

REVISED MAY 2003

EXHIBIT 2

5

8.    Financial Statements and Tax Returns. The Guarantor hereby agrees to deliver to the Lender, the following: (a) within 90 days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year, (b) upon request by the Lender from time to time, quarterly Financial Statements in form and detail satisfactory to the Lender within 30 days of quarter end, Tax Returns for the Guarantor within 30 days of filing, and copies of audited Financial Statements prepared for the Guarantor, in each case certified in a manner acceptable to the Lender.

9.    Indemnification by the Guarantor. Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.    Rights of Setoff. Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.    Waivers and Amendments. No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.    Remedies. Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.    Costs and Expenses. The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

REVISED MAY 2003

**EXHIBIT 2**

6

14.    Notices.  All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of California as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement. Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.    Binding Agreement.  This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender.  The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.    Multiple Guarantors.  If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.    Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of California.

18.    Time of Essence.  Time is of the essence of each and every provision of this Guaranty.

19.    Nature of Waivers.  THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.    Waiver of Jury Trial.  EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

**[Signatures Commence on Next Page]**

REVISED MAY 2003

**EXHIBIT_2**

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR":

_____  
Ali K. Amidy

_____  
Guiti Nahavandi Amidy

Guarantor's Address:  
16840 Cypress Way  
Los Gatos, CA 95032

REVISED MAY 2003

**EXHIBIT 2**

Loan No. 49-0320000

## GENERAL GUARANTY

(Real Estate Secured Loan)

TO:  INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated September 30, 2005, is made by Centra Net Investment, LLC, a California limited liability company (the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty between the Lender and Eden Garden, LLC, a California limited liability company (the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference. The Agreement provides, among other things, for rules of construction which apply to this Guaranty.  Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $5,904,000.00 (the "Loan") to finance the real estate project of the Borrower known as Eden Garden Townhomes (the "Project").  The Loan will be secured by a Trust Deed executed by the Borrower with respect to the Project.  As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.      Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $5,904,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise.  Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

REVISED MAY 2003

**EXHIBIT  3**

2

2.    Nature of Guaranty. This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan. This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred. The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.    Obligations Independent. The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security. The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security. The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.    Action with Respect to Other Obligations or Security. The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to: (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

REVISED MAY 2003

EXHIBIT 3

3

5.  Waiver of Defenses. The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of: (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party. Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property. This means, among other things:

1.  The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2.  If the Lender forecloses on any real property collateral pledged by the Borrower:

    (A)  The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

    (B)  The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

REVISED MAY 2003

**EXHIBIT 3**

4

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a nonjudicial sale or other disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of California or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.    Waiver of Reimbursement Rights. Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.    Representations of the Guarantor. The Guarantor represents and warrants to the Lender that: (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

REVISED MAY 2003

**EXHIBIT 3**

5

8.      Financial Statements and Tax Returns.  The Guarantor hereby agrees to deliver to the Lender, the following:  (a) within 90 days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year, (b)  upon request by the Lender from time to time, quarterly Financial Statements in form and detail satisfactory to the Lender within 30 days of quarter end, Tax Returns for the Guarantor within 30 days of filing, and copies of audited Financial Statements prepared for the Guarantor, in each case certified in a manner acceptable to the Lender.

9.      Indemnification by the Guarantor.  Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.     Rights of Setoff.  Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.     Waivers and Amendments.  No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.     Remedies.  Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document.  Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine.  No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.     Costs and Expenses.  The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

REVISED MAY 2003

**EXHIBIT 3**

6

14.     Notices.  All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of California as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement. Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.     Binding Agreement.  This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender.  The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.     Multiple Guarantors.  If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.     Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of California.

18.     Time of Essence.  Time is of the essence of each and every provision of this Guaranty.

19.     Nature of Waivers.  THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.     Waiver of Jury Trial.  EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

**[Signatures Commence on Next Page]**

REVISED MAY 2003

**EXHIBIT 3**

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR":

Centra Net Investment, LLC,                    Guarantor's Address:
a California limited liability company          Centra Net Investment, LLC
                                                655 Campbell Technology Park, Ste. 125
By: _____ 10-11-05                  Campbell, CA 95008
    Ali K. Amidy, Managing Member

REVISED MAY 2003

**EXHIBIT 3**

 

## SHEPPARD MULLIN
#### SHEPPARD MULLIN RICHTER & HAMPTON LLP
A T T O R N E Y S   A T   L A W

48th Floor | 333 South Hope Street | Los Angeles, CA 90071-1448
213-620-1780 *office* | 213-620-1398 *fax* | *www.sheppardmullin.com*

pWriter's Direct Line: 714-424-2853
mwallin@sheppardmullin.com

April 7, 2008

Our File Number: 0TBY-135376

*VIA E-MAIL AND U.S. MAIL*
*aliamidy@aol.com*

Eden Garden, LLC
Attn: Ali Amidy, Managing Member
P.O. Box 369
Los Gatos, California 95031

Re:     IndyMac Loan to Eden Garden, LLC – Loan No. 49-0320000 (the "Loan")

Dear Mr. Amidy:

Pursuant to a Building Loan Agreement (Residential Tract Construction) dated as of September 30, 2005, as amended by that certain Additional Advance and First Modification Agreement dated February 14, 2007 (as amended, the "Loan Agreement") between IndyMac Bank, F.S.B. ("Lender") and Eden Garden, LLC, a California limited liability company ("Borrower"), Lender agreed to make a Loan to Borrower in the maximum amount of Six Million Eight Hundred Twenty Thousand Six Hundred Twenty Eight and No/100 Dollars ($6,820,628.00) (the "Loan"). The Loan is evidenced by that certain Promissory Note dated as of September 30, 2005 (the "Note") and is secured by that certain Construction Trust Deed With Assignment Of Rents, Security Agreement And Fixture Filing from Borrower in favor of Lender dated as of September 30, 2005 and recorded with the Santa Clara County Recorder on November 8, 2005, as Document No. 18668901. The Loan is guaranteed by Ali K. Amidy, an individual, Guiti Nahavandi Amidy, an individual, and Centra Net Investment, LLC, a California limited liability company (collectively, "Guarantors") pursuant to (1) certain General Guaranties dated as of September 30, 2005, and (2) certain Environmental Guaranties dated as of September 30, 2005. The Loan is also evidenced and secured by other documents and instruments collectively, with the documents described above, the "Loan Documents." Initially capitalized terms in this letter, unless otherwise defined herein, shall have the definitions ascribed in the Loan Documents.

The maturity date ("**Maturity Date**") of the Loan occurred on March 28, 2008. Borrower failed to pay the Loan in full on the Maturity Date, which failure constituted an "Event of Default" under the Loan Agreement without the necessity of any further notice or demand.

**EXHIBIT 4**

 

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Eden Garden, LLC
April 7, 2008
Page 2

Please note that there may be other defaults under the Loan Documents that are not identified in this letter, which defaults are not intended to be and shall not be waived or excused by Lender, notwithstanding that they are not set forth in this letter.

As an accommodation only, Lender hereby makes formal demand upon Borrower for immediate payment in full of all principal, interest, charges, costs, expenses and attorneys' fees incurred by Lender and allowed by law and under the Loan Documents. The principal and interest owing on the Note as of April 4, 2008 is (i) $4,814,781.69 in principal, and (ii) $41,399.98 in accrued interest, plus charges, costs, expenses and attorneys' fees which continue to accrue.

By this letter, Lender also hereby notifies Guarantors of the defaults stated in this letter, and makes demand upon Guarantors for full payment of all amounts owing under the Loan Documents, for which they are independently liable.

Nothing contained in this letter shall diminish, prejudice or waive any of Lender's rights and remedies under the Loan Documents or the Guaranties or at law or in equity, and Lender expressly reserves all of such rights and remedies. Further, any discussions, proposals, drafts, communications or courses of conduct that Borrower, Guarantors and Lender have previously had or may hereafter have are not intended to and shall not create any commitment (express or implied) to waive any defaults or excuse strict performance by Borrower or Guarantors under the terms of the Loan Documents, or to modify any of the terms of the Loan Documents. No officer or representative of Lender has any authority to bind Lender without formal credit approval and a written agreement executed by Lender.

If you have any questions, or want an exact payoff figure, please contact Joyce Barrone at IndyMac Bank.

Sincerely,

Michael A. Wallin

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:3MAW1\400767328.1

**EXHIBIT 4**

 

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Eden Garden, LLC
April 7, 2008
Page 3

cc:   Ali K. Amidy  (E-Mail and U.S. Mail)
      P.O. Box  369
      Los Gatos, California  95031

      Guiti Nahavandi Amidy (Via U.S. Mail)
      P.O. Box  369
      Los Gatos, California  95031

      Centra Net Investment, LLC (Via U.S. Mail)
      655 Campbell Technology Park, Suite 125
      Campbell, California  95008

      Joyce Barrone (Via E-Mail joyce.barrone@imb.com)
      Gary Arnett (Via-Email gary.arnett@imb.com)

**EXHIBIT 4**

 

**SHEPPARD MULLIN**

A T T O R N E Y S   A T   L A W

650 Town Center Drive | 4th Floor | Costa Mesa, CA 92626-1993
714-513-5100 *office* | 714-513-5130 *fax* | *www.sheppardmullin.com*

Writer's Direct Line: 714-424-2804
kfox@sheppardmullin.com

October 24, 2008

Our File Number: 0TBY-135376

*(VIA U.S. FIRST CLASS MAIL AND
U.S. CERTIFIED MAIL)*

Eden Garden, LLC
Attn: Ali Amidy, Managing Member
P.O. Box 369
Los Gatos, California 95031

Eden Garden, LLC
Attn: Ali Amidy, Managing Member
16840 Cypress Way
Los Gatos, California 95030

Re:   IndyMac Loan to Eden Garden, LLC – Loan No. 49-0320000 (the "Loan")

Dear Mr. Amidy:

This firm represents Indymac Federal Bank, FSB ("Lender") with respect to the matters set forth below.

Pursuant to a Building Loan Agreement (Residential Tract Construction) dated as of September 30, 2005, as amended by that certain Additional Advance and First Modification Agreement dated February 14, 2007 (as amended, the "Loan Agreement") between IndyMac Bank, F.S.B. and Eden Garden, LLC, a California limited liability company ("Borrower"), IndyMac Bank, F.S.B. agreed to make a Loan to Borrower in the maximum amount of Six Million Eight Hundred Twenty Thousand Six Hundred Twenty Eight and No/100 Dollars ($6,820,628.00) (the "Loan"). The Loan is evidenced by that certain Promissory Note dated as of September 30, 2005 (the "Note") and is secured by that certain Construction Trust Deed With Assignment Of Rents, Security Agreement And Fixture Filing from Borrower in favor of IndyMac Bank, F.S.B. dated as of September 30, 2005 and recorded with the Santa Clara County Recorder on November 8, 2005, as Document No. 18668901. The Loan is guaranteed by Ali K. Amidy, an individual, Guiti Nahavandi Amidy, an individual, and Centra Net Investment, LLC, a California limited liability company   (collectively, "Guarantors") pursuant to (1) certain General Guaranties dated as of September 30, 2005, and (2) certain Environmental Guaranties

**EXHIBIT 5**

 

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Eden Garden, LLC
October 24, 2008
Page 2

dated as of September 30, 2005. The Loan is also evidenced and secured by other documents and instruments collectively, with the documents described above, the "Loan Documents." Initially capitalized terms in this letter, unless otherwise defined herein, shall have the definitions ascribed in the Loan Documents.

As previously noted in that certain default letter sent to the parties dated April 7, 2008, the maturity date ("Maturity Date") of the Loan occurred on March 28, 2008. Borrower failed to pay the Loan in full on the Maturity Date, which failure constituted an "Event of Default" under the Loan Agreement without the necessity of any further notice or demand.

Please note that there may be other defaults under the Loan Documents that are not identified in this letter, which defaults are not intended to be and shall not be waived or excused by Lender, notwithstanding that they are not set forth in this letter.

As an accommodation only, Lender hereby makes formal demand upon Borrower for immediate payment in full of all principal, interest, charges, costs, expenses and attorneys fees incurred by Lender and allowed by law and under the Loan Documents. The principal and interest owing on the Note as of October 24, 2008 is (i) $4,961,454.77 in principal, and (ii) $257,233.95 in accrued interest from March 1, 2008 to October 24, 2008. In addition, interest will accrue thereafter on a daily basis in the amount of $1,102.55 per day (subject, however, to change if the "Prime Rate" as defined in the Note changes) until October 31, 2008, after which interest will accrue at the "Alternate Rate" as more particularly described below. In addition, a late charge is owing for each monthly installment not received by Lender by the 20th calendar day of the month prior to the Maturity Date. In addition, Lender may have or may hereafter incur costs and attorneys fees as a result of the defaults under the Loan, that are also owing to Lender. An exact payoff number will be provided upon request to Lender.

By this letter, Lender also hereby notifies Guarantors of the defaults stated in this letter, and makes demand upon Guarantors for full payment of all amounts owing under the Loan Documents, for which they are independently liable.

As an accommodation only, and without waiving any Event of Default or establishing a course of dealing or performance or creating any reliance or expectancy rights, if Borrower or Guarantors pay to Lender, in immediately available funds received on or before 5:00 PM (California time) on October 31, 2008, all amounts owing with respect to the Loan, Lender will not charge default interest at the "Alternate Rate" provided for in the Note. If full payment is not received as aforesaid, after October 31, 2008 Lender will charge interest at the Alternate Rate on all principal and interest owing on the Loan, as permitted by the terms of the Note.

Nothing contained in this letter shall diminish, prejudice or waive any of Lender's rights and remedies under the Loan Documents or the Guaranties or at law or in equity, and Lender expressly reserves all of such rights and remedies. Further, any discussions, proposals,

**EXHIBIT 5**



SHEPPARD MULLIN RICHTER & HAMPTON LLP

Eden Garden, LLC
October 24, 2008
Page 3

drafts, communications or courses of conduct that Borrower, Guarantors and Lender have previously had or may hereafter have are not intended to and shall not create any commitment (express or implied) to waive any defaults or excuse strict performance by Borrower or Guarantors under the terms of the Loan Documents, or to modify any of the terms of the Loan Documents. No officer or representative of Lender has any authority to bind Lender without formal credit approval and a written agreement executed by Lender.

If you have any questions, or want an exact payoff figure, please contact Joyce Barrone at IndyMac Bank.

Sincerely,

Kenneth D. Fox

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:3KDF1\401103066.1

cc: Ali K. Amidy  (Via U.S. Mail)
    P.O. Box 369
    Los Gatos, California  95031

    Guiti Nahavandi Amidy (Via U.S. Mail)
    P.O. Box 369
    Los Gatos, California  95031

    Ali K. Amidy  (Via U.S. Mail)
    16840 Cypress Way
    Los Gatos, California  95030

    Guiti Nahavandi Amidy (Via U.S. Mail)
    16840 Cypress Way
    Los Gatos, California  95030

    Centra Net Investment, LLC (Via U.S. Mail)
    655 Campbell Technology Park, Suite 125
    Campbell, California  95008

    Joyce Barrone (Via E-Mail joyce.barrone@imb.com)
    Gary Arnett (Via E-mail gary.arnett@imb.com)

**EXHIBIT 5**

1  <u>**CERTIFICATE OF SERVICE**</u>

2         The undersigned hereby certifies that:  I am over the age of eighteen (18) and

3  not a party to the within action.  I am employed in the law firm of Allen Matkins

4  Leck Gamble Mallory & Natsis LLP, 1900 Main Street, Fifth Floor, Irvine,

5  California 92614-7321.

6         On June 8, 2011, I used the Northern District of California's Electronic Case

7  Filing System, with the ECF registered to A. Kristine Floyd to file the following

8  document:

9         **COUNTERCLAIM OF INDYMAC VENTURE, LLC FOR**

10        **BREACH OF WRITTEN GUARANTIES**

11        **[DEMAND FOR JURY TRIAL]**

12

13        The ECF system is designed to send an e-mail message to all parties in the

14  case, which constitutes service.  The parties by e-mail in this case are found on the

15  Court's Electronic Mail Notice List.

16        Notice has been given via First Class U.S. Mail to:

17                    W. Kenneth Howard, Esq.
                      Attorney At Law
18                    116 East Campbell Avenue, Suite 7
                      Campbell, California 95008
19                    Phone:  (408) 379-1904
                      Fax:  (408) 379-1902
20

21

22        I declare under penalty of perjury under the laws of the United States of

23  America that the foregoing is true and correct.

24        Executed on June 8, 2011, at Irvine, California.

25

26        By:_____*/s/A. Kristine Floyd*_____

27                    A. KRISTINE FLOYD

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

925725.03/OC

-10-

COUNTERCLAIM OF INDYMAC VENTURE,
LLC FOR BREACH OF WRITTEN
GUARANTIES