1  A. KRISTINE FLOYD (BAR NO. 155930)
2  NICHOLAS S. SHANTAR (BAR NO. 228980)
   ALLEN MATKINS LECK GAMBLE
3    MALLORY & NATSIS LLP
   1900 Main Street, Fifth Floor
4  Irvine, California 92614-7321
   Phone:  (949) 553-1313
5  Fax:  (949) 553-8354
   E-Mail:  kfloyd@allenmatkins.com
6          nshantar@allenmatkins.com

7  Attorneys for Defendant and Counterclaimant
   INDYMAC VENTURE. LLC

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  EDEN GARDEN, LLC, a California limited liability company; ALI K. 11  AMIDY, an individual; GUITI NAHAVANDI AMIDY, an individual; 12  CENTRA NET INVESTMENT LLC, a California limited liability company, <br><br> 13 <br> Plaintiffs, <br><br> 14 <br> v. <br><br> 15  INDY MAC VENTURE, LLC, a limited 16  liability company; FEDERAL DEPOSIT INSURANCE CORPORATION, as 17  Conservator of IndyMac Federal Bank, FSB, and Does 1 through 10, <br><br> 18 <br> Defendants. <br> 19 <br> 20  INDYMAC VENTURE, LLC, a limited liability company, <br> 21 <br><br> 22 <br> Counterclaimant, <br><br> 23 <br> v. <br><br> 24  ALI K. AMIDY, an individual; GUITI NAHAVANDI AMIDY, an individual; 25  CENTRA NET INVESTMENT LLC, a California limited liability company, <br> 26 <br> Counterdefendants. | Case No. CV11-02356-JF <br><br> **DECLARATION OF ALISA ASHIKYAN IN SUPPORT OF DEFENDANT INDYMAC VENTURE, LLC'S MOTION TO EXPUNGE LIS PENDENS** <br><br> *[Filed concurrently with Notice of Motion and Motion to Expunge Lis Pendens; Memorandum of Points and Authorities in Support Thereof; Declaration of Nicholas S. Shantar in Support of Motion to Expunge; and Request for Judicial Notice In Support of Motion to Expunge]* <br><br> Date:   August 5, 2011 <br> Time:  9:00 a.m. <br> Ctrm:  3, Fifth Floor <br><br> Complaint Filed:   May 13, 2011 |

27
28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

927589.02/OC

I, Alisa Ashikyan, declare as follows:

1.      I am a Vice President at OneWest Bank, FSB ("OneWest"), a loan servicer for Defendant Indymac Venture, LLC ("IMV") in connection with the Loan, the Loan Documents, and the Guaranties (all as defined below).  I am authorized to make this declaration on behalf of IMV.  I make this Declaration in support of IMV's Motion to Expunge the Lis Pendens filed and recorded by Plaintiffs Eden Garden, LLC ("Borrower") and Ali K. Amidy, Guiti Amidy, and Centra Net Investment, LLC (collectively "Guarantors") in the above-captioned action.

2.      OneWest and IMV are engaged in the business of, among other things, commercial real estate lending.  I have been in the commercial lending business for more than 20 years.  I have been employed by OneWest as a Vice President since March 19, 2009.  Prior to that I was a Vice President at IndyMac Federal Bank ("IMFB") since July 11, 2008.  Prior to that I was a Vice President at IndyMac Bank, FSB ("Original Lender") since October 14, 2002.

3.      On July 11, 2008, Original Lender was seized by the Office of Thrift Supervision ("OTS"), which appointed the FDIC as Receiver for Original Lender. On July 11, 2008, the OTS also chartered IMFB as a new federal savings bank, appointed the FDIC Conservator of IMFB, and the FDIC, as Receiver for Original Lender, transferred some, but not all, of the assets and liabilities of Original Lender to IMFB, including the Loan, the Loan Documents, and the Guaranties (as defined below).

4.      On or about March 19, 2009:

(a)      The OTS appointed the FDIC as Receiver for IMFB;

(b)      The FDIC, as Receiver for IMFB, set up IMV as a single member limited liability company, of which the FDIC as Receiver for IMFB was the sole member, and, pursuant to an Asset Contribution and Assignment Agreement (the "Asset Contribution Agreement"), transferred to IMV some, but not all, of the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

927589.02/OC                -2-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

1    assets and liabilities of IMFB, including the Loan, the Loan Documents, and the

2    Guaranties (as defined below).  A true and correct copy of the Asset Contribution

3    Agreement, with redactions to protect confidential information, is attached hereto as

4    Exhibit A and is publicly available at http://www.fdic.gov/buying/historical/

5    structured/INDYMAC_asset_contribution_assignment_agreement.pdf.

6           (c)     Pursuant to a Limited Liability Company Interest Sale and

7    Assignment Agreement, the FDIC sold the membership interest in IMV to OneWest

8    Ventures Holdings, LLC, a wholly owned subsidiary of OneWest; and

9           (d)     OneWest and IMV, entered into that certain Servicing

10   Agreement (the "Servicing Agreement") pursuant to which, among other things,

11   OneWest was appointed to service, administer, manage, and dispose of certain loans

12   and collateral held by IMV, including the Loan.  A copy of the Servicing Agreement

13   is publically available and can be reviewed, with redactions to protect confidential

14   information, at http://www.fdic.gov/buying/historical/structured/INDYMAC_

15   servicing_agreement.pdf.

16        5.     In accordance with the terms of the Servicing Agreement, OneWest

17   services the Loan, the Loan Documents, and the Guaranties (as defined below) to

18   the above-captioned Plaintiffs.

19        6.     As part of my duties as Vice President at OneWest, I supervise and am

20   responsible for servicing of OneWest's commercial real estate loans.  As such, I am

21   one of the custodians of OneWest's documents, books and records (collectively,

22   "Documents") regarding the Loan, the Loan Documents and the Guaranties (as

23   defined below).  I have access to the originals of such Documents referred to and/or

24   attached as exhibits to this declaration, which originals are either in OneWest's

25   possession, custody, or control, and/or part of the Official Records of the Santa

26   Clara County Clerk and Recorder's Office (the "Official Records").  Included within

27   the Documents are (i) the documents, books, and records made and maintained by

28   OneWest in the ordinary and regular course of business at or near the time of the

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

927589.02/OC

-3-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

1  act, condition or event of which they are a record, and made by persons who had a

2  business duty to OneWest to make such records; and (ii) the documents, books, and

3  records OneWest obtained pursuant to the Asset Contribution Agreement (the

4  "Original Lender Documents").  I am informed and believe that the Original Lender

5  Documents were made by Original Lender in the ordinary and regular course of

6  business at or near the time of the act, condition or event of which they are a record,

7  and made and maintained by persons who had a business duty to Original Lender to

8  make such records, and that Original Lender relied on the maintenance of such

9  documents in the course of its business.

10       7.    OneWest maintains accurate copies or originals of the Documents and

11  relies on the maintenance of such documents in the course of its business.

12       8.    As a Vice President, my duties and responsibilities also include

13  overseeing the account status, payments, and defaults with regard to promissory

14  notes and loan agreements.  I am required to know and I am familiar with the

15  responsibilities of OneWest's commercial real estate loan servicing employees who

16  work on and with the Documents, including the methods they use in making and

17  keeping records for which I am ultimately responsible.  I maintain and routinely

18  review documents and correspondence relating to IMV's commercial real estate

19  loans, including such documents described below and attached to this Declaration.  I

20  have personally reviewed IMV's business records with respect to Plaintiffs and this

21  Declaration accurately reflects such records.  The facts stated in this declaration are

22  true and correct based upon my personal knowledge, information and belief, and/or

23  my review of the Documents, and, if called as a witness, I could and would testify

24  competently thereto.

25       9.    On or about September 30, 2005, Original Lender and Borrower

26  entered into a Building Loan Agreement dated September 30, 2005 ("Loan

27  Agreement").  A true and correct copy of the Loan Agreement, redacted in

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

927589.02/OC

-4-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

1  accordance with Federal Rules of Civil Procedure Rule 5.2, is attached hereto as

2  Exhibit B.

3          10.     Pursuant to the Loan Agreement, Original Lender agreed to loan

4  Borrower the original principal sum of $5,904,000, which was subsequently

5  increased to 6,820,628 (the "Loan"), as evidenced by a Promissory Note dated

6  September 30, 2005, as amended (the "Note").  A true and correct copy of the Note,

7  redacted in accordance with Federal Rules of Civil Procedure Rule 5.2, is attached

8  hereto as Exhibit C.  The Loan was made to finance Borrower's construction of

9  eighteen housing units on certain real property located in the County of Santa Clara

10 ("Property").

11         11.     To secure Borrower's obligations under the Loan Agreement and the

12 Note, Borrower made, executed and delivered to Original Lender a Construction

13 Trust Deed with Assignment of Rents, Security Agreement and Fixture Filing dated

14 September 30, 2005 ("Trust Deed").  A true and correct copy of the original Trust

15 Deed, redacted in accordance with Federal Rules of Civil Procedure Rule 5.2, is

16 attached hereto as Exhibit D.

17         12.     On or about February 14, 2007, Original Lender and Borrower entered

18 into (1) that certain Additional Advance and First Modification Agreement to the

19 Building Loan Agreement; Promissory Note; Construction Deed of Trust with

20 Assignment of Rents, Security Agreement and Fixture Filing and Other Loan

21 Documents (long form), dated as of February 14, 2007, and (2) that certain

22 Additional Advance and First Modification Agreement to the Building Loan

23 Agreement; Promissory Note; Construction Deed of Trust with Assignment of

24 Rents, Security Agreement and Fixture Filing and Other Loan Documents (short

25 form), dated as of February 14, 2007, executed by Borrower and Original Lender,

26 and recorded in the Official Records of Santa Clara County, California on April 19,

27 2007 as Instrument No. 19392640 (collectively, the "Amendments").  True and

28 correct copies of the Amendments, redacted in accordance with Federal Rules of

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

927589.02/OC                                              -5-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

1  Civil Procedure Rule 5.2, are collectively attached hereto as Exhibit E.  (The Loan
2  Agreement, the Note, and the Trust Deed, as amended by the Amendments, are
3  hereinafter referred to collectively as the "Loan Documents").

4          13.    In connection with the Loan and the Loan Documents, Guarantors
5  Ali K. Amidy and Guiti Nahavandi Amidy executed that certain General Guaranty
6  (Real Estate Secured Loan) dated September 30, 2005 ("Amidy Guaranty").
7  Furthermore, Guarantor Centra Net Investment, LLC executed that certain General
8  Guaranty (Real Estate Secured Loan) dated September 30, 2005 ("Centra Net
9  Guaranty").  Subsequently, in connection with the Amendments, Guarantors
10 executed that certain Reaffirmation of General Guaranty and Environmental
11 Guaranty in Connection with Additional Advance and First Modification Agreement
12 to the Building Loan Agreement; Promissory Note; Construction Deed of Trust with
13 Assignment of Rents, Security Agreement and Fixture Filing and Other Loan
14 Documents, dated as of September 30, 2005 ("Reaffirmation").  True and correct
15 copies of the Amidy Guaranty, the Centra Net Guaranty, and the Reaffirmation,
16 redacted in accordance with Federal Rules of Civil Procedure Rule 5.2, are attached
17 hereto collectively as Exhibit F.

18         14.    Pursuant to the Loan Documents, Borrower was required to pay all
19 principal under the Note, as amended, on or before March 28, 2008 ("Maturity
20 Date").  Borrower failed and continues to fail to pay the principal balance on,
21 before, and after that date, and Guarantors have also failed and continue to fail to
22 pay the principal balance pursuant to the Guaranties.

23         15.    On or about May 4, 2010, Plaintiffs and IMV entered into an
24 Agreement Tolling Statutes of Limitation ("Tolling Agreement").  A true and
25 correct copy of the Tolling Agreement is attached hereto as Exhibit G.

26 ///

27 ///

28 ///

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

927589.02/OC                                    -6-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

16.     As of January 28, 2011, the total outstanding balance on the Note, as amended, exceeded $6,817,000. Accordingly, on or about January 31, 2011, after public notice, IMV proceeded with a non-judicial foreclosure sale of the Property. The Property was purchased at the foreclosure sale by a third party, IMV 7 CA LLC, a wholly-owned subsidiary of IMV.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on June 17, 2011, at Pasadena, California.

ALISA ASHIKYAN

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

927589.02/OC

-7-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS

Execution Copy

ASSET CONTRIBUTION AND ASSIGNMENT AGREEMENT

BY AND BETWEEN

THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER
FOR INDYMAC FEDERAL BANK, FSB

AND

INDYMAC VENTURE, LLC

Dated as of March 19, 2009

10085014 V22

**EXHIBIT A**

## Table of Contents

<div align="right"><u>Page</u></div>

ARTICLE I DEFINITIONS AND CONSTRUCTION ........................................................... 2
    Section 1.01    Definitions............................................................................... 2
    Section 1.02    Construction ...........................................................................10

ARTICLE II CONTRIBUTION AND CONVEYANCE OF ASSETS ................................. 11
    Section 2.01    Terms and Conditions of the Contribution of Assets.....................11
    Section 2.02    Allocation of Payments...........................................................13
    Section 2.03    Rebates and Refunds...............................................................13
    Section 2.04    Interest Conveyed ..................................................................13
    Section 2.05    Retained Claims and Release ....................................................14
    Section 2.06    Taxes ..................................................................................14

ARTICLE III TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING. 14
    Section 3.01    Delivery of Documents............................................................14
    Section 3.02    Forwarding Post-Closing Date Items............................................15
    Section 3.04    Delivery of Loans. .................................................................15
    Section 3.05    Recordation of Documents .......................................................16
    Section 3.06    Additional Actions; Transaction Costs. .......................................17

ARTICLE IV COVENANTS, DUTIES AND OBLIGATIONS OF THE COMPANY............. 17
    Section 4.01    Servicing of Loans .................................................................17
    Section 4.02    Insured or Guaranteed Loans. ....................................................17
    Section 4.03    Reporting to or for the Applicable Taxing Authorities.............................17
    Section 4.04    Loans in Litigation.................................................................18
    Section 4.05    Loans in Bankruptcy ...............................................................20
    Section 4.06    Loan Related Insurance............................................................21
    Section 4.07    Loans with Escrow Accounts.....................................................21
    Section 4.08    [Reserved] ............................................................................21
    Section 4.09    Notice to Borrowers ...............................................................22
    Section 4.10    Notice of Claim .....................................................................22
    Section 4.11    Use of the FDIC's Name and Reservation of Statutory Powers.............22
    Section 4.12    Prior Servicer Information ........................................................22
    Section 4.13    Release of Initial Member.........................................................22
    Section 4.14    Indemnification .....................................................................23
    Section 4.15    Cooperation..........................................................................25

<div align="center">i</div>

**EXHIBIT A**

Section 4.16    Additional Title Documents.................................................25
Section 4.17    Contracts for Deed.........................................................25
Section 4.18    Leases.........................................................................25
ARTICLE V REPRESENTATIONS AND WARRANTIES.............................................25
Section 5.01    Assets Conveyed "AS IS"; Company Acknowledgements.....................25
Section 5.02    No Warranties or Representations with Respect to Escrow
                Accounts......................................................................26
Section 5.03    No Warranties or Representations as to Amounts of Unfunded
                Principal.....................................................................27
Section 5.04    Disclaimer Regarding Calculation or Adjustment of Interest on any
                Loan..........................................................................27
Section 5.05    No Warranties or Representations with Regard to Information...........27
Section 5.06    Intervening or Missing Assignments...................................27
Section 5.07    No Warranties or Representations as to Documents......................27
Section 5.08    Representations and Warranties of the Initial Member.................27
Section 5.09    Asset-Level Statements with Respect to Loans.........................28
ARTICLE VI REMEDIES FOR DEFECTIVE ASSETS..............................................29
Section 6.01    Remedy........................................................................29
Section 6.02    Conditions Precedent to Remedy......................................29
Section 6.03    Notice and Evidence of Defect.......................................30
Section 6.04    Processing of Remedy Request........................................31
Section 6.05    Re-delivery of Notes, Files and Other Documents.....................31
Section 6.06    Waiver of Remedy....................................................32
Section 6.07    Satisfaction of Obligation to Provide Remedy........................32
ARTICLE VII NOTICES...................................................................33
Section 7.01    Notices.......................................................................33
Section 7.02    Article VI Notice.....................................................33
Section 7.03    Transfer Documents..................................................33
Section 7.04    All Other Notices...................................................33
ARTICLE VIII MISCELLANEOUS PROVISIONS.................................................34
Section 8.01    Severability..................................................................34
Section 8.02    Governing Law.........................................................35
Section 8.03    Cost, Fees and Expenses.............................................35
Section 8.04    Waivers; Amendment and Assignment...................................35
Section 8.05    No Presumption......................................................35
Section 8.06    Entire Agreement....................................................36

**EXHIBIT A**

Section 8.07    Jurisdiction; Venue and Service ........................................................36

Section 8.08    Waiver of Jury Trial ........................................................................36

Section 8.09    Counterparts; Facsimile Signatures ................................................37

Section 8.10    Headings ..........................................................................................37

Section 8.11    Compliance with Law ......................................................................37

Section 8.12    Right to Specific Performance .........................................................37

Section 8.13    No Third Party Beneficiaries. ..........................................................38

Section 8.14    Timing ..............................................................................................38

Section 8.15    Survival ............................................................................................38

Section 8.16    Termination ......................................................................................38

**Attachments**

Attachment A        Loan Schedule
Attachment B        Affidavit and Assignment of Claim
Attachment C        Assignment and Lost Instrument Affidavit
Attachment D        Limited Power of Attorney

**Schedules**

Schedule 2.01(c)    Assumed Litigation

**EXHIBIT A**

## ASSET CONTRIBUTION AND ASSIGNMENT AGREEMENT

THIS ASSET CONTRIBUTION AND ASSIGNMENT AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (including its successors and assigns, the "**Initial Member**") and INDYMAC VENTURE, LLC, a Delaware limited liability company (the "**Company**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and on March 19, 2009, the FDIC was appointed Receiver for IndyMac Federal  (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, the Initial Member owns the Loans (as defined below) described on the Loan Schedule (as defined below) attached hereto as Attachment A;

WHEREAS, the Initial Member has formed the Company and holds the sole membership interest in the Company (the "**LLC Interest**");

WHEREAS, the Initial Member desires to contribute the Assets (as defined below) as a capital contribution to the Company, as more fully set forth herein;

WHEREAS, the Initial Member and the Company have entered into a Participation and Servicing Agreement dated as of even date hereof (the "**Participation Agreement**"), pursuant to which the Company will transfer and convey to the Initial Member a participation interest in the Assets, as more fully set forth therein;

WHEREAS, pursuant to the Limited Liability Company Interest Sale and Assignment Agreement dated as of even date hereof (the "**LLC Interest Sale Agreement**"), the Initial Member has agreed, subject to the terms and conditions of the LLC Interest Sale Agreement and the other Ancillary Documents, to sell and transfer the LLC Interest to OneWest Ventures Holdings LLC (the "**LLC Interest Transferee**") for a purchase price equal to the Groups 6-8 Final Purchase Price (as defined below) (the completion of such sale, the "**Closing**"); and

WHEREAS, the Initial Member and the Company desire to memorialize their agreement relating to the contribution and certain other matters as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and

**EXHIBIT A**

sufficiency of which are hereby acknowledged, the Initial Member and the Company hereby agree as follows.

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.01   Definitions.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger, supporting subsidiary ledgers and schedules, and loan servicing system records of the Initial Member.

"**Acquired Collateral**" means real or personal property to which title is acquired by the Company by foreclosure, by deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, in any such case in accordance with the Loan Documents.

"**Adjustment Date**" means, as to each Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Note and Mortgage.

"**Affected Loan**" has the meaning given in Section 4.04(c).

"**Affidavit and Assignment of Claim**" means an Affidavit and Assignment of Claim in the form of Attachment B to this Agreement.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person); provided, however, that for purposes of this Agreement, the Initial Member shall not be deemed to be an Affiliate of the Company or of any Affiliate of the Company.  For purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Ancillary Documents**" means the Participation Agreement (including the Servicing Agreement, the Electronic Tracking Agreement, one or more Account Control Agreements and the Custodial Agreement attached as exhibits thereto), the LLC Interest Sale Agreement (and the Guaranty required to be delivered thereby), the Limited Liability Company Operating Agreement of the Company, the Master Purchase Agreement, the FDIC Guaranty and the Confidentiality Agreement, in each case once executed and delivered, and any and all other agreements and instruments executed and delivered contemporaneously in connection with the Closing, including all account control agreements entered into pursuant to the Participation Agreement.

"**Asset-Level Statements**" has the meaning given in Section 5.01(b).

2

"**Assets**" has the meaning given in Section 2.01(a).

"**Assignment and Lost Instrument Affidavit**" means an Assignment and Lost Instrument Affidavit in the form of Attachment C to this Agreement.

"**Authorized Funding Draw**" has the meaning given in the Participation Agreement.

"**Bankruptcy Rule**" means the rules set forth under the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

"**Borrower**" means the borrower or other obligor with respect to a Loan.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Claims Termination Date**" means the first Business Day after the second anniversary of the Closing Date.

"**Closing**" has the meaning given in the recitals.

"**Closing Date**" means the date on which the Closing occurs.

"**Collateral**" means any and all real or personal property, whether tangible or intangible, securing or pledged to secure a Loan, including any account, equipment, guarantee or contract right, or other interest that is the subject of any Collateral Document and, as the context requires, includes Acquired Collateral whether or not so expressly specified.

"**Collateral Document**" means any pledge agreement, security agreement, personal or corporate guaranty, deed of trust, deed, mortgage, contract for the sale of real property, assignment, collateral agreement or other agreement or document of any kind, whether an original or a copy, whether similar to or different from those enumerated, (i) securing in any manner the performance or payment by any Borrower of its obligations or the obligations of any other Borrower under any of the Loans or the Notes evidencing the Loans or (ii) evidencing the Acquired Collateral.

"**Collection Account**" has the meaning given in the Participation Agreement.

"**Company**" has the meaning given in the preamble.

"**Confidentiality Agreement**" means the Confidentiality Agreement, dated December 31, 2008, executed by IMB HoldCo LLC.

"**Conservator**" has the meaning given in the recitals.

"**Contract for Deed**" means an executory contract with a third party to convey real property, including any installment land contract.

3

**EXHIBIT A**

"**Custodial Account**" means an account maintained by the Initial Member or its agent for the deposit of principal and interest payments received in respect of one or more Loans.

"**Custodial Agreement**" has the meaning given in the Participation Agreement.

"**Custodial Documents**" has the meaning given in the Custodial Agreement.

"**Defect**" means the failure of any Asset-Level Statement to be true as of the Closing Date.

"**Defective Loan**" has the meaning given in Section 6.01.

"**Defect Notice**" has the meaning given in Section 6.03.

"**Deficiency Balance**" means the remaining unpaid principal balance of any Note purchased hereunder after crediting to it the proceeds of a foreclosure sale.

"**Document Custodian**" has the meaning given in the Participation Agreement.

"**Electronic Tracking Agreement**" has the meaning given in the Participation Agreement.

"**Environmental Hazard**" means the presence at, in or under any real property Collateral (whether held in fee simple estate or subject to a ground lease or otherwise, and including any improvements whether by buildings or facilities, and any personal property, fixtures, leases and other property or rights pertaining thereto), of any "hazardous substance," as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601(14), or any petroleum (including crude oil or any fraction thereof that is liquid at standard conditions of temperature and pressure), at a level or in an amount that requires remediation or abatement under applicable environmental Law.

"**Escrow Account**" means an account maintained by the Initial Member or its agent for the deposit of Escrow Payments received in respect of one or more Loans.

"**Escrow Payments**" means the amounts constituting ground rents, taxes, assessments, water rates, common charges in condominiums and planned unit developments, mortgage insurance premiums, fire and hazard insurance premiums and other payments which have been escrowed by the Borrower with the Initial Member or its agent pursuant to any Loan.

"**Excess Damage Liability**" has the meaning given in Section 4.04(c).

"**Excluded Assets**" has the meaning given in the Master Purchase Agreement.

"**Excluded Liabilities**" means, collectively, all liabilities of the Initial Member other than the Assumed Liabilities.

**EXHIBIT A**

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Failed Thrift**" has the meaning given in the recitals.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**FDIC Guaranty**" means the Guaranty Agreement, dated as of March 18, 2009, by and among the FDIC, in its corporate capacity, IMB HoldCo LLC and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**Foreign Jurisdiction**" means any jurisdiction other than the United States, and any subdivision of or in such other jurisdiction.

"**Foreign Loan**" means a Loan with respect to which any of the Collateral is located in any Foreign Jurisdiction.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Gross Margin**" means, with respect to each Loan, the fixed percentage amount set forth in the related Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Loan Schedule.

"**Groups 6-8 Final Purchase Price**" has the meaning given in the LLC Interest Sale Agreement.

"**Guarantor**" means any guarantor of all or any portion of any Loan or all or any of any Borrower's obligations set forth and described in the Loan Documents.

"**Indemnified Parties**" has the meaning given in Section 4.14(a).

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Initial Member**" has the meaning given in the preamble.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

**EXHIBIT A**

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**Limited Power of Attorney**" means a Limited Power of Attorney in the form of Attachment D to this Agreement.

"**LIP Account**" has the meaning given in the Participation Agreement.

"**LLC Interest**" has the meaning given in the recitals.

"**LLC Interest Sale Agreement**" has the meaning given in the recitals.

"**LLC Interest Transferee**" has the meaning given in the recitals.

"**Loan**" means any loan or Participated Loan listed on the Loan Schedule and any loan into which any loan or Participated Loan listed on the Loan Schedule is refinanced, and includes with respect to each such loan or Participated Loan: (i) any obligation evidenced by a Note; (ii) all rights, powers or Liens of the Initial Member or the Failed Thrift in or under the Collateral Documents; (iii) any Contract for Deed and the real property which is subject to any such Contract for Deed; and (iv) any lease and the related leased property.

"**Loan Documents**" means all documents, agreements, certificates, instruments and other writings (including all Collateral Documents) now or hereafter executed by or delivered or caused to be delivered by any Borrower, any Guarantor or any other obligor evidencing, creating, guaranteeing or securing, or otherwise executed or delivered in respect of, all or any part of a Loan or any Acquired Collateral or evidencing any transaction contemplated thereby, and all Modifications thereto.

"**Loan File**" means all documents pertaining to any Loan, either copies or originals, that are in the possession of the Initial Member or any of its employees or contractors responsible for the servicing of the Loan, other than (i) the original Note, renewals of the Note and other Custodial Documents and Collateral Documents and (ii) confidential or privileged communications between the Initial Member (or any predecessor-in-interest, including the Failed Thrift) and its legal counsel; provided, however, that the Loan Files do not include files maintained by other employees or agents of the Initial Member, or attorney-client or work product privileged materials held by the Initial Member's legal counsel, unless in the opinion of such counsel, the disclosure of the material is not likely to result in the waiver of the attorney-client or work product privilege.

"**Loan Proceeds**" has the meaning given in the Participation Agreement.

"**Loan Schedule**" means the schedule of Loans attached as Attachment A (and delivered in electronic format to the Company), which shall be updated as of the Closing Date. The Loan Schedule shall contain the following fields of information:

(1)     the Loan number;

6

**EXHIBIT A**

(2)     the address, city, state and zip code of the Mortgaged Property;

(3)     the current Mortgage Interest Rate;

(4)     the current Monthly Payment;

(5)     the original term to maturity;

(6)     the scheduled maturity date;

(7)     the unpaid principal balance of the Loan;

(8)     the Gross Margin, if applicable;

(9)     the next Adjustment Date, if applicable; and

(10)    the paid through date or due date.

"**Loan Value**" has the meaning given in the LLC Interest Sale Agreement.

"**Loan Value Schedule**" has the meaning given in the LLC Interest Sale Agreement.

"**Losses**" has the meaning given in Section 4.14(a).

"**Master Purchase Agreement**" means the Master Purchase Agreement, dated as of March 18, 2009, by and among the Conservator (and, on the date hereof, following the appointment of the FDIC as receiver for IndyMac Federal, the Receiver by joinder as of the date hereof), IMB HoldCo LLC, OneWest Bank Group LLC and the OneWest Bank, FSB (by joinder as of the date hereof).

"**MERS**" means Mortgage Electronic Registration Systems, Incorporated.

"**MERS Registered Mortgages**" has the meaning given in Section 3.01(c).

"**MERS® System**" has the meaning given in the Participation Agreement.

"**Modification**" means any extension, renewal, substitution, replacement, supplement, amendment or modification of any agreement, certificate, document, instrument or other writing, whether or not contemplated in the original agreement, document or instrument.

"**Monthly Payment**" means, with respect to any Loan, the scheduled monthly payment of principal and interest on such Loan which is payable by the related Borrower from time to time under the related Note.

"**Mortgage**" means, with respect to a Loan, a mortgage, deed of trust or other security instrument creating a Lien upon real property and any other property described therein which secures a Note, together with any assignment, reinstatement, extension, endorsement or Modification of any thereof.

**EXHIBIT A**

"**Mortgage Interest Rate**" means, with respect to each fixed rate Loan, the fixed annual rate of interest provided for in the related Note and, with respect to each adjustable rate Loan, the annual rate at which interest accrues and adjusts in accordance with the provisions of the related Note.

"**Mortgaged Property**" means the real property Collateral, including land, fixtures and improvements, if any, securing the repayment of any Loan.

"**Note**" means each note or promissory note, lost instrument affidavit, loan agreement, shared credit or Participated Loan agreement, intercreditor agreement, reimbursement agreement, any other evidence of indebtedness of any kind, or any other agreement, document or instrument evidencing a Loan, and all Modifications to the foregoing.

"**Obligations**" means all obligations and commitments of the Initial Member relating to a Loan and arising or due or payable after the Closing Date under and in accordance with any of the related Notes, Collateral Documents, Loan Documents or Related Agreements, including any commitment to make Authorized Funding Draws.

"**Participant**" has the meaning given in the Participation Agreement.

"**Participant's Share**" has the meaning given in the Participation Agreement.

"**Participated Loan**" means any loan subject to a shared credit, participation or similar intercreditor agreement under which the Initial Member or any of its predecessors-in-interest was the lead or agent financial depository institution or otherwise managed or held the credit or sold participations, or under which the Initial Member or any of its predecessors-in-interest was a participating financial depository institution or purchased participations in a credit managed by another Person.

"**Participation Agreement**" has the meaning given in the recitals.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Pre-Approved Charges**" means the costs and expenses expressly designated as "Pre-Approved Charges" in Sections 2.06, 3.01(c), 3.04(a), 3.04(c), 3.05, 3.06, 4.02, 4.04(c), 4.05, 4.16 and 5.06, and no other costs or expenses.

"**Receiver**" has the meaning given in the recitals.

"**Redemption Period**" means the statutory time period, if any, during which a foreclosed owner may buy back foreclosed real property from the foreclosure sale purchaser under the Law of the jurisdiction in which the property is located, which period (if the jurisdiction provides for the same) may vary among the jurisdictions which do provide for a Redemption Period.

**EXHIBIT A**

"**Related Agreement**" means (i) any agreement, document or instrument (other than the Note and Collateral Documents) relating to or evidencing any obligation to pay or securing any Loan (including any equipment lease, letter of credit, bankers' acceptance, draft, system confirmation of transaction, loan history, affidavit, general collection information, and correspondence and comments relating to any obligation), (ii) any real property or rights in or to any real property (including leases, tenancies, concessions, licenses or other rights of occupancy or use and security deposits related thereto) related to any Loan, (iii) any collection, contingency fee, and tax and other service agreements that are specific to the Loans (or any of them), and (iv) any obligations under contracts of insurance or guaranty with respect to any Loans that are insured or guaranteed by any Governmental Authority. Related Agreements shall not include any performance or completion bond or letter of credit or other assurance filed with any Governmental Authority for the purpose of ensuring that improvements constructed or to be constructed in accordance with any governmental regulations or building requirements applicable to the proposed or completed improvement. The term Related Agreements does not include any loan servicing agreement that exists between the Participant or the Failed Thrift and any other Person.

"**Related Party**" means any party related to the Borrower in the manner delineated in 26 U.S.C.A § 267(b) and the regulations promulgated thereunder, as such law and regulations may be amended from time to time.

"**Released Parties**" has the meaning given in Section 4.13(b).

"**Remedy**" has the meaning given in Section 6.01.

"**Repurchase Percentage**" means, with respect to any Loan, (a) the quotient (expressed as a decimal) of the Loan Value for such Loan divided by the unpaid principal balance of such Loan as of the Closing Date, divided by (b) 0.2.

"**Repurchase Price**" means an amount equal to (a) the Repurchase Percentage multiplied by the unpaid principal balance of the Loan as of the date of the repurchase, *plus* (b) outstanding Servicing Expenses that have been advanced with respect to such Loan by the Company but not reimbursed as of or prior to the date of the repurchase, *reduced by* (c) the amount of any positive escrow balance with respect to the Loan as of the date of the repurchase that is not transferred to the Initial Member at the time of the repurchase.

"**RESPA**" means the Real Estate Settlement Procedures Act of 1974, as amended, and all rules and regulations promulgated thereunder.

"**Servicer**" has the meaning given in the Participation Agreement.

"**Servicing Expenses**" has the meaning given in the Participation Agreement.

"**Third Party Claim**" has the meaning given such term in Section 4.14(a).

"**Transfer Documents**" means the endorsements and alloges to Notes, Assignment and Lost Instrument Affidavits (if applicable), assignments, deeds and other documents of assignment, conveyance or transfer required under any applicable Law to evidence the transfer to

**EXHIBIT A**

the Company of the Assets hereunder or the assignment and assumption of the Assumed Liabilities hereunder.

"**Transfer Taxes**" means any taxes, assessments, levies, imposts, duties, deductions, fees, withholdings or other charges of whatever nature (other than any taxes imposed on or measured by net income or any franchise taxes), including interest and penalties thereon, required to be paid to any taxing authority with respect to the transfer of the Loans, the Collateral and the Collateral Documents, the rights in the Collateral or the assignment and assumption of the Obligations thereunder.

"**Uniform Commercial Code**" means the Uniform Commercial Code in effect in the applicable jurisdiction, as the same may be amended from time to time.

Section 1.02    Construction.  This Agreement shall be construed and interpreted in accordance with the following:

(a)    References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)    The term "or" is not exclusive.

(c)    A reference to a law includes any amendment, modification or replacement to such law.

(d)    Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)    References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)    Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)    The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)    The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

**EXHIBIT A**

(i)      Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## CONTRIBUTION AND CONVEYANCE OF ASSETS

Section 2.01   Terms and Conditions of the Contribution of Assets.

(a)      Contribution of Assets.  On the terms and subject to the conditions set forth in this Agreement and in the Ancillary Documents, the Initial Member hereby conveys to the Company, and the Company hereby acquires and accepts from the Initial Member, by way of a capital contribution, without representation or warranty, express or implied, except as set forth in this Agreement and the Master Purchase Agreement, all of the Initial Member's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "**Assets**" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Initial Member, and no others:

(i)      all of the Initial Member's rights, title and interests in, to and under the Loans identified on the Loan Schedule attached hereto as Attachment A, which shall be updated by the Company as of the Closing Date and delivered to the Participant and the LLC Interest Transferee within forty-five (45) calendar days after the Closing Date;

(ii)      all of the Initial Member's rights in, to and under the Collateral pursuant to the Collateral Documents;

(iii)      all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Initial Member with respect to the Loans, the Collateral or the ownership, use, function, value of or other rights pertaining thereto, whether arising by way of counterclaim or otherwise, other than any claims retained by the Initial Member pursuant to Section 2.05; and

(iv)      all guaranties, warranties, indemnities and similar rights in favor of the Initial Member with respect to any of the Assets.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Initial Member that the parties hereto intended to be transferred in connection with the purchase and assumption contemplated in this Agreement, but that were omitted from the attachment to this Agreement, the Initial Member shall or shall cause its Affiliates promptly to assign and transfer to the Company all right, title and interest in such asset.  The Initial Member and the Company agree that the conveyance contemplated by this Section and the other provisions of this Agreement is intended to be an absolute conveyance and transfer of ownership of the Assets by capital contribution.

(b)      Excluded Assets.  The Assets shall not include, and the Company shall not otherwise acquire, the Excluded Assets.

11

**EXHIBIT A**

(c)    Assumption of Liabilities.  On the terms and subject to the conditions contained herein and in the Ancillary Documents (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles V and VI hereto), the Company shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Initial Member and no others (collectively, the "**Assumed Liabilities**"):

(i)    the Obligations; and

(ii)    all obligations of the Initial Member with respect to (i) the lawsuits, judgments, claims and demands listed on Schedule 2.01(c), and (ii) any additional lawsuit, judgment, claim or demand involving foreclosures, bankruptcies, liens, title disputes, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, tax sale, mechanic's liens and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.01(c), as determined by the Initial Member in its reasonable judgment (as evidenced by written notice thereof given to the Company), if such determination is made (and such notice is provided) within sixty (60) days after the Closing Date, or by the  mutual agreement of the Initial Member and the Company, if such determination is after such sixty (60)-day period.

(d)    Excluded Liabilities.  Notwithstanding anything to the contrary in this Section 2.01, it is understood and agreed that the Company shall not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities, including the following:

(i)    any liabilities and obligations with respect to any claims expressly retained by the Initial Member pursuant to Section 2.05;

(ii)    any liabilities or obligations of the Initial Member arising under this Agreement or any of the Ancillary Documents;

(iii)    any legal and accounting fees and expenses incurred by the Initial Member in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

(iv)    any indebtedness of the Initial Member for borrowed money;

(v)    any liability or indebtedness of the Initial Member for contingent liabilities or liabilities in respect of any injury to any Person or property;

(vi)    any liabilities or obligations of the Initial Member attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

(vii)    all liabilities and obligations arising out of or with respect to the Excluded Assets;

**EXHIBIT A**

(viii)   all obligations of the Initial Member with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.01(c) or otherwise described in Section 2.01(c)(ii);

(ix)   any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive; and

(x)   any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825.

Section 2.02   Allocation of Payments.  All payments and other amounts received on account of any of the Loans on or before the Closing Date shall belong to the Initial Member (except with respect to payments on any Loan that have been paid in advance, which shall belong to the Company to the extent that any such prepayments are not reflected in the unpaid principal balance of such Loans as of the Closing Date).  All payments and other amounts received on account of any of the Loans after the Closing Date shall belong to the Company, subject to the provisions of the Participation Agreement.

Section 2.03   Rebates and Refunds.  The Company is not entitled to any rebates or refunds from the Initial Member or the Failed Thrift from any pre-computed interest Loan regardless of when the Note matures.  Further, on pre-computed interest Loans, neither the Initial Member nor the Failed Thrift will refund any unearned discount amounts to the Company.

Section 2.04   Interest Conveyed.  In the event a foreclosure with respect to any Loan occurs after the Closing Date, or occurred on or before the Closing Date but the Redemption Period had not expired on or before the Closing Date, the Initial Member shall convey to the Company the Deficiency Balance, if any, together with the net proceeds, if any, of such foreclosure sale.  If the Initial Member was the purchaser at such foreclosure sale, the Initial Member shall convey to the Company the Deficiency Balance, if any, together with a special warranty deed to the property purchased at such foreclosure sale.  The Company acknowledges and agrees that the Company shall not acquire any interest in or to any performance or completion bond or letter of credit or other assurance filed with any Governmental Authority with respect to any Loan for the purpose of ensuring that improvements constructed or to be constructed are completed in accordance with any governmental regulations or building requirements applicable to the proposed or completed improvement.

**EXHIBIT A**

Section 2.05   Retained Claims and Release.  Notwithstanding anything to the contrary contained in this Agreement, the Initial Member and the Company hereby agree that the contribution of the Loans pursuant to this Agreement will exclude the transfer to the Company of all right, title and interest of the Initial Member, the Failed Thrift and predecessors-in-interest thereto in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the Initial Member, the Failed Thrift or predecessors-in interest thereto have or had, as the case may be, or that any might have against any of the following  (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by the Initial Member, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest, underwriters or any other similar Persons who have caused a loss to the Initial Member, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest in connection with the origination, servicing or administration of a Loan, (b) any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other Persons who performed services for the Initial Member, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest relative to a Loan, (c) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of a Loan or (d) any appraiser or other Person with whom the Initial Member, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of a Loan.

Section 2.06   Taxes.  Except as otherwise provided herein, the Company shall pay, indemnify and hold harmless the Initial Member from and against any Transfer Taxes, and shall timely file any returns required to be filed with respect to such Transfer Taxes; provided, however, that the Initial Member shall pay (and shall not be entitled to be reimbursed for) any Transfer Taxes in the nature of mortgage recording taxes and shall timely file any returns required to be filed with respect to such Transfer Taxes.  Taxes paid by the Company pursuant to this Section shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

## ARTICLE III

## TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING

Section 3.01   Delivery of Documents.  The Company and the Initial Member agree to execute and deliver to one another the following:

(a)      On the Closing Date, such Transfer Documents executed by the Initial Member as the Initial Member elects to deliver to the Company.

(b)      Subject to the provisions of the Participation Agreement, the Initial Member shall deliver to the Document Custodian the original Notes and other Custodial Documents and Collateral Documents and, on or within a reasonable period of time after the Closing Date, shall deliver the Loan Files to the Company or the Servicer.

**EXHIBIT A**

(c)     If any of the mortgages and/or any other Collateral Documents securing the Loans are registered on the MERS® System (collectively, the "**MERS Registered Mortgages**"), the Company and the Initial Member shall cause the MERS Registered Mortgages to be transferred on the MERS® System on or within a reasonable time after the Closing Date. The costs imposed by MERS with respect to the transfer of the MERS Registered Mortgages shall be borne by the Company and all such costs shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

Section 3.02   Forwarding Post-Closing Date Items.  With respect to any checks or other funds in respect of any Loan which are received by the Initial Member within thirty (30) calendar days after the Closing Date, the Initial Member shall, to the extent no Limited Power of Attorney is granted to the Company in accordance with Section 3.04(a), promptly endorse without recourse and send the same to the Company via overnight mail.  Any checks or other funds in respect of any Loan which are received by the Initial Member after such thirty (30) day period shall be endorsed without recourse by the Initial Member to the Company and sent by first class mail to the Company promptly after receipt.  Except as otherwise provided herein, the Initial Member shall promptly forward to the Company all correspondence, Tax bills or any other correspondence or documentation related to any of the Loans or the other Assets which is received by the Initial Member after the Closing Date.

Section 3.04   Delivery of Loans.

(a)     The Initial Member will grant a Limited Power of Attorney to the Company in the form attached hereto as Attachment D.  The Company will prepare and execute on behalf of the Initial Member, within a reasonable time after the Closing Date, all Transfer Documents not delivered by the Initial Member to the Company at Closing, and the Company shall perform all acts required to be performed by the Initial Member pursuant to Section 3.01. The Initial Member shall cooperate with the Company with respect to the Company's obligation to prepare and record (if applicable) such Transfer Documents.  All Transfer Documents prepared by the Company shall be in appropriate form suitable for filing or recording (if applicable) in the relevant jurisdiction and otherwise subject to the limitations set forth herein, and the Company shall be solely responsible for the preparation, contents and form of such documents.  The Company hereby releases the Initial Member from any loss or damage incurred by the Company due to the contents or form of any documents prepared pursuant to this Section 3.04 and shall indemnify and hold the Initial Member harmless from and against any claim, action or cause of action asserted by any Person, including the Company, arising out of the contents or form of any Transfer Document, including any claim relating to the adequacy or inadequacy of any such document or instrument for the purposes thereof, and the use (or purported use) by the Company of the Limited Power of Attorney in any way not expressly permitted by its terms.  All expenses incurred by the Company in compliance with this Section 3.04 shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

(b)     The parties hereby agree that all Notes evidencing Loans shall be endorsed without recourse, and without representation or warranty by the Initial Member, express or implied, except (as to the Company) as set forth in this Agreement.  The form of any endorsement of Notes or allonge to the Notes is as follows:

15

Pay to the order of
IndyMac Venture, LLC
Without Recourse

Federal Deposit Insurance Corporation as Receiver for IndyMac
Federal Bank, FSB

By: _____

   Name: _____

   Title:      Attorney-in-Fact

All other documents of assignment, conveyance or transfer shall contain the following sentence:
"This assignment is made without recourse, representation or warranty, express or implied, by
the FDIC in any capacity."

   (c)      As to Foreign Loans, the Company must retain counsel licensed in the
Foreign Jurisdictions involved with the Foreign Loans. Such foreign counsel shall draft the
documents necessary to assign the Foreign Loans to the Company. Expenses incurred by the
Company in complying with the obligations set forth in the preceding sentence shall constitute
Pre-Approved Charges for purposes of the Participation Agreement. Documents presented to the
Initial Member to assign Foreign Loans to the Company must be accompanied by a letter on the
foreign counsel's letterhead, signed by the foreign counsel preparing those documents, certifying
that those documents conform to the Law of the Foreign Jurisdiction. Each such document shall
be delivered to the Initial Member in the English language, provided, however, that any
document required for its purposes to be executed by the Initial Member in a language other than
the English language shall be delivered to the Initial Member in such language, accompanied by
a translation thereof in the English language, certified as to its accuracy by an executive officer
or general counsel of the Company and, if such executive officer or general counsel shall not be
fluently bilingual, by the translator thereof.

   (d)      Nothing contained herein or elsewhere in this Agreement shall require the
Initial Member to make any agreement, representation or warranty or provide any indemnity in
any document or instrument or otherwise, nor is the Initial Member obligated to obtain any
consents or approval to the sale or transfer of the Loans or the related servicing rights, if any, or
the assumption by the Company of the Obligations.

   (e)      The Initial Member agrees to cooperate with the Company and to execute
and acknowledge any additional documents required by applicable Law or necessary to
effectively transfer and assign all of the Initial Member's right, title and interest in and to any
and all Loans to the Company (subject to the rights of the Initial Member under the Participation
Agreement). The Initial Member shall have no obligation to provide, review or execute any such
additional documents unless the same shall have been requested of the Initial Member within 365
calendar days after the Closing Date.

   Section 3.05   Recordation of Documents. The Company shall promptly submit all
Transfer Documents for recordation or filing in the appropriate land, chattel, Uniform
Commercial Code, and other records of the appropriate county, state or other jurisdictions

16

**EXHIBIT A**

(including any Foreign Jurisdiction) to effect the transfer of the Assets to the Company, and to render legal, valid and enforceable the obligations of the Borrowers to the Company and the assumption by the Company of Assumed Liabilities. The Company shall also be responsible for following up on the status of Transfer Documents submitted for recordation. Expenses incurred by the Company in complying with the obligations set forth in this Section shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

Section 3.06    Additional Actions; Transaction Costs. The Initial Member shall, if such is affirmatively required under applicable Law, take such actions as are necessary to effect the purposes of this Article III. All Taxes, fees, costs and expenses incurred in connection with the transfer of the Assets to the Company shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

<p align="center">ARTICLE IV</p>

<p align="center">COVENANTS, DUTIES AND OBLIGATIONS OF THE COMPANY</p>

Section 4.01    Servicing of Loans. From and after the Closing Date, the Company shall service the Loans in compliance with the Participation Agreement.

Section 4.02    Insured or Guaranteed Loans. If any Loans being transferred pursuant to this Agreement are insured or guaranteed by any Governmental Authority, and such insurance or guaranty is not being specifically terminated by the Initial Member, the Company acknowledges and agrees that such Loans must be serviced by a servicer, lender or mortgagee approved by such Governmental Authority, if such approval is required. The Company further acknowledges and agrees that, upon assumption of the Assumed Liabilities with respect to the Loans, it assumes full responsibility for determining whether or not any such insurance or guarantees are in full force and effect on the Closing Date and, with respect to those Loans with respect to which any such insurance or guarantee is in effect on the date of this Agreement, the Company acknowledges and agrees that, upon assumption of the Assumed Liabilities with respect to the Loans, it assumes full responsibility for taking any and all actions as may be necessary to insure such insurance or guarantees remain in full force and effect. The Company acknowledges and agrees that, upon assumption of the Obligations with respect to the Loans, it assumes and agrees to fulfill all of the Initial Member's or IndyMac Federal's obligations under the contracts of insurance or guaranty. Any out-of-pocket fees due to any insurer or guarantor incurred by the Company to fulfill its obligations set forth in the preceding sentence shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

Section 4.03    Reporting to or for the Applicable Taxing Authorities. The Initial Member shall be responsible for providing to customers and submitting to the Internal Revenue Service all Internal Revenue Service information returns related to the Loans for all applicable periods ending on or prior to December 31, 2008. The Company shall be responsible for submitting all Internal Revenue Service information returns related to such Loans for all applicable periods commencing thereafter. Internal Revenue Service information returns include reports on Forms 1098 and 1099. The Company shall be responsible for submitting all information returns required under applicable Law of any Foreign Jurisdiction, to the extent such are required to be filed by the Company or the Initial Member under such Law, relating to such

<p align="center">17</p>

<p align="right">**EXHIBIT A**</p>

Loans, for the calendar or tax year beginning January 1, 2009 and thereafter.  The Initial Member shall provide the Company with any information that is required to comply with any of the Company's Tax reporting responsibilities, including the responsibilities described herein; provided that, such information is in the possession of the Initial Member and not in the possession of the Company, IMB HoldCo LLC or OneWest Bank Group LLC.

Section 4.04   Loans in Litigation.

(a)   With respect to any Loans that, at the Closing Date, are subject to any type of pending litigation that is listed on Schedule 2.01(c) or of which the Company has received written notice of from the Initial Member, the Company shall notify the FDIC's Regional Counsel, 1601 Bryan Street, Dallas, Texas 75201, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving such written notice, as the case may be, of the name of the attorney selected by the Company to represent the Company's interests in the litigation. The Company shall, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, notify the clerk of the court or other appropriate official and all counsel of record that ownership of the Loan was transferred from the Initial Member to the Company. Subject to the provisions of Section 4.04(c) and 4.04(d), the Company shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within thirty five (35) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, substituting the Company's attorney for the Initial Member's attorney, removing the Initial Member and IndyMac Federal (or any predecessor-in-interest) as a party to the litigation and substituting the Company as the real party-in-interest.  Nothing contained in this Agreement shall preclude the Company from retaining the same attorney retained by the Initial Member (or the Failed Thrift) to handle litigation with respect to the Loans, provided, that, with respect to litigation referred to in Section 4.04(c), the Company shall not retain the same counsel that represents the Initial Member in connection with such litigation unless the FDIC's Regional Counsel (referred to above) agrees in writing to such dual representation.  Except as otherwise provided in Section 4.04(b) (and the Company's compliance with its obligations therein), in the event the Company fails to comply with this Section 4.04(a) within thirty five (35) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, (1) the Initial Member may, but shall have no obligation to, continue to pursue or defend such litigation on behalf of the Company and (2) in the event the Initial Member does continue to pursue or defend such litigation, the Company shall be liable for and hereby agrees to pay all costs and expenses incurred by the Initial Member in connection therewith, which expenses shall constitute Servicing Expenses.

(b)   If the Company is unable, as a matter of applicable Law or due to the actions or inactions of third parties unrelated to the Company and over whom the Company has no control, to cause the Initial Member and IndyMac Federal (or any predecessor-in-interest) to be replaced by the Company as party-in-interest in any pending litigation as required by Section 4.04(a), the Company shall provide to the FDIC's Regional Counsel, at the address specified above, within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described in Section 4.04(a), as the case may be, evidence to such effect, including reference to any applicable Law, and stating the reasons for

18

such inability. In any such event, (i) the Company shall cause its attorney to conduct such litigation at the Company's expense, which expense will constitute Servicing Expenses; (ii) the Company shall cause the removal of the Initial Member and IndyMac Federal (or its predecessor-in-interest) and substitution of the Company as party-in-interest in such litigation as soon as reasonably practicable; (iii) the Company shall use commercially reasonable efforts to cause such litigation to be resolved by judgment or settlement in as reasonably efficient a manner as practical; (iv) the Initial Member shall cooperate with the Company and the Company's attorney as reasonably required to bring such litigation or any settlement relating thereto to a reasonable and prompt conclusion; and (v) no settlement shall be agreed upon by the Company or its agents or counsel without the express prior written consent of the Initial Member, unless such settlement includes an irrevocable and complete waiver and release of any and all potential claims against the Initial Member and IndyMac Federal (or its predecessor-in-interest) in relation to such litigation or the subject Loans or obligations by any Person asserting any claim in the litigation and any Borrower, and any and all losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses relating thereto shall be paid by the Company without recourse of any kind to the Initial Member or IndyMac Federal (or its predecessor-in-interest) (other than to the extent the same constitute Servicing Expenses). The Company shall provide to the Participant twenty (20) Business Days following the Closing Date a status report for each pending litigation regarding replacement of the Company as the party-in-interest. The Company shall pay all of the costs and expenses incurred by it in connection with the actions required to be taken by it pursuant to Section 4.04(a) and this Section 4.04(b), which expenses shall constitute Servicing Expenses, including all legal fees and expenses and court costs, which expenses shall constitute Servicing Expenses, and shall reimburse the Initial Member for all reasonable out-of-pocket costs, including all legal expenses, incurred by the Initial Member on or after the Closing Date with respect to any such litigation, including costs incurred in connection with the dismissal thereof or withdrawal therefrom.

(c) In the event there is asserted against the Initial Member or IndyMac Federal (or its predecessor-in-interest) or the Company any claim or action with respect to one or more Loans that is based upon or arises out of any act or omission of the Initial Member or IndyMac Federal (or its predecessor-in-interest) on or prior to the Closing Date (and not any act or omission of or on behalf of the Company) and that alleges liability that, in the opinion of both the Initial Member and the Company, is reasonably likely to exceed the liability of the Company as the assignee and owner of the Loan after the Closing Date, (i) the Company shall be responsible for and shall control and assume the defense of the Company and the Company's interest in the Loans, at the Company's own expense and by the Company's own counsel, which counsel must be reasonably satisfactory to the Initial Member; and (ii) the Initial Member shall be responsible for and shall control and assume the defense of the Initial Member and the Failed Thrift at the Initial Member's own expense. To the extent their interests are not in conflict, the Company and the Initial Member shall cooperate in the defense of any such claims or action and shall use commercially reasonable efforts to work together to resolve or settle such claims or action in a manner that is mutually agreeable and in their respective best interests. The Company shall obtain the prior written approval of the Initial Member before ceasing to defend against any such claims or action. The costs and expenses incurred by the Company in connection with its defense of any claim or action described in this Section 4.04(c), including (x) reasonable attorneys' fees and expenses incurred to defend against (or investigate) the same or pursue counterclaims or cross-claims against other parties, (y) awards or judgments assessed against the

19

**EXHIBIT A**

Company with respect to any such claim or action, or (z) the costs of any settlement of such claim or action, shall constitute Pre-Approved Charges for purposes of the Participation Agreement. If, as a result of any claim or action subject to the provisions of this Section 4.04(c), (i) there is entered against the Company either (1) a final, non-appealable monetary judgment holding the Company liable for damages in excess of an amount equal to the Loan Value of the Loan relating to or that is the subject of such claim (such Loan, the "**Affected Loan**") divided by 0.2 (such excess amount, the "**Excess Damage Liability**"), or (2) a final monetary judgment that is appealable, which the Initial Member agrees in writing need not be appealed further by the Company, and that imposes an Excess Damage Liability on the Company, or (ii) the Company enters into a final settlement agreement with the consent of the Initial Member (such consent not to be unreasonably withheld), pursuant to which the Company is obligated to pay an Excess Damage Liability, then, in any such case, the Initial Member shall reimburse the Company for the Excess Damage Liability and the Initial Member shall be entitled, at its option, to repurchase the Affected Loan at its Repurchase Price; provided, however, that the Initial Member shall not be liable pursuant to this sentence for any liability imposed upon the Company that arises as a result of any act or omission of the Company.

(d)     The provisions of Sections 4.04(a), 4.04(b) and 4.04(c) are subject to the right of the Initial Member to retain claims pursuant to Section 2.05 of this Agreement, including any such claims as may have been asserted in litigation pending as of the Closing Date. If the Initial Member determines to pursue any claim retained pursuant to Section 2.05, then, at the Initial Member's discretion, litigation involving any such claims shall be bifurcated, with the Initial Member retaining the real party-in-interest and retaining control over (and being responsible for pursuing and bearing the related costs to pursue) claims retained by it pursuant to Section 2.05 and with the Company substituting itself as the real party-in-interest and taking control of (and being responsible for pursuing and bearing the cost of pursuing) the remaining claims in the litigation.

(e)     Notwithstanding the foregoing, the Company shall retain all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles V and VI hereto.

Section 4.05   Loans in Bankruptcy. In accordance with Bankruptcy Rules 3001 and 3002, the Company shall take all actions necessary to file, within thirty (30) Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy cases involving any Loans for which the Initial Member or IndyMac Federal (or its predecessors-in-interest) have not already filed a proof of claim, and (ii) all documents required by Bankruptcy Rule 3001 and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Loans in order to evidence and assert the Company's rights. The Company shall prepare and provide to the Initial Member within thirty (30) Business Days after the Closing Date, an Affidavit and Assignment of Claim or any similar forms as may be required in any relevant Foreign Jurisdiction and shall be acceptable to the Initial Member, for each Loan where a Borrower under such Loan is in bankruptcy as of the Closing Date. The Company hereby releases the Initial Member and IndyMac Federal (and its predecessors-in-interest) and the FDIC from any claim, demand, suit or cause of action the Company may have as a result of any action or inaction on the part of the Initial Member or IndyMac Federal (or its predecessors-in-interest) or the FDIC with respect to such Loan and the

**EXHIBIT A**

Company further agrees to reimburse the Initial Member for any cost or expense incurred by the Initial Member as a result of the Company's failure to file an Affidavit and Assignment of Claim or similar forms as required herein. In the event the Company fails to comply with this <u>Section 4.05</u> within thirty-five (35) days after the Closing Date, (1) the Initial Member may, but shall have no obligation to, file proofs of claim or other documents as the Initial Member determines may be necessary or appropriate to evidence and assert the Company's rights and, (2) in the event the Initial Member does take any such actions, the Company shall be liable for and hereby agrees to pay all costs and expenses incurred by the Initial Member in connection therewith. The provisions of this Section are subject to the right of the Initial Member to retain claims pursuant to <u>Section 2.05</u> of this Agreement, including any such claims as may have been asserted in litigation pending as of the Closing Date. If the Initial Member determines to pursue any claim retained pursuant to <u>Section 2.05</u>, then, at the Initial Member's discretion, litigation involving any such claims shall be bifurcated, with the Initial Member remaining the real party-in-interest and retaining control over (and being responsible for pursuing and bearing the related costs to pursue) claims retained by it pursuant to <u>Section 2.05</u> and with the Company substituting itself as the real party-in-interest and taking control of (and being responsible for pursuing and bearing the cost of pursuing) the remaining claims in the litigation. Costs and expenses incurred by the Company pursuant to this Section 4.05 (including costs and expenses incurred by the Initial Member which are subsequently reimbursed by the Company) shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

Section 4.06    <u>Loan Related Insurance</u>. As of the Closing Date, the Initial Member shall cause to be assigned, to the extent assignable, all existing insurance policies in respect of the Collateral of each Loan. As of the Closing Date, the Company shall cause to be put into place for the Collateral with respect to each Loan with respect to which the Borrower has failed to maintain required fire, hurricane, flood and hazard insurance with extended coverage as is customary in the area in which the Collateral is located and in such amounts and with such deductibles as, in the reasonable judgment of the Company, are prudent. Upon the cancellation of any insurance policy maintained by the Initial Member or the Failed Thrift with respect to any Loan and the receipt by the Company or the Initial Member of any refund of any premiums previously paid with respect thereto, such refunded amount shall inure to the benefit of the Borrowers with respect to the affected Loans, and such refunded amount shall be remitted to (or retained by) the Company and applied as appropriate to adjust the escrow accounts with respect to such affected Loans.

Section 4.07    <u>Loans with Escrow Accounts</u>. Escrow funds, custodial funds and other amounts or balances related to the Loans on deposit in Escrow Accounts, Custodial Accounts or other accounts held or controlled by the Initial Member shall be transferred by the Initial Member, along with the related accounts, to the Company on the Closing Date. It is intended that the Initial Member will use commercially reasonable efforts to cause such Escrow Accounts, Custodial Accounts and other accounts to be retitled in the name of the Company. All such funds and related accounts shall become the responsibility of the Company when transferred by the Initial Member. Any negative escrow balances shall be netted against the amount of any positive escrow balances held in the Escrow Accounts transferred to the Company.

Section 4.08    [Reserved]

**EXHIBIT A**

Section 4.09 <u>Notice to Borrowers</u>. The Company shall, on a timely basis in accordance with RESPA and any other applicable Laws, and pursuant to the Limited Powers of Attorney granted to it in accordance with <u>Section 3.05(a)</u>, prepare and transmit to each Borrower a joint "hello" and "goodbye" letter, at the Company's expense. The form of such letter shall be subject to the review and reasonable approval of the Initial Member.

Section 4.10 <u>Notice of Claim</u>. The Company shall promptly notify the Initial Member, in accordance with the notice provisions of <u>Section 7.04</u>, of any claim, threatened claim or litigation against the Initial Member or the Failed Thrift arising out of any Asset of which the Company becomes aware.

Section 4.11 <u>Use of the FDIC's Name and Reservation of Statutory Powers</u>. The Company shall not use or permit the use by its agents, successors or assigns of any name or combination of letters that is similar to "FDIC" or "Federal Deposit Insurance Corporation." The Company will not represent or imply that it is affiliated with, authorized by or in any way related to the FDIC. The Company shall be entitled to assert (and claim the benefit of) the statute of limitations established under 12 U.S.C. § 1821 (d)(14). However, the Company acknowledges and agrees that the assignment of any Loan or Collateral Document pursuant to the terms of this Agreement shall not constitute the assignment of any other rights, powers or privileges granted to the Initial Member pursuant to the provisions the Federal Deposit Insurance Act, including those granted pursuant to 12 U.S.C. § 182l(d), 12 U.S.C. § 1823(e) and 12 U.S.C. § 1825, all such rights and powers being expressly reserved by the Initial Member, nor shall the Company assert or attempt to assert any such right, power or privilege in any pending or future litigation involving any Loan transferred hereunder.

Section 4.12 <u>Prior Servicer Information</u>. The Company acknowledges and agrees that the Initial Member might not have access to information from prior servicers of a Loan and that the Initial Member has not requested any information not in the possession of the Initial Member or its servicing contractor from any prior servicer of a Loan. The Company acknowledges and agrees that the Initial Member will not be required under the terms of this Agreement to request any information from any prior servicer.

Section 4.13 <u>Release of Initial Member</u>.

(a)     Except as otherwise specifically provided in <u>Article VI</u> of this Agreement or in the Participation Agreement or any other Ancillary Document, the Company hereby releases and forever discharges the Initial Member, the Failed Thrift and its predecessors-in-interest, and the FDIC, and all of their respective officers, directors, employees, agents, attorneys, contractors and representatives, and all of their respective successors, assigns (other than the Company) and Affiliates, from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that the Company had, has or might have in the future, whether known or unknown, which are related in any manner whatsoever to the Loans, the servicing of the Loans by the Initial Member, the Failed Thrift or its predecessors-in-interest, the FDIC or any Person acting on behalf of the Initial Member, the Failed Thrift or its predecessors-in-interest, or the FDIC, or the acquisition of the Loans (other than gross negligence or willful misconduct); <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 4.13(a)</u> shall constitute or be

22

**EXHIBIT A**

interpreted as a waiver of any express right that the Company has under this Agreement or any of the Ancillary Documents.

(b)    The Company agrees that it will not renew, extend, renegotiate, compromise, settle or release any Note or Loan or any right of the Company founded upon or growing out of this Agreement, except upon payment in full thereof, unless all Borrowers on said Note or Loan shall first release and discharge the Failed Thrift, the FDIC and the Initial Member with respect to such Loan and their respective agents and assigns (other than the Company) (the "**Released Parties**") from all claims, demands and causes of action which any such Borrower may have against any such Released Party arising from or growing out of any act or omission occurring prior to the date of such release.

Section 4.14    Indemnification.

(a)    The Company shall indemnify and hold harmless the Initial Member and the Initial Member's Affiliates, and their respective officers, directors, employees, partners, principals, agents and contractors (the "**Indemnified Parties**"), from and against any losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines, other than Excluded Losses (collectively, "**Losses**"), arising out of or resulting from any breach by the Company or any of its Affiliates or any of their respective officers, directors, employees, partners, principals, agents or contractors of any of the Company's obligations under or covenants or agreements contained in this Agreement (including any claim asserted by the Initial Member against the Company to enforce its rights hereunder or by any third party), or any third-party allegation or claim based upon facts alleged that, if true, would constitute such a breach, or any gross negligence, bad faith or willful misconduct (including any act or omission constituting theft, embezzlement, breach of trust or violation of any Law). Such indemnity shall survive the termination of this Agreement. In order for an Indemnified Party to be entitled to any indemnification provided for under this Agreement in respect of, arising out of or involving a Loss or a claim or demand made by any Person against the Indemnified Party (a "**Third Party Claim**"), such Indemnified Party shall deliver notice thereof to the Company promptly after receipt by such Indemnified Party of written notice of the Third Party Claim, describing in reasonable detail the facts giving rise to any claim for indemnification hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Indemnified Party and as the Company may reasonably request. The failure or delay to provide such notice, however, shall not release the Company from any of its obligations under this Section 4.13 except to the extent that it is materially prejudiced by such failure or delay.

(b)    If for any reason the indemnification provided for herein is unavailable or insufficient to hold harmless the Indemnified Parties, the Company shall contribute to the amount paid or payable by the Indemnified Parties as a result of the Losses of the Indemnified Parties in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties, on the one hand, and the Company (including any Servicer or subservicer), on the other hand in connection with a breach of the Company's obligations under this Agreement.

**EXHIBIT A**

(c)     If the Company confirms in writing to the Indemnified Party within fifteen (15) days after receipt of a Third Party Claim the Company's responsibility to indemnify and hold harmless the Indemnified Party therefor, the Company may elect to assume control over the compromise or defense of such Third Party Claim at the Company's own expense and by the Company's own counsel, which counsel must be reasonably satisfactory to the Indemnified Party, underline{provided} that (i) the Indemnified Party may, if such Indemnified Party so desires, employ counsel at such Indemnified Party's own expense to assist in the handling (but not control the defense) of any Third Party Claim; (ii) the Company shall keep the Indemnified Party advised of all material events with respect to any Third Party Claim; (iii) the Company shall obtain the prior written approval of the Indemnified Party before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Indemnified Party or any of its Affiliates; and (iv) the Company will not, without the prior written consent of the Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened action in respect of which indemnification may be sought hereunder (whether or not any such Indemnified Party is a party to such action), unless such settlement, compromise or consent by its terms obligates the Company to satisfy the full amount of the liability in connection with such Third Party Claim and includes an unconditional release of such Indemnified Party from all liability arising out of such Third Party Claim.

(d)     Notwithstanding anything contained herein to the contrary, the Company shall not be entitled to control (and if the Indemnified Party so desires, it shall have sole control over) the defense, settlement, adjustment or compromise of (but the Company shall nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such defense, settlement or compromise): (i) any Third Party Claim that seeks an order, injunction or other equitable relief against the Indemnified Party or any of its Affiliates; (ii) any action in which both the Company (or any Affiliate) and the Indemnified Party are named as parties and either the Company (or such Affiliate) or the Indemnified Party determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party or that a conflict of interest between such parties may exist in respect of such action; and (iii) any matter that raises or implicates any issue relating to any power, right or obligation of the FDIC under any Law.  If the Company elects not to assume the compromise or defense against the asserted liability, fails to timely and properly notify the Indemnified Party of its election as herein provided, or, at any time after assuming such defense, fails to diligently defend against such Third Party Claim in good faith, the Indemnified Party may pay, compromise or defend against such asserted liability (but the Company shall nevertheless be required to pay all Losses incurred by the Indemnified Party in connection with such defense, settlement or compromise).  In connection with any defense of a Third Party Claim (whether by the Company or the Indemnified Party), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

(e)     Under no circumstances shall any liability of the Company under the provisions of this underline{Section 4.13} constitute a Servicing Expense or otherwise be charged to the

**EXHIBIT A**

Initial Member or the Participant or be deducted from the Participant's Share of any Loan Proceeds.

Section 4.15    Cooperation. The Initial Member and the Company shall mutually cooperate in order to facilitate an orderly transition of the Assets and Assumed Liabilities to the Company. Each party will cooperate in good faith with the other and will take all appropriate action that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder. From and after the Closing Date, the Initial Member will promptly refer all inquiries with respect to the Assets (including ownership thereof) and Assumed Liabilities to the Company, and the Company will promptly refer all inquires with respect to the Excluded Assets (including ownership thereof) and Excluded Liabilities to the Initial Member.

Section 4.16    Additional Title Documents. The Initial Member and the Company each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance (in form suitable for recording in the applicable jurisdiction, if applicable) as shall be reasonably necessary to vest in the Company its full legal or equitable title in and to the Assets. The Company shall prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Initial Member) as shall be necessary to vest title to the Assets in the Company. The Company shall be responsible for recording such instrument and documents of conveyance and all expenses incurred by the Company pursuant to this Section 4.16 shall constitute Pre-Approved Charges for purposes of the Participation Agreement.

Section 4.17    Contracts for Deed. The Company shall comply with all Obligations set forth in any Contract for Deed contained in any Loan subject to this Agreement. Pursuant to the provisions of Section 3.01 hereof, the Initial Member may require the Company to prepare and furnish special warranty deeds (or equivalent) or such other form of deed as may be required by the Contract for Deed for the Initial Member's approval, execution and acknowledgement, conveying the real property and any interest therein subject to any such contract to the Company. Title curative work, if required, shall be at the Company's sole cost and expense.

Section 4.18    Leases. The Company shall comply with all Obligations set forth in any lease related to any Loan, unless, in the opinion of the Company, complying with the Obligations of such lease would not be in the best interests (in terms of maximizing the value of the Loan) of the Company and the Initial Member or would otherwise be inconsistent with the Servicing Standard (as defined in the Participation Agreement). Pursuant to the provisions of Section 3.01 hereof, the Initial Member may require the Company to prepare and furnish applicable Transfer Documents for the Initial Member's approval and execution.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Assets Conveyed "AS IS"; Company Acknowledgements.

(a)    THE ASSETS ARE CONVEYED TO THE COMPANY "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR

**EXHIBIT A**

GUARANTY WHATSOEVER, INCLUDING AS TO COLLECTIBILITY, ENFORCEABILITY, VALUE OF COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY WITH RESPECT TO THE LOANS, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING THE INITIAL MEMBER, THE FAILED THRIFT OR THE FDIC, OR ANY PREDECESSOR OR AFFILIATE OF THE INITIAL MEMBER, THE FAILED THRIFT OR THE FDIC, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.

(b)     The Company acknowledges that (i) the Initial Member has performed limited due diligence with respect to the Assets and, therefore, none of the Initial Member, the Failed Thrift or the FDIC makes (or can make) any representations, warranties or guaranties with respect to the Assets or the presence or absence of Defects, (ii) the statements set forth in Section 5.09 (the "**Asset-Level Statements**") are being provided solely as a means for providing the Company with a basis for a remedy in the event a Defect is discovered, so long as all conditions for obtaining a remedy are otherwise met, (iii) the only remedies available to the Company in connection with any Defect are those that are set forth in Section 6.01, and (iv) in no event will the existence of any Defect be evidence of bad faith, misconduct or fraud, even in the event that it is shown that the Initial Member, the Failed Thrift or the FDIC, or any of their respective directors, employees, officers or agents, knew or should have known of the existence of any facts relating to the existence of such Defect.

(c)     Nothing contained in this Agreement shall be construed as a representation, warranty or guaranty with respect to the Assets or that no Defect exists with respect thereto, whether oral or written, past or present, express or implied or by operation of law, and each of the Initial Member, the Failed Thrift and the FDIC specifically disclaims, and the Company expressly waives and releases the Initial Member, the Failed Thrift and the FDIC from, any and all liability or other obligation under this Agreement with respect to any of the following:

(i)     except for the remedies set forth in Section 6.01, any Defect; or

(ii)     any fraud or misrepresentation of any kind in connection with the origination or servicing of a Loan, whether committed by the mortgagor, the originator, a servicer, an appraiser or any other party involved in the origination or servicing of such Loan; or

(iii)     any underwriting deficiency or failure to properly underwrite a Loan in any way related to any of the following: (x) a failure to properly verify Borrower information, such as income, credit history or rental history, (y) a failure to properly verify the value of the Collateral, including as a result of a fraudulent or inaccurate appraisal or otherwise, or (z) the reliance on any fraudulent or overstated Borrower information or appraisal.

Section 5.02   No Warranties or Representations with Respect to Escrow Accounts. Without limiting the generality of Section 5.01, the Initial Member makes no warranties or

26

**EXHIBIT A**

representations of any kind or nature as to the sufficiency of funds held in any escrow account to discharge any obligations related in any manner to an escrow obligation, as to the accuracy of the amount of any monies held in any escrow account or as to the propriety of any previous disbursements or payments from any escrow account.

Section 5.03    No Warranties or Representations as to Amounts of Unfunded Principal. Without limiting the generality of Section 5.01, the Initial Member makes no warranties or representations of any kind or nature as to the amount of any additional or future advances of principal the Company may be obligated to make.

Section 5.04    Disclaimer Regarding Calculation or Adjustment of Interest on any Loan. Without limiting the generality of Section 5.01, the Initial Member makes no warranties or representations of any kind or nature as to the accuracy of any calculation or adjustment of interest on any Loan, including any adjustable rate Loan, whether such calculation or adjustment is made by the Failed Thrift, the FDIC, the Initial Member or any Affiliate, agent or contractor of any of the foregoing, or any predecessor-in-interest of the Initial Member or any other party.

Section 5.05    No Warranties or Representations with Regard to Information.  The Initial Member makes no warranties or representations of any kind or nature as to the completeness or accuracy of any information provided by or on behalf of the Initial Member with respect to any Loan. The Company acknowledges that, for example, and not by way of limitation, some Loan Files may be missing forms or notices, or may contain incomplete or inaccurate forms or notices, that may be required by one or more federal or state consumer protection statutes.

Section 5.06    Intervening or Missing Assignments.  The Company acknowledges and agrees that the Initial Member shall have no obligation to secure or obtain any missing intervening assignment or any assignment to the Initial Member or the Failed Thrift that is not contained in the Loan File or among the Collateral Documents. The Company shall bear all responsibility and expense of securing from the appropriate source any intervening assignment or any assignment to the Initial Member or the Failed Thrift that may be missing from the Collateral Documents, but the cost thereof shall constitute a Pre-Approved Charge for purposes of the Participation Agreement.

Section 5.07    No Warranties or Representations as to Documents.  The Initial Member makes no warranties or representations of any kind or nature as to the effectiveness or enforceability in any Foreign Jurisdiction of this Agreement or any other document or instrument delivered or prepared in connection herewith, whether or not prepared and executed in the forms provided herewith, all of such forms being provided for reference only.

Section 5.08    Representations and Warranties of the Initial Member.  Notwithstanding the provisions of Sections 5.01 to 5.07, the Initial Member hereby makes the following representations and warranties to the Company as of the Closing Date:

(a)    The Initial Member has all requisite corporate power and authority to execute and deliver this Agreement and all other related agreements and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement and

**EXHIBIT A**

all other related agreements) and the consummation of the transactions contemplated hereby by the Initial Member have been duly and validly authorized and, assuming the due authorization, execution and delivery by the Company, this Agreement evidences the valid and binding obligation of the Initial Member, enforceable against the Initial Member in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(b)    None of the execution and delivery of this Agreement by the Initial Member, the consummation of the transactions contemplated hereby, or the fulfillment of or compliance with the terms and conditions of this Agreement by the Initial Member, will conflict with or result in a breach of any of the terms, conditions or provisions of the Initial Member's charter or by-laws or other constituent documents.

(c)    There is no action, suit, proceeding or investigation pending against the Initial Member which, either individually or in the aggregate, if adversely decided against the Initial Member would reasonably be expected to materially and adversely affect the Initial Member's ability to perform its obligations under this Agreement.

(d)    No consent, approval, authorization or order of any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of, or the consummation of the transactions contemplated by, this Agreement by the Initial Member, except for those consents, approvals, authorizations and orders that (x) have been obtained on or prior to the Closing Date, or (y) have not been and will not be obtained due to the Initial Member's exercise of its statutory authority to transfer assets without obtaining any approval, assignment or consent with respect to such transfer.

(e)    Except for Barclays Capital Inc. (including any predecessor company or company acquired by Barclays Capital Inc.) and Deutsche Bank Securities, Inc., and the fees and expenses payable to each of them (which fees and expenses will not be the responsibility of the Company), the Initial Member has not employed any broker, investment banker or registered financial adviser in a manner that would reasonably be expected to result in any liability on the part of the Company for any broker's fees, commissions or similar fees in connection with the consummation of the transactions contemplated hereby.

Section 5.09    Asset-Level Statements with Respect to Loans.  Notwithstanding the provisions of Sections 5.01 to 5.07, the Initial Member hereby makes the following statements with respect to each Loan as of the Closing Date:

(a)    None of the following has occurred with respect to the Loan: (i) the Borrower has been discharged in a no asset bankruptcy proceeding, (ii) there is no Collateral securing the Loan and out of which the Loan may be satisfied, or (iii) all Guarantors or sureties of the Note, if any, or the obligations contained therein, have similarly been discharged in no asset bankruptcies.

**EXHIBIT A**

(b)    A court of competent jurisdiction has not entered a final judgment (other than a bankruptcy decree or judicial foreclosure order) holding that neither the Borrower nor any Guarantor or surety owes an enforceable obligation to pay the holder of the Note or its assignees.

(c)    Neither the Failed Thrift nor the Initial Member has executed and delivered to the Borrower a release of liability from all obligations under the Note.

(d)    No title defect exists in connection with the property which is the subject of a Contract for Deed, which requires a prior order or judgment of a court to enable the Initial Member to convey title to such property in accordance with the terms and conditions set forth in the Contract for Deed.

(e)    The Initial Member is the owner of the Loan (or, in the case of a Participated Loan, the Initial Member is the owner of the pro rata interest in such Participated Loan set forth on the Loan Schedule).

(f)    There does not exist any Environmental Hazard.

## ARTICLE VI

## REMEDIES FOR DEFECTIVE ASSETS

Section 6.01    Remedy.  In the event a Defect is discovered with respect to any Loan (a "**Defective Loan**"), then, subject to the terms and conditions of this Article VI, the Initial Member shall, at the Initial Member's sole option, either (i) cure the Defect (which may include, among other things, a purchase price adjustment), if the Initial Member determines that the Defect is curable using commercially reasonable means, or (ii) repurchase the Defective Loan at the Repurchase Price (each, a "**Remedy**").  IN NO EVENT SHALL ANY DEFECT OR THE OBLIGATION TO PROVIDE A REMEDY HEREUNDER WITH RESPECT TO A DEFECTIVE ASSET BE EVIDENCE OF ANY BAD FAITH, MISCONDUCT OR FRAUD ON THE PART OF THE INITIAL MEMBER, THE FAILED THRIFT OR THE FDIC EVEN IF IT IS SHOWN THAT THE INITIAL MEMBER, THE FAILED THRIFT OR THE FDIC OR ANY AFFILIATE THEREOF, OR ANY OF THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, CONTRACTORS OR AGENTS, (A) KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF ANY FACTS RELATING TO SUCH DEFECT, (B) CAUSED SUCH DEFECT OR (C) FAILED TO MITIGATE SUCH DEFECT OR ANY OF THE LOSSES RESULTING THEREFROM.

Section 6.02    Conditions Precedent to Remedy.  The obligation of the Initial Member to provide a Remedy for any Defective Loan is contingent upon the satisfaction (as determined by the Initial Member in its sole discretion) or waiver (which may be granted by the Initial Member in its sole discretion) of each of the following conditions:

(a)    the Company has delivered the Defect Notice and any supporting evidence required by Section 6.03 to the Initial Member on or prior to the Claims Termination Date, and has provided the Initial Member with all additional supporting evidence requested by the Initial Member pursuant to, and within the timeframe set forth in, Section 6.03;

29

**EXHIBIT A**

(b)      neither the Company nor the Servicer has taken any action or omitted to take any action (other than as required by <u>Section 6.02(c)</u>) with respect to the Defective Loan that (x) materially and adversely affects the Initial Member's ability to process the request for, or provide, a Remedy, or (y) materially and adversely affects the ability or increases the cost to cure the Defect, or the Initial Member's ability to mitigate Losses, or otherwise results in a Loss (including any Excluded Losses) to the Initial Member;

(c)      the Company or the Servicer has serviced or otherwise maintained the Defective Loan in accordance with the customary and usual standards of practice of prudent servicers servicing or maintaining similar assets; and

(d)      if the Company is seeking a Remedy as a result of the Asset-Level Statement set forth in <u>Section 5.09(f)</u> failing to be true with respect to a Loan as of the Closing Date, the following additional criteria must be met:

(i)      the presence of Environmental Hazards was not disclosed in such Loan, the Loan File or other material provided by the Initial Member to the LLC Interest Transferee or any of its Affiliates prior to submission of the bid to purchase the LLC Interest that was accepted by the Initial Member;

(ii)      as of the date the Remedy is requested, the Loan has an unpaid principal balance greater than $250,000.00;

(iii)      the Company has delivered to the Initial Member the following, each of which must be satisfactory in form and substance to the Initial Member in its sole discretion: (a) a Phase I environmental assessment, from a qualified and reputable firm, of the real property Collateral; (b) a Phase II environmental assessment or lead-based paint survey of such Collateral from a qualified and reputable firm, which assessment shall confirm (x) the existence of Environmental Hazards on such Collateral and (y) that the regulator is likely to require remediation; and (c) in the case of a Loan, a written certification of the Company under penalty of perjury that no action has been taken by or on behalf of the Company (I) to initiate foreclosure proceedings in the case of the Loan or (II) to accept a deed-in-lieu-of-foreclosure in connection with such Loan; and

(iv)      neither the Company nor the Servicer has caused or materially exacerbated the Environmental Hazard or increased any resulting Loss.

Section 6.03   <u>Notice and Evidence of Defect</u>. The Company shall notify the Initial Member of each Defective Loan with respect to which the Company seeks a Remedy under <u>Section 6.01</u> promptly upon discovery of the Defect, but in any event no later than ten (10) Business Days after the end of the month in which such discovery is made. Such notice (the "**Defect Notice**") shall be in writing on the Company's letterhead and shall include the following information:

(a)      the Company's tax identification number and wire transfer instructions;

(b)      the identification of the particular Asset-Level Statement in <u>Section 5.09</u> that the Company believes was untrue as to the Loan as of the Closing Date;

30

**EXHIBIT A**

(c)     evidence supporting the basis for requesting a Remedy and the satisfaction of the conditions precedent to the Initial Member's obligation to provide a Remedy or, if any conditions precedent have not been satisfied, a request for a waiver of such conditions precedent, including the reasons why the Company believes such waiver should be granted; and

(d)     a certification by the Company that the Defect Notice is being submitted in good faith and is complete and accurate in all respects to the best of the Company's knowledge.

Promptly upon request by the Initial Member, but in any event no later than ten (10) Business Days thereafter, the Company shall supply the Initial Member with any additional evidence or information that the Initial Member may reasonably request.

Section 6.04   Processing of Remedy Request.  Within a reasonable period of time following the receipt by the Initial Member of the Defect Notice and all additional information that the Initial Member may have requested pursuant to Section 6.03, the Initial Member will notify the Company as to whether the request for a Remedy with respect to a Defective Loan has been accepted or rejected and, if accepted, the Remedy that the Initial Member expects to provide and the expected timing for such Remedy.  Subject to the terms and conditions of this Article VI, the Initial Member will use commercially reasonable efforts to provide the selected Remedy to the Company within sixty (60) days after providing the above-referenced notice to the Company.

Section 6.05   Re-delivery of Notes, Files and Other Documents.  If the Remedy to be provided by the Initial Member pursuant to Section 6.01 is the repurchase of the Defective Loan, the Company shall do the following as applicable with respect to the Loan to be repurchased:  (i) re-endorse and deliver the Note to the Initial Member (or its designee), (ii) assign all Collateral Documents associated with such Loan and reconvey any real property subject to a Contract for Deed or transferred by special warranty deed pursuant to Section 2.04, and execute and deliver such other documents or instruments as shall be necessary or appropriate to convey the Loan to the Initial Member (or its designee), (iii) deliver to the Initial Member (or its designee) the Loan File, along with any additional records compiled or accumulated by the Company pertaining to the Loan, (iv) take such actions as are necessary to transfer from the Company to the Initial Member any litigation or bankruptcy action involving the Defective Loan in accordance with the provisions of Sections 4.04 and 4.05, as applicable, substituting the duties of the Company for the Initial Member and the Initial Member for the Company, and with respect to the Affidavit and Assignment of Claim, a form of which is attached as Attachment B, substituting the duties of the Assignor (as defined therein) for the Assignee (as defined therein) and the Assignee for the Assignor, and (v) deliver to the Initial Member (or its designee) a certification, notarized and executed under penalty of perjury by a duly authorized representative of the Company, certifying that, as of the date of repurchase by the Initial Member, neither the Company nor the Servicer has taken any of the actions set forth in clauses (a) through (m) of Section 6.06.  The documents evidencing such conveyance shall be substantially the same as those executed pursuant to Article III of this Agreement to convey the Loan to the Company.  In all cases in which the Company recorded or filed among public records any document or instrument evidencing a transfer of the Loan to the Company, the Company shall cause to be recorded or filed among such records a similar document or instrument evidencing the conveyance of the Loan to the Initial Member.

31

**EXHIBIT A**

Section 6.06   Waiver of Remedy. The Initial Member may determine that it will not repurchase any Defective Loan if, without the prior written consent of the Initial Member, the Company or the Servicer: (a) modifies any of the terms of the Defective Loan (including the terms of any Collateral Document or Contract for Deed), other than the permanent refinance of the Defective Loan in connection with the final Authorized Funding Draw; (b) exercises forbearance with respect to any scheduled payment on the Defective Loan; (c) accepts or executes new or modified lease documents assigned by the Initial Member to the Company with respect to the Defective Loan; (d) sells, assigns or transfers the Defective Loan or any interest therein (other than the participation interest in the Loans issued to the Initial Member pursuant to the Participation Agreement); (e) fails to comply with the Participation Agreement in the maintenance, collection, servicing and preservation of the Defective Loan, including delinquency prevention, collection procedures and protection of the Collateral as warranted; (f) initiates any litigation in connection with the Defective Loan, or the related Collateral, other than litigation to force payment or to realize on the Collateral securing the Defective Loan; (g) completes any action with respect to foreclosure on, or accepts a deed-in-lieu of foreclosure for any Collateral securing the Defective Loan; (h) causes, by action or inaction, the priority of title to the Defective Loan, Collateral and other related security to be lower in priority than the priority of title that existed at the time the Defective Loan was conveyed by the Initial Member; (i) causes, by action or inaction, the security for the Defective Loan to be different than that conveyed by the Initial Member, except as may be required by the terms of the Collateral Documents; (j) causes, by action or inaction, a claim of third parties to arise against the Company that, as a result of repurchase of the Defective Loan under this Agreement, might be asserted against the Initial Member; (k) causes, by action or inaction, a Lien with respect to the Defective Loan to arise (other than a Lien in favor of the Initial Member); (l) is the Borrower or any Related Party under such Defective Loan; or (m) makes a disbursement in respect of the Defective Loan other than an Authorized Funding Draw or the funding of a Servicing Expense as and to the extent permitted by the Participation Agreement. With respect to any Defective Loan that fails to qualify for a repurchase because of any of the foregoing actions or inactions of the Company or the Servicer, if the Initial Member determines that a Defect is not curable using commercially reasonable means, and the Company has not proposed an alternate cure that is reasonably acceptable to the Initial Member, then, unless the Initial Member waives the restrictions of this Section 6.06, the Initial Member will be relieved of its obligation to provide any Remedy for such Defect.

Section 6.07   Satisfaction of Obligation to Provide Remedy. At such time as the Initial Member shall have provided a Remedy with respect to a Defect, the Company shall have no further or additional rights to, and shall be deemed to have released the Initial Member from any obligation to provide, any additional or different Remedy with respect to such Defect. If the Initial Member repurchases a Defective Loan, the Company shall have no further or additional rights to, and shall be deemed to have released the Initial Member from any obligation to provide, any additional or different remedy with respect to such Defective Loan, even if a Defect other than the one specified in the Defect Notice is subsequently identified.

**EXHIBIT A**

## ARTICLE VII

## NOTICES

Section 7.01   Notices.  All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, directed to the address of such Person as set forth in the applicable Section of this Article VII.  Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient.  From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified in this Article VII.

Section 7.02   Article VI Notice.  Any notice, request, demand or other communication required or permitted to be given to the Initial Member pursuant to the provisions of Article VI shall be delivered to:

| | |
|---|---|
| Initial Member: | Manager, Structured Transactions<br>c/o Federal Deposit Insurance Corporation<br>550 17th Street, NW (Room F-7008)<br>Washington, D.C. 20429-0002<br>Attention:  George Alexander |
| with a copy to: | Senior Counsel<br>FDIC Legal Division<br>Litigation and Resolutions Branch, Receivership Section<br>Special Issues Unit<br>3501 Fairfax Drive (Room E-7056)<br>Arlington, Virginia  22226<br>Attention:  David Gearin |

Section 7.03   Transfer Documents.  For purposes of designating the Company as the return addressee on Transfer Documents, the following address shall be used:

| | |
|---|---|
| Company after the Closing: | IndyMac Venture, LLC<br>888 East Walnut Street<br>Pasadena, California 91101-7211<br>Attention:  Steven Mnuchin |

Section 7.04   All Other Notices.  Any notice, request, demand or other communication required or permitted to be given pursuant to any provision of this Agreement and that is not governed by the provisions of Section 7.02 or Section 7.03 shall be delivered to:

**EXHIBIT A**

| | |
|---|---|
| Company before the Closing: | Manager, Structured Transactions<br>c/o Federal Deposit Insurance Corporation<br>550 17th Street, NW (Room F-7008)<br>Washington, D.C. 20429-0002<br>Attention:  George Alexander |
| with a copy to: | Senior Counsel<br>FDIC Legal Division<br>Litigation and Resolutions Branch, Receivership Section<br>Special Issues Unit<br>3501 Fairfax Drive (Room E-7056)<br>Arlington, Virginia 22226<br>Attention:  David Gearin |
| Company after the Closing: | IndyMac Venture, LLC<br>888 East Walnut Street<br>Pasadena, California 91101-7211<br>Attention:  Steven Mnuchin |
| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Attention: Paul E. Glotzer |
| Initial Member: | Manager, Structured Transactions<br>c/o Federal Deposit Insurance Corporation<br>550 17th Street, NW (Room F-7008)<br>Washington, D.C. 20429-0002<br>Attention:  George Alexander |
| with a copy to: | Senior Counsel<br>FDIC Legal Division<br>Litigation and Resolutions Branch, Receivership Section<br>Special Issues Unit<br>3501 Fairfax Drive (Room E-7056)<br>Arlington, Virginia 22226<br>Attention:  David Gearin |

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01   Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows: (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such

**EXHIBIT A**

particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement. Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including without limitation, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding. Nothing in this Section is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of <u>Section 8.02</u>.

Section 8.02   <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 8.03   <u>Cost, Fees and Expenses</u>. Except as otherwise provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including fees and disbursements to its accountants, brokers, financial advisors and counsel.

Section 8.04   <u>Waivers; Amendment and Assignment</u>. No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons (including Borrowers or any co-lender or other Person with any interest in or liability under any of the Loans) shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Initial Member and any attempted assignment without such consent shall be void *ab initio*.

Section 8.05   <u>No Presumption</u>. This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or

**EXHIBIT A**

requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 8.06    Entire Agreement.  This Agreement and the Ancillary Documents contain the entire agreement between the Initial Member (including in its capacity as Participant) and the Company and/or its Affiliates with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written.  In the event of a conflict between the terms of this Agreement and the terms of any Transfer Document or other document or instrument executed in connection herewith or in connection with the transactions contemplated hereby, including any translation into a foreign language of this Agreement for the purpose of any Transfer Document, or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, and furthermore, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such Transfer Document or other document or instrument.

Section 8.07    Jurisdiction; Venue and Service.  Each of the Company, for itself and its Affiliates, and the Initial Member hereby irrevocably and unconditionally:

(a)    (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

(b)    agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 8.07(a) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to Article VII (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 8.07 shall affect the ability of any party to be served process in any other manner permitted by Law;

(c)    (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in Section 8.07(a), (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)    agrees that nothing contained in this Section 8.07 shall be construed as a limitation on any removal rights the FDIC may have.

Section 8.08    Waiver of Jury Trial.  EACH OF THE COMPANY, FOR ITSELF AND ITS AFFILIATES, AND THE INITIAL MEMBER HEREBY IRREVOCABLY AND

**EXHIBIT A**

UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 8.09    <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement.  This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 8.10    <u>Headings</u>.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.  All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 8.11    <u>Compliance with Law</u>.  Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all applicable Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 8.12    <u>Right to Specific Performance</u>.  THE COMPANY HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE INITIAL MEMBER AS A RESULT OF THE COMPANY'S BREACH OF THIS AGREEMENT WILL BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY THE COMPANY MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW.  ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE INITIAL MEMBER SHALL BE ENTITLED TO (I) IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY), AND (II) SOLELY IN THE CASE OF A BREACH OF <u>SECTION 4.11</u> HEREOF, LIQUIDATED DAMAGES IN THE AMOUNT OF $25,000 FOR EACH BREACH OF SUCH SECTION.  THE PARTIES AGREE AND STIPULATE THAT THE INITIAL MEMBER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND THE COMPANY FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST

**EXHIBIT A**

SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF. NOTHING CONTAINED IN THIS SECTION SHALL LIMIT EITHER PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 8.13   No Third Party Beneficiaries.   This Agreement is made for the sole benefit of the Initial Member and the Company and their respective successors and permitted assigns, and no other Person or Persons (including any Borrower or co-lender or other Person with any interest in or liability under any of the Loans) shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary to this Agreement.

Section 8.14   Timing.  The Company agrees that, although the Initial Member has agreed to use commercially reasonable efforts to take certain actions pursuant to this Agreement within specified periods of time, the failure of the Initial Member to take any such actions within such specified periods of time shall not be dispositive evidence of a breach by the Initial Member of this Agreement.

Section 8.15   Survival.    The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

Section 8.16   Termination.  This Agreement shall terminate upon the termination of the Master Purchase Agreement in accordance with its terms.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**EXHIBIT A**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Contribution and Assignment Agreement to be executed as of the day and year first above written.

INITIAL MEMBER:

**FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB**

By: _Ralph Mal_____
Name: _Ralph Malami_____
Title: Manager, Non Structured Sales and Asset Management

**COMPANY:**

**INDYMAC VENTURE, LLC, a Delaware Limited Liability Company**

By:  Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB, as Sole Member and Manager

By: _Ralph Mal_____
Name: _Ralph Malami_____
Title: Manager, Non Structured Sales and Asset Management

**EXHIBIT A**

## ATTACHMENT A

**LOAN SCHEDULE**

SEE SECTION VI (GROUPS 6-8), SCHEDULES TO ASSET CONTRIBUTION AND
ASSIGNMENT AGREEMENT, ON THE SCHEDULES CD.

**EXHIBIT A**

## ATTACHMENT B

## AFFIDAVIT AND ASSIGNMENT OF CLAIM

### (For use with Loans in Bankruptcy)

*(Note to Preparer: When preparing the actual Affidavit and Assignment, delete this instruction and the reference to Attachment B above.)*

State of _____   §
                             §
County of _____    §

The undersigned, being first duly sworn, deposes and states as follows:

The Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB ("Assignor"), acting by and through its duly authorized officers and agents, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to IndyMac Venture, LLC, a Delaware limited liability company ("Assignee"), and its successors and assigns, all of the Assignor's interest in any claim(including any and all proofs of claim filed by the Assignor with the Bankruptcy Court (as defined below) in respect of such claim) in the bankruptcy case commenced by or against *{insert Obligor's name}* ("Obligor") in the *{insert (1) appropriate U. S. Bankruptcy Court, including the district of the court, such as for the Western District of Texas, or (2) the Foreign Jurisdiction Bankruptcy Court}* ("Bankruptcy Court") being designated as Case Number *{insert docket number assigned case}* ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of *{insert the names of the makers of the note exactly as they appear on the note}*, dated *{insert the date the note was made}*, and made payable to *{insert the name of the payee on the note exactly as it appears on the note}*, provided, however, that this assignment is made pursuant to the terms and conditions as set forth in that certain Asset Contribution and Assignment Agreement between the Assignor and the Assignee dated [_____], 2009 (the "Agreement").

For purposes of Rule 3001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 3001"), this assignment and affidavit represent the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described above and shall constitute the statement of the transferor acknowledging the transfer and stating the consideration therefor as required by said Bankruptcy Rule 3001. The Assignor hereby waives any objection to the transfer of the Bankruptcy Claim to the Assignee to the extent set forth above on the books and records of the Obligor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Bankruptcy Rule 3001, the Bankruptcy Code, applicable local bankruptcy rules or applicable law with respect to the Bankruptcy Claim to such extent. The Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to the Assignor transferring to the Assignee the Bankruptcy Claim to the extent set forth above and recognizing the Assignee as the sole owner and holder of the Bankruptcy Claim

B-1

**EXHIBIT A**

to such extent.  The Assignor further notifies the Obligor, the Bankruptcy Court and all other interested parties that all further notices relating  to the Bankruptcy Claim to such extent, and all payments or distributions of money or property in respect of the Bankruptcy Claim to such extent, shall be delivered or made to the Assignee.

This transfer was not for the purpose of the enhancement of any claim in a pending bankruptcy.  The transfer of the debt was pursuant to the Agreement, through which numerous debts were sold; no specific amount of the total consideration was assigned to the debt that forms the basis of Bankruptcy Claim.

This assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the claim.

**EXHIBIT A**

IN WITNESS WHEREOF, the Assignor has caused this Affidavit and Assignment of Claim to be executed this ___ day of _____, 20__.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____
    Name:
    Title:   Attorney-in-Fact

**EXHIBIT A**

**ACKNOWLEDGMENT**

STATE OF _____          §
                                  §
COUNTY OF _____            §


      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as Attorney-in-Fact of the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB acting in the capacity stated above, and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB, for the purposes and consideration therein expressed, and in the capacity therein stated.

      Given under my hand and seal of office on this the ___ day of _____, _____.


                    _____

[SEAL]                  Notary Public
                        My Commission expires: _____

**EXHIBIT A**

## ATTACHMENT C

### ASSIGNMENT AND LOST INSTRUMENT AFFIDAVIT

*(Note to Preparer: When preparing the actual Affidavit delete this instruction and the reference to Attachment C above.)*

STATE OF _____        §
                                §
COUNTY OF _____          §

    Before me, the undersigned authority, personally appeared _____, who upon being duly cautioned and sworn deposes and says, to the best of his /her knowledge, as follows:

    1.    That s/he is the _____ for the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB, whose address is 550 17th Street, NW, Washington, DC 20429-0002 ("Initial Member").

    2.    That at the time of the preparation of transfer to IndyMac Venture, LLC (the "Company"), the Initial Member was the owner of that certain loan, obligation or interest in a loan or obligation evidenced by a promissory note, evidencing an indebtedness or evidencing rights in an indebtedness (the "Instrument"), as follows:

Loan Number: _____

Name of Maker: _____

Original Principal Balance: _____

Date of Instrument: _____

    3.    That the original Instrument has been lost or misplaced. The Instrument was not where it was assumed to be, and a search to locate the Instrument was undertaken, without results. Prior to the transfer to the Company the Instrument had not been assigned, transferred, pledged or hypothecated.

    4.    That if the Initial Member subsequently locates the Instrument, the Initial Member shall use reasonable efforts to provide written notice to the Company and deliver and endorse the Instrument to the Company in accordance with written instructions received from the Company (or such other party designated in writing by the Company).

    5.    That the purpose of this affidavit is to establish such facts. This affidavit shall not confer any rights or benefits, causes or claims, representations or warranties (including, without limitation, regarding ownership or title to the Instrument or the obligations evidenced thereby)

**EXHIBIT A**

upon the Company, its successors or assigns. All such rights, benefits, causes or claims, representations and warranties (if any) shall be as set forth in the Asset Contribution and Assignment Agreement between the Company and the Initial Member dated March 19, 2009 (the "Contribution Agreement").

6.      That, pursuant to the terms and conditions of the aforementioned Contribution Agreement, the Instrument (including, without limitation, any and all rights the Initial Member may have to enforce payment and performance of the Instrument, including any rights under Section 3-309 of the Uniform Commercial Code) is hereby assigned effective as of the date hereof, without recourse, representation or warranty, to the Company, except as set forth in the Contribution Agreement and the Master Purchase Agreement (as defined in the Contribution Agreement).  A copy of the Instrument is attached to this affidavit, if available.

<div style="margin-left:40%">

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB


By:_____
    Name:
    Title:   Attorney-in-Fact

</div>

**EXHIBIT A**

**ACKNOWLEDGMENT**

STATE OF _____     §
                               §
COUNTY OF _____     §

    Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as Attorney-in-Fact of the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB acting in the capacity stated above, and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB, for the purposes and consideration therein expressed, and in the capacity therein stated.

    Given under my hand and seal of office on this the _____ day of _____, 20___.

_____
Notary Public

[SEAL]

My Commission expires: _____

C-3

**EXHIBIT A**

## ATTACHMENT D

## LIMITED POWER OF ATTORNEY

### [Sale Name]

*(Note to Preparer: When preparing the actual Limited Power of Attorney, delete this instruction and the reference to Attachment D above.)*

KNOW ALL PERSONS BY THESE PRESENTS, that the FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as Receiver for IndyMac Federal Bank, FSB, hereafter called the "Receiver", hereby designates the individual(s) set out below (the "Attorney(s)-in-Fact") for the sole purpose of executing the documents outlined below:

_____

_____

WHEREAS, the undersigned has full authority to execute this instrument on behalf of the FDIC as Receiver under applicable Resolutions of the FDIC's Board of Directors and redelegations thereof.

NOW THEREFORE, the FDIC as Receiver grants to the above-named Attorney(s)-in-Fact the authority, subject to the limitations herein, as follows:

1.     To execute, acknowledge, seal and deliver on behalf of the FDIC as Receiver for IndyMac Federal Bank, FSB all instruments of transfer and conveyance, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits and supporting documents as may be necessary or appropriate to evidence the sale and transfer of any asset pursuant to that certain Asset Contribution and Assignment Agreement, dated as of _____, ____ 2009, between the Receiver and IndyMac Venture, LLC.

The form which the Attorney(s)-in-Fact shall use for endorsing promissory notes or preparing allonges to promissory notes is as follows:

Pay to the order of
IndyMac Venture, LLC
Without Recourse

FEDERAL DEPOSIT INSURANCE
CORPORATION as Receiver for IndyMac Federal
Bank, FSB

By:_____
     Name: _____
     Title:     Attorney-in-Fact

D-1

**EXHIBIT A**

All other documents of assignment, conveyance or transfer shall contain this sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver."

     2.     To grant to each Attorney-in-Fact full power and authority to do and perform all acts necessary to carry into effect the powers granted by this Limited Power of Attorney as fully as the FDIC or the Receiver might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for.

     This Limited Power of Attorney shall be effective from _____, 2009 and shall continue in full force and effect through _____, 2010, unless otherwise terminated by an official of the FDIC authorized to do so by the Board of Directors ("Revocation").  At such time this Limited Power of Attorney will be automatically revoked. Any third party may rely upon this document as the named individual(s)' authority to continue to exercise the powers herein granted unless a Revocation has been recorded in the public records of the jurisdiction where this Limited Power of Attorney has been recorded, or unless a third party has received actual notice of a Revocation.

     IN WITNESS WHEREOF, the FDIC by its duly authorized officer empowered by appropriate resolution of its Board of Directors, has caused these presents to be executed and subscribed in its name this ___ day of _____, 2009.

                                 **FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for IndyMac Federal Bank, FSB**

                                   By:_____
                                       Name:
                                       Title:  Attorney-in-Fact

                          **[CONTINUED ON NEXT PAGE]**

**EXHIBIT A**

(CORPORATE SEAL)        ATTEST:_____

                                Name:  Herbert J. Messite
                                Title:  Counsel

Signed, sealed and delivered
in the presence of

By:_____
Name:_____
        Witness
By:_____
Name:_____
        Witness

**[ACKNOWLEDGMENT ON NEXT PAGE]**

D-3

**EXHIBIT A**

# ACKNOWLEDGMENT

UNITED STATES OF AMERICA   )
                                    )

DISTRICT OF COLUMBIA        )

On this ___ day of _____, 2009, before me, Notary Public in and for the District of Columbia, personally appeared _____ and Herbert J. Messite, with a business address of 550 17th Street, NW, Washington, DC 20429, who, being duly sworn, severally depose and say:

First, _____, first affiant, for himself, says that he is _____ of the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation by due authority of the Corporation's Board of Directors, and that the said _____ acknowledges that said Limited Power of Attorney to be the free act and deed of the said Corporation.

Second, Herbert J. Messite, second affiant, for himself, says that he is a Counsel with the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the seal affixed to the said Limited Power of Attorney is the corporate seal of the said Federal Deposit Insurance Corporation, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation and its seal thereto affixed by due authority of the Corporation's Board of Directors, and that the said Herbert J. Messite acknowledged the said Limited Power of Attorney to be the free act and deed of the said Corporation.

_____
**Notary Public, District of Columbia**
**United States of America**

**My Commission Expires:**

_____

**EXHIBIT A**

## SCHEDULE 2.01 (c)

### ASSUMED LITIGATION

SEE SECTION VI (GROUPS 6-8), SCHEDULES TO ASSET CONTRIBUTION AND
ASSIGNMENT AGREEMENT, ON THE SCHEDULES CD.

**EXHIBIT A**

9/30/05

Loan No █████0000

## BUILDING LOAN AGREEMENT

(Residential Tract Construction)

Dated as of September 30, 2005

Eden Garden, LLC, a California limited liability company (the "Borrower"), and INDYMAC BANK, F.S.B. (the "Lender"), agree as follows:

1.00   Preliminary Statement.  The Borrower owns or is about to acquire the Land described in Exhibit "A", which consists of approximately 0.80 acres, and intends to construct eighteen (18) residential housing Units and other Improvements on the Land in accordance with the Improvement Plans submitted by the Borrower to the Lender.  In order to finance the Land and the construction of the Improvements and the payment of various costs and expenses relating to the Project, the Borrower has applied to the Lender for a Loan in the amount of $5,904,000.00, the repayment of which will be secured by the Borrower's interest in the Land and the Improvements and the other Collateral covered by the Trust Deed to be executed by the Borrower in favor of the Lender.  The Lender is willing to make the Loan to the Borrower on the terms and conditions set forth in this Agreement.

Capitalized terms used in this Agreement and not otherwise defined are used with the meanings set forth in Exhibit "F".

2.00   Documentation.  Prior to the earlier of the first Disbursement of the proceeds of the Loan or the issuance of the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower, the Borrower shall deliver or cause to be delivered to the Lender, in form and substance satisfactory to the Lender, the Loan Documents and other "Required Items" specified in Exhibit "C" and shall satisfy the conditions specified in Exhibit "C", together with such other Documents and information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request.

3.00   Disbursements, Set Aside Letters and Letters of Credit.  Subject to the terms, conditions and procedures set forth in this Agreement and in the "Disbursement Schedule" attached as Exhibit "B", the Lender shall make Disbursements to or for the account of the Borrower and issue or cause to be issued Set Aside Letters and Letters of Credit from time to time from the date of this Agreement to the Banking Day immediately preceding the Maturity Date.  The aggregate amount of all Disbursements made by or on behalf of the Lender (including amounts funded under any Set Aside Letter or Letter of Credit) shall not exceed the Loan Amount plus the amount of any "Borrower's Funds" deposited with the Lender pursuant to the Disbursement Schedule (provided, however, that the foregoing limitation shall not affect the liability of the Borrower for payment of any Disbursements in excess of such amounts and interest thereon, whether occurring by reason of a payment under a Letter of Credit or Set Aside Letter or

1

REVISED MAY 2003

**EXHIBIT B**

otherwise). All Disbursements of the proceeds    of the Loan shall be evidenced by and repayable in accordance with the terms of the Note.

4.00  **Covenants of the Borrower.**  Unless the Lender otherwise consents in writing:

4.01    Construction of Improvements.  The Borrower shall cause construction of the Improvements to commence immediately after the date the Trust Deed is recorded, and shall be diligently and continuously prosecuted to completion, subject in each case to the following requirements:  (a) the Improvements shall be constructed in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, and in a good and workmanlike manner with new materials of good quality; (b) except as otherwise contemplated by the Improvement Plans with respect to any "Site Development" referred to in the Project Budget, the Improvements shall be constructed entirely on the Land and shall not encroach upon or overhang any lot line, boundary, set-back, easement, right-of-way or other land; (c) the "plan number" for each Unit shall be constructed on the lot or at the location specified in Exhibit "E"; and (d) construction of the Improvements shall in any event be completed on or before the Maturity Date; and (e) the Borrower hereby covenants and agrees, on behalf of itself and any of its Affiliates, that no such Person shall construct, create, arrange, develop, purchase or sell any residential housing improvement (or units which are components thereof) which constitute a Competing Project.

If at any time the Lender notifies the Borrower that construction of the Improvements does not conform to the requirements of this § 4.01 or any such nonconformity is otherwise discovered by the Borrower, the Borrower shall immediately cause such nonconforming construction to be stopped and all necessary corrective work to be commenced and diligently and continuously prosecuted to completion.

4.02    Change Orders.  The Borrower shall not permit any Change Order to the Improvement Plans to be implemented without the prior approval of the Lender, provided that this § 4.02 shall not prevent routine changes in construction which would not cause the Improvements to fail to be in substantial conformity with the approved Improvement Plans and which are not otherwise material in the aggregate.

4.03    Compliance with Laws and Other Requirements.  The Borrower shall (a) designate the Lender as "construction lender" in all applications for building permits and in the Construction Contract, if any, and provide the Lender's name and address to all Lien Claimants who have given preliminary 20-day notice, in each case as required by § 3097 of the California Civil Code, (b) comply in all material respects with all other applicable Laws and Other Requirements relating to the Collateral or the Project, and (c) obtain and maintain all Authorizations required in connection with the Collateral or the Project.

4.04    Project Agreements.  The Borrower shall (a) take all action reasonably necessary or appropriate to maintain and enforce its rights and interests under each of the Project Agreements (including the Architect Agreement, the Construction Contract, if any, and any Financing Commitment), (b) comply in all material respects with its obligations under each of the Project Agreements, (c) not permit or agree to any supplement, modification, amendment or termination of, or consent or agree to any waiver of or departure from the terms of, any of the Project Agreements, and (d) not transfer, encumber or release any interest in, or commit or permit any material breach or default on the part of the Borrower under, any of the Project Agreements,

REVISED MAY 2003

2

except that so long as no Event of Default has occurred, this § 4.04 shall not apply (i) to any amendment of the Architect Agreement or the Construction Contract, if any, to incorporate any Change Orders which are permitted to be implemented by § 4.02, or (ii) to the termination of any Project Agreement as a result of a material breach or default by a party other than the Borrower, provided such Project Agreement is replaced with a contract between the Borrower and a contractor reasonably approved by the Lender, in form and content reasonably approved by the Lender, which contract provides for performance of the work of the terminated Project Agreement within the time and budget approved by the Lender, and the Borrower delivers to the Lender an assignment of such contract and a consent by the contractor to such assignment, in each case in form and content reasonably approved by the Lender.

     4.05     Lien Priority and Restrictions on Sale or Encumbrance; Partial Releases.  The Borrower shall take all action necessary or appropriate from time to time to maintain the Trust Deed as an indefeasible first priority perfected Lien in the Collateral, and shall not at any time part with possession of or abandon any of the Collateral or cause or permit any interest in any of the Collateral to be sold, transferred, leased, encumbered, released, relinquished or otherwise disposed of (whether voluntarily, by operation of law or otherwise), provided that; (a) so long as no Event of Default has occurred and is continuing, and subject to satisfaction of all "Presale Requirements" set forth in Exhibit "C" and receipt by the Lender of the applicable "Release Price" set forth in Exhibit "E" and payment of all applicable costs, fees and expenses, (i) the Borrower may sell Units (together with undivided interests in common areas to be transferred to purchasers of such Units) in the ordinary course of business for an amount not less than the "Minimum Sales Price" set forth in Exhibit "E" and transfer common areas to a homeowners association if and when required by applicable Laws or Other Requirements, (ii) the Lender shall release Units and common areas or interests in common areas so sold or transferred from the Lien of the Trust Deed, and (iii) the Borrower may, in the ordinary course of business, receive, hold and dispose of any excess proceeds resulting from the sale of any Unit after payment of the applicable "Release Price"; and (b) the requirements of this sentence shall not prohibit (1) the creation or existence of any Permitted Exceptions or other Permitted Transfers, or (2) any action with respect to any Project Agreements to the extent permitted by § 4.04.

     The amount of any "Release Price" received by the Lender shall be applied to the principal of the Note, provided that if such amount exceeds the principal of the Note then outstanding, the excess shall be held by the Lender in a Cash Collateral Account and thereafter applied by the Lender (A) so long as no Event of Default has occurred and is continuing, to future advances of principal under the Note as and when made, or (B) if an Event of Default has occurred and is continuing, to any Obligations of the Borrower under the Loan Documents at such time or times and in such manner as the Lender deems appropriate.  Upon payment in full of all Obligations of the Borrower and termination of all obligations of the Lender under the Loan Documents (including obligations of the Lender under any Set Aside Letters issued by the Lender hereunder) and all Letters of Credit, the Lender shall release its interest in any amounts then held in any such Cash Collateral Account.

     The Borrower shall at all times use its best efforts to market and sell Units in compliance with the terms of this Agreement.

**EXHIBIT B**

4.06  Personal Property.  The Borrower shall not (a) install or otherwise use or acquire for use in connection with the Collateral or the Project any Personal Property (including replacement Personal Property pursuant to clause (iii) below) which is not owned by the Borrower free and clear of all Liens (including conditional sale contracts) and Rights of Others (other than Permitted Exceptions) or which is not a part of the Collateral, or (b) cause or permit the removal from the Land (or, in the case of offsite improvements, from the location of installation) of any Personal Property which is installed or otherwise used or acquired for use in connection with the Collateral or the Project, except that so long as no Event of Default has occurred and is continuing, this clause (b) shall not prohibit (i) the temporary removal of Personal Property for repairs in the ordinary course of business, (ii) the removal of Personal Property of insignificant value which is not reasonably necessary or appropriate to the completion of the Project, or (iii) the removal of defective or worn out Personal Property which has been replaced by other Personal Property of equal or greater suitability and value which is intended for the same purpose. Upon removal of any Personal Property in compliance with clauses (ii) and (iii) above, the Borrower shall be permitted to transfer or otherwise dispose of such Personal Property as the Borrower may determine.

4.07  Liens and Taxes.  The Borrower shall (a) pay, prior to delinquency, all Taxes which are or may become a Lien affecting any of the Collateral, and not consent to any Special Taxes which affect or may affect any of the Collateral, (b) keep the Collateral free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers, (c) promptly pay or cause to be paid, and obtain valid and enforceable lien releases or waivers (together with invoices or receipts identifying the nature of each payment) from, all Lien Claimants, (d) to the extent permitted by applicable Laws, diligently file or procure the filing of valid notices of completion upon completion of construction of any Improvements and a notice of cessation of labor upon cessation of construction for a continuous period of 30 days or more, and take all other steps necessary to forestall the assertion of Lien Claims, and (e) pay and perform when due all other obligations secured by or constituting a Lien affecting any of the Collateral, except that the Borrower shall not be required to pay or perform any such Taxes, Lien Claims or other obligations which are being actively contested in good faith by appropriate proceedings, provided that the Borrower has posted such security for the payment or performance of such Taxes, Lien Claims or other obligations as the Lender may reasonably require and, by reason of nonpayment, none of the Collateral or any Lien or other interest of the Lender under the Loan Documents is prejudiced or in danger of being sold, foreclosed or otherwise lost or forfeited.

In the event that a stop notice is asserted against the Lender or any action or other proceeding is instituted to enforce any Lien (including any mechanics lien, and whether or not such Lien constitutes a Permitted Exception) against any of the Collateral, the Borrower shall immediately make such payments, obtain such surety bonds and/or take such other action as the Lender may reasonably require in order to release the stop notice or Lien. Upon failure of the Borrower to release any such stop notice, the Lender may, at its option, file an interpleader action to resolve any pending claims.

The Borrower irrevocably appoints the Lender as its agent (such agency being coupled with an interest) to file any notices (including notices of completion and cessation of labor) that the Lender deems appropriate in order to protect its interests under the Loan Documents.

4.08  Property and Liability Insurance.  The Borrower shall at all times maintain the following policies of insurance:

4

(a)     with respect to any Improvements as to which construction has commenced but has not been completed and any Personal Property used or to be used in connection with such Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage;

(b)     with respect to any Improvements as to which construction has been completed and any other Improvements now or in the future located on the Land and any Personal Property used or to be used in connection with such Improvements, property "all risk" fire and extended coverage insurance (including coverage for vandalism and malicious mischief but without coverage restriction for vacancy);

(c)     commercial general liability insurance in favor of the Borrower (and naming the Lender and its Affiliates as additional insureds) in an aggregate amount not less than $2,000,000.00 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)     such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including comprehensive form boiler and machinery insurance, if applicable).

The Borrower shall also cause the Contractor, if any, and each subcontractor to maintain all policies of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain all of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of professional liability and errors and omissions insurance, in each case for such periods and in such amounts and with such deductible amounts as the Lender may reasonably require from time to time.

Each policy of property insurance required by this § 4.08 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "full replacement cost" endorsement, shall insure against flood loss risk if the Land is located in a Flood Hazard Area, shall insure against loss due to earthquake and earth movement if required by the Lender, and shall name the Lender and its Affiliates as "loss payee" pursuant to form BFU 438 or other form approved by the Lender. Each policy of commercial general liability insurance required by this § 4.08 shall cover personal injury, property damage, owner/contractor protective, blanket contractual liability and (where applicable) completed operations, with x, c and u exclusions deleted, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductibles and such endorsements as the Lender may reasonably require. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies and certificates evidencing such policies.

5

REVISED MAY 2003

**EXHIBIT  B**

4.09     Title Insurance and Searches.  The Borrower shall deliver to the Lender, in form and substance satisfactory to the Lender, a Title Policy, such endorsements to the Title Policy and such preliminary title reports and other title or lien searches (including UCC searches) and tax service contracts as the Lender may reasonably require from time to time.

4.10     Books, Records and Inspections.  The Borrower shall at all times maintain (a) full and complete books of account and other records with respect to the Collateral and the Project and its business and operations, (b) complete copies of the Improvement Plans (including all Change Orders), all Project Agreements and all Authorizations issued in connection with the Collateral or the Project, and (c) a complete file of all invoices, receipts and lien releases and waivers obtained by the Borrower with respect to amounts paid for Project Costs, and shall permit the Lender and its agents, upon request from time to time, to inspect and copy any of such books, records and other Documents and to enter and inspect the Real Property and any other Collateral and all work and materials furnished in connection with the Project.

4.11     Construction Information and Reporting Requirements.  The Borrower shall cause to be delivered to the Lender, in form and detail satisfactory to the Lender:

(a)     promptly after discovery by the Borrower, notice of (i) any fact or circumstance that may or will cause the Project Costs associated with any Line Item to exceed or be less than the corresponding amount set forth in the Project Budget or the Line Item Budget by more than 5%, or that may or will cause any Project Costs for any matters not covered by specific Line Items to exceed, in the aggregate, $50,000, (ii) any failure of the Project or the Improvements to be in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, (iii) any actual or anticipated material delays in construction, (iv) any serious threat or the commencement of any action or other proceeding (including any action to foreclose or otherwise enforce any Lien Claim or other Lien and any proceedings in condemnation or eminent domain) affecting or relating to any of the Collateral or the Project, (v) the occurrence or allegation of any termination, material breach or default, or failure of any material condition or other requirement under the Architect Agreement, the Construction Contract, if any, or any Financing Commitment, (vi) any dispute between the Borrower and any Governmental Agency relating to any of the Collateral or the Project, the adverse determination of which could adversely affect the Collateral or the Project in any material respect, (vii) any injury or damage to or loss or destruction of any of the Collateral if the cost of repair, restoration or replacement exceeds $25,000, (viii) any imposition of or proposal for any Special Taxes which affect or may affect any of the Collateral, (ix) any material adverse change in the financial condition, operations, properties or prospects of any Loan Party, (x) any event which has or may have a material adverse impact on the Collateral or the Project, (xi) the occurrence of any Event of Default or event which, with the giving of notice and/or the passage of time, could become an Event of Default, and (xii) any Change Order required by Section 4.02.

(b)     promptly after receipt by the Borrower, copies of all notices or other communications delivered to the Borrower or the Real Property which are addressed to the Lender or to "construction lender";

6

REVISED MAY 2003

EXHIBIT  B

(c)    on or before the 15th day of each month, a report on a form approved by the Lender describing sales activities for the Project as of the end of the prior month;

(d)    the end of each fiscal year for each Loan Party, Financial Statements for such Loan Party for and as at the end of such fiscal year, and upon request by the Lender from time to time, quarterly Financial Statements and Tax Returns for each Loan Party and copies of any audited Financial Statements prepared for any Loan Party, in each case certified in a manner acceptable to the Lender as more fully defined in Exhibit C of this Agreement; and

(e)    such other Documents or information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request from time to time.

The Lender is authorized at any time and from time to time to directly contact the Contractor, if any, or any subcontractor or other Lien Claimant or potential Lien Claimant or other Person to verify any information provided by the Borrower or for any other purpose.

4.12    Costs, Fees and Expenses.  The Borrower shall bear sole responsibility for and promptly pay or cause to be paid all costs and expenses relating to the performance by the Borrower of its Obligations or the delivery to the Lender of any Documents or other items or information under or in connection with any of the Loan Documents, and any Taxes (other than income taxes of the Lender), costs, expenses, fees or charges payable or determined to be payable in connection with the execution, delivery, filing or recording of, or otherwise with respect to, any Loan Document or any other Document delivered under or in connection with any Loan Document.

The Borrower shall pay the Loan Fee to the Lender at or prior to the time of recordation of the Trust Deed, and shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the approval of the Loan by the Lender and the negotiation, preparation, execution, delivery, administration, supplement, modification, amendment, waiver and enforcement of, and any other action taken by the Lender under or otherwise to protect its rights and interests in respect of, any Loan Document, and any litigation, dispute, action or other proceeding (including bankruptcy proceedings) relating thereto, including recording fees, filing fees, search fees, reconveyance fees, title insurance premiums, appraisal, engineering, inspection and consulting fees, the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, the reasonable charges of the Lender's internal legal counsel, and any fees or other charges of the Lender for appraisals or inspections or for review of appraisals, budgets, plans and specifications or other matters relating to the Project or the Collateral.

The Borrower shall also pay to the Lender, as a condition to the issuance by the Lender of any Set Aside Letter or Letter or Letter of Credit or any extension or modification thereof, the applicable Set Aside Letter Fee or Letter of Credit Fee and/or the applicable extension or modification fee, as the case may be.

Any amount payable to the Lender under any of the Loan Documents (including any amount payable under this § 4.12) which is not paid on the date when due shall, from and after

7

such date, bear interest at the Alternate Rate    until paid.  Such interest shall be payable by the Borrower to the Lender immediately and without demand.

4.13    <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify, defend and save and hold harmless the Lender and its Affiliates, and the respective directors, officers, agents, attorneys and employees of each (collectively the "<u>Indemnitees</u>") from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees, charges and disbursements of internal and external legal counsel) suffered or incurred by any Indemnitee as a result of (a) any failure of the Borrower to perform any of its Obligations under any Loan Document, (b) any failure of any Representation by the Borrower to be correct in all respects when made, (c) injury or death to persons or damage to property or other loss occurring on or in connection with the Collateral or the Project, whether caused by the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or by negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or otherwise, (d) any claim of any surety in connection with any bond relating to construction of any Improvements or offsite Improvements, and (e) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee which relates to or arises out of the Loan Documents, the Loan, any Set Aside Letter or Letter of Credit or any disbursement thereunder, the Collateral, the Project or any transaction contemplated by, or the relationship between the Borrower and the Lender or any action or inaction by the Lender under, the Loan Documents, provided that no Indemnitee shall be entitled to indemnification under this § 4.13 for matters caused solely by such Indemnitee's gross negligence or willful misconduct.  Any obligation of the Borrower under this § 4.13 shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and shall be secured by the Trust Deed for so long as the Trust Deed remains a lien upon the Real Property, and shall continue as an unsecured obligation of the Borrower thereafter.

4.14    <u>Additional Covenants.</u>  The Borrower shall perform each of the obligations (if any) set forth in Exhibit "C", in the manner and within the time limits set forth therein.

4.15    <u>Actions and Further Assurances</u>.  The Borrower shall appear in and defend all actions and other proceedings purporting to affect any of the Collateral or the Project or the rights or interests of the Lender under the Loan Documents (and the Lender may, at the Borrower's expense, appear in and defend any such action or other proceeding as the Lender may determine), and the Borrower shall take or cause to be taken such further action and execute and deliver or cause to be executed and delivered such further Documents as the Lender from time to time may reasonably require to maintain, perfect, protect, assure and confirm the Lender's rights and interests (including rights and interests in the Collateral), the Borrower's Obligations and the intention of the parties under the Loan Documents.

4.16    <u>Performance by the Lender</u>.  If the Borrower fails to perform any of its Obligations under any Loan Document and the Lender reasonably determines that remedial action is necessary to protect the rights or interests of the Lender, the Lender may, without notice to or demand on the Borrower, perform any such Obligations in such manner and to such extent and take such other action as the Lender may deem appropriate, and all costs, expenses and charges of the Lender relating to any such action shall be payable by the Borrower to the Lender in accordance with § 4.12.

8

5.00    Representations of the Borrower.  The Borrower represents and warrants to the Lender that:

5.01    Formation and Qualification.  Each Loan Party which is a corporation is duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified in California; each Loan Party which is a limited liability company, partnership, trust or other entity is duly formed and validly existing under the Laws of the jurisdiction of its formation and, in the case of a limited liability company or limited partnership formed under the Laws of a jurisdiction other than California, is duly registered in California; each Loan Party which is a corporation, limited liability company, or limited partnership is in good standing in California; and each Loan Party has all requisite power and authority to conduct its business and to own and lease its properties.

5.02    Loan Documents.  The execution, delivery and performance of the Loan Documents by each Loan Party are within such Loan Party's power and authority, have been duly authorized by all necessary action and do not and will not (a) require any Authorization which has not been obtained (except to the extent indicated in § 5.05(b) with respect to Authorizations required in connection with the Collateral or the Project), (b) contravene the Charter Documents of any Loan Party, any applicable Laws or Other Requirements or any agreement or restriction binding on or affecting any Loan Party or its property, or (c) result in or require the creation or imposition of any Lien or Right of Others upon or with respect to any property now or in the future owned by any Loan Party (other than Liens in favor of the Lender).  No Authorization which has not been obtained is required for the creation of the Liens or the enforcement by the Lender of its Remedies under the Loan Documents.  Each Loan Document, when executed and delivered, will constitute the legal, valid and binding obligations of each Loan Party which is a party to or bound by such Loan Document, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally.

5.03    Finder's or Broker's Fees.    Except as otherwise disclosed in Part B of Exhibit "C": (a) no finder's, broker's or other fee or compensation of any kind is payable to any Person in connection with the Loan, and (b) the payment of any such fee disclosed in Part B of Exhibit "C" is the sole responsibility of the Borrower and such fee has been (or upon recordation of the Trust Deed will be) paid in full by the Borrower.  The Borrower hereby indemnifies and holds harmless the Lender from any claims, liability, damages, costs or expenses (including without limitation the fees and expenses of legal counsel) resulting from or arising out of any claims or assertions by any Person (including without limitation any broker, agent, financial advisor or other intermediary) for any finder's, broker's or other fee or compensation of any kind in connection with the Loan.  Such indemnification obligation on the part of the Borrower shall survive termination of the Loan Documents.

5.04    Collateral.  The Borrower has and will continue to have (or upon recordation of the Trust Deed will have and from and after such recordation will continue to have) good and marketable title to the Collateral, free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers.  Upon recordation of the Trust Deed and filing of the financing statement executed by the Borrower, the Trust Deed will create a valid and indefeasible first priority perfected Lien in the Collateral securing the payment and performance of all Obligations, subject only to Permitted Prior Exceptions and Permitted Transfers.  No financing

9

**EXHIBIT  B**

statements covering any of the Collateral are on   file in any public office, except financing statements in favor of the Lender and any other financing statements approved by the Lender in writing.

5.05   Project Information.  (a) The Borrower and, to the best knowledge of the Borrower, any Governmental Agency having jurisdiction over the Land, have complied in all material respects with all applicable Laws and Other Requirements relating to the division and development of the Real Property, and the Borrower is, and the construction of the Improvements in accordance with the terms of this Agreement will be, in compliance in all respects with all applicable Laws and Other Requirements relating to the Collateral or the Project.  (b) Except as otherwise disclosed in Part B of Exhibit "C", (i) all Authorizations required in connection with the Collateral or the Project have been regularly and finally received (other than routine permits for work which has not yet commenced and any required certificates of occupancy or other approvals of construction by any Governmental Agency which (in each case) are to be issued on a ministerial basis as required from time to time during the course of construction and after completion), and (ii) the development and use of the Real Property for its intended purpose do not require the payment of extraordinary fees or assessments or the construction of other improvements, will not contravene any applicable Laws or Other Requirements, and are not subject to any other legal, contractual or practical impediments which are material in the aggregate.  (c) The Project Budget and any Line Item Budget delivered to the Lender are based on information deemed reliable by the Borrower and represent the Borrower's best estimate of all Project Costs that will be required in connection with the Project, and all Project Costs shown in the Project Budget or any such Line Item Budget as "Previously Paid By Borrower" have been paid in full.  (d) All Utility Services, streets, walks and other offsite improvements relating to or adjoining the Land or necessary for the development of the Project and the occupancy of the Real Property for its intended purpose have been or will be promptly completed and/or otherwise made available at no further expense to the Borrower (except for costs relating to such work reflected in the Project Budget for "Site Development") and are not and will not be subject to any conditions or restrictions which may adversely affect the Collateral or the Project in any material respect.  (e) The approximate acreage of the Land is correctly set forth in § 1.00 and, except as otherwise disclosed in Part B of Exhibit "C", (i) the Land is not located in a Flood Hazard Area, nor is the Land subject to or affected by any existing or proposed Special Taxes (other than Special Taxes approved in writing by the Lender after the date of this Agreement), and (ii) each Unit (together with any undivided interests in common areas to be transferred to the purchaser of such Unit) and any common areas to be transferred to a homeowners association are separately transferable in compliance with all applicable subdivision Laws and Other Requirements.  (f) Except as otherwise disclosed in writing to the Lender, the Architect Agreement and the Construction Contract, if any, are in full force and effect and free from any material breach or default by any party.

5.06   Financial Information.  (a) The Financial Statements of each Loan Party which have been furnished to the Lender fairly present such Loan Party's financial condition as at the dates of such Financial Statements and the  results of operations for the periods covered by such Financial Statements in accordance with generally accepted accounting principles consistently applied (or such other method of preparation approved by the Lender in writing), and since the respective dates of such Financial Statements, there has been no material adverse change in the financial condition, operations, properties or prospects of such Loan Parties.  (b) Each Loan Party has filed all tax returns required to be filed by it, and has paid all Taxes due pursuant to such returns or in respect of any of its properties (except for any such Taxes which are being actively contested in good faith by appropriate proceedings), and to the best knowledge of each Loan Party, no basis

10

EXHIBIT  B

exists for additional assessments which have not been adequately reserved against in the Financial Statements referred to above or otherwise disclosed in writing to the Lender.

5.07   Litigation and Other Matters.  Except as otherwise disclosed in writing to the Lender:  (a) no actions or other proceedings affecting or relating to the Collateral or the Project are pending or, to the best knowledge of each Loan Party, threatened, (b) no actions or other proceedings are pending or, to the best knowledge of each Loan Party, threatened against or affecting any Loan Party or any property of any Loan Party which, if determined adversely to such Loan Party, could materially impair the financial condition, operations, properties or prospects of such Loan Party or the ability of such Loan Party to perform its obligations under the Loan Documents, and (c) the Borrower has given notice to the Lender of any other matters which the Borrower is required to disclose to the Lender under § 4.11(a).

5.08   Documents and Other Information.  All Documents and other information delivered to the Lender pursuant to any of the Loan Documents are and will be complete and correct in all material respects at the time of delivery to the Lender.

5.09   Competing Projects.  The Borrower hereby represents and warrants that neither the Borrower nor any of its affiliates has or intends to construct, create, arrange, develop, purchase or sell any residential housing improvements (or units which are components hereof) which constitute a Competing Project.

5.10   Compliance with Laws.  Without in any way limiting any of Borrower's other representations, warranties or covenants contained in this Agreement, Borrower hereby represents, warrants and covenants that the Improvement Plans are, and the construction of the Improvements according thereto will be, in compliance with all applicable federal, state and local laws, rules, regulations, ordinances and codes, including without limitation the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et. seq., as amended, and the Fair Housing Act, 42 U.S.C. § 3601, et. seq., as amended.

6.00   Events of Default and Remedies of the Lender.

6.01   Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default:

(a)   the Borrower shall fail to pay all or any portion of the principal of the Note when due; or

(b)   the Borrower shall fail to pay any installment of interest on the Note when due, or shall fail to pay any other amount payable by the Borrower to the Lender under the Loan Documents (including any deposit of Borrower's Funds required by the Disbursement Schedule) within 20 days after the date when due, or the Borrower shall fail to pay all accrued interest and all other amounts then payable by the Borrower to the Lender under the Loan Documents on the Maturity Date or the date of final payment of the principal of the Note in full; or

**EXHIBIT   B**

(c)     any Loan Party shall fail     to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed and either (i) such failure shall continue for more than 30 days after notice of such failure is given by the Lender to such Loan Party, unless such failure is not reasonably capable of being cured within such 30-day period (but is reasonably capable of being cured within 60 days after such notice) and such Loan Party commences action to cure such failure within such 30-day period and diligently and continuously prosecutes such action to completion and causes such failure to be cured within 60 days after such notice, or (ii) such failure is not reasonably capable of being cured within 60 days after notice of such failure is given by the Lender to such Loan Party; or

(d)     any Representation proves to have been incorrect in any material respect when made; or

(e)     work relating to construction of the Improvements ceases for 15 consecutive days for any reason other than acts of God or other causes beyond the reasonable control of the Borrower, or such work ceases for 30 consecutive days for any reason; or

(f)     the Borrower is enjoined by any court or other Governmental Agency from constructing the Improvements or selling Units or performing any Obligations and such injunction continues unreleased and unstayed for 45 days; or

(g)     all or a substantial or material portion of the Collateral is damaged or destroyed by fire or other casualty and the Lender has reasonably determined that the security of the Trust Deed has been impaired or that the repair, restoration or replacement of the Collateral in accordance with the requirements of the Trust Deed is not economically practicable or is not likely to be completed prior to the Maturity Date; or all or a substantial or material portion of the Collateral is condemned, seized or appropriated by any Governmental Agency or subject to any action or other proceeding instituted by any Governmental Agency for any such purpose; or

(h)     any Loan Party is dissolved or liquidated or merged with or into any other Person; or for any period of more than 10 days any Loan Party which is a corporation, limited liability company, partnership, trust or other entity ceases to exist in its present form and (where applicable) in good standing and duly qualified under the Laws of the jurisdiction of its incorporation or formation and California; or any Loan Party who is an individual dies or becomes incapacitated; or all or substantially all of the assets of any Loan Party are sold or otherwise transferred; or

(i)     any Loan Party ceases to be managed and controlled by the Person or Persons who manage and control such Loan Party as of the date of this Agreement, or any Loan Party assigns or attempts to assign any rights or interests under any Loan Document without the prior written consent of the Lender; or any Loan Document becomes or is claimed by any Loan Party to be unenforceable against any Loan Party; or the Trust Deed shall cease to constitute a valid and indefeasible first priority perfected Lien in the Collateral, or any sale, transfer or encumbrance of all or any portion of the Collateral occurs in violation of Section 4.05, subject only to Permitted Prior Exceptions and Permitted Transfers; or

12

**EXHIBIT  B**

(j)      any Loan Party is subject to an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors; or any Loan Party applies for or consents to the appointment of any receiver, trustee or similar official for it or for all or any part of its property (or any such appointment is made without its consent and the appointment continues undischarged and unstayed for 60 days); or any Loan Party institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceeding relating to it or to all or any part of its property under the Laws of any jurisdiction (or any such proceeding is instituted without its consent and continues undismissed and unstayed for 60 days); or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against any of the Collateral or any other property of any Loan Party and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(k)      any demand for payment is made to the Lender under any Set Aside Letter and not rescinded or withdrawn within 3 days; or any demand for payment is made to the LC Bank under any Letter of Credit and not rescinded or withdrawn prior to payment thereunder; or

(l)      any Guarantor purports to revoke, cancel or terminate its Guaranty prior to the termination date (if any) provided therein;

(m)      any material adverse change shall occur in the financial condition, operations, properties or prospects of any Loan Party, or any event shall occur which has a material adverse impact on the Collateral or the Project, or.

(n)      any Loan Party is in default or an event of default has occurred (with respect to any loan or other obligation owing by Loan Party to Lender) or on Loan Party's debt with any other lender.

6.02     Remedies of the Lender.  Upon the occurrence of any Event of Default, the Lender may, without notice to or demand upon the Borrower, which are expressly waived by the Borrower (except for notices or demands otherwise required by applicable Laws to the extent not effectively waived by the Borrower and any notices or demands specified in the Loan Documents), exercise any one or more of the following Remedies as the Lender may determine:

(a)      the Lender may, at its option, terminate all commitments to make Disbursements or issue Set Aside Letters or cause the issuance of Letters of Credit, or to release any Collateral from the Trust Deed, or the Lender may waive the Event of Default or, without waiving, determine, upon terms and conditions satisfactory to the Lender, to make further Disbursements or issue further Set Aside Letters or cause the issuance of further Letters of Credit, or to release any Collateral from the Trust Deed;

(b)      the Lender may declare the unpaid principal of the Note and all accrued interest and other amounts payable under the Loan Documents to be immediately due and

13

payable, in which event all such amounts shall immediately be due and payable without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Borrower;

(c) the Lender may demand from the Borrower, and upon such demand the Borrower shall pay to the Lender, for placement in a Cash Collateral Account, in addition to all other amounts payable by the Borrower under the Loan Documents, an amount equal to the sum of (i) the maximum aggregate unfunded potential liability of the Lender under all Set Aside Letters then outstanding, and (ii) the maximum aggregate amount that could be drawn under all Letters of Credit then outstanding, assuming strict compliance with all conditions to drawing;

(d) the Lender may perform any of the Borrower's Obligations in such manner as the Lender may determine;

(e) the Lender may foreclose upon the Collateral by judicial action or private power of sale;

(f) the Lender may, either directly or through an agent or court-appointed receiver, take possession of the Collateral and enter into such contracts and take such other action as the Lender deems appropriate to complete or partially construct all or any part of the Improvements, subject to such modifications and changes in the Project or the plan of development as the Lender may deem appropriate;

(g) the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Borrower against any and all obligations of the Borrower under this Agreement; and

(h) the Lender may proceed to protect, exercise and enforce any and all other Remedies provided under the Loan Documents or by applicable Laws.

All costs, expenses, charges and advances of the Lender in exercising any such Remedies (including any such amounts which cause the obligations of the Borrower to exceed the face amount of the Note) shall be payable by the Borrower to the Lender in accordance with § 4.12.

Each of the Remedies of the Lender provided in the Loan Documents is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in the Loan Documents or by applicable Laws. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy. No application of payments, or any advances or other action by the Lender, will cure or waive any Event of Default or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents or prevent the exercise, or continued exercise, of any Remedies of the Lender.

7.00   Miscellaneous.

14

REVISED MAY 2003

7.01   <u>Waivers and Amendments</u>.  No supplement to, modification or amendment of, or waiver, consent or approval under, any of the Loan Documents shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

7.02   <u>Survival of Representations</u>.  All Representations shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and have been or will be relied upon by the Lender, notwithstanding any Investigation made by the Lender or on its behalf.

7.03   <u>Notices</u>.  All notices and other communications provided under any Loan Document shall be in writing and mailed or personally delivered to the appropriate party at the address set forth on the signature page of this Agreement or any other Loan Document or, as to any party, at any other address in the State of California as shall be designated by it in a written notice sent to the other party.  All notices and other communications by the Borrower which are expressly subject to receipt by the Lender under the terms of the Loan Documents will be effective when received by an officer or other representative of the Lender having direct responsibility for administration of the Loan.  In all other cases, any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered, provided that the requirements of this sentence shall not impair or delay the effectiveness of any notice or other communication given by the Lender under the Trust Deed or any Additional Collateral Agreements when such notice or other communication is given in compliance with and would otherwise be effective under applicable Laws.

7.04   <u>Relationship of Parties</u>.  The relationship between the Borrower and the Lender is, and at all times shall remain, solely that of debtor and creditor, and shall not be, or be construed to be, a joint venture, equity venture, partnership or other relationship of any nature.

7.05   <u>Nonliability of the Lender</u>.  The Borrower acknowledges and agrees that:

(a)   the Borrower shall be solely responsible for and shall rely solely on its own judgment with respect to all matters relating to the Collateral or the Project, including the conduct of the Borrower and its agents and employees, the quality, adequacy and suitability of the Improvement Plans and any Change Orders and any work or materials furnished or to be furnished in connection with the Project, the skill, qualifications and performance of architects, contractors, subcontractors and suppliers, the feasibility of the Project and the sufficiency of budgets, cost projections and Insurance, the supervision, status and progress of construction and compliance by the Borrower with the requirements of this Agreement with respect to such construction and the accuracy and completeness of all Disbursement Requests, Set Aside Letter Requests and Letter of Credit Requests, and the Lender does not assume any responsibility to the Borrower or any other Person to review, inspect, supervise or approve, or to provide any advice or information with respect to, any such matters;

15

(b)      Inspections of                    construction made by or on behalf of the Lender, and acceptance, approval or review by the Lender of any Documents, information, conditions or performance or any other action by the Lender under any of the Loan Documents, are for purposes of administration of the Loan only and for the sole protection of the Lender, and shall not constitute a representation or warranty by the Lender to the Borrower or any other Person or be relied upon by the Borrower or any other Person for any other purpose;

(c)      the Lender shall have no responsibility or liability for any delays in funding or construction caused by any inspection of construction or review of Documents, information, conditions or performance or any other action by the Lender in connection with any Disbursement or Change Order;

(d)      the Lender does not owe any duty of care to protect the Borrower or any other Person against or to inform the Borrower or any other Person of, and the Lender shall not be responsible or liable to the Borrower or any other Person for any loss, damage, liability or claim of any kind relating to injury or death to persons or damage to property or other loss resulting from, the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or any negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or the improper application of any Disbursements; and

(e)      the provisions set forth in this Agreement for the issuance of Letters of Credit are included solely as an accommodation to the Borrower and shall not constitute an agreement, commitment, guarantee or other assurance by the Lender that any such Letters of Credit are available or will be issued on the terms set forth herein or otherwise, and the Lender shall in no event have any liability or obligation to the Borrower, or be subject to any setoff, counterclaim or other defense, as a result of the failure, inability or unwillingness of the Lender to designate one or more LC Banks hereunder or to request or cause any LC Bank to issue any Letters of Credit hereunder.

7.06     Benefits and Assignment.  The Loan Documents are made for the purpose of defining the rights and obligations of the Loan Parties and the Lender in connection with the Loan and are intended for the sole protection of the Loan Parties and the Lender and the Lender's successors and assigns, and no other Person shall have any rights of any nature under or by reason of the Loan Documents.  The Loan Documents shall be binding on and inure to the benefit of each of the Loan Parties and the Lender and their respective successors and assigns, except that no Loan Party shall have the right to assign any rights or interests under any Loan Document without the prior written consent of the Lender.  The Lender may from time to time sell participations in the Loan to any Person (including Affiliates of the Lender) without notice to or the consent of any Loan Party.

7.07     Payments and Computations.  All payments by any Loan Party under the Loan Documents shall be made in lawful money of the United States free and clear of, and without reduction by reason of, any Taxes.  Any payment which is stated to be due on a day which is not a Banking Day shall be made on the next succeeding Banking Day, and any such extension shall be included in the computation of the payment of Interest.  Whenever any interest or other amount payable under the Loan Documents is to be computed on the basis of a year of a specified number of days, the amount shall be calculated on the basis of a year of such specified number of days for

EXHIBIT  B

the actual number of days (including the first, but excluding the last) occurring in the period for which such calculation is made. For purposes of calculating amounts paid or payable under the Loan Documents, credit for payments shall be given upon receipt of same day funds by the Lender at its office located at 3465 E. Foothill Blvd, Pasadena, California 91107, Attention: Homebuilder Division (or such other location specified by the Lender from time to time in writing) at or before the close of business, Los Angeles time, on any Banking Day. Except as otherwise expressly provided in the Loan Documents, all payments on the Obligations received by the Lender shall be applied to the Obligations in such order and manner as the Lender may determine.

7.08   Publicity. During the course of construction of the Improvements and until the Loan is repaid in full, the Lender may place signs on the Land and issue or publish releases or announcements stating that construction financing is being provided by the Lender to the Borrower.

7.09   Unsecured Environmental Obligations. Anything contained in this Agreement or the Trust Deed to the contrary notwithstanding, (a) the Borrower shall have no obligation or liability under this Agreement or the Trust Deed for any obligation or liability of the Borrower under any Environmental Indemnity executed by the Borrower which does not state it is secured by the Trust Deed (any such obligation or liability being deemed to arise and exist solely under such Environmental Indemnity), and (b) any obligation or liability of the Borrower under such Environmental Indemnity shall not be secured by the Trust Deed.

7.10   Obligations Absolute. The obligations of the Borrower under this Agreement with respect to any Letter of Credit or Set Aside Letter (including the obligation to pay or reimburse to the Lender any and all amounts paid thereunder and interest thereon) shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and the Note under all circumstances, including without limitation the following circumstances:

(a)      any lack of validity or enforceability of this Agreement, any Letter of Credit or Set Aside Letter or any other agreement or instrument relating thereto  (this Agreement and all of the other foregoing being collectively referred to herein as the "Related Documents");

(b)      any change in the time, manner or place of payment of, or in any other term of, any or all of the obligations of the Borrower in respect of any Related Document or any other amendment or waiver of or any consent to departure from any Related Document;

(c)      the existence of any claim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a Letter of Credit or Set Aside Letter (or any Persons for whom any such beneficiary or any such transferee may be acting), the Lender, the LC Bank or any other Person, whether in connection with the transactions contemplated by the Related Documents or any unrelated transaction;

(d)      any statement or any other document presented under a Letter of Credit or Set Aside Letter proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

17

REVISED MAY 2003

**EXHIBIT  B**

(e)     payment by the LC Bank under   a Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit;

(f)     any exchange, release or non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any guarantee, for any or all of the obligations of the Borrower in respect of the Related Documents; or

(g)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

7.11    _Rules of Construction._ (a) For purposes of this Agreement and the other Loan Documents: (i) any reference to "days" or "months" shall mean calendar days or months, (ii) the word "including" shall mean "including without limitation", (iii) any reference in any of the Loan Documents to any Loan Document or other Document or exhibit shall mean such Loan Document or other Document or exhibit as it may from time to time be supplemented, modified, amended and extended in accordance with the terms of this Agreement, (iv) defined terms shall be equally applicable to the singular and plural forms, and (v) all existing and future exhibits to this Agreement are incorporated in this Agreement by this reference. (b) Time is of the essence of the Loan Documents, and the provisions of the Loan Documents are declared to be severable. (c) All accounting terms used and not otherwise defined in any Loan Document shall be construed in conformity with, and all financial information maintained or submitted by any Loan Party or other Person under any Loan Document shall be prepared in accordance with, generally accepted accounting principles consistently applied (or such other principles approved by the Lender in writing). (d) If more than one Loan Party signs or is otherwise bound by any Loan Document, the liability of each shall be joint and several. (e) The Loan Documents shall be governed by, and construed and enforced in accordance with, the Laws of California.

7.12    _Counterparts; Facsimile Signatures._ This Agreement, and any document executed in connection with this Agreement, may be signed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page. Any signature page of this Agreement, or any document executed in connection with this Agreement, may be detached from any counterpart of this Agreement or such other document and reattached to any other counterpart of this Agreement or such other document identical in form hereto or thereto but having attached to it one or more additional signature pages. This Agreement, and any document executed in connection with this Agreement, shall be deemed executed upon each party's delivery of signed signature pages of this Agreement or such other document, which signature pages may be delivered by facsimile with the same effect as delivery of the originals.

7.13    _Waiver of Jury Trial._ EACH OF THE LENDER AND THE BORROWER WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE BORROWER AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE BORROWER OR ANY ACTION OR INACTION BY EITHER PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

18

REVISED MAY 2003

**EXHIBIT B**

[Signatures Commence on Next Page]

REVISED MAY 2003

19

EXHIBIT B

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Agreement to be duly executed as of the date first written above.

"LENDER":

INDYMAC BANK, F.S.B.

By: _____
     Kenneth Shellem, S.V.P.

"BORROWER":

Eden Garden, LLC,
a California limited liability company

By: _____
     Ali K. Amidy, Managing Member

Lender's Address:
IndyMac Bank, F.S.B.
3465 E. Foothill Blvd., FH-01-09
Pasadena, California 91107
Attn: Homebuilder Division

Borrower's Address:
Eden Garden, LLC
655 Campbell Technology Park, #125
Campbell, CA 95008

REVISED MAY 2003

**EXHIBIT B**

Loan No. 0000

EXHIBIT "A"

**LEGAL DESCRIPTION OF LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE, COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DECRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

REVISED MAY 2003

A-1

**EXHIBIT  B**

Loan No0000                EXHIBIT "B"

### DISBURSEMENT SCHEDULE

All Disbursements, Set Aside Letters and Letters of Credit shall be made or issued in accordance with the following terms, conditions and procedures:

(a)    Disbursement Account.  The following demand deposit account (the "Disbursement Account") has been opened at the _____ branch of _____ (the "Bank") in the name of the Borrower, subject to a security interest in favor of the Lender, which has been acknowledged in writing by the Bank:  Account Number _____, A BA Routing Number _____.

(b)    Method of Disbursement.  Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule:  (i) each Disbursement shall be made on the basis of a Disbursement Request submitted (in duplicate) by the Borrower to the Lender, pursuant to which Borrower shall certify that the Project Costs covered by the Disbursement Request have been paid or incurred by the Borrower, and (ii) upon the Lender's approval of the Disbursement Request, the proceeds of the Disbursement shall be deposited into the Disbursement Account or, in the case of Disbursements for any Line Item for "Land," into an escrow designated by the Borrower and approved by the Lender, except that (A) the proceeds of any Disbursement to pay interest or other amounts owing to the Lender shall be made by book entry, and (B) at the Lender's option, Disbursements may otherwise be made by the Lender directly to the Borrower, to the Contractor, if any, or to any other Lien Claimant, or jointly to one or more of such Persons or to other Persons designated by the Borrower, or in such other manner as the Lender may approve or require, including, without limitation, through the title company.

(c)    Set Aside Letters and Letters of Credit.  Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule, the Lender shall issue Set Aside Letters from time to time and cause the LC Bank to issue Letters of Credit from time to time upon written request of the Borrower, provided that (i) the obligation of the Lender to issue any Set Aside Letter and the agreement of the Lender to cause the LC Bank to issue any Letter of Credit shall be subject to receipt by the Lender of the applicable Set Aside Letter Fee or Letter of Credit Fee and to the Lender's approval, in its sole discretion, of the form and substance of the Set Aside Letter or Letter of Credit and, except insofar as the purpose and maximum amount of the Set Aside Letter or Letter of Credit are set forth in Part C of Exhibit "C", the purpose and maximum amount of the Set Aside Letter or Letter of Credit, (ii) the issuance of any Letter of Credit shall be further subject to the consent and approval of the LC Bank in its sole discretion and to the approval by the Lender in its sole discretion of the terms and conditions of issuance, and the provisions for the issuance of Letters of Credit set forth herein shall in any event be subject to § 7.05(e) of the Agreement, and (iii)  unless the Lender otherwise consents, (A) no Set Aside Letter shall obligate the Lender to advance funds after the Maturity Date, (B) no Letter of Credit shall have an expiration date after the Maturity Date, and (C) no Set

EXHIBIT  B

Aside Letter or Letter of Credit shall be issued if the Lender has reasonably determined that any Project Costs intended to be covered or secured by such Set Aside Letter or Letter of Credit are not likely to be incurred prior to the Maturity Date. The maximum amount that the Lender may be obligated to fund under any Set Aside Letter at any time plus any amounts actually funded by the Lender under any such Set Aside Letter or by the LC Bank under any Letter of Credit shall reduce, to that extent, the amount otherwise available to be disbursed or set aside for other Project Costs covered by the same Line Item, and any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall be deemed to be a Disbursement of the proceeds of the Loan or Borrower's Funds (as the case may be) for purposes of the Agreement, the Note and the other Loan Documents (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount), except that the funding of any such amount shall not be subject to any conditions or requirements other than those set forth in the Set Aside Letter or Letter of Credit. Without limitation on the foregoing provisions of this paragraph (c), the Borrower acknowledges and agrees that (1) any disbursement by the LC Bank under any Letter of Credit represents an advance of the proceeds of the Loan to or for the account of the Borrower on behalf of the Lender, and (2) in consideration of the issuance of any such Letter of Credit and the obligation of the Lender to reimburse the LC Bank for any such disbursement thereunder, each such disbursement shall be deemed to be a Disbursement of the Loan (as described above) and the Borrower agrees to pay to the Lender the amount of each such disbursement, with interest thereon, on the terms set forth in the Note with respect to all Disbursements of the Loan (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount).

(d)     Line Item Budgets; Use of Proceeds. The Borrower shall deliver to the Lender, prior to the earlier of the first Disbursement or the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower (or prior to such later date as the Lender may approve in writing), a Line Item Budget for the Project. Unless the Lender otherwise consents: (i) each Disbursement shall be made and used solely to pay or reimburse the Borrower for payment of, and each Set Aside Letter or Letter of Credit shall be issued solely with respect to, Project Costs associated with specific Line Items set forth in the Project Budget and any applicable Line Item Budget as specified in the Disbursement Request, and (ii) the total amount disbursed for Project Costs associated with any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget (plus any amounts disbursed by the Lender for such purpose from "Contingency" in accordance with clause (B) below), and the amount of any Set Aside Letter or Letter of Credit issued in respect of any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget less the total of all amounts previously disbursed or set aside (or secured by any Letter of Credit) for such Line Item. For purposes of this paragraph: (A) Disbursements with respect to any Line Item for "Land" shall be made for the purchase price of the Land and any existing improvements (if not previously purchased by the Borrower) and payment of existing Liens affecting the Collateral (other than Permitted Exceptions), with any balance to be disbursed as directed by the Borrower, (B) Disbursements with respect to any Line Item for "Contingency" shall be available for cost overruns on specific Line Items or for Project Costs for matters not covered by specific Line Items shall not exceed the percent of hard costs complete as determined by Lender's most current inspection, subject in each case to the prior approval of the Lender, and (C) Disbursements with

REVISED MAY 2003

B-2

**EXHIBIT B**

respect to any Line Item for "Developer Overhead" and "Project Indirects" shall not exceed the percent of hard costs complete as determined by Lender's most current inspection.

If the Borrower effects any cost savings with respect to any Line Item, the Borrower shall give notice to the Lender of such cost savings promptly upon the discovery of the same, whereupon the amount of such cost savings shall be transferred from the Line Item(s) in question to the "Contingency" Line Item, and shall thereafter be available for disbursement as stated in clause (B) above.

Unless the Lender otherwise consents, no modifications shall be made to the Project Budget or any Line Item Budget at any time, except that (i) the Project Budget shall be supplemented from time to time by any Line Item Budget approved by the Lender, and (ii) the Project Budget and any applicable Line Item Budget shall be appropriately modified by the Lender from time to time to reflect any increase in Project Costs for which additional Borrower's Funds have been deposited by the Borrower with the Lender in accordance with paragraph (f) below.

(e)     Disbursement, Set Aside Letter and Letter of Credit Procedures.  Each Disbursement (other than Disbursements to pay interest or other amounts owing to the Lender) and each Set Aside Letter or Letter of Credit shall be subject to prior receipt by the Lender, in form and substance satisfactory to the Lender, of each of the following items: (i) a Disbursement Request or Set Aside Letter Request or Letter of Credit Request, as the case may be, submitted (in duplicate) by the Borrower, certifying the status of construction of the Improvements and the amount requested (and the total of all amounts previously requested) with respect to each Line Item, and also certifying that no Event of Default has occurred and is continuing and that all Representations made by the Borrower in any of the Loan Documents are correct in all material respects as of the date of the Disbursement Request or Set Aside Letter Request or Letter of Credit Request, (ii) if requested by the Lender, a certificate or statement from the Contractor, if any, and/or the Architect with respect to the status of construction or the amount requested, (iii) originals or copies of such bills, invoices, receipts, lien releases or waivers or other evidence of payment or information as the Lender may reasonably require with respect to any Lien Claims or potential Lien Claims or the status of construction or amounts paid or payable for any Project Costs, (iv) to the extent that any Disbursement relates to costs for building materials, equipment or other Personal Property, evidence that such building materials, equipment or other Personal Property have been incorporated into the Improvements or have been delivered to the Borrower and stored and insured in a manner satisfactory to the Lender, (v) evidence of any insurance required by § 4.08 (if not previously furnished to the Lender) and, if requested by the Lender, evidence that any required Financing Commitment is in full force and effect, (vi) such endorsements to the Title Policy (including CLTA Endorsement No. 102.5 upon completion of foundations and CLTA Endorsement No. 122) and such other Documents and information relating to the Collateral or the Project as the Lender may reasonably request, (vii) in the case of the first Disbursement or Set Aside Letter or Letter of Credit only, the "Required Items" described in Exhibit "C", and (viii) to the extent provided in paragraph (d) above, any Line Item Budget required to be delivered to the Lender prior to the Disbursement or Set Aside Letter or Letter of Credit, and (ix) in the case of any portion of the Loan which is subject to any "Retention Requirements" or other "Holdback Requirements" specified in Exhibit "C", such evidence as the Lender may require that all applicable conditions have been fulfilled.

REVISED MAY 2003

B-3

Unless the Lender otherwise consents, not more than 2 Disbursements (other than Disbursements to pay interest or other amounts owing to the Lender) shall be made during any month. Unless otherwise paid by the Borrower, and notwithstanding paragraph (b) above, Disbursements for interest and other amounts owing to the Lender may be made by the Lender without further authorization from the Borrower.

Unless the Lender otherwise consents, the Lender shall not be obligated to make any Disbursement or issue any Set Aside Letter or cause any Letter of Credit to be issued if (A) the Lender has determined that an Event of Default has occurred or that an event which, with notice of the passage of time or both, would be an Event of Default has occurred or that any Representation made by the Borrower in any of the Loan Documents would not be correct in all material respects if made on and as of the date of the Disbursement or Set Aside Letter or Letter of Credit, or (B) the Lender has determined, based on inspections by or on behalf of the Lender or such other information as the Lender deems appropriate, that the construction of the Improvements is not substantially as represented by the Borrower or is not in compliance with the requirements of the Agreement, or (C) the Borrower has failed to deposit with the Lender any Borrower's Funds required by paragraph (f) below, or (D) the Lender is required under applicable Laws to withhold the Disbursement or Set Aside Letter or Letter of Credit or a stop notice has been asserted against the Lender and has not been fully released, or (E) the Lender has determined that any Liens or Rights of Others, other than Permitted Prior Exceptions, may have priority over the Trust Deed with respect to the Disbursement or amounts that may be funded under the Set Aside Letter or Letter of Credit.

(f)     Deposit of Borrower's Funds. Prior to the first Disbursement or Set Aside Letter or Letter of Credit (or prior to such later date as the Lender may approve in writing), the Borrower shall deposit with the Lender Borrower's Funds in an amount equal to all "Additional Costs To Be Paid By Borrower" set forth in the original Project Budget, and the Borrower may from time to time deposit additional Borrower's Funds with the Lender as the Borrower deems appropriate to cover any increase in Project Costs. In addition, if the Lender at any time determines that any actual or estimated Project Costs have exceeded or can reasonably be expected to exceed the corresponding amount set forth in the Project Budget or any applicable Line Item Budget (whether as a result of Change Orders or otherwise), or that Project Costs for any matters not covered by specific Line Items have been or may be incurred by the Borrower, or that the undisbursed portion of the Loan [together with the undisbursed portion of all Borrower's Funds deposited with the Lender under this paragraph (f)] is or may be insufficient to pay all Project Costs that may be payable under the Loan Documents or otherwise required in connection with the Project (including a reasonable reserve for contingency, interest and other costs and expenses), then the Borrower shall deposit with the Lender, on demand, additional Borrower's Funds in an amount deemed reasonably necessary by the Lender to pay such Project Costs or to cover such insufficiency. Any Borrower's Funds deposited with the Lender under this paragraph (f) shall be held in a Cash Collateral Account and shall be disbursed by the Lender prior to further Disbursements of the Loan.

(g)     Disbursement Controls. Notwithstanding anything in this Exhibit "B" to the contrary, the disbursement controls shall be as follows:

**EXHIBIT   B**

| Disbursement Controls | Standard ☒ |
|---|---|
| Guidelines for selection: | Established customers with conforming projects |
| Disbursement Processing Description: | |
| • Loan Admin Due Diligence Review | Prior to Disbursement |
| • Backup Invoices for Hard Costs | Not Required |
| • Backup Invoices for Soft Costs | Required |
| • Conditional/Unconditional Lien Waivers | Not Required |
| • Retention | Consistent with Building Contract |
| • Inspection of Hard Cost Items | Prior to Disbursement |
| • Title Endorsement | At disbursement |
| • Borrower's Draw Request (HBD –CL Form) | Required |
| • Frequency of Disbursement | 1-2 a month |
| Sales Verification | Monthly Sales Report |
| Specify Retention percentage | 5% |

REVISED MAY 2003

B-5

**EXHIBIT  B**

Loan No.0000

## EXHIBIT "C"

### LOAN REQUIREMENTS

(Residential Tract Construction)

Borrower: Eden Garden, LLC, a California limited liability company

Project: Eden Garden Townhomes

Loan Amount: $5,904,000.00

Loan Fee: $44,280.00 (0.75% of Loan Amount)

A.  Required Items (to be furnished by the Borrower prior to the first Disbursement or Set Aside Letter):

   1. Promissory Note in the face amount of $5,904,000.00 executed by the Bor rower in favor of the Lender to evidence the Loan.

   2. Construction Trust Deed with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower in favor of the Lender to secure the Loan and other Obligations of the Borrower, which shall cover the Real Property, certain Personal Property, the Project Agreements, the Improvement Plans and such other rights, properties and interests relating to the Project or any other Collateral as the Lender may require.

   3. Financing statement for the account of the B orrower in favor of the Lender with respect to such Collateral as the Lender may require.

   4. Unsecured Environmental Indemnity executed by the B orrower.

   5. General Guaranty of all Obligations of the Borrower executed by Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

   6. Completion Guaranty executed. N/A

   7. Environmental Guaranty executed by Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

   8. Authorizing Resolutions for each Loan Party.

   9. Charter Documents for each Loan Party.

REVISED MAY 2003

C-1

**EXHIBIT  B**

10. Current Financial Statements for Eden Garden, LLC, a California limited liability company, Centra Net Investment, LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

11. Evidence of insurance required by § 4.08 and Insurance Requirements Letter.

12. Copy of Improvement Plans.

13. Copy of Architect Agreement.

14. Copy of Construction Contract.

15. Copy of Contractor's Resume.

16. Assignment of Project Documents executed by the Borrower.

17. Copies of permits when available.

18. Copy of preliminary title report and recorded exceptions.

19. Copy of soils report. N/A

20. Copy of final subdivision map.

21. Evidence of compliance with zoning and other land use restrictions.

22. Copy of environmental impact report or negative declaration. N/A

23. Environmental investigative report. N/A

24. Environmental Questionnaire shall be fully executed.

25. Appraisal prepared by the Lender or an appraiser approved by the Lender confirming the prospective market value of the Real Property, assuming completion of the Improvements, to be not less than $7,380,000.00.

26. Cost Review prepared by Construction Services Manager in form and content satisfactory to Lender.

27. Evidence of Utility Services.

28. Copy of any proposed CC&R's or easements.

29. List of bonds, security deposits, set aside letters or letters of credit required in connection with the Project.

**EXHIBIT B**

30. Evidence of payment of all Project Costs "Previously Paid By Borrower" set forth in the Project Budget.

31. Borrower's Funds in the form of cash deposits for all "Additional Costs To Be Paid By Borrower" set forth in the Project Budget.

32. Evidence of recording/filing of Trust Deed/financing statement.

33. Confirmation that Title Policy has been or will be issued at or prior to first Disbursement or Set Aside Letter.

34. Evidence that the Loan Fee and all of Lender's closing costs payable by the Borrower under § 4.12 have been or will be paid at or prior to the recordation of the Trust Deed.

35. Opinion of counsel for the Loan Parties. N/A

36. Loan Servicing Guaranty executed. N/A

37. Additional Collateral Agreements. N/A

38. Copy of Takeout Commitment. N/A

39. Copy of budget for homeowners association.

40. Statement of conditions for transfer of common areas to homeowners association.

41. Insured Closing Protection Letter from the title company addressed to Lender concerning the title agent, if applicable.

42. UCC searches showing financing statement executed by the Borrower to be a first priority filing.

B.  **Additional Matters** (including disclosure of finder's or broker's fees, Special Taxes, flood conditions, development conditions or impediments, pending or unissued consents and approvals, delayed delivery of Line Item Budgets and delayed deposit of Borrower's Funds): "NONE"

C.  **Set Aside Letters and Letters of Credit.** The Borrower anticipates that the following Set Aside Letter(s) and Letter(s) of Credit may be necessary or desirable in connection with the Project: "NOT KNOWN AT THIS TIME"

| Beneficiary | Purpose | Maximum Amount |
|---|---|---|
| | | |

REVISED MAY 2003

**EXHIBIT B**

1. _____  _____  $_____

2. _____  _____  $_____

3. _____  _____  $_____

As a condition to the issuance of each Set Aside Letter and Letter of Credit, the Borrower shall pay to the Lender a nonrefundable Set Aside Letter Fee in an amount equal to 2% of the face amount of such Set Aside Letter or a nonrefundable Letter of Credit Fee in an amount equal to 2% of the face amount of such Letter of Credit. Each such Set Aside Letter Fee or Letter of Credit Fee shall be fully earned when paid and shall not be refundable, in whole or in part, under any circumstances.

D. Presale Requirements: "NONE"

1. No sales of Units shall be closed and no common areas shall be transferred to any homeowners association until at least ___ Units have become "sold" Units.

2. Unless the Lender otherwise consents in writing, no "Model Units" shown on Exhibit "E" shall be sold or closed until all other Units in the Project of the same type have become "sold" Units or "closed" Units.

3. *No Letter credit and No charge of 2% at any time* A 4 JA

As used in Part D of this Exhibit: (a) a "closed" Unit means a Unit as to which title has been conveyed to the purchaser, and (b) a "sold" Unit means a Unit as to which a purchaser (other than the Borrower or an Affiliate of the Borrower) has entered into a binding agreement to purchase the Unit for an amount not less than the "Minimum Sales Price" set forth on Exhibit "E" and has paid a nonrefundable deposit to the Borrower, and escrow instructions have been executed by the Borrower and the purchaser.

E. Holdback Requirements (other than any "Retention Requirements" specified below): "NONE"

F. Retention Requirements:

Ninety five percent (95%) of each line item disbursed; five percent (5%) withheld until completion of applicable line item – ninety five percent (95%) of the amount otherwise available for disbursement at any time for costs associated with any Line Item for direct or hard construction costs may be disbursed with the remaining 5% retained and not disbursed to Borrower; the 5% retained amount may be disbursed upon satisfactory completion of the work associated with such Line Item and receipt by the Lender of a certification from the Borrower and the contractor, if any, and such other evidence as the Lender any require to confirm that such work has been completed and that upon disbursement of such balance all direct or hard construction costs relating to such work will

REVISED MAY 2003

**EXHIBIT B**

be paid in full and all Lien Claims and potential Lien Claims with respect to such work will be released or otherwise discharged.

EXHIBIT  B

**G** Financial Covenants:

    1.    Borrower shall provide or cause to provide to Lender until the Loan is paid in full:

        a.  Financial Statement for each Borrower after the end of each fiscal year end within 90 days prepared in accordance with generally accepted accounting principals consistently applied;

        b.  Financial Statement for each Guarantor after the end of each fiscal year end within 90 days prepared in accordance with generally accepted accounting principals consistently applied;

        c.  Financial Statement for each Borrower after the end of each quarter end within 30 days prepared in accordance with generally accepted accounting principals consistently applied;

        d.  Financial Statement for each Guarantor after the end of each quarter end within 30 days prepared in accordance with generally accepted accounting principals consistently applied;

        e.  Federal Tax Returns with all schedules including K-1, if applicable, for each Borrower within 30 days of filing;

        f.  Federal Tax Returns with all schedules including K-1, if applicable, for each Guarantor within 30 days of filing;

    2.  Borrower acknowledges that net worth is a significant consideration to Lender in connection with the making of the Loan. Accordingly, Borrower agrees that the failure by Borrower and Guarantors to maintain the following financial capabilities shall constitute an Event of Default.

        a.  tangible net worth of not less than Five Million Dollars And No Cents ($5,000,000.00) as of the end of each calendar quarter. Tangible Net Worth shall mean the excess of Assets over Liabilities, excluding, however from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, including without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

        b.  liquid assets of not less than Three Hundred Thousand Dollars And No Cents ($300,000.00) as of the end of each calendar quarter. Liquid assets shall mean cash or readily marketable publicly traded securities traded or nationally recognized public exchange.

REVISED MAY 2003

**EXHIBIT B**

    c.  maximum Debt to worth ratio not exceeding 1.00 to 1.00, measured at the end of each calendar quarter. For purposes of this section, the maximum debt to worth ratio shall be calculated by adding together total liabilities, minority partner's interest and including contingent liabilities divided by the equity. As used in this Section "Debt" shall be defined as direct liabilities plus the outstanding balances of contingent liabilities.

H.    <u>Subdivisions.</u>  The Borrower shall cause a final subdivision map or a parcel map, as applicable, covering all of the Land, to be filed for record in the county in which the Land is located, subdividing the Land in a manner consistent with the plans for the Project approved by the Lender, in full compliance with all Laws and requirements of Governmental Agencies (including without limitation the requirements of the California Subdivision Map Act and all local ordinances thereunder), on or before N/A.

I.    <u>Absorption Rate.</u>  The Borrower shall cause not less than two (2) Units to be sold during each month commencing the Sales Start Date.

J.    <u>Sales Start Date.</u>  The Borrower shall cause the first Unit to be available for sale no later than May 1, 2006.

K.    <u>Speculative Unit Limit</u> The Borrower shall not have more than eighteen (18) Speculative Units at any one time. "Speculative Unit" shall be defined as a unit that is not complete and has not been sold.

L.    <u>Unit Closings.</u>  The Borrower shall cause the first Unit to close no later than August 1, 2006 and shall cause not less than three (3) Units to be closed during each month, commencing after the first Unit closing or August 1, 2006, whichever is sooner.

M.    <u>Maximum Units Under Construction.</u> The maximum number of Units allowed under construction at any one time is eighteen (18) Units.

P.    <u>Standing Inventory.</u> Standing Inventory of completed and unsold Units shall not exceed eighteen (18) Units at any one time in the aggregate.

Q.    <u>Plans.</u>  Borrower shall provide a complete set of city-approved plans to Lender for review when available.

R.    <u>Subcontracts.</u>  There shall be no disbursements made for vertical construction until Lender receives copies for subcontracts for all major trades (including, but not limited to grading, concrete, masonry, rough lumber and framing, roofing, stucco, drywall, painting, plumbing, HVAC and electrical) in form and content acceptable to Lender .

**EXHIBIT B**

Loan No. 000

Exhibit "D"
Budget Summary

| Cost Category | Total Project Cost | Total Loan Funds | Cash Equity | Deferred / and Apprec. Equity |
|---|---|---|---|---|
| Land | $880,000 | $0 | $880,000 | $920,000 |
| Land Cost | $880,000 | $0 | $880,000 | $920,000 |
| Land Cost Other | $0 | $0 | $0 | $0 |
| OTHER | $0 | $0 | $0 | $0 |
| Site Costs | $50,497 | $50,497 | $0 | $0 |
| Overall Sitework | $50,497 | $50,497 | $0 | $0 |
| Direct Construction Costs | $4,518,748 | $4,491,248 | $27,500 | $0 |
| Direct Construction Costs | $4,518,748 | $4,491,248 | $27,500 | $0 |
| Indirect Construction Costs | $1,350,884 | $500,644 | $850,240 | Cash Flow |
| Developer O/H Firm Contract | $343,594 | $343,594 | $0 | $0 |
| Indirect Soft Costs | $323,030 | $30,550 | $292,480 | $0 |
| Insurance | $442,500 | $126,500 | $316,000 | $0 |
| Permits & Fees | $241,760 | $0 | $241,760 | $0 |
| Sales / Marketing Costs | $0 | $0 | $0 | $0 |
| On-going Marketing/Advertising | $0 | $0 | $0 | $0 |
| Start-Up Marketing | $0 | $0 | $0 | $0 |
| Model Landscape/Furnishing | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| Financing Costs | $641,574 | $635,824 | $5,750 | $0 |
| Interest Reserve | $532,188 | $532,188 | $0 | $0 |
| Loan Fee - HBD | $44,280 | $44,280 | $0 | $0 |
| Appraisal Fee – | $8,750 | $1,000 | $5,750 | $0 |
| Cost Analysis- | $1,500 | $1,500 | $0 | $0 |
| PBG Application Fee- | $2,195 | $2,195 | $0 | $0 |
| Closing costs | $15,916 | $15,916 | $0 | $0 |
| Loan Document fees | $1,500 | $1,600 | $0 | $0 |
| In-house appraisal & Cost Review | $525 | $525 | $0 | $0 |
| Inspection Fees | $7,200 | $7,200 | $0 | $0 |
| Loan Fee – Broker | $29,520 | $29,520 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 |
| General Contingency | $225,787 | $225,787 | $0 | $0 |
| Contingency | $225,787 | $225,787 | $0 | $0 |
| Additional Contingency | $0 | $0 | $0 | $0 |
| OTHER | $0 | $0 | $0 | $0 |
| Total | $7,667,490 | $5,904,000 | $1,763,490 | $920,000 |

REVISED MAY 2003

D-1

**EXHIBIT  B**

Loan No. ████0000

Exhibit "D" Continued
Line Item Breakdown

 **IndyMac Bank.**
Homebuilder Division

| Borrower Name | Eden Garden LLC | Tel # 408-399-4888 | Permit # | |
|---|---|---|---|---|
| Project name | Eden Graden Townhomes | | Architect | Tel# |
| CONTRACTOR: | Masuda Services Co. | Tel # 408-353-5552 | Engineer | Tel# |

| | Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|---|
| | **A. Land Costs** | | | | |
| 1001 | Land Acquisition | $ 880,000 | $ 880,000 | $ (920,000.00) | 0 |
| 1002 | Land Cost Other | | | $ | $ - |
| 1003 | OTHER | $ 880,000 | $ 880,000 | $ (920,000) | $ - |
| **TOTAL LAND COSTS** | | | | | $ - |
| | **B. PRE CONSTRUCTION COSTS:** | | | | |
| 101 | Architect, Engineering & Soils Study Fees | $ 291,230 | $ 260,680 | | $ 30,550 |
| 102 | Design Review/Plan Check Fees | | | $ - | $ - |
| 103 | Permits - City/County | $ 241,760 | $ 241,760 | | $ - |
| 104 | Utility Connection Fees | $ 25,997 | | $ - | $ 25,997 |
| 105 | School/Park/Misc. Taxes | | | $ - | $ - |
| 106 | Project Bonds- Letters of Credit | $ 31,800 | $ 31,800 | | $ - |
| 107 | Insurance incl. General Liability Ins. | $ 442,500 | $ 316,000 | $ - | 126,500 |
| 108 | Prcotection | | | $ - | $ 163,047 |
| **TOTAL PRE-CONSTRUCTION COSTS** | | $ 1,033,287 | $ 850,240 | $ - | $ 183,047 |
| | **C. "SITE" CONSTRUCTION COSTS:** | | | | |
| 201 | Temporary Utilities & Facilities | $ 20,500 | | $ - | $ 20,500 |
| 202 | Special Inspections/Testing-Geo-tech, Structural | | | $ - | $ - |
| 203 | Job Security | $ 4,000 | | $ - | $ 4,000 |
| 204 | Equipment Rental | | | $ - | $ - |
| 205 | Jobsite overhead | | | $ - | $ - |
| 206 | Project Management/Supervision | $ 343,594 | | | $ 343,594 |
| 207 | General Contractor's office overhead/profit. | | | $ - | $ - |
| 208 | State Sales Tax (where applicable) | | | $ - | $ - |
| 209 | Builder Contingency | | | $ - | $ - |
| 210 | General Liability Ins. | $ - | $ - | $ - | $ - |
| **SUB-TOTAL GENERAL REQUIREMENTS** | | $ 368,094 | $ - | $ - | $ 368,094 |
| 301 | Demolition | $ 5,600 | $ 5,600 | | $ - |
| 302 | Clearing/Stakeout ( Hauling) | $ 12,000 | | | 12,000 |
| 303 | Rough grading/shoring/excavation/fill | $ 101,000 | | | 101,000 |
| 304 | Site retaining walls/waterproofing/backfill | | | $ - | $ - |
| 305 | Site drainage | $ 50,000 | | $ - | 50,000 |
| 306 | Curb / Gutter / Walks | $ 24,000 | | $ - | 24,000 |
| 307 | PG & E | $ 124,400 | $ 14,400 | $ - | 110,000 |
| 308 | Utility Trenching | $ 20,000 | | $ - | 20,000 |
| 309 | san jose water | $ 4,500 | $ 4,500 | $ - | $ - |
| 310 | Sewer Hook Up - Pumps | $ 45,000 | | $ - | 45,000 |
| 311 | Water Mains & Meters | $ 105,000 | | $ - | 105,000 |
| 312 | Off-Site Paving | | | $ - | $ - |
| 313 | Dry Utilities | | | $ - | $ - |
| 314 | Landscape | | | $ - | $ - |
| **SUB-TOTAL SITE PREPARATION** | | $ 491,500 | $ 24,500 | $ - | $ 467,000 |

REVISED MAY 2003

D-2

**EXHIBIT  B**

Loan No ███████0000     Line Item Breakdown Continued

| | Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|---|
| 401 | | $ - | | | $ - |
| 402 | Plumbing System - Ground | $ 69,000 | | | $ 69,000 |
| 403 | Ground Mechanical | | | | $ - |
| 404 | Electrical System Ground & Rough | $ 153,000 | | | $ 153,000 |
| 405 | Embedded hardware | | | | $ - |
| 406 | Foundation & Building retaining walls poured | | | | $ - |
| 407 | Concrete slab poured-house, garage | $ 266,985 | | | $ 266,985 |
| SUB-TOTAL FOUNDATION COMPLETE | | $ 488,985 | $ - | $ - | $ 488,985 |
| 501 | Structural masonry | | | | $ - |
| 502 | Rough Framing - Labor & Material | $ 1,080,000 | | $ - | $ 1,080,000 |
| 503 | Structural steel | $ 242,817 | | | $ 242,817 |
| 504 | Modular or Sectional Mfg. Home | | | | $ - |
| 505 | Mfg. Trusses/components | | | | $ - |
| 506 | Rough framing labor | | | | $ - |
| 507 | Lightweight concrete interior floors | | | | $ - |
| 508 | Plumbing top-out | $ 138,000 | | | $ 138,000 |
| 509 | Rough heating, ventilation, air conditioning | $ 135,000 | | | $ 135,000 |
| 510 | Rough electrical | | | | $ - |
| 511 | Fire protection sprinklers - rough in | $ 43,000 | $ 3,000 | | $ 40,000 |
| 512 | Fireplaces incl. Flues | $ 12,000 | | | $ 12,000 |
| 513 | Security & Communications pre-wiring | | | | $ - |
| 514 | Exterior painting | | | | $ - |
| SUB-TOTAL BUILDING ROUGH-IN COMPLETION | | $ 1,650,817 | $ 3,000 | $ - | $ 1,647,817 |
| 601 | Waterproofing decks, shower pans, etc. | | | | $ - |
| 602 | Gutters & Downspouts | $ 34,212 | | | $ 34,212 |
| 603 | Roofing 61.4K / hot mopping 2.4K / Sheetmetal 10K | $ 73,805 | | | $ 73,805 |
| 604 | Windows | $ 101,000 | | | $ 101,000 |
| 605 | Wood & Glass doors | $ 28,000 | | | $ 28,000 |
| 606 | Skylights | | | | $ - |
| 607 | Glazing | | | | $ - |
| 608 | Exterior siding | $ 600 | | | $ 600 |
| 609 | Exterior trim- planters | $ 260,000 | | | $ 260,000 |
| 610 | Stucco | | | | $ - |
| 611 | Masonry veneer | $ 11,250 | | | $ 11,250 |
| 612 | Ornamental iron | $ 16,800 | | | $ 16,800 |
| 613 | Garage Doors | | | | $ - |
| 614 | Exterior painting | | | | $ - |
| SUB-TOTAL EXTERIOR WEATHER-TIGHT | | $ 515,667 | $ - | $ - | $ 515,667 |
| 701 | Insulation | $ 33,809 | | | $ 33,809 |
| 702 | Drywall/Plaster | $ 75,400 | | | $ 75,400 |
| 703 | Finish Lumber | $ 35,000 | | | $ 35,000 |
| 704 | Cabinetry | $ 194,448 | | | $ 194,448 |
| 705 | Finish Materials/Millwork | | | | $ - |
| 706 | Stairs & Railing | $ 174,000 | | | $ 174,000 |
| 707 | Finish Hardware | $ 30,000 | | | $ 30,000 |
| 708 | Finish Carpentry Labor & Fine Tuning | $ 92,708 | | | $ 92,708 |
| SUB-TOTAL DRYWALL/FINISH CARPENTRY | | $ 635,365 | $ - | $ - | $ 635,365 |
| 801 | Countertops | $ 42,000 | | | $ 42,000 |
| 802 | Tub/shower/enclosures | | | | $ - |
| 803 | Interior painting/Wall Coverings | $ 96,000 | | | $ 96,000 |
| 804 | Hard surface finish flooring labor 86K Material By Ow | $ 88,000 | | | $ 88,000 |
| 805 | Carpeting | $ 100,488 | | | $ 100,488 |
| 806 | Built-in Appliances | $ 50,000 | | | $ 50,000 |
| 807 | Special Equipment | | | | $ - |
| 808 | Scaffolding | $ 20,000 | | | $ 20,000 |
| 809 | Intercom | | | | $ - |
| 810 | Fire protection sprinklers - Finish | $ 8,000 | | | $ 8,000 |
| 811 | Finish Plumbing | $ 23,000 | | | $ 23,000 |
| 812 | Plumbing Fixtures | $ 30,000 | | | $ 30,000 |
| 813 | Finish Electrical | $ 17,000 | | | $ 17,000 |

REVISED MAY 2003

**EXHIBIT B**

Loan No. ████████0000          Line Item Breakdown Continued

| | Line Item Description | Orig Budget A | Prepaids B | Appreciated Equity Adj C | Current Budget D |
|---|---|---|---|---|---|
| 814 | Lighting Fixtures By Owner | $ 40,000 | | | $ 40,000 |
| 815 | Finish Heating, Ventilating, Air Cond. | $ 45,000 | | | $ 45,000 |
| 816 | Mirrors | $ 8,000 | | | $ 8,000 |
| 817 | Bath Accessories | $ 9,000 | | | $ 9,000 |
| 818 | Tub and Shower Doors | $ 13,200 | | | $ 13,200 |
| 819 | Finish Grading | | | | $ - |
| 820 | Pool/Spa | | | | $ - |
| 821 | Hardscape-Driveway, Walkways, Steps | $ 58,364 | | | $ 58,364 |
| 822 | Landscaping | $ 50,362 | | | $ 50,362 |
| 823 | Irrigation System | | | | $ - |
| 824 | Fencing Including Gates | $ 10,000 | | | $ 10,000 |
| 825 | Touch-up/Clean Up 20K Final Cleaning 10K | $ 30,000 | | | $ 30,000 |
| | SUB-TOTAL BUILDING COMPLETION | $ 736,414 | $ - | $ - | $ 736,414 |
| | **D. Sales / Marketing Costs** | | | | $ - |
| 901 | On-going Marketing/Advertising | | | | $ - |
| 902 | Start-Up Marketing | | | | $ - |
| 903 | Model Landscape/Furnishing | | | | $ - |
| 904 | OTHER | | | | $ - |
| 905 | OTHER | | | | $ - |
| | SUB-TOTAL SALES & MARKETING | $ - | $ - | $ - | $ - |
| | **E. Financing Costs** | | | | |
| 6001 | Loan Fee - IndyMac | $ 44,280 | | | $ 44,280 |
| 6002 | Loan Fee - Broker | $ 29,520 | | | $ 29,520 |
| 6003 | Closing Costs | $ 15,916 | | | $ 15,916 |
| 6004 | Loan Document Fees | $ 1,500 | | | $ 1,500 |
| 6005 | Inspection Fees | $ 7,200 | | | $ 7,200 |
| 6006 | Inhouse Appraisal& Cost Review | $ 525 | | | $ 525 |
| 6007 | PBG Application Fee | $ 2,195 | | | $ 2,195 |
| 6008 | Appraisal Fee | $ 6,750 | $ 5,750 | | $ 1,000 |
| 6009 | Cost Analysis | $ 1,500 | | | $ 1,500 |
| 6010 | OTHER | | | $ - | $ - |
| 6011 | OTHER | | | $ - | $ - |
| | SUB-TOTAL FINANCING COSTS | $ 109,386 | $ 5,750 | $ - | $ 103,636 |
| | **F. LENDER RESERVES** | | | | |
| 7002 | Interest Reserve | $ 532,188 | | | $ 532,188 |
| 7003 | Contingency | $ 225,787 | | | $ 225,787 |
| 7004 | Additional Contingency | | | | $ - |
| 7005 | OTHER | | | | $ - |
| 7006 | OTHER | | | | $ - |
| | SUB-TOTAL LENDERS RESERVES | $ 757,975 | $ - | $ - | $ 757,975 |
| | TOTAL | $ 7,087,490 | $ 1,763,490 | $ (920,000) | $ 5,904,000 |

I hereby certify that the above referenced numbers are accurate and complete to the best of my knowledge.

X _____                    09/30/2005
Borrower      Eden Garden LLC                          Date

X _____                    09/30/2005
Contractor    Masuda Services Co.                      Date

**EXHIBIT B**

Loan No.0000

## EXHIBIT "E"

### MINIMUM SALES AND RELEASE PRICES

#### (Residential Tract Construction)

| Plan | Number of Units | Minimum Sales Price | Release - 120% of PAR per Unit | SQFT |
|------|-----------------|---------------------|--------------------------------|------|
| A | 2 | $ 456,375.00 | $ 355,686.70 | 1,217 |
| B | 1 | $ 462,750.00 | $ 360,655.21 | 1,234 |
| C | 3 | $ 529,480.00 | $ 507,372.32 | 1,736 |
| D | 4 | $ 476,700.00 | $ 398,065.15 | 1,362 |
| E | 1 | $ 482,250.00 | $ 375,853.00 | 1,286 |
| F | 1 | $ 470,400.00 | $ 392,804.38 | 1,344 |
| G | 1 | $ 494,325.00 | $ 444,535.31 | 1,521 |
| H | 3 | $ 428,250.00 | $ 333,766.81 | 1,142 |
| I | 1 | $ 437,625.00 | $ 341,073.44 | 1,167 |
| J | 1 | $ 439,875.00 | $ 342,827.04 | 1,173 |

REVISED MAY 2003

E-1

**EXHIBIT  B**

Loan No. 000

**EXHIBIT "F"**

**DEFINITIONS**

(Residential Tract Construction)

As used in this Agreement, the following terms shall have the following meanings:

"Additional Collateral Agreements" means the "Additional Collateral Agreements" (if any) specified in Exhibit "C" and any other mortgages, assignments or other agreements (other than the Trust Deed) now or in the future securing the Loan or any Guaranty.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with the Person specified.

"Agreement" means this Building Loan Agreement, including all exhibits.

"Alternate Rate" means the "Alternate Rate" set forth in the Note.

"Architect" means any Person engaged by the Borrower from time to time as an architect or to perform similar functions in connection with the Project.

"Architect Agreement" means, as to any Architect, the agreement between the Borrower and the Architect relating to services to be provided by the Architect in connection with the Project.

"Authorization" means any authorization, consent, approval, order, license, permit, exemption or other action by or from, or any filing, registration or qualification with, any Governmental Agency or other Person.

"Authorizing Resolutions" means (a) in the case of a corporation, a certified copy of resolutions adopted by its board of directors, (b) in the case of a partnership (whether general or limited), a certificate signed by all of its general partners, and (c) in the case of a trust or any other entity, evidence of such other action as the Lender may require, in each case authorizing the execution, delivery and performance of all Loan Documents to which it is a party or by which it is bound.

"Banking Day" means any day (excluding Saturdays and Sundays) on which banks located in California are not authorized or required by law to close.

"Borrower's Funds" means funds of the Borrower deposited with the Lender pursuant to the Disbursement Schedule.

REVISED MAY 2003

F-1

**EXHIBIT  B**

"Cash Collateral Account" means a cash collateral account maintained by the Lender for the account of the Borrower for purposes of this Agreement or any of the other Loan Documents which shall be subject to a security interest in favor of the Lender for the purpose of securing the Borrower's Obligations and over which the Lender shall have sole and exclusive control and right of withdrawal.

"Certificate of Reasonable Value" means a Master Certificate of Reasonable Value issued by the United States Veterans Administration with respect to Units constructed or to be constructed in accordance with the Improvement Plans.

"Change Order" means a change in, or supplement to, the Improvement Plans.

"Charter Documents" means (a) in the case of a corporation, its articles of incorporation and bylaws, (b) in the case of a limited liability company, its articles of organization and operating and/or management agreement, (c) in the case of a partnership, its partnership agreement and any certificate or statement of partnership, and (d) in the case of a trust or any other entity, its formation documents, in each case as amended from time to time.

"Collateral" means all property in which the Lender is granted or purportedly granted a Lien pursuant to the Trust Deed.

"Competing Project" means any residential housing improvements or units which are located within a radius of five miles (5) of the Project and the Minimum Sales Price for which on a per unit basis, is within $5,000.00 of any Unit in the Project.

"Conditional Commitment" means a HUD Conditional Commitment issued by the Federal Housing Administration or the United States Veterans Administration with respect to Units constructed or to be constructed in accordance with the Improvement Plans.

"Construction Contract" means, as to any Contractor, the agreement between the Borrower and the Contractor relating to services to be provided by the Contractor in connection with the Project.

"Contractor" means any Person engaged by the Borrower from time to time as a general contractor in connection with the Project.

"Cost Savings" means the excess, if any, of any Line Item over the actual Project Costs incurred in connection with the work associated with such Line Item, as determined by the Lender after such work has been completed and all such Project Costs have been paid in full and all Lien Claims and potential Lien Claims relating to such work have been released or otherwise discharged to the satisfaction of the Lender.

"Disbursement" means each disbursement of the proceeds of the Loan and each disbursement of any Borrower's Funds in accordance with the Disbursement Schedule or any Set Aside Letter or Letter of Credit. Without limitation on the foregoing, any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall

be deemed to be a disbursement of the proceeds of the Loan (or, in the case of any Set Aside Letter, a disbursement of Borrower's Funds, if applicable).

"Disbursement Account" has the meaning set forth in paragraph (a) of the Disbursement Schedule.

"Disbursement Request" means a written request for a Disbursement in a form approved by the Lender.

"Disbursement Schedule" means the "Disbursement Schedule" attached as Exhibit "B".

"Documents" means written documents and materials, including agreements, approvals, certificates, consents, instruments, financing statements, reports, budgets, forecasts and opinions.

"Environmental Indemnity" means the Environmental Indemnity executed by the Borrower in favor of the Lender and described in Exhibit "C".

"Events of Default" means the events set forth in § 6.01.

"Financial Statements" means balance sheets and income statements.

"Financing Commitment" means any Certificate of Reasonable Value, Conditional Commitment or Takeout Commitment.

"Flood Hazard Area" means an area which has been designated as a special flood hazard area or subject to comparable risks by the Federal Emergency Management Agency or any successor to such Agency.

"Governmental Agency" means (a) any government or municipality or political subdivision of any government or municipality, (b) any assessment, improvement, community facilities or other special taxing district, (c) any governmental or quasi-governmental agency, authority, board, bureau, commission, corporation, department, instrumentality or public body, (d) any court, administrative tribunal, arbitrator, public utility or regulatory body, or (e) any central Lender or comparable authority.

"Guarantor" means any Person who has executed or is required to execute a Guaranty, and such Person's successors and assigns.

"Guaranty" means any Guaranty executed in favor of the Lender and described in Exhibit "C".

"Improvement Plans" means the improvement plans and specifications described in Exhibit "C", as modified by any Change Orders approved by the Lender.

REVISED MAY 2003

F-3

**EXHIBIT  B**

"<u>Improvements</u>" means the Units and other improvements, including site development work (if any), constructed or to be constructed pursuant to the Improvement Plans.

"<u>Land</u>" means the land described in Exhibit "A".

"<u>Laws</u>" means all federal, state and local laws, rules, regulations, ordinances and codes.

"<u>LC Bank</u> " means a bank designated by the Lender as the LC Bank in connection with any Letter of Credit to be issued under this Agreement.

"<u>Letter of Credit</u>" means a standby letter of credit issued by an LC Bank for the account of the Lender, or for the account of the Borrower and the Lender, in favor of a surety, Governmental Agency or other Person approved by the Lender, to secure the payment of Project Costs by the Borrower or the payment or performance of other obligations of the Borrower in connection with the Project, in each case as approved by the Lender in its sole discretion.

"<u>Letter of Credit Fee</u>" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Letter of Credit, in each case in the amount set forth in Exhibit "C".

"<u>Letter of Credit Request</u>" means a written request for a Letter of Credit in a form approved by the Lender.

"<u>Lien</u>" means any lien, mortgage, deed of trust, pledge, security interest or other charge or encumbrance.

"<u>Lien Claim</u>" means (a) any mechanics lien affecting any of the Collateral, (b) any stop notice affecting the undisbursed portion of the Loan or any Borrower's Funds, (c) any right of any Person to assert or maintain any such mechanics lien or stop notice, and (d) any other claim to payment by any Lien Claimant.

"<u>Lien Claimant</u>" means the Contractor, if any, and any other Person who has furnished labor, service, equipment or material in connection with the Project or who is otherwise entitled to payment for any Project Costs.

"<u>Line Item</u>" means each of the separate items set forth in the Project Budget and in any Line Item Budget.

"<u>Line Item Budget</u>" means a budget for the Project in form and substance satisfactory to the Lender and setting forth in such detail as the Lender may require the nature and amount of all Project Costs anticipated in connection with the Project as such budget may be modified from time to time in accordance with the Disbursement Schedule.

"<u>Loan</u>" means the loan to be made by the Lender to the Borrower pursuant to this Agreement in an amount not to exceed the Loan Amount.

**EXHIBIT B**

"Loan Amount" means the amount of the Loan set forth in § 1.00.

"Loan Documents" means this Agreement, the Note, the Trust Deed, the Environmental Indemnity, the Guaranties, if any, and any Additional Collateral Agreements, as the same may be amended, renewed or extended from time to time.

"Loan Fee" means a nonrefundable loan fee to be paid by the Borrower to the Lender at or prior to the time of recordation of the Trust Deed in the amount set forth in Exhibit "C".

"Loan Party" means (a) the Borrower, (b) any Guarantor which at the time has or may have any obligation or liability (whether fixed, contingent or otherwise) under the Guaranty executed or to be executed by it, (c) any Person executing any Additional Collateral Agreements, and (d) in the case of any Loan Party which is a partnership, any general partner of such Loan Party.

"Maturity Date" means the maturity date of the Note; as such maturity date may be extended pursuant to this Agreement.

"Note" means the Promissory Note executed by the Borrower in favor of the Lender to evidence the Loan.

"Obligations" means all obligations of the Borrower of every nature under the Loan Documents.

"Other Requirements" means (a) the terms, conditions and requirements of all Project Agreements, Authorizations and Rights of Others relating to the Collateral or the Project and all other Documents, agreements and restrictions relating to, binding on or affecting the Collateral or the Project, including covenants, conditions and restrictions, leases, easements, reservations, rights and rights-of-way, (b) requirements relating to the sale or transfer of individual Units or common areas or portions of common areas or the supply of Utility Services to the Real Property, (c) requirements and recommendations of the soils report and any environmental impact report or negative declaration, (d) all building, zoning, land use, planning and subdivision requirements, and (e) requirements relating to construction of any offsite improvements or any construction contemplated by any Set Aside Letter or Letter of Credit.

"Permitted Exceptions" means (a) Liens in favor of the Lender, (b) Permitted Prior Exceptions, and (c) other matters expressly approved by the Lender in writing which are subject and subordinate to the Lien of the Trust Deed.

"Permitted Prior Exceptions" means (a) general ad valorem real property taxes which are not delinquent, (b) Special Taxes described in Part B of Exhibit "C" or otherwise approved in writing by the Lender which in each case are not delinquent, (c) mechanics liens affecting the Real Property and arising from the construction of the Improvements, over which the Title Policy has insured the priority of the Lien of the Trust Deed, and (d) such other matters as the Lender shall expressly approve in writing as "Permitted Prior Exceptions" for purposes of this Agreement.

**EXHIBIT B**

"Permitted Transfer" means (a) any sale or other transfer of Units and common areas (or undivided interests in common areas) and the disposition of any excess proceeds of sale, in each case to the extent permitted by § 4.05, and (b) any transfer or other disposition of Personal Property permitted by § 4.06.

"Person" means any person or entity, whether an individual, trustee, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association or firm, joint venture, Governmental Agency or otherwise.

"Personal Property" means tangible personal property and fixtures, including building materials and supplies, appliances, furnishings, equipment and other "Goods" (as defined in the Trust Deed), but excluding construction equipment of a type intended for use in connection with other projects.

"Project" means the project for the acquisition and/or refinancing of the Land, the construction of the Improvements, the acquisition and installation of certain Personal Property and the development of the Land in accordance with the Improvement Plans, and the marketing and sale of Units.

"Project Agreements" means (a) the Architect Agreement, the Construction Contract, if any, any Financing Commitment and any other takeout, refinancing or permanent loan commitment issued or assigned to the Borrower with respect to the Real Property, and (b) all leases, rental agreements, service and maintenance agreements, purchase and sale agreements, purchase options and other agreements of any nature relating to the Collateral or the Project, including agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents and consultants.

"Project Budget" means the budget for the Project attached as Exhibit "D", as supplemented by each Line Item Budget approved by the Lender from time to time, in each case as modified from time to time in accordance with the Disbursement Schedule.

"Project Costs" means all costs and expenses of any nature relating to the Project or the financing of the Project.

"Real Property" means the Land and the Improvements and all other buildings, structures and improvements now or in the future located on the Land.

"Remedy" means any right, power or remedy.

"Representations" means the representations and warranties of the Borrower set forth in § 5.00 and all other representations, warranties and certifications to the Lender in the Loan Documents or in any other Document delivered under or in connection with the Loan Documents.

"Right of Others" means, as to any property in which a Person has an interest, any legal or equitable claim or other interest (other than a Lien but including a leasehold interest, a right of first refusal or a right of repossession or removal) in or with respect to such property held by any

**EXHIBIT B**

other Person, and any option or right held by any other Person to acquire any such claim or other interest or any Lien in or with respect to such property.

"Set Aside Letter" means (a) a letter from the Lender to a surety setting forth the Lender's undertaking to fund Project Costs for construction of Improvements to be bonded by the surety in connection with the Borrower's development of the Project, or (b) a letter from the Lender to a Governmental Agency setting forth the Lender's undertaking to fund Project Costs for construction of Improvements in connection with the Borrower's development of the Project.

"Set Aside Letter Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Set Aside Letter, in each case in the amount set forth in Exhibit "C".

"Set Aside Letter Request" means a written request for a Set Aside Letter in a form approved by the Lender.

"Special Tax" means, as to any property, (a) any special assessment or other Tax which is or may become a Lien affecting such property, other than general ad valorem real property taxes, and (b) any assessment, improvement, community facilities or other special taxing district in or into which such property is or may be located or incorporated or under which any special assessment or other Tax which is or may become a Lien affecting such property is or may be imposed.

"Takeout Commitment" means a commitment issued by an institutional lender to make permanent loans to purchasers of Units.

"Taxes" means all taxes, assessments, charges, fees and levies (including interest and penalties) imposed, assessed or collected by any Governmental Agency.

"Title Policy" means an ALTA extended coverage lender's policy of title insurance in form and substance satisfactory to the Lender, issued by an insurer selected by the Borrower and satisfactory to the Lender, together with such indorsements and policies of coinsurance and/or reinsurance as may be required by the Lender, in a policy amount equal to the Loan Amount, insuring the Trust Deed to be a valid first priority Lien on the Land and showing the Land to be subject only to Permitted Prior Exceptions.

"Trust Deed" means the Construction Trust Deed with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower to secure the Loan.

"Unit" means a single-family residential housing unit to be constructed on the Land in accordance with the Improvement Plans.

"Utility Services" means all utility services, including water, gas, electricity, telephone, garbage removal and sewer services.

**EXHIBIT B**

9/30/05

Loan No. 0000

## PROMISSORY NOTE

$5,904,000.00

Pasadena, California

September 30, 2005

THIS NOTE PROVIDES FOR INTEREST AT A FLUCTUATING RATE PER ANNUM BASED ON THE PRIME RATE (PLUS ANY APPLICABLE SPREAD OVER THE PRIME RATE INDICATED BELOW) ON THE TERMS AND CONDITIONS SET FORTH BELOW.

This Note is executed pursuant to the Building Loan Agreement dated as of the date of this Note between Eden Garden, LLC, a California limited liability company (the "Borrower") and INDYMAC BANK, F.S.B., (the "Lender") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Note as the "Loan Agreement"), the terms and conditions of which are hereby incorporated by reference. Capitalized terms not otherwise defined in this Note shall have the meaning ascribed thereto in the Agreement.

1.     FOR VALUE RECEIVED, the Borrower promises to pay to the Lender, or order, at the Lender's office located at 3465 East Foothill Boulevard, FH-01-09, Pasadena, California 91107, (or such other location specified by the Lender from time to time in writing), the principal amount of Five Million Nine Hundred Four Thousand Dollars and No Cents ($5,904,000.00), or so much of such amount as may be advanced by or on behalf of the Lender from time to time, together with interest as provided in § 3 below.

2.     If not sooner paid, the principal of this Note shall be payable on March 29, 2007 (the "Maturity Date"). Accrued interest shall be payable on the first day of each calendar month, on the Maturity Date and on the date of final payment of the principal of this Note in full, except that any interest which accrues after the Maturity Date or the acceleration of the maturity of this Note shall be payable immediately and without demand.

3.     (a)     The unpaid principal of this Note outstanding from time to time shall bear interest at a fluctuating rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal at all times to the Prime Rate plus one and one quarter percent (1.25%) per annum, with each change in such rate taking effect simultaneously with the corresponding change in the Prime Rate (such fluctuating rate of interest being referred to in this Note as the "Base Rate")). Notwithstanding the preceding, in no event shall the Base Rate be less than eight percent (8.00%) per annum.

(b)     Accrued interest not paid when due shall, from and after the date when due until the date such interest is paid, bear interest at the Alternate Rate.

(c)     If accrued interest is not paid to Lender on or before the twentieth (20th) calendar day of each month in which it becomes due, Borrower shall pay, upon demand by the

47654\1146124v2

**EXHIBIT C**

Lender, a late or collection charge equal to five percent (5.00%) of the amount of such unpaid interest payment. Borrower agrees that this late or collection charge represents a reasonable sum considering all of the circumstances existing on the date of execution of this Note and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower further agrees that proof of actual damages would be costly and inconvenient. Acceptance by Lender of payment of the late or collection charge payable pursuant to this Section 3(c) will not constitute a waiver of the Event of Default which occurred by reason of the failure of Borrower to make timely payment and will not prevent Lender from exercising any other rights or remedies available to Lender by reason of such Event of Default.

(d) Notwithstanding § 3(a), any principal of this Note not paid when due (whether at the stated maturity, by acceleration or otherwise) shall, from and after the date when due until the date such principal is paid, bear interest at the Alternate Rate.

(e) As used in this Note:

"Alternate Rate" means a fluctuating rate per annum (computed on the basis of a year of 360 days) equal at all times to the Base Rate plus 3.00% per annum, with each change in such rate taking effect simultaneously with the corresponding change in the Base Rate.

"Prime Rate" means the rate as published in the "Money Rates" section of The Wall Street Journal with changes thereon to be effective as of the date of such change. The foregoing notwithstanding, if The Wall Street Journal ceases to publish the "Money Rates" section or if there is a suspension of publication of The Wall Street Journal, then an alternative source for determining the Prime Rate shall be selected by Lender in its sole discretion."

4. Payments under this Note shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under this Note is returned to Lender unpaid, Lender may require that any or all subsequent payments due under this Note be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer. Payments are deemed received by Lender when received at the location designated in this Note or at such other location as may be designated by Lender in writing. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under this Note.

5. This Note may be prepaid in whole or in part at any time without penalty. All payments on this Note shall be made in lawful money of the United States in same day funds.

6. This Note is secured by a mortgage, deed to secure debt, deed of trust, or similar instrument of even date herewith (the "Security Instrument") from Borrower to Lender

**EXHIBIT C**

encumbering certain real property in Santa Clara County, California which, together with this Note, the Loan Agreement, UCC-1 Financing Statements, and other documents or instruments which evidence or secure the loan or have been or hereafter are executed in connection therewith, are referred to herein as the "Loan Documents."

7.     This Note is the "Note" referred to in, and is entitled to the rights and benefits of, the Loan Agreement, and evidences advances of the proceeds of the loan made by or on behalf of the Lender to the Borrower under the Agreement.

8.     Borrower hereby agrees that it shall be in default under this Note if at any time: (a) any installment of principal or interest due hereunder shall not be fully paid on or before the due date thereof, (b) Borrower breaches or is in default under any other term of this Note or (c) the occurrence of an Event of Default under any of the Loan Documents.

9.     In the event that Borrower shall become in default under this Note, and at any time thereafter so long as Borrower shall remain in default, at the option of Lender, the entire outstanding principal sum then remaining unpaid hereunder, together with all interest accrued thereon (whether billed or unbilled), shall immediately become due and payable in full, without further notice, and Lender shall have the right to institute any proceedings on this Note, the Loan Documents, or any of them, or any other collateral given to secure the same, without limitation, for the purposes of collecting the indebtedness due hereunder, and Borrower agrees to pay all costs and expenses incurred thereby, including without limitation, reasonable attorneys' fees and costs.

10.     This Note shall be governed by, and construed and enforced in accordance with, the laws of California.

11.     Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all indebtedness that constitutes interest, as well as all other charges made in connection with the indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

12.     Borrower warrants that the Loan is being made solely to acquire or carryon a business or commercial enterprise, and/or that Borrower is operating as a business or commercial

**EXHIBIT  C**

organization.  Borrower further warrants that all of the proceeds of this Note shall be used for commercial purposes and is made for other than personal, family, personal household or agricultural purposes, and Borrower stipulates that the Loan shall be construed for all purposes as a commercial loan.

13.     Borrower for itself, its legal representatives, successors and assigns, respectively, expressly waives presentment, demand, protest, notice of dishonor, notice of protest, notice of non-payment, notice of maturity, notice of intent to accelerate, notice of acceleration, and all other notices (except any notices which are specifically required by this Note or any other loan Document) and consents to the extension of time of payment or other modification of the terms of payment of any portion of the debt evidenced hereby, upon request of any other person liable hereon, which extension or modification shall not alter or diminish the liability of any other person hereon.

14.     Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower.  Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding.  Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions.

15.     The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties.  The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.  As further provided in the Loan Agreement, Lender may, at any time, sell, transfer, or assign this Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement.

16.     THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

17.     EACH OF THE LENDER AND THE BORROWER WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE BORROWER AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS NOTE, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE BORROWER OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

18.     Time is of the essence with respect to Borrower's obligations under this Note.  If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly

**EXHIBIT  C**

and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (b) agree that Lender shall not be required first institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (c) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (d) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the State of CALIFORNIA, and venue in the county in which payment is to be made as specified in Section 1 of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (e) waive the benefit of all homestead and similar exemptions as to this Note; (f) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or un perfected; and hereby subordinate to the Loan and the Loan Documents any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.

"BORROWER":

Eden Garden, LLC,
a California limited liability company

By: _____  10/11-05

    Ali K. Amidy, Managing Member

**EXHIBIT C**

11/8/05

DOCUMENT: 18668901

Pages: 15

Fees.... 65.00
Taxes...
Copies..
AMT PAID 65.00

Loan No. ~~~~~~0000

RECORDING REQUESTED BY:
*Fidelity National Title*
*Title only # 5103 4570*
WHEN RECORDED MAIL TO:

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Fidelity National Title Ins.

RDE # 005
11/08/2005
8:00 AM

INDYMAC BANK, F.S.B.
3465 E. Foothill Blvd., FH-01-09
Pasadena, CA 91107
Attention: HOMEBUILDER DIVISION
         Loan Closing

_____SPACE ABOVE LINE FOR RECORDER'S USE_____

*APN #03-10-011*

## CONSTRUCTION TRUST DEED WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS CONSTRUCTION TRUST DEED WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING ("Trust Deed"), dated September 30, 2005, is made by Eden Garden, LLC, a California limited liability company, whose address is 655 Campbell Technology Park, Suite 125, Campbell, California 95008 ("Trustor"), in favor of Fidelity National Title Insurance Company, whose address is 4041 MacArthur Boulevard, Suite 490, Newport Beach, California 92660 ("Trustee"), and INDYMAC BANK, F.S.B., whose address is 3465 E. Foothill Blvd., FH-01-09, Pasadena, California 91107, Attention: Homebuilder Division ("Beneficiary"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Trust Deed between Beneficiary and Trustor (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Trust Deed as the "Agreement"), the provisions of which are incorporated in this Trust Deed by reference. The Agreement provides, among other things, for rules of construction which apply to this Trust Deed. Capitalized terms used in this Trust Deed and not otherwise defined are used with the meanings set forth in the Agreement.

    1.00   <u>Grant in Trust and Security Agreement</u>. For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee, in trust, with power of sale, for the benefit of Beneficiary, the following property (the "Trust Estate"):

        (a)   the real property described in Exhibit "A" attached to this Trust Deed and incorporated in this Trust Deed by reference (the "Land");

        (b)   all buildings, structures and other improvements now or in the future located or to be constructed on the Land (the "Improvements");

        (c)   all tenements, hereditaments, appurtenances, privileges and other rights and interests now or in the future benefitting or otherwise relating to the Land or the Improvements, including easements, rights-of-way, development rights, mineral rights, water rights and water stock (the "Appurtenances," and together with the Land and the Improvements, the "Real Property");

REVISED MAY 2003

**EXHIBIT D**

2

(d)    subject to the assignment to Beneficiary set forth in § 3.08 below, all rents, issues, income, revenues, royalties and profits now or in the future payable with respect to or otherwise derived from the Real Property or the ownership, use, management, operation, leasing or occupancy of the Real Property, including those past due and unpaid ("the Rents");

(e)    all present and future right, title and interest of Trustor in and to all inventory, equipment, fixtures and other goods (as those terms are defined in Division 9 of the California Uniform Commercial Code (the "UCC"), now or in the future located at, upon or about, or affixed or attached to or installed in, the Real Property, or used or to be used in connection with or otherwise relating to the Real Property or the ownership, use, development, construction, maintenance, management, operation, marketing, leasing or occupancy of the Real Property, including furniture, furnishings, machinery, appliances, building materials and supplies, generators, boilers, furnaces, water tanks, heating, ventilating and air conditioning equipment and all other types of tangible personal property of any kind or nature, and all accessories, additions, attachments, parts, proceeds, products, repairs, replacements and substitutions of or to any of such property (the "Goods," and together with the Real Property, the "Property"); and

(f)    all present and future right, title and interest of Trustor in and to all accounts, general intangibles, chattel paper, deposit accounts, money, instruments and documents (as those terms are defined in the UCC) and all other agreements, obligations, rights and written materials (in each case whether existing now or in the future) now or in the future relating to or otherwise arising in connection with or derived from the Property or any other part of the Trust Estate or the ownership, use, development, construction, maintenance, management, operation, marketing, leasing, occupancy, sale or financing of the Property or any other part of the Trust Estate, including (i) permits, approvals, development agreements and other governmental authorizations, (ii) improvement plans and specifications and architectural drawings, (iii) agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents, leasing agents, owners of other properties, consultants and property managers, (iv) takeout, refinancing and permanent loan commitments, (v) warranties, guaranties, indemnities and insurance policies (including insurance policies obtained in accordance with the Agreement), together with insurance payments and unearned insurance premiums, (vi) claims, demands, awards, settlements and other payments arising or resulting from or otherwise relating to any insurance or any loss or destruction of, injury or damage to, trespass on or taking, condemnation (or conveyance in lieu of condemnation) or public use of any of the Property, (vii) the Disbursement Account and any Cash Collateral Account maintained pursuant to any of the Loan Documents, and any Borrower's Funds or other amounts deposited by Trustor with Beneficiary which are to be held in any such Cash Collateral Account or are paid in respect of any Secured Obligations, (viii) leases, rental agreements, license agreements, service and maintenance agreements, purchase and sale agreements and purchase options, together with advance payments, security deposits and other amounts paid to or deposited with Trustor under any such agreements, (ix) reserves, deposits, bonds, deferred payments, refunds (including property tax refunds), reimbursements (including reimbursements from governmental agencies and other property owners in respect of any fees and other amounts paid, improvements constructed or services provided in connection with the development of the Real Property), rebates, discounts, cost savings, escrow proceeds, sale proceeds and other rights to the payment of money, trade names, trademarks, goodwill and all other types of

REVISED MAY 2003

3

intangible personal property of any kind or nature, and (x) all supplements, modifications, amendments, renewals, extensions, proceeds, replacements and substitutions of or to any of such property (the "Intangibles," and together with the Appurtenances and the Rents, the "Rights").

Trustor further grants to Beneficiary, pursuant to the UCC, a security interest in all present and future right, title and interest of Trustor in and to all Goods and Intangibles and all other personal property in which a security interest may be created under the UCC (the "Personal Property"). Trustor hereby authorizes Beneficiary at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by the UCC and required by Beneficiary to establish or maintain the validity, perfection and priority of the security interest granted in this Trust Deed. Trustor shall pay all fees and costs that Beneficiary may incur in filing such documents in public office and in obtaining such record searches as Beneficiary may require.

2.00 <u>Obligations Secured</u>. This Trust Deed is given for the purpose of securing payment and performance of the following (the "Secured Obligations"): (a) all present and future indebtedness evidenced by the Note dated the date of this Trust Deed in the face principal amount **Five Million Nine Hundred Four Thousand Dollars and No Cents ($5,904,000.00)** executed by Trustor in favor of Beneficiary, including principal, interest and all other amounts payable under the terms of the Note; (b) all present and future obligations of Trustor under this Trust Deed; (c) all other present and future obligations of Trustor to Beneficiary under the Agreement and the other Loan Documents (including obligations in respect of Letters of Credit and Set Aside Letters, but excluding obligations under any Environmental Indemnity executed by Trustor in favor of Beneficiary unless such Environmental Indemnity states that it is secured by this Trust Deed); and (d) all additional present and future obligations of Trustor to Beneficiary under any other agreement or instrument (whether existing now or in the future) which states that it is, or such obligations are, secured by this Trust Deed; in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise.

3.00 <u>Trustor's Covenants</u>. To protect the security of this Trust Deed, Trustor agrees as follows:

3.01 <u>Payment and Performance of Secured Obligations</u>. Trustor shall pay and perform all Secured Obligations in accordance with the respective terms of such Secured Obligations, whether evidenced by or arising under this Trust Deed, the Note, the Agreement, any of the other Loan Documents or otherwise.

3.02 <u>Maintenance of Trust Estate</u>. Unless Beneficiary otherwise consents in writing, Trustor shall (a) keep the Property in good condition and repair, and promptly and in a good and workmanlike manner (and with new materials of good quality) complete any Improvements to be constructed on the Land, repair or restore any part of the Real Property that may be injured, damaged or destroyed, and repair, restore or replace any Goods that may be injured, damaged, destroyed or lost or that may be or become obsolete, defective or worn out (except that Trustor

4

shall not be required to repair, restore or replace any such Goods of insignificant value which are not reasonably necessary or appropriate to the efficient operation of the Real Property or the completion of the Project), and in each case pay when due all valid claims for labor, service, equipment and material and any other costs incurred in connection with any such action, (b) not remove, demolish or materially alter any Improvements, (c) not construct any Improvements on the Land or undertake any site development work unless contemplated by the Loan Documents or otherwise approved by Beneficiary, (d) not commit or permit any waste of any part of the Property, (e) not permit or consent to any restriction that would prevent or otherwise impair the use or development of the Real Property for the purposes contemplated by the Agreement; (f) comply in all respects with all Laws and Other Requirements, and not commit or permit any violation of any Laws or Other Requirements, which affect any part of the Trust Estate or require any alterations or improvements to be made to any part of the Property, (g) take such action from time to time as may be reasonably necessary or appropriate, or as Beneficiary may reasonably require, to protect the physical security of the Property, (h) except as otherwise permitted by the Agreement, not part with possession of or abandon any part of the Trust Estate or cause or permit any interest in any part of the Trust Estate to be sold, transferred, leased, encumbered, released, relinquished, terminated or otherwise disposed of (whether voluntarily, by operation of law or otherwise), and (i) take all other action which may be reasonably necessary or appropriate to preserve, maintain and protect the Trust Estate, including the enforcement or performance of any rights or obligations of Trustor or any conditions with respect to any Rights.

Without limitation on any obligations of Trustor under the preceding paragraph, in the event that (i) all or a substantial or material portion of the Property is injured, damaged or destroyed by fire or other casualty, or (ii) any of the Property is damaged, destroyed or lost and any Damage Proceeds (as defined in § 3.03) are payable as a result of such occurrence or the cost of the repair, restoration or replacement is reasonably expected to exceed $50,000, or (iii) any part (but less than all) of the Property is condemned, seized or appropriated by any Governmental Agency (or conveyed, with Beneficiary's consent, in lieu of any such action), the following additional provisions shall apply:

(A) within 30 days (or such longer period as Beneficiary may approve in writing) after the date of such injury, damage, destruction, loss or other event, Trustor shall deliver to Beneficiary, in form and substance reasonably satisfactory to Beneficiary: (1) a written plan for the repair, restoration or replacement of the Property (any such repair, restoration or replacement being referred to as a "Restoration"), including the estimated cost of the Restoration and time of completion, (2) if requested by Beneficiary, a copy of the plans and specifications for the Restoration, and (3) such other Documents and information relating to the Restoration as Beneficiary may reasonably request;

(B) if and to the extent required by Beneficiary, any contracts entered into by Trustor with architects, contractors, subcontractors or suppliers in connection with the Restoration shall be in form and substance and with a Person reasonably satisfactory to Beneficiary, and Trustor shall deliver to Beneficiary, promptly following request by Beneficiary to do so, an assignment of each such contract and a consent by the contractor to such assignment, in each case in form and content reasonably approved by Beneficiary;

REVISED MAY 2003

5

(C)     the Restoration shall be conducted in accordance with the requirements of the Agreement for construction of Improvements and such other procedures and requirements as Beneficiary may reasonably specify, and shall be in substantial conformity with the applicable plans and specifications and the plan referred to in paragraph (A) above and in compliance in all respects with all applicable Laws and Other Requirements;

(D)     if Beneficiary reasonably determines at any time that any available Damage Proceeds that Beneficiary may be required to release to Trustor for the Restoration pursuant to § 3.03 are or may be insufficient to pay for all costs of completing the Restoration, then Trustor shall deposit with Beneficiary, on demand, an amount deemed reasonably necessary by Beneficiary to cover such insufficiency (any such amount to be held and disbursed by Beneficiary in accordance with paragraph (E) below); and

(E)     any Damage Proceeds that Beneficiary may be required to release to Trustor for the Restoration pursuant to § 3.03, together with any amounts deposited by Trustor with Beneficiary pursuant to paragraph (D) above, shall be held by Beneficiary in a Cash Collateral Account, shall be used solely to pay the cost of the Restoration and shall be disbursed in accordance with the terms, conditions and procedures set forth in the Agreement for Disbursements of the Loan and/or such other terms, conditions and procedures as Beneficiary may reasonably require (including compliance by Trustor with the provisions of paragraphs (A) through (D) above), provided that (1) Beneficiary shall have no obligation to disburse any such amounts if an Event of Default has occurred or if an event which, with notice or the passage of time, or both, would be an Event of Default has occurred and is continuing, and (2) if the amount of any such Damage Proceeds received by Beneficiary exceeds the cost of completing the Restoration, the excess may be applied by Beneficiary to the Secured Obligations in such order and manner as Beneficiary may determine or, at the option of Beneficiary, may be released to Trustor.

Any application or release of Damage Proceeds or additional amounts deposited with Beneficiary pursuant to paragraph (D) above (whether under this § 3.02 or § 3.03) shall not cure or waive any Event of Default or notice of default or invalidate any act done pursuant to such notice.

3.03    Insurance, Condemnation and Damage Claims.  Trustor shall maintain fire and other insurance on the Property to the extent required by the Agreement.  All proceeds of any claim, demand, award, settlement or other payment arising or resulting from or otherwise relating to any such insurance or any loss or destruction of, injury or damage to, trespass on or taking, condemnation (or conveyance in lieu of condemnation) or public use of any of the Property (a "Damage Claim") are assigned and shall be payable and delivered to Beneficiary (any such proceeds of any Damage Claim being referred to in this Trust Deed as "Damage Proceeds"). Trustor shall take all action reasonably necessary or required by Beneficiary in order to protect Trustor's and Beneficiary's rights and interests with respect to any Damage Claim, including the commencement of, appearance in and prosecution of any appropriate action or other proceeding, and Beneficiary may in its discretion participate in any such action or proceeding at the expense of Trustor.

REVISED MAY 2003

**EXHIBIT  D**

6

So long as no Event of Default has occurred, Trustor may settle, compromise or adjust any Damage Claim with the prior written consent of Beneficiary (which shall not be unreasonably withheld). Upon the occurrence of any Event of Default, Beneficiary shall have the sole right to settle, compromise or adjust any Damage Claim in such manner as Beneficiary may determine, and for this purpose Beneficiary may, in its own name or in the name of Trustor, take such action as Beneficiary deems appropriate to realize on any such Damage Claim. In either case, all Damage Proceeds payable in connection with any such Damage Claim shall be delivered directly to Beneficiary as provided in the preceding paragraph.

Any Damage Proceeds received by Beneficiary may be applied by Beneficiary in payment of the Secured Obligations in such order and manner as Beneficiary may determine, provided that so long as no Event of Default has occurred and no event which, with notice or the passage of time, or both, would be an Event of Default has occurred and is continuing, Beneficiary shall release such Damage Proceeds to Trustor for the Restoration of the Property in the manner and subject to the conditions set forth in § 3.02, except that Beneficiary shall not be required to release such Damage Proceeds (and may apply such Damage Proceeds to the Secured Obligations as set forth above) to the extent that such Damage Proceeds relate to any condemnation, seizure or other appropriation by any Governmental Agency of all or any portion of the Property (including Damage Proceeds payable in lieu of any such action), or if Beneficiary has reasonably determined that the security of this Trust Deed has been impaired, and will remain impaired notwithstanding release of Damage Proceeds to Trustor.

3.04    Liens and Taxes. Subject to the right of Trustor to contest any such payments in accordance with the terms of the Agreement, (a) Trustor shall pay, prior to delinquency, all Taxes which are or may become a Lien affecting any part of the Trust Estate (including assessments on appurtenant water stock), and (b) Trustor shall pay and perform when due all other obligations secured by or constituting a Lien affecting any part of the Trust Estate.

3.05    Actions. Trustor shall appear in and defend any claim or any action or other proceeding purporting to affect title or other interests relating to any part of the Trust Estate, the security of this Trust Deed or the rights or powers of Beneficiary or Trustee, and give Beneficiary prompt written notice of any such claim, action or proceeding. Beneficiary and Trustee may, at the expense of Trustor, appear in and defend any such claim, action or proceeding and any claim, action or other proceeding asserted or brought against Beneficiary or Trustee in connection with or relating to any part of the Trust Estate or this Trust Deed.

3.06    Action By Beneficiary or Trustee. If Trustor fails to perform any of its obligations under this Trust Deed and either (i) such failure shall continue for more than 10 days after notice thereof is given to Trustor, or (ii) Beneficiary shall reasonably determine that immediate corrective action is necessary or appropriate to protect the rights or interests of Beneficiary or Trustee, Beneficiary or Trustee may, but without any obligation to do so and without further notice to or demand upon Trustor and without releasing Trustor from any obligations under this Trust Deed, and at the expense of Trustor: (a) perform such obligations in such manner and to such extent and make such payments and take such other action as either may deem necessary in order to protect the security of this Trust Deed, Beneficiary or Trustee being authorized to enter upon the Real Property for such purposes, (b) appear in and defend any claim or any action or other

REVISED MAY 2003

**EXHIBIT D**

7

proceeding purporting to affect title or other interests relating to any part of the Trust Estate, the security of this Trust Deed or the rights or powers of Beneficiary or Trustee, and (c) pay, purchase, contest or compromise any Lien or Right of Others which in the reasonable judgment of either is or appears to be or may for any reason become prior or superior to this Trust Deed. If Beneficiary or Trustee shall elect to pay any such Lien or Right of Others or any Taxes which are or may become a Lien affecting any part of the Trust Estate or make any other payments to protect the security of this Trust Deed, Beneficiary or Trustee may do so without inquiring into the validity or enforceability of any apparent or threatened Lien, Right of Others or Taxes, and may pay any such Taxes in reliance on information from the appropriate taxing authority or public office without further inquiry.

3.07    Obligations With Respect to Trust Estate. Neither Beneficiary nor Trustee shall be under any obligation to preserve, maintain or protect the Trust Estate or any of Trustor's rights or interests in the Trust Estate, or make or give any presentments, demands for performance, protests, notices of nonperformance, protest or dishonor or other notices of any kind in connection with any Rights, or take any other action with respect to any other matters relating to the Trust Estate. Beneficiary and Trustee do not assume and shall have no liability for, and shall not be obligated to perform, any of Trustor's obligations with respect to any Rights or any other matters relating to the Trust Estate, and nothing contained in this Trust Deed shall release Trustor from any such obligations.

3.08    Assignment of Rents. Trustor absolutely, unconditionally and irrevocably grants, transfers and assigns to Beneficiary, during the continuance of this Trust Deed, all of Trustor's right, title and interest in and to the Rents. Notwithstanding such assignment, so long as no Event of Default has occurred, Trustor shall have the right to collect, receive, hold and dispose of the Rents as the same become due and payable, provided that unless Beneficiary otherwise consents in writing: (a) any such Rents paid more than 30 days in advance of the date when due shall be delivered to Beneficiary and held by Beneficiary in a Cash Collateral Account, to be released and applied on the date when due (or, if an Event of Default has occurred and is continuing, at such other time or times and in such manner as Beneficiary may determine), and (b) if an Event of Default has occurred, Trustor's right to collect and receive the Rents shall cease and Beneficiary shall have the sole right, with or without taking possession of the Real Property, to collect all Rents, including those past due and unpaid. Any such collection of Rents by Beneficiary shall not cure or waive any Event of Default or notice of default or invalidate any act done pursuant to such notice. Failure or discontinuance of Beneficiary at any time, or from time to time, to collect the Rents shall not in any manner affect the subsequent enforcement by Beneficiary of the right to collect the same. Nothing contained in this Trust Deed, nor the exercise of the right by Beneficiary to collect the Rents, shall be deemed to make Beneficiary a "mortgagee in possession" or shall be, or be construed to be, an affirmation by Beneficiary of, or an assumption of liability by Beneficiary under, or a subordination of the Lien of this Trust Deed to, any tenancy, lease or option.

3.09    Default. Upon the occurrence of any Event of Default: (a) Trustor shall be in default under this Trust Deed, and upon acceleration of the maturity of any Secured Obligations in accordance with the terms of the Agreement, all Secured Obligations shall immediately become due and payable without further notice to Trustor; (b) upon demand by Beneficiary,

REVISED MAY 2003

**EXHIBIT D**

8.

Trustor shall pay to Beneficiary, in addition to all other payments specifically required under the Loan Documents, in monthly installments, at the times and in the amounts required by Beneficiary from time to time, sums which when cumulated will be sufficient to pay one month prior to the time the same become delinquent, all Taxes which are or may become a Lien affecting the Trust Estate and the premiums for any policies of insurance to be obtained under the Agreement (all such payments to be held in a Cash Collateral Account as additional security for the Secured Obligations); and (c) Beneficiary may, without notice to or demand upon Trustor, which are expressly waived by Trustor (except for notices or demands otherwise required by applicable Laws to the extent not effectively waived by Trustor and any notices or demands specified below), and without releasing Trustor from any of its Obligations, exercise any one or more of the following Remedies as Beneficiary may determine:

    (i) Beneficiary may, either directly or through an agent or court-appointed receiver, and without regard to the adequacy of any security for the Secured Obligations:

    (A)    enter, take possession of, manage, operate, protect, preserve and maintain, and exercise any other rights of an owner of, the Trust Estate, and use any other properties or facilities of Trustor relating to the Trust Estate, all without payment of rent or other compensation to Trustor;

    (B)    enter into such contracts and take such other action as Beneficiary deems appropriate to complete all or any part of the Project or any other construction on the Land, subject to such modifications and other changes in the Project or the plan of development as Beneficiary may deem appropriate;

    (C)    make, cancel, enforce or modify leases, obtain and evict tenants, fix or modify rents and, in its own name or in the name of Trustor, otherwise conduct any business of Trustor in relation to the Trust Estate and deal with Trustor's creditors, debtors, tenants, agents and employees and any other Persons having any relationship with Trustor in relation to the Trust Estate, and amend any contracts between them, in any manner Beneficiary may determine;

    (D)    either with or without taking possession of the Trust Estate, notify obligors on any Rights that all payments and other performance are to be made and rendered directly and exclusively to Beneficiary, and in its own name supplement, modify, amend, renew, extend, accelerate, accept partial payments or performance on, make allowances and adjustments and issue credits with respect to, give approvals, waivers and consents under, release, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Rights, including collection of amounts past due and unpaid (Trustor agreeing not to take any such action after the occurrence of an Event of Default without prior written authorization from Beneficiary);

    (E)    endorse, in the name of Trustor, all checks, drafts and other evidences of payment relating to the Trust Estate, and receive, open and dispose of all mail addressed to Trustor and notify the postal authorities to change the address for delivery of such mail to such address as Beneficiary may designate; and

**EXHIBIT D**

9

(F)    take such other action as Beneficiary deems appropriate to protect the security of this Trust Deed.

(ii)    Beneficiary may execute and deliver to Trustee written declaration of default and demand for sale and written notice of default and of election to cause all or any part of the Trust Estate to be sold, which notice Trustee shall cause to be filed for record; and after the lapse of such time as may then be required by law following the recordation of such notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell such property at the time and place fixed by it in such notice of sale, either as a whole or in separate parcels and in such order as Beneficiary may direct (Trustor waiving any right to direct the order of sale), at public auction to the highest bidder for cash in lawful money of the United States (or cash equivalents acceptable to Trustee to the extent permitted by applicable law), payable at the time of sale. Trustee may postpone the sale of all or any part of the Trust Estate by public announcement at such time and place of sale, and from time to time after any such postponement may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to the purchaser at such sale its deed conveying the property so sold, but without any covenant or warranty, express or implied, and the recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustee or Beneficiary, may purchase at such sale, and any bid by Beneficiary may be, in whole or in part, in the form of cancellation of all or any part of the Secured Obligations. Any such sale shall be free and clear of any interest of Trustor and any lease, encumbrance or other matter affecting the property so sold which is subject or subordinate to this Trust Deed, except that any such sale shall not result in the termination of any such lease (A) if and to the extent otherwise provided in any estoppel or other agreement executed by the tenant and Beneficiary (or executed by the tenant in favor of, and accepted by, Beneficiary), or (B) if the purchaser at such sale gives written notice to the tenant, within 30 days after date of sale, that the lease will continue in effect.

(iii)    Beneficiary may commence and prosecute a judicial action for foreclosure of this Trust Deed;

(iv)    With respect to any Personal Property, Beneficiary shall have in any jurisdiction where enforcement of this Trust Deed is sought all Remedies of a secured party under the UCC and may require Trustor, on demand, to assemble all Personal Property and make it available to Beneficiary at places that Beneficiary may select that are reasonably convenient for both parties, whether at the premises of Trustor or elsewhere.

(v)    Beneficiary may proceed to protect, exercise and enforce any and all other Remedies provided under the Loan Documents or by applicable Laws.

All proceeds of collection, sale or other liquidation of the Trust Estate shall be applied first to all costs, fees, expenses and other amounts (including interest) payable by Trustor under § 3.10 of this Trust Deed and to all other Secured Obligations not otherwise repaid in such order and manner as Beneficiary may determine, and the remainder, if any, to the person or persons legally entitled thereto.

REVISED MAY 2003

**EXHIBIT D**

10

Without limitation on any other provision of this Trust Deed, no Person who acquires any interest in the Trust Estate under a sale thereof pursuant to this § 3.09 shall be deemed, as a result of such acquisition, to have assumed any of Trustor's obligations with respect to any Rights or any other matters relating to the Trust Estate, except to the extent that such obligations are expressly assumed by such Person in writing.

Each of the Remedies provided in this Trust Deed is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Trust Deed or by applicable Laws or under any other Loan Document. Each Remedy may be exercised from time to time as often as deemed necessary by Trustee and Beneficiary, and in such order and manner as Beneficiary may determine. This Trust Deed is independent of any other security for the Secured Obligations, and upon the occurrence of an Event of Default, Trustee or Beneficiary may proceed in the enforcement of this Trust Deed independently of any other Remedy that Trustee or Beneficiary may at any time hold with respect to the Trust Estate or the Secured Obligations or any other security. Trustor, for itself and for any other person claiming by or through Trustor, waives, to the fullest extent permitted by applicable Laws, all rights to require a marshalling of assets by Trustee or Beneficiary or to require Trustee or Beneficiary to first resort to any particular portion of the Trust Estate or any other security (whether such portion shall have been retained or conveyed by Trustor) before resorting to any other portion, and all rights of redemption, stay and appraisal.

3.10    Costs, Fees and Expenses.  Trustor shall pay, on demand, all costs, fees, expenses, advances, charges, losses and liabilities of Trustee and Beneficiary under or in connection with this Trust Deed or the enforcement of, or the exercise of any Remedy or any other action taken by Trustee or Beneficiary under, this Trust Deed or the collection of the Secured Obligations, in each case including (a) reconveyance and foreclosure fees of Trustee, (b) costs and expenses of Beneficiary or Trustee or any receiver appointed under this Trust Deed in connection with the operation, maintenance, management, protection, preservation, collection, sale or other liquidation of the Trust Estate or foreclosure of this Trust Deed, (c) advances made by Beneficiary to complete or partially construct all or any part of the Project or any other construction on the Land or otherwise to protect the security of this Trust Deed, (d) cost of evidence of title, and (e) the reasonable fees and disbursements of Trustee's and Beneficiary's legal counsel and other out-of-pocket expenses, and the reasonable charges of Beneficiary's internal legal counsel; together with interest on all such amounts until paid (i) at the Alternate Rate in the case of any such interest payable to Beneficiary, and (ii) at the rate provided by law in the case of any such interest payable to Trustee.

3.11    Late Payments.  By accepting payment of any part of the Secured Obligations after its due date, Beneficiary does not waive its right either to require prompt payment when due of all other Secured Obligations or to declare a default for failure to so pay.

3.12    Action by Trustee.  At any time and from time to time upon written request of Beneficiary and presentation of this Trust Deed for endorsement, and without affecting the personal liability of any Person for payment of the Secured Obligations or the security of this Trust Deed for the full amount of the Secured Obligations on all property remaining subject to this Trust Deed, Trustee may, without notice and without liability for such action, and notwithstanding

EXHIBIT D

12

3.19    Construction Trust Deed.  This Trust Deed is a Construction Trust Deed made by Trustor, as the owner of the Land, in favor of Beneficiary, as the lender (the addresses of each of which are set forth in the first paragraph of this Trust Deed).  Trustor represents that a complete legal description of the Land and, if indicated, the proper street address, are set forth in Exhibit "A".

3.20    Fixture Filing.  This Trust Deed covers certain Goods which are or are to become fixtures related to the Land and constitutes a "fixture filing" with respect to such Goods executed by Trustor (as "debtor") in favor of Beneficiary (as "secured party").

3.21    Governing Law.  This Trust Deed shall be governed by, and construed and enforced in accordance with, the Laws of California.

3.22    Request for Notice.  Trustor requests that a copy of any notice of default and a copy of any notice of sale be mailed to Trustor at Trustor's address set forth above.  Notices under this Trust Deed shall be given in accordance with the notice provisions of the Agreement.

3.23    Further Assurances.  Trustor shall, at its sole expense and without expense to Beneficiary, do such further acts and execute and deliver such further documents as Beneficiary from time to time may reasonably require for the purpose of assuring and confirming to Beneficiary the rights created by this Trust Deed or intended now or in the future so to be, or for carrying out the intention or facilitating the performance of the terms of this Trust Deed or for assuring the validity of any security interest or lien under this Trust Deed.

3.24.    Time of Essence.  Time is of the essence of each and every provision of this Trust Deed.

3.25.    Waiver of Jury Trial.  EACH OF THE BENEFICIARY AND TRUSTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE BENEFICIARY AND TRUSTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS TRUST DEED, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE BENEFICIARY AND TRUSTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

"TRUSTOR":

Eden Garden, LLC,
a California limited liability company

By: _____
       Ali K. Amidy, Managing Member

REVISED MAY 2003

**EXHIBIT D**

13

REVISED MAY 2003

EXHIBIT  D

Loan No. 0000

Exhibit "A"

To Construction Trust Deed

LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE,
COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DECRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain
map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California
recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

Street address (if any): 508 Hillsdale Ave., San Jose, California 95136

REVISED MAY 2003                              A-1

**EXHIBIT  D**

## ACKNOWLEDGMENTS

STATE OF CALIFORNIA                    )
          _Santa Clara_                 ) SS.:
COUNTY OF ~~LOS ANGELES~~              )


On _OCT 7,_____, 200_5_, before me, _D WHITE_____, Notary Public,
personally appeared _ALI K AMIDY_____, ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/~~are~~
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


Signature _D White_____                    (Seal)




```
D. WHITE
COMM; # 1369741
NOTARY PUBLIC-CALIFORNIA
SANTA CLARA COUNTY
COMM. EXP. AUG. 21, 2006
```

REVISED MAY 2003

**EXHIBIT D**

**RECORDING REQUESTED BY:**
**Fidelity National Title**
Escrow: 27006443
Title Order: 27006443-BF

**When Recorded Mail Document**
**and Tax Statement To:**
IndyMac Bank
3465 E. Foothill Blvd.
Pasadena, CA 91107

DOCUMENT: 18668935

| | |
|---|---|
| Pages: | 20 |
| Fees.... | 66.00 |
| Taxes... | |
| Copies.. | |
| AMT PAID | 66.00 |

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Fidelity National Title Ins.

RDE # 011
11/08/2005
8:00 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# DEED OF TRUST

**EXHIBIT D**

| DOCUMENT: 19392640 | | Pages: 5 |
|---|---|---|
| | Fees.... | 21.00 |
| | Taxes... | |
| | Copies.. | |
| | AMT PAID | 21.00 |

**imb**
## IndymacBank
### Homebuilder Division

REGINA ALCOMENDRAS          RDE # 005
SANTA CLARA COUNTY RECORDER   4/19/2007
Recorded at the request of    2:03 PM
Fidelity National Title Ins.

RECORDING REQUESTED BY AND )
WHEN RECORDED MAIL TO:       )
IndyMac Bank, F.S. B.        )
155 North Lake Avenue, LK-11-19  )
Pasadena, California 91101   )
Attn: Digia Dam
Loan No. ⬛⬛⬛0000

51034570      Space Above for Recorder's Use

## ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS

(short form)

This Additional Advance And First Modification Agreement To The Building Loan Agreement; Promissory Note; Construction Deed Of Trust With Assignment Of Rents, Security Agreement And Fixture Filing And Other Loan Documents ("Agreement-(short form)") is made as of February 14, 2007, by Eden Garden LLC, a California limited liability company ("Borrower") and INDYMAC BANK, F.S.B. ("Lender").

### Factual Background

A.       Under a building loan agreement dated September 30, 2005, (the "Loan Agreement"), Lender agreed to make a loan (the "Loan") to Borrower. The Loan Agreement has subsequently been modified by that certain First Modification to Building Loan Agreement and Loan Documents dated February 14, 2007 ("First Modification"). The First Modification and Loan Agreement are hereinafter referred to collectively to them as the "Loan Agreement". Capitalized terms used here without definition have the meanings given to them in the Loan Agreement.

B.       The Loan is evidenced by a Note dated September 30, 2005, made payable to Lender in the stated principal amount of $5,904,000.00. The Note is secured by a Deed of Trust dated September 30, 2005, executed by Borrower as trustor, Fidelity National Title Insurance Company, whose address is 4041 MacArthur Boulevard, Suite 490, Newport Beach, California 92660, as trustee, for the benefit of Lender as beneficiary. The Deed of Trust was recorded on November 08, 2005 in the Official Records of Santa Clara County, California, as Instrument No. 18668901. The Deed of Trust encumbers certain Property located in Santa Clara County, California, as more particularly therein described.

C.       As used here, the term "Loan Documents" means the Loan Agreement, the Note, the Deed of Trust, and any other documents executed in connection with the Loan, including those which evidence, guaranty, secure or modify the Loan, as any or all of them may have been amended to date.

D.       Lender and Borrower have agreed to modify the Loan as provided in an Additional Advance and First Modification Agreement to Building Loan Agreement and First Modification to Trust Deed and Loan Documents (the "Agreement") of the same date as this Agreement-(short form). This Agreement-(short form) and the Agreement are Loan Documents.

Additional Advance Mod
Loan Number: 49-0320000                    Page 1 of 3

## EXHIBIT E

<u>Agreement</u>

Therefore, Borrower and Lender agree as follows:

      1.     The Agreement is incorporated in this Agreement-(short form) reference, the same as though set forth here in full.

      2.     The Loan is amended on the terms and subject to the conditions of the Agreement. Among other things, the stated principal amount of the Note is now increased to $6,820,628.00 and the budget and release prices have been revised.

      3.     The Deed of Trust is modified to secure payment and performance of the Loan as amended to date, in addition to all other "Secured Obligations" as therein defined. The foregoing notwithstanding, certain obligations continue to be excluded from the Secured Obligations, as provided in the Deed of Trust.

"BORROWER"

Eden Garden, LLC,
a California limited liability company

By: _____
    Ali K. Amidi, Managing Member

"LENDER"

INDYMAC BANK, F.S.B.

By: _____
    Grace Soueidan, First Vice President

Additional Advance Mod
Loan Number: ████████0000

Page 2 of 3

**EXHIBIT E**

## ACKNOWLEDGEMENT

STATE OF _CALIFORNIA_ )
COUNTY OF _SANTA CLARA_ )

On _2/21_, 200_7_, before me, _HOUMAN SIASI_, a
Notary Public, personally appeared _ALI K. AMIDY_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

```
                    HOUMAN S. SIASI
                    COMM. #1709955
              NOTARY PUBLIC - CALIFORNIA
                 SANTA CLARA COUNTY
              COMM. EXPIRES DEC. 10, 2010
```

_____
(Signature)

(Space above for official notarial seal)

## ACKNOWLEDGEMENT

STATE OF _____ )
COUNTY OF _____ )

On _____, 20___, before me, _____, a
Notary Public, personally appeared _____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s], or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

_____
(Signature)

(Space above for official notarial seal)

Additional Advance Mod
Loan Number ███████0000

Page 3 of 3

**EXHIBIT  E**

## ACKNOWLEDGEMENT

STATE OF _CALIFORNIA_ )
COUNTY OF _SANTA CLARA_ )

On _2/21_ , 2007, before me, _HOUMAN SIASI_ , a
Notary Public, personally appeared _ALI K. AMADY_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s] or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

HOUMAN S. SIASI
COMM. #1709955
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES DEC. 10, 2010

_____
(Signature)

(Space above for official notarial seal)

## ACKNOWLEDGEMENT

STATE OF _California_ )
COUNTY OF _Los angeles_ )

On _April 13, 2007_ , 20___ before me, _Divia Dam_ , a
Notary Public, personally appeared _Grace souleidan_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person[s] whose
name[s] [is/are] subscribed to the within instrument and acknowledged to me that [he/she/they] executed
the same in [his/her/their] authorized [capacity/capacities], and that by [his/her/their] signature[s] on the
instrument the person[s] or the entity upon behalf of which the person[s] acted, executed the instrument.

WITNESS my hand and official seal.

DIVIA DAM
Commission # 1639057
Notary Public - California
Los Angeles County
My Comm. Expires Jan 17, 2010

_____
(Signature)

(Space above for official notarial seal)

Additional Advance Mod
Loan Number

Page 3 of 3

**EXHIBIT E**



**IndymacBank** "

Homebuilder Division

Loan Number ███████0000

## ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS

### (Long Form)

This Additional Advance And First Modification Agreement To The Building Loan Agreement; Promissory Note; Construction Deed Of Trust With Assignment Of Rents, Security Agreement And Fixture Filing And Other Loan Documents (the "Agreement") is dated as of February 14, 2007, by and between Eden Garden LLC, a California limited liability company ("Borrower") and INDYMAC BANK, F.S.B. ("Lender") as follows:

<u>R E C I T A L S:</u>

A.       Unless otherwise defined herein, all initially-capitalized terms used herein shall have the same meanings ascribed to such terms in the Loan Agreement (as hereinafter defined).

B.       Borrower and Lender have entered into that certain Building Loan Agreement, dated as of September 30, 2005 (the "Loan Agreement"), pursuant to the terms and conditions of which Lender agreed to make a loan (the "Loan") to Borrower in the stated principal amount of $5,904,000.00. The Loan Agreement has subsequently been modified by that certain First Modification Agreement to the Building Loan Agreement and Loan Documents dated February 14, 2007 ("First Modification"). The First Modification and Loan Agreement are hereinafter referred to collectively as the "Loan Agreement". The Loan is evidenced by that certain Promissory Note, dated September 30, 2005, in the original principal amount of $5,904,000.00, executed by Borrower, and payable to the order of Lender (the "Note").

C.       The repayment of the Note and Borrower's performance of its obligations under the Loan Agreement and the other Loan Documents are secured, <u>inter alia</u>, by (i) that certain Construction Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, dated as of September 30, 2005, executed by Borrower, as Trustor, to Fidelity National Title Insurance Company, whose address is 4041 MacArthur Boulevard, Suite 490, Newport Beach, California 92660, as Trustee, in favor of Lender, as Beneficiary, recorded on November 08, 2005, as Instrument No. 18668901, in the Official Records of Santa Clara County, California (the "Trust Deed").

D.       The Loan Documents also include that certain General Guaranty, Environmental Guaranty, and that certain Completion Guaranty, each dated as of September 30, 2005, executed by Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC, a California limited liability company (individually and collectively, the "Guarantor"), in favor of the Lender. The General Guaranty and the Environmental Guaranty shall hereinafter be referred to collectively as the "Guaranty".

E.       In connection with the Loan, Borrower executed an Unsecured Indemnity Agreement ("Borrower's Unsecured Indemnity").  Borrower's Unsecured Indemnity is not a Loan Document, as defined below.

**EXHIBIT  E**

F. Borrower has requested that Lender increase the amount of the Loan from $5,904,000.00 to $6,820,628.00 and Lender is willing to do so upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing Recitals, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Borrower and Lender hereby incorporate the foregoing Recitals by reference herein and further agree as follows:

1.    Modification to Loan Agreement.

(a)    Loan Amount. The Loan Amount referenced in § 1.00 of the Loan Agreement, and elsewhere in the Loan Agreement and in the other Loan Documents, is hereby amended to read as $6,820,628.00, which includes additional Loan funds in the amount of $916,628.00.

(b)    Loan Fees. At or prior to the time of recordation of the First Modification to Trust Deed and Loan Documents referenced in this Agreement, Borrower shall pay to Lender a nonrefundable Loan fee with respect to the additional advance in the amount of $66,540.00, an Appraisal fee in the amount of $6,500.00, a Loan Documentation fee in the amount of $300.00, and a Title Modification Endorsement and Recording fees in the amount of $609.00 (estimated).

(c)    Loan. All references in the Loan Agreement and in the other Loan Documents to the Loan shall mean and refer to the Loan, as amended herein.

(d)    Loan Documents. All references in the Loan Agreement and in the other Loan Documents to the Loan Documents shall mean and refer to the Loan Documents, as amended herein. The Loan Documents, however, do not include Borrower's Unsecured Indemnity. This Agreement is a Loan Document.

(e)    Section "J" of Exhibit "C" in the Loan Agreement under "Sales Start Date" shall be amended and replaced with the following:

"J.    Sales Start Date. The Borrower shall cause the first Unit to be available for sale no later than July 30, 2007."

(f)    Section "L" of Exhibit "C" in the Loan Agreement under "Unit Closings" shall be amended and replaced with the following:

"L.    Unit Closings. The Borrower shall cause the first Unit to close no later than September 30, 2007 and shall cause not less than three (3) Units to be closed during each month, commencing after the first Unit closing or September 30, 2007, whichever is sooner."

(f)    Exhibit "D" Budget line items shall be amended and superseded with the following line item increases:

"Additional Advance of $916,628.00 applied as follows:

| SITE: | #2005 Site Drainage | $24,000.00 |
|---|---|---|
| | #2008 Utility Trenching | $68,000.00 |
| | #2010 Sewer Hook-up/Pumps | $145,000.00 |


**EXHIBIT E**

| DIRECT CONSTRUCTION: | #3005 Rough Framing-Labor/Material | $238,590.00 |
| | #3008 Rough HVAC | $65,000.00 |
| | #3010 Fireplaces including Flues | $10,000.00 |
| | #3018 Garage Doors | $4,000.00 |
| | #3020 Drywall/Plaster | $51,600.00 |
| | #3027 Interior Paintings/Wall Covering | $32,000.00 |
| INDIRECT COSTS: | #4003 Permits & Fees | $104,489.00 |
| FINANCING COSTS: | #6010 Inspection Fees | $6,600.00 |
| | #6012 Loan Extension/Mod Fees | $66,540.00 |
| | #6013 Mod/Appraisal Fees | $6,500.00 |
| | #6014 Mod/Loan Documentation Fees | $300.00 |
| | #6015Mod/Title.110.10 Endorsement Fee | $609.00 |
| GENERAL CONTINGENCY: | #7001 Contingency | $93,400.00 |
| | Additional Advance Total: | $916,628.00 |

(g)     Exhibit "E" Minimum Release Prices shall be amended and replaced with the following:

## "MINIMUM RELEASE PRICES"

### (Residential Tract Construction)

| Plan | Number of Units | Release Prices – 110% of PAR per Unit | Approx. SQFT |
|---|---|---|---|
| A | 2 | $406,745.00 | 1,217 |
| A-1 | 1 | $414,008.00 | 1,234 |
| B | 3 | $457,588.00 | 1,736 |
| C | 1 | $421271.00 | 1,358 |
| C-1 | 3 | $421,271.00 | 1,362 |
| C-2 | 1 | $421,271.00 | 1,286 |
| C-3 | 1 | $421,271.00 | 1,344 |
| D | 1 | $428,535.00 | 1,521 |
| E | 2 | $384,955.00 | 1,142 |
| E-1 | 1 | $384,955.00 | 1,143 |
| F | 1 | $392,218.00 | 1,167 |
| G | 1 | $399,482.00 | 1,173 |

(h)     The defined term "Note" referenced in Exhibit "F" attached to the Loan Agreement shall be amended and replaced with the following:

"Note" means the Promissory Note and the ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST


EXHIBIT  E

WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS executed by the Borrower in favor of Lender.

(i)     Paragraph 5.10 is hereby added to the Loan Agreement as follows:

5.10   <u>Compliance with Laws</u>. Without in any way limiting any of Borrower's other representations, warranties or covenants contained in this Agreement, Borrower hereby represents, warrants and covenants that the Improvement Plans are, and the construction of the Improvements according thereto will be, in compliance with all applicable federal, state and local laws, rules, regulations, ordinances and codes, including without limitation the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et. seq., as amended, and the Fair Housing Act, 42 U.S.C. § 3601, et. seq., as amended.

2.   <u>Modification to Note</u>.

(a)    The dollar amount of "$5,904,000.00" set forth in the upper left hand corner of the Note is hereby deleted and restated in its entirely to read "$6,820,628.00".

(b)    Paragraphs 1 and 2 of the Note are hereby deleted and restated in its entirely to read as follows:

"1.    FOR VALUE RECEIVED, the Borrower promises to pay to the Lender, or order, at the Lender's office located at 155 North Lake Avenue, LK-11-19, Pasadena, California 91101, Attention: Homebuilder Division - PBG (or such other location specified by the Lender from time to time in writing), the principal amount of Six Million Eight Hundred Twenty Thousand Six Hundred Twenty-Eight Dollars and No Cents ($6,820,628.00), or so much of such amount as may be advanced by or on behalf of the Lender from time to time, together with interest as provided in § 3 below."

"2.    If not sooner paid, the principal of this Note shall be payable on March 28, 2008 (the "<u>Maturity Date</u>"). Accrued interest shall be payable on the first day of each calendar month, on the Maturity Date and on the date of final payment of the principal of this Note in full, except that any interest which accrues after the Maturity Date or the acceleration of the maturity of this Note shall be payable immediately and without demand."

(c)    Sub-paragraph (e) is hereby added to Section 3 in the Note as follows:

"3. (e)  Accrued interest not paid to Lender on or before the twentieth (20th) calendar day of each month in which it becomes due, Borrower shall pay, upon demand by the Lender, a late or collection charge equal to five percent (5.00%) of the amount of such unpaid interest payment. Borrower agrees that this late or collection charge represents a reasonable sum considering all of the circumstances existing on the date of execution of this Note and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower further agrees that proof of actual damages would be costly and inconvenient. Acceptance by Lender of payment of the late or collection charge payable pursuant to this Section 3(e) will not constitute a waiver of the Event of Default which occurred by reason of the failure of Borrower to make timely


**EXHIBIT E**

payment and will not prevent Lender from exercising any other rights or remedies available to Lender by reason of such Event of Default."

3.   Modification to Trust Deed. Clause (a) of Section 2.00 of the Trust Deed is hereby deleted and restated in its entirely to read as follows:

(a)   all present and future indebtedness evidenced by the Note dated the date of this Trust Deed in the face principal amount up to $6,820,628.00 executed by Trustor in favor of Beneficiary, including principal, interest and all other amounts payable under the terms of the Note, and any and all supplements, amendments and modifications thereto and any and all extensions and renewals thereof;"

4.   Modification to All Loan Documents. All of the Loan Documents shall be amended to reflect that the Loan Amount has been increased $916,628.00 to $6,820,628.00, and that such Loan Documents have been modified by this Agreement, together with any and all amendments, modifications and supplements thereto.

5.   Representations and Warranties. Borrower hereby represents and warrants to Lender that:

(a)   Borrower has full power and authority to execute, deliver and perform its obligations under this Agreement, and this Agreement is binding upon, and enforceable against Borrower in accordance with its terms; and

(b)   As of the date hereof, there is no Event of Default hereunder or under the Loan Agreement, the Note, the Trust Deed, or any of the other Loan Documents, and no event exists which, with the giving of notice or the passage of time, or both, would give rise to an Event of Default hereunder or thereunder.

6.   Reaffirmation of Obligations.   Borrower hereby acknowledges and reaffirms its obligations under the Loan Agreement, the Note, the Trust Deed, and the other Loan Documents, as such documents have been amended by this Agreement, and agrees that any reference made in the Loan Agreement, the Note, the Trust Deed, or any of the other Loan Documents, to such document shall mean as amended pursuant to this Agreement.

7.   Events of Default. The breach or default by Borrower of any term, covenant, agreement, condition, provision, representation or warranty contained herein, and the expiration of any applicable cure period set forth in the Loan Agreement or in such other applicable Loan Document, shall constitute an Event of Default under the Loan Agreement and shall give Lender the right, exercisable at Lender's sole option, to pursue any or all of its remedies under the Loan Documents.

8.   Closing Conditions.   Notwithstanding anything to the contrary contained herein, the modification to the Loan Documents set forth herein shall not be effective prior to the date that the Agreement (short form) (as defined below) has been recorded in the Official Records of Santa Clara County, California, and Borrower has delivered or caused to be delivered to Lender the following items, all of which shall be satisfactory in form and content to Lender and, if applicable, duly executed (and acknowledged where necessary) by the appropriate parties thereto:

(a)   The **ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY**


**EXHIBIT E**

**AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS** ("Agreement-(short form)") dated the date hereof.

(b)    Exhibit "A" attached to this Agreement, executed by each Guarantor in favor of the Lender (the "Reaffirmation of Guaranty"), under the terms of which each Guarantor reaffirms its obligations under each Guaranty and each Environmental Guaranty;

(c)    An updated preliminary title report for the Land and evidence satisfactory to Lender that the title insurer under the Lender's Title Policy is prepared to issue such endorsement, including 110.10 endorsement, to the Lender's Title Policy as required by Lender in its reasonable discretion, all of which shall be in form and substance satisfactory to Lender;

(d)    Federal Tax Returns for 2005 for Eden Garden LLC, a California limited liability company, Ali K. Amidy, and Guiti Nahavandi Amidy.

(e)    Such other documents, materials or information as Lender may reasonably require.

9.    Modification to Loan Documents. Upon the recording of the Agreement-(short form) with the Official Records of Santa Clara County, California, the parties hereto agree that the Loan Agreement, the Note, the Trust Deed and the other Loan Documents shall be amended in the manner and to the extent set forth herein.

10.    Effect on Loan Documents. Except as specifically amended pursuant to the terms of this Agreement, the terms and conditions of the Loan Agreement, the Note, the Trust Deed and the other Loan Documents shall remain unmodified and in full force and effect.

11.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

12.    Counterparts.    This Agreement may be executed in counterparts, all of which executed counterparts shall together constitute a single document. Signature pages may be detached from the counterparts and attached to a single copy of this document to physically form one document.

13.    Submission of Agreement. The submission of this Agreement to Borrower or its agents or attorneys for review or signature does not constitute a commitment by Lender to increase the Loan Amount, and this Agreement shall have no binding force or effect until the closing conditions under Section 8 above have been satisfied.

14.    Indemnification and Waiver.

(a)    Indemnification. Refer to Section 4.13 of the Agreement.

(b)    Waivers and Amendments. Refer to Section 7.01 of the Agreement.

(c)    Non-Reliance and Non-Liability. Refer to Section 7.05 of the Agreement.

(d)    Waiver of Jury Trial. Refer to Section 7.13 of the Agreement.


**EXHIBIT E**

15.   <u>Entire Agreement</u>. This Agreement and the Exhibits hereto, contains the entire agreement between the parties relating to the subject matter hereof.  Any oral representations or statements concerning the subject matter hereof or thereof shall be of no force or effect.

"BORROWER"

Eden Garden, LLC,
a California limited liability company

By: _____
    Ali K. Amidy, Managing Member

"LENDER"

INDYMAC BANK, F.S.B.

By: _____
    Grace Soueidan, First Vice President

Additional Advance Mod
Loan Number: ████████000

Page 7 of 9

**EXHIBIT E**

Exhibit "A"

REAFFIRMATION OF GENERAL GUARANTY AND ENVIRONMENTAL GUARANTY IN
CONNECTION WITH ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO
THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST
WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER
LOAN DOCUMENTS, DATED SEPTEMBER 30, 2005.

Pursuant to that certain Building Loan Agreement dated as of September 30, 2005 by and
between INDYMAC BANK, F.S.B., (the "Lender"), Eden Garden LLC, a California limited liability
company(the "Borrower"), Lender agreed to make a loan to Borrower in the amount of $5,904,000.00
(the "Loan"). The Loan is evidenced by that certain Promissory Note, dated September 30, 2005,
executed by Borrower and payable to the order of Lender (the "Note"). Capitalized terms not otherwise
defined herein shall have the same meaning given to such terms in the Loan Agreement.

Pursuant to that certain General Guaranty (the "Guaranty"), dated as of September 30, 2005, and
that certain Environmental Guaranty (the "Environmental Guaranty") dated as of September 30, 2005,
executed by Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC, a California
limited liability company (individually and collectively the "Guarantor"), Guarantor has guaranteed the
punctual and complete payment and performance when due of certain obligations of the Borrower to the
Lender under the Loan Documents, and has guaranteed the punctual and complete payment and
performance of certain obligations of the Borrower to the Lender under the Environmental Indemnity.

Guarantor understands that Lender and Borrower have agreed to modify the Loan Documents for
the purpose of, among other things, increasing the Loan Amount from $5,904,000.00 to $6,820,628.00,
all as more particularly set forth in that certain **ADDITIONAL ADVANCE AND FIRST
MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY
NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY
AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS]**, dated the date
hereof (the "Agreement"), between Borrower and Lender.

By this Exhibit "A", Guarantor acknowledges and agrees that Guarantor has read, consulted with
its attorneys regarding, and understands that this consent to the execution of this Agreement dated the
date hereof, agrees to remain fully bound by the Guaranty and Environmental Guaranty notwithstanding
the modification of the Loan Documents evidenced by the execution and delivery of the Agreement, and
agrees that any reference made in the Guaranty or in the Environmental Guaranty to any of the Loan
Documents or any terms or conditions contained therein shall mean such loan documents, terms or
conditions as modified by this agreement.

[The remainder of this page has been left intentionally blank. The signature page(s) follow(s).]



**EXHIBIT E**

Exhibit "A" (continued)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR"

_____
Ali K. Amidy, an individual

Guarantor's Address:
16840 Cypress Way
Los Gatos, CA 95032

_____
Guiti Nahavandi Amidy, an individual

16840 Cypress Way
Los Gatos, CA 95032

Centra Net Investment, LLC,
a California limited liability company

By: _____
Ali K. Amidy, Managing Member
04-8-07

Centra Net Investment, LLC
655 Campbell Technology Park, Suite 125
Campbell, CA 95008

**EXHIBIT  E**

Title No. 05-**51034570**-B-PM
Locate No. CAFNT0943-0943-0051-0051034570

## LEGAL DESCRIPTION

### EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE , COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

APN: 455-52-036 through 455-52-053

CLTA Preliminary Report Form (11/17/04)

## EXHIBIT E

9/30/05

Loan No. ████0000

## GENERAL GUARANTY

(Real Estate Secured Loan)

TO:  INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated September 30, 2005, is made by Ali K. Amidy and Guiti Nahavandi Amidy (individually and collectively the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty between the Lender and Eden Garden, LLC, a California limited liability company (the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference. The Agreement provides, among other things, for rules of construction which apply to this Guaranty. Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $5,904,000.00 (the "Loan") to finance the real estate project of the Borrower known as Eden Garden Townhomes (the "Project"). The Loan will be secured by a Trust Deed executed by the Borrower with respect to the Project. As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.    Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $5,904,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise. Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

REVISED MAY 2003

**EXHIBIT  F**

2

2.    Nature of Guaranty.  This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan.  This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.    Obligations Independent.  The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security.  The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security.  The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.    Action with Respect to Other Obligations or Security.  The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to:  (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of  any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

REVISED MAY 2003

3

5.    Waiver of Defenses.  The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of:  (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party.  Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property.  This means, among other things:

1.    The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2.    If the Lender forecloses on any real property collateral pledged by the Borrower:

    (A)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

    (B)    The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

REVISED MAY 2003

**EXHIBIT F**

4

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a nonjudicial sale or other disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of California or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6. Waiver of Reimbursement Rights. Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7. Representations of the Guarantor. The Guarantor represents and warrants to the Lender that: (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

REVISED MAY 2003

**EXHIBIT F**

5

8.    Financial Statements and Tax Returns.  The Guarantor hereby agrees to deliver to the Lender, the following:  (a) within 90 days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year, (b)  upon request by the Lender from time to time, quarterly Financial Statements in form and detail satisfactory to the Lender within 30 days of quarter end, Tax Returns for the Guarantor within 30 days of filing, and copies of audited Financial Statements prepared for the Guarantor, in each case certified in a manner acceptable to the Lender.

9.    Indemnification by the Guarantor.  Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.    Rights of Setoff.  Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.    Waivers and Amendments.  No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.    Remedies.  Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document.  Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine.  No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy, nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.    Costs and Expenses.  The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

REVISED MAY 2003

6

14. <u>Notices</u>. All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of California as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement. Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15. <u>Binding Agreement</u>. This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender. The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16. <u>Multiple Guarantors</u>. If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17. <u>Governing Law</u>. This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of California.

18. <u>Time of Essence</u>. Time is of the essence of each and every provision of this Guaranty.

19. <u>Nature of Waivers</u>. THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20. <u>Waiver of Jury Trial</u>. EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

**[Signatures Commence on Next Page]**

REVISED MAY 2003

**EXHIBIT _F**

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR":

_Ali K. Amidy_                                    Guarantor's Address:
                                                  16840 Cypress Way
                                                  Los Gatos, CA 95032
_Guiti Nahavandi Amidy_

REVISED MAY 2003

**EXHIBIT  F**

Loan No. 0000

<div align="center">

**GENERAL GUARANTY**

(Real Estate Secured Loan)

</div>

TO:  INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated September 30, 2005, is made by Centra Net Investment, LLC, a California limited liability company,(the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty between the Lender and Eden Garden, LLC, a California limited liability company (the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference. The Agreement provides, among other things, for rules of construction which apply to this Guaranty. Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $5,904,000.00 (the "Loan") to finance the real estate project of the Borrower known as Eden Garden Townhomes (the "Project"). The Loan will be secured by a Trust Deed executed by the Borrower with respect to the Project. As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.      Guaranteed Obligations. The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"): (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $5,904,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise. Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

REVISED MAY 2003

<div align="right">

**EXHIBIT F**

</div>

2

2.      **Nature of Guaranty.**  This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan.  This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.      **Obligations Independent.**  The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security.  The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security.  The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.      **Action with Respect to Other Obligations or Security.**  The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to:  (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations or Security or participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

REVISED MAY 2003

**EXHIBIT F**

3

5.    Waiver of Defenses. The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of: (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party. Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property. This means, among other things:

1.    The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2.    If the Lender forecloses on any real property collateral pledged by the Borrower:

(A)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)    The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

REVISED MAY 2003

**EXHIBIT F**

4

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a nonjudicial sale or other disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of California or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.      Waiver of Reimbursement Rights. Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.      Representations of the Guarantor. The Guarantor represents and warrants to the Lender that: (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

REVISED MAY 2003

**EXHIBIT F**

5

8.     Financial Statements and Tax Returns.  The Guarantor hereby agrees to deliver to the Lender, the following:  (a) within 90 days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year, (b)  upon request by the Lender from time to time, quarterly Financial Statements in form and detail satisfactory to the Lender within 30 days of quarter end, Tax Returns for the Guarantor within 30 days of filing, and copies of audited Financial Statements prepared for the Guarantor, in each case certified in a manner acceptable to the Lender.

9.     Indemnification by the Guarantor.  Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.     Rights of Setoff.  Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.     Waivers and Amendments.  No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.     Remedies.  Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document.  Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine.  No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.     Costs and Expenses.  The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

REVISED MAY 2003

**EXHIBIT  F**

6

14.   Notices.  All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of California as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement. Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.   Binding Agreement.  This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender.  The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.   Multiple Guarantors.  If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.   Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of California.

18.   Time of Essence.  Time is of the essence of each and every provision of this Guaranty.

19.   Nature of Waivers.  THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.   Waiver of Jury Trial.  EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

**[Signatures Commence on Next Page]**

REVISED MAY 2003

**EXHIBIT F**

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR":

Centra Net Investment, LLC,
a California limited liability company

By: _____  10-11-05

Ali K. Amidy, Managing Member

Guarantor's Address:
Centra Net Investment, LLC
655 Campbell Technology Park, Ste. 125
Campbell, CA 95008

REVISED MAY 2003

**EXHIBIT F**

Exhibit "A"

REAFFIRMATION OF GENERAL GUARANTY AND ENVIRONMENTAL GUARANTY IN
CONNECTION WITH ADDITIONAL ADVANCE AND FIRST MODIFICATION AGREEMENT TO
THE BUILDING LOAN AGREEMENT; PROMISSORY NOTE; CONSTRUCTION DEED OF TRUST
WITH ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND OTHER
LOAN DOCUMENTS, DATED SEPTEMBER 30, 2005.

Pursuant to that certain Building Loan Agreement dated as of September 30, 2005 by and
between INDYMAC BANK, F.S.B., (the "Lender"), Eden Garden LLC, a California limited liability
company(the "Borrower"), Lender agreed to make a loan to Borrower in the amount of $5,904,000.00
(the "Loan"). The Loan is evidenced by that certain Promissory Note, dated September 30, 2005,
executed by Borrower and payable to the order of Lender (the "Note"). Capitalized terms not otherwise
defined herein shall have the same meaning given to such terms in the Loan Agreement.

Pursuant to that certain General Guaranty (the "Guaranty"), dated as of September 30, 2005, and
that certain Environmental Guaranty (the "Environmental Guaranty") dated as of September 30, 2005,
executed by Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC, a California
limited liability company (individually and collectively the "Guarantor"), Guarantor has guaranteed the
punctual and complete payment and performance when due of certain obligations of the Borrower to the
Lender under the Loan Documents, and has guaranteed the punctual and complete payment and
performance of certain obligations of the Borrower to the Lender under the Environmental Indemnity.

Guarantor understands that Lender and Borrower have agreed to modify the Loan Documents for
the purpose of, among other things, increasing the Loan Amount from $5,904,000.00 to $6,820,628.00,
all as more particularly set forth in that certain **ADDITIONAL ADVANCE AND FIRST
MODIFICATION AGREEMENT TO THE BUILDING LOAN AGREEMENT; PROMISSORY
NOTE; CONSTRUCTION DEED OF TRUST WITH ASSIGNMENT OF RENTS, SECURITY
AGREEMENT AND FIXTURE FILING AND OTHER LOAN DOCUMENTS]**, dated the date
hereof (the "Agreement"), between Borrower and Lender.

By this Exhibit "A", Guarantor acknowledges and agrees that Guarantor has read, consulted with
its attorneys regarding, and understands that this consent to the execution of this Agreement dated the
date hereof, agrees to remain fully bound by the Guaranty and Environmental Guaranty notwithstanding
the modification of the Loan Documents evidenced by the execution and delivery of the Agreement, and
agrees that any reference made in the Guaranty or in the Environmental Guaranty to any of the Loan
Documents or any terms or conditions contained therein shall mean such loan documents, terms or
conditions as modified by this agreement.

[The remainder of this page has been left intentionally blank. The signature page(s) follow(s).]



**EXHIBIT E**

Exhibit "A" (continued)

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"GUARANTOR"

Ali K. Amidy, an individual

Guarantor's Address:
16840 Cypress Way
Los Gatos, CA 95032

Guiti Nahavandi Amidy, an individual

16840 Cypress Way
Los Gatos, CA 95032

Centra Net Investment, LLC,
a California limited liability company

By:
Ali K. Amidy, Managing Member
04-8-07

Centra Net Investment, LLC
655 Campbell Technology Park, Suite 125
Campbell, CA 95008

**EXHIBIT E**

Title No. 05-**51034570**-B-PM
Locate No. CAFNT0943-0943-0051-0051034570

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN JOSE , COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, as shown upon that certain map entitled, "Tract No. 9484", and recorded in the County of Santa Clara, State of California recorded June 16, 2005 in Book 787 of Maps, pages 42 and 43.

APN: 455-52-036 through 455-52-053

2

**EXHIBIT E**

## AGREEMENT TOLLING STATUTES OF LIMITATION

This Agreement ("Tolling Agreement") is dated as of May 4, 2010 (the "Effective Date") by and between IndyMac Venture, LLC ("IVLLC"), on the one hand, and Eden Garden, LLC, Ali K. Amidy, Guiti Nahavandi Amidy, and Centra Net Investment, LLC (collectively, "Defendants"), on the other hand. IVLLC and Defendants are collectively referred to herein as the "Parties."

### RECITALS

A.     WHEREAS, IVLLC is the proper plaintiff in an action pending in Santa Clara County Superior Court, Case No. 108CV127419 (the "Action");

B.     WHEREAS, the Action relates to a loan made by IndyMac Bank, F.S.B. to Eden Garden, LLC in September 2005;

C.     WHEREAS, Defendants have filed a cross-complaint within the Action.

D.     WHEREAS, the Parties wish to conduct further investigation to determine the necessity of continued litigation and to avoid unnecessary litigation expenses.

NOW, THEREFORE, for good and valuable consideration, had and received, the Parties agree as follows:

1.     Dismissal of Action.  IVLLC agrees to dismiss the Action without prejudice to its ability to reinstate the Action in the event the Parties are not able to resolve the Action.

2.     Dismissal of Cross-Complaint.  Defendants agree to dismiss the cross-complaint without prejudice to their ability to re-file the cross-complaint in the event the Parties are not able to resolve the dispute.

3.     Tolling of Time Defenses.  The Parties agree to extend the date or deadline for any of the Parties to pursue any rights, claims, causes of action and/or defenses against any of the other Parties which result from or arise out of the Action. The Parties thus agree to toll from the Effective Date of this Tolling Agreement all statutes of limitations, and any other time-related bar, including without limitation, the equitable defense of laches (collectively, the "Time Defenses") with respect to any and all of the claims or defenses that the Parties may have against another regarding the Action or cross-complaint and all other defenses which could be raised upon any delay in filing or prosecuting the Action which exists and is not time-barred as of the date of the filing of the Action. This Tolling Agreement shall continue up through and including December 31, 2011 or until revoked by any of the Parties hereto by providing notice as set forth in paragraph 4.

4.     Termination Date.  The Parties agree that this Agreement can be terminated at any time.  Termination of this Tolling Agreement will be effective as to all Parties to this Tolling Agreement on the thirtieth (30th) day after delivery of written notification of same

**EXHIBIT G**

from any Party ("Termination Date"), at which time this Agreement will become null and void.
Notification shall be addressed as follows:

> *On behalf of Defendants, to:*
> Ali Amidy
> PO Box 369
> Los Gatos, CA 95031
> aliamidy@aol.com

> *On behalf of IVLLC, to:*
> Michael Wallin
> Sheppard, Mullin, Richter & Hampton LLP
> 650 Town Center Drive, Fourth Floor
> Costa Mesa, CA 92626
> mwallin@sheppardmullin.com

     5.    <u>No Admissions.</u> By entering into this Tolling Agreement, the Parties do not waive any rights or causes that they or any of them may have against each other, existing as of the date of the filing of the Action. By entering into this Tolling Agreement, the Parties do not thereby admit any liability in connection with any of the above-referenced claims, possible claims, causes of action or defenses, which may be available to any of them arising out of the Action. Entering into this Tolling Agreement shall not constitute an admission, nor shall it be used against any Party hereto as an admission, of any liability in favor of any of the other Parties to this Tolling Agreement.

     6.    <u>Modifications.</u> All modifications to this Tolling Agreement must be in writing and signed by the parties hereto.

     7.    <u>Governing Law.</u> This Tolling Agreement shall be governed by and under the laws of the State of California.

     8.    <u>Severability.</u> If any provision of this Tolling Agreement is determined to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, the remaining provisions shall be deemed valid and enforceable to the maximum extent possible. The headings in this Tolling Agreement are for reference only, and shall not affect the meaning or interpretation of this Tolling Agreement.

     9.    <u>Waiver.</u> Any waiver with respect to the provisions of this Tolling Agreement shall not be effective unless in writing and signed by the party against whom it is asserted. The waiver of any provision of this Tolling Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same provision or a waiver of any other provision of this Tolling Agreement.

**EXHIBIT G**

10.     Entire Agreement.  This Tolling Agreement contains the sole and entire agreement between the parties pertaining to the subject matter contained in it, specifically, the tolling of limitations periods, and supersedes any and all prior and/or contemporaneous oral or written negotiations, agreements, representations, and understandings with respect to such subject matter.  The parties, and each of them, understand that this Tolling Agreement is made without reliance upon any inducement, statement, promise, or representation other than those contained within this Tolling Agreement.

11.     Voluntary Agreement.  This Tolling Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the parties hereto.  The Parties acknowledge that:

(a)     They have read this Tolling Agreement;

(b)     They have been represented in the preparation, negotiation, and execution of this Tolling Agreement by legal counsel of their own choice; and

(c)     They are fully aware of the legal and binding effect of this Tolling Agreement.

12.     Binding on Successors and Assigns.  This Tolling Agreement shall be binding upon and inure to the benefit of the Parties, and their respective officers, employees, agents, heirs, administrators, executors, successors and assigns.  Each party hereto shall give the other party prompt notice of any transfer or assignment of rights under this Tolling Agreement; provided, however, that a failure to promptly provide such notice shall not constitute a material breach of this Tolling Agreement.

13.     Counterparts.  This Tolling Agreement may be executed in one or more counterparts, which taken together shall constitute but one agreement.

Dated:  May 4, 2010

EDEN GARDEN, LLC, a California
limited liability company

By _____

Ali K. Amidy, Managing Member

**EXHIBIT  G**

Dated: May 4, 2010

_____
Ali K. Amidy, an individual

Dated: May 4, 2010

_____
Guiti Nahavandi Amidy, an individual

Dated: May 4, 2010

CENTRA-NET INVESTMENT, LLC, a California
limited liability company

By _____
    Ali K. Amidy, Managing Member

Dated: May 4, 2010

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
    MICHAEL A. WALLIN
    Attorneys for IndyMac Venture, LLC

**EXHIBIT G**

1

## CERTIFICATE OF SERVICE

2   The undersigned hereby certifies that:  I am over the age of eighteen (18) and

3   not a party to the within action.  I am employed in the law firm of Allen Matkins

4   Leck Gamble Mallory & Natsis LLP, 1900 Main Street, Fifth Floor, Irvine,

5   California 92614-7321.

6   On June 22, 2011, I used the Northern District of California's Electronic Case

7   Filing System, with the ECF registered to Nicholas S. Shantar to file the following

8   document:

9   **DECLARATION OF ALISA ASHIKYAN IN SUPPORT OF**

10   **DEFENDANT INDYMAC VENTURE, LLC'S MOTION TO**

11   **EXPUNGE *LIS PENDENS***

12   The ECF system is designed to send an e-mail message to all parties in the

13   case, which constitutes service.  The parties by e-mail in this case are found on the

14   Court's Electronic Mail Notice List.

15   Notice has been given via First Class U.S. Mail to:

16                          W. Kenneth Howard, Esq.
                            Attorney At Law
17                          116 East Campbell Avenue, Suite 7
                            Campbell, California 95008
18                          Phone:  (408) 379-1904
                            Fax:  (408) 379-1902
19

20

21   I declare under penalty of perjury under the laws of the United States of

22   America that the foregoing is true and correct.

23   Executed on June 22, 2011, at Irvine, California.

24

25                          By:        */s/Nicholas S. Shantar*
                                       NICHOLAS S. SHANTAR
26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

927589.02/OC                    -8-

DECL. OF ALISA ASHIKYAN IN SUPPORT
OF DEF. INDYMAC VENTURE, LLC'S
MOTION TO EXPUNGE LIS PENDENS